510 F.Supp. 381 (1981)
In re MIDWEST MILK MONOPOLIZATION LITIGATION.
Robert B. ALEXANDER et al., Plaintiffs,
v.
The NATIONAL FARMERS ORGANIZATION, INC., et al., Defendants,
v.
ASSOCIATED MILK PRODUCERS, INC., et al., Counterclaim Defendants.
JPML Docket No. 83. Civ. No. 19191-1.
United States District Court, W. D. Missouri, W. D.
January 29, 1981.
*382 *383 *384 Harry P. Thomson, Jr., George E. Leonard, Shughart, Thomson & Kilroy, Kansas City, Mo., for Mid-Am.
Sydney Berde and Richard M. Hagstrom, Sydney Berde, P. A., St. Paul, Minn., for CMPC.
Donald M. Barnes, Arent, Fox, Kintner, Plotkin & Kahn, Washington, D. C., Colvin A. Peterson, Jr., Watson, Ess, Marshall & Enggas, Kansas City, Mo., for AMPI.
William A. Carey, Barnett, Alagia & Carey, Washington, D. C., for ARSPC.
Worth Rowley, Washington, D. C., for NFO.

MEMORANDUM OPINION, FINDINGS OF FACT AND CONCLUSIONS OF LAW OF PHASE I, PHASE II AND PHASE III AND ORDERS TO CLERK

VOLUME I OF TWO VOLUMES, containing:

Complete Table of Contents for both volumes Pages 385 to 462, inclusive.

 TABLE OF CONTENTS
 VOLUME I
 PHASE I
 PAGE
Introduction 385
PHASE I FINDINGS OF FACTS 385
Ultimate Facts Regarding NFO Membership
 Contract as a Tying Arrangement 407
Ultimate Facts Regarding NFO's
 Unfair Trade Practices 410
Robinson-Patman Factual Findings 414
Ultimate Facts Regarding NFO
 Violation of Missouri Law 415
Ultimate Factual Findings in
 Support of the Plaintiff's Damages 416
PHASE I CONCLUSIONS OF LAW 417
Discussion of NFO's Proposed Conclusions of
 Law Regarding its Alleged Antitrust
 Exemption 423
Conclusions of Law Regarding Alleged Illegal
 Boycott 426
Conclusions of Law Regarding NFO Membership
 Agreement as a Tying Arrangement 427
Conclusions of Law Regarding NFO's
 Alleged Unfair Trade Practices 429
Conclusions of Law in Regard to
 Mid-Am's Robinson-Patman Claim 431
Conclusions of Law in Regard to
 NFO's Alleged Violation of Missouri Law 432
Conclusions of Law in Regard to
 Plaintiff's Damages 434
 PHASE II PAGE
PHASE II FINDINGS OF FACTIntroduction 434
 I. The Case and the Parties 436
 II. Trade and Commerce:
 Milk Marketing in General
 A. Grade A Milk 436
 B. Supply and Assembly Patterns 437
 C. Federal Milk Marketing
 Regulations in General 438
 D. Class II Pricing: The M-W Series 439
 E. Class I Prices 439
 F. Blend Prices 440
 G. Class I Utilization 440
 H. The Pooling and the
 Producer-Settlement Fund 440
 I. Cooperative Qualification 441
 J. Geographic Marketing Areas 442
 K. Cooperatives and Premiums 443
III. Early Days of the Alleged Conspiracy
 A. The Formation, Scope and Purposes
 of Associated Dairymen, Inc. 443
 B. Mergers 444
 Percentages of Milk Pooled by AMPI
 and Mid-Am on Various Federal Orders 448
 C. ADI Establishes a Standby Pool 449
 D. AMPI/Mid-Am Alleged Agreements
 Not to Compete 452
 E. Additional Merger Data 453
 F. CACF 453
 G. Some Alleged Early Efforts Allegedly
 to Eliminate Outsiders 453
 IV. NFO's Alleged Capability in Dairy
 A. NFO Formation and Purpose 454
 B. NFO's Recruiting Efforts 454
 C. NFO Membership Structure 454
 D. NFO Marketing Structure 455
 E. Master Contracts 455
 F. The Holding Action 455
 G. NFO Revamps Dairy Department 455
 H. Supply Contracts 456
 I. NFO Decides to Enter Direct
 Marketing of Milk 456
 J. NFO Allegedly Calls Upon Experience
 Marketing Hogs, Cattle, Grain 457
 K. NFO Milk Allegedly Attractive
 to Handlers 457
 L. NFO Focuses Grade A Dairy
 Program in Midwest 457
 M. NFO Allegedly Preaches Gospel
 to Non-Members 457
 N. Interest in NFO Grade A Milk
 Marketing Allegedly Grows 457
 O. NFO's Claims Regarding "Poisoning
 NFO's Well and Trying to Get It to
 Join the Club" 458
 P. Conclusion 458
 V. The Southwest
 A. Texas 458
 B. Oklahoma 462
 C. Missouri 467
 VI. Chicago 476
VII. Minnesota 487

*385
 PAGE
VIII. Nebraska 494
 IX. Kansas and Northwest Missouri 496
 X. Alleged Suppression of Evidence 499
PHASE II CONCLUSIONS OF LAW 501
PHASE III FINDINGS OF FACT
 A. Background and Parties 504
 B. NFO Programs and Policies
 Before 1969 506
 C. 1969 Meetings Between NFO and
 Cooperative Leaders 508
 D. NFO's Alleged Efforts to Coerce or
 Destroy Regional Cooperatives 509
 E. Alleged Misrepresentation 517
 F. Alleged Misrepresentation to
 USDA and IRS 518
 G. Alleged Bad Faith Counterclaim 524
 Discussion of NFO's Phase III
 Proposed Findings of Fact 525
PHASE III CONCLUSIONS OF LAW 527
ORDERS TO THE CLERK IN REGARD TO
THE ENTRY OF JUDGMENTS 528

JOHN W. OLIVER, Senior District Judge.

Introduction
For the convenience of the Court and counsel for the parties, the trial of this complex litigation was divided into three parts consistently referred to as Phase I, Phase II and Phase III. For further convenience the various parties were and are referred to as follows:
National Farmers' Organization, Inc., as "NFO."
Mid-America Dairymen, Inc., as "Mid-Am."
Associated Milk Producers, Inc., as "AMPI."
Central Milk Producers Cooperative as "CMPC."
Associated Reserve Standby Pool Cooperative as "ARSPC."
Phase I of this case involves Mid-Am's claim as plaintiff against NFO as defendant for alleged violations of Section 1 of the Sherman Act, Section 2(c) of the Robinson-Patman Act, and Section 274.260 R.S.Mo. 1969. Mid-Am claimed actual damages in the amount of $1,989,350.00, to be trebled, and its attorneys' fees and costs. In accordance with the findings of fact and conclusions of law separately made and stated in connection with Mid-Am's Phase I claim against NFO, an order will be entered directing that judgment be entered against Mid-Am on its Phase I claim and in favor of NFO.
Phase II of this case involves NFO's counterclaim against Mid-Am, CMPC, ARSPC, for alleged violations of Sections 1 and 2 of the Sherman Act and Sections 3 and 7 of the Clayton Act. NFO sought equitable relief and damages in the amount of $14,064,068.76, to be trebled, and its attorneys' fees and costs. In accordance with the findings of fact and conclusions of law separately made and stated in connection with NFO's Phase II counterclaim against Mid-Am, CMPC, and ARSPC, an order will be entered directing that judgment be entered against NFO on its Phase II counterclaim and in favor of Mid-Am, CMPC, and ARSPC.
Phase III of this case involves AMPI's claims against NFO and nineteen individual NFO members and/or employees for alleged violations of Sections 1 and 2 of the Sherman Act and certain provisions of the Agricultural Fair Practices Act of 1967. AMPI sought equitable relief and claimed damages in the amount of $9,145,003.83, to be trebled, and its attorneys' fees and costs. In accordance with the findings of fact and conclusions of law separately made and stated in connection with AMPI's Phase III claim against NFO, an order will be entered directing that judgment be entered against AMPI on its Phase III claim and in favor of NFO.

PHASE I FINDINGS OF FACTS

A.
Court Exhibit I is a stipulation of 3,206 agreed facts with respect to Mid-Am's claim against NFO. While Mid-Am filed a 289 page document entitled "Plaintiff's Post-Trial Proposed Findings of Fact," which contained 2,224 separate paragraphs of proposed findings of fact, Mid-Am simultaneously filed its "Proposed Findings of Ultimate Facts and Proposed Conclusions of *386 Law," 52 pages in length and containing 239 separate paragraphs of proposed ultimate factual findings. That filing fully sets forth Mid-Am's basic factual and legal theories in support of Mid-Am's liability claims against NFO. NFO's filing entitled "Defendant's Post-Trial Proposed Findings of Fact and Conclusions of Law," 35 pages in length, contains 206 separate proposed factual findings to support NFO's various defenses to Mid-Am's claims.
Both Mid-Am's proposed findings of ultimate facts and NFO's post-trial proposed findings of fact rely in large part on particular paragraphs of Court Exhibit I, the stipulation of agreed facts. Indeed, Mid-Am, for the most part, actually quotes particular paragraphs of the stipulation as a particular paragraph of a proposed finding of ultimate fact. NFO, on the other hand, elected to cite and paraphrase rather than quote many of the stipulated paragraphs. While Mid-Am consistently and quite routinely denied the accuracy of NFO's paraphrase of the various paragraphs of the stipulation, Mid-Am did, as it must, agree that the various paragraphs cited by NFO in support of its proposed findings of fact were true and accurate factual statements.
Careful study of the findings proposed by both parties established that each party in a great many instances either quoted or cited exactly the same paragraph of the stipulation of agreed facts to support one of their respective proposed findings of fact. Each party, of course, either quoted or cited other particular paragraphs of the stipulation in support of other proposed findings which were not quoted or cited by the other party.
It is apparent that all questions concerning the accuracy of NFO's paraphrase of a particular paragraph of the stipulation will be eliminated if the Court makes its finding of fact in the exact language of the paragraph of the stipulation which NFO cited in support of a particular finding proposed by NFO. It is also apparent that all questions concerning the accuracy of Mid-Am's paraphrase of particular paragraphs of the stipulation in various of its proposed findings of ultimate fact which are denied by NFO will be eliminated if we make findings in the exact language of the stipulation which are cited and relied upon by Mid-Am in support of any particular denied proposed finding.
By following the above procedure it will be apparent that both parties will have available for likely appellate review all agreed factual data from the stipulation which both sides will have either quoted or cited to support proposed findings based on particular paragraphs of the stipulation. Because NFO commendably admitted all except a relatively small number of Mid-Am's proposed findings of ultimate facts, we shall make all findings proposed by Mid-Am in its filing which have been admitted by NFO and insert additional paragraphs from the stipulation which NFO either quoted or cited in support of findings proposed by NFO. We shall also insert additional paragraphs from the stipulation which Mid-Am cited and relied upon to support particular findings of ultimate fact which it proposed but which were denied by NFO.
For purposes of clarity, the paragraphs of the stipulation which we will insert will carry an appropriate paragraph number which will show that it is an inserted paragraph of the stipulation which either Mid-Am or NFO either quoted or cited in support of one of its proposed findings of fact. We will not, of course, repeat or renumber the numerous paragraphs of the stipulation which both sides either quoted or relied upon to support a particular paragraph of their respective proposed findings.
The facts that will be found in part I of this opinion will therefore reflect facts which both sides will have agreed in their stipulation to be true and accurate factual statements. As will be apparent from later portions of this memorandum opinion, the real disputes in regard to Phase I of this litigation, for the most part, present legal questions and relate, on the facts, to questions of what inferences should be drawn from stipulated and undisputed underlying factual circumstances.

*387 B.
We find the following facts:

ULTIMATE FACTS ON ISSUES OF ILLEGAL BOYCOTT[1]
1. This action involves claims by the plaintiff that the defendant violated Section 1 of the Sherman Act, 15 U.S.C. § 1. In addition thereto plaintiff asserts that the defendant violated Section 2(c) of the Robinson-Patman Act, 15 U.S.C. § 13(c) and Section 274.260, R.S.Mo.1969.
2. The activities complained of include alleged attempts by the defendant to force the plaintiff, its predecessors, and other dairy cooperatives to sign Master Contracts pursuant to which NFO members would allegedly be guaranteed a specific price for their milk; a milk holding action in 1967 which was sponsored by the defendant for the alleged purpose of inducing dairy cooperatives to sign Master Contracts; withdrawals of milk from plaintiff and its predecessors by dairy farmers at the defendant's encouragement, for the alleged purpose of inducing the plaintiff to sign a Milk Supply Contract allegedly guaranteeing defendant's members a greater return for their milk than other dairy cooperative members.
3. Plaintiff, Mid-Am and its predecessors have been engaged in marketing the milk of their dairy farmer members in interstate commerce since at least the early 1960's. (Stip. 104)
4. NFO is a national membership organization with state, county and district units established at various locations throughout the United States. (Stip. 10)
5. In the milk industry milk is usually sold from the farm to either an independent bottler or manufacturer, or to a bottling or manufacturing facility operated by a cooperative association. (Stip. 138)
6. Dairy cooperatives handling fluid milk (Grade A  approved milk) dispose of their member's milk either by sales to handlers or cooperative's fluid milk processors or to the cooperative's own manufacturing facilities or the manufacturing facilities of other independent or cooperative organizations. (Stip. 140)
7. As a result of NFO's activities it was able to obtain Master Contracts and Milk Supply Contracts from many cooperatives and proprietary plants located throughout the Middle West. (Stip. 193, 479-561)
8. The 1967 Milk Holding Action was sponsored by the defendant NFO and resulted in milk being withheld and dumped on the ground in Missouri, Iowa, Nebraska, Minnesota and elsewhere. (Stip. 348, 356, 372, 375, 379, 388, 389, 395, 396)
9. [Mid-Am's proposed finding of ultimate fact No. 9 was expressly denied by NFO. It stated:
9. NFO's activities in 1969, 1970, and 1971 to induce members of Mid-Am to withdraw their milk from Mid-Am in an effort to force Mid-Am into signing a Milk Supply Contract involved both a withdrawal of milk from Mid-Am and the shipment of that milk from Missouri farms to buyers in Oklahoma and Texas. (Stip. 95, 96, 98, 99, 663, 700, 702)
In order to remove any doubt about the accuracy of Mid-Am's paraphrase of the cited paragraphs of the stipulation, we reject the finding proposed in paragraph 9 and, in lieu thereof, make additional findings and insert additional paragraphs in our *388 findings of fact in the exact language of the paragraphs of the stipulation which have been cited and relied upon by Mid-Am to support its denied proposed finding of ultimate fact.
The same insertion of additional paragraphs from the stipulation will be followed in connection with other denied and rejected paragraphs of Mid-Am's proposed findings of ultimate fact which are based on paragraphs of the stipulation.
Additional paragraph "9-95" will indicate that in lieu of making Mid-Am's denied proposed finding No. 9, the Court is making and inserting additional findings in the language of the paragraphs of the stipulation which Mid-Am has cited to support its proposed finding. "9" identifies the number of Mid-Am's denied proposed finding; "95" identifies the paragraph 95 of the stipulation.
We shall follow this same numerical practice in connection with all other Mid-Am denied and rejected proposed findings of ultimate fact which are based on particular paragraphs of the stipulation.]
9-95. Beginning in February, 1970, NFO shipped milk produced in Missouri to Midwest Creamery, Ponca City, Oklahoma. (Ct. Exh. # 1, ¶ 95)
9-96. At various times since February, 1970, NFO shipped milk produced in Wisconsin to Midwest Creamery, Ponca City, Oklahoma, and milk produced in Missouri to Boswell Dairy, Fort Worth, Texas. (Ct. Exh. # 1, ¶ 96)
9-98. In May, 1971, NFO shipped Missouri-produced milk to Midwest Creamery, Ponca City, Oklahoma. (Ct. Exh. # 1, ¶ 98)
9-99. NFO has from time to time shipped milk produced in Missouri to Packett Dairy, O'Fallon, Illinois.
9-663. On July 19, 1969, NFO entered into a Milk Supply Contract with Midwest Creamery of Ponca City, Oklahoma. (I Avila Exhibit 2) (Boxley Ex. 6)
9-700. The Mountain Grove Reload facility was established in late January or early February, 1970, and began to ship milk to Midwest Creamery, Ponca City, Oklahoma. (Ct. Exh. # 1, ¶ 700)
9-702. Beginning in late February, 1970, milk was shipped directly from the NFO Jefferson City Reload facility to Midwest Creamery, Ponca City, Oklahoma.
10. Mid-America Dairymen, Inc., is a co-operative marketing association incorporated July 1, 1968 under Chapter 17-1601 of the Cooperative Marketing Act of the State of Kansas, engaged in collectively marketing fluid grade (Grade A) milk on behalf of its members and manufacturing into finished dairy products the surplus fluid grade milk and non-fluid grade milk of its members. (Stip. 1, 4, Tr. 909-927)
11. NFO is a not-for-profit non-stock membership corporation organized in 1955 under Chapter 504 of the Iowa Code. (Stip. 9)
12. NFO's national organization has its principal office in Corning, Iowa and in accordance with NFO's by-laws numerous state, district and county units have been chartered. (Stip. 9, 10, P. Ex. 9)
13. Although originally organized as a protest organization to oppose the federal government's agricultural policy as it existed in 1955, NFO in 1957 amended its Articles of Incorporation to add as an object and purpose of the corporation bargaining collectively on non-pecuniary basis for prices, terms and conditions of sale and delivery and payment for its members agricultural products. (Tr. 124-125; Stip. 18)
14. NFO's By-Laws adopted in 1970 recite that a purpose and objective of NFO is "to unite into one organization ... all farmers engaged in the production of agricultural commodities." (Stip. 158)
14A. By the terms of its By-Laws, NFO is expressly forbidden "to enter into, or engage in any business in behalf of or in the name of the organization, of the sort commonly engaged in by corporations for profit." By-Laws, Art. II, S 5. (Ct. Exh. # 1, ¶ 37)[2]
*389 14 B. The organization, until dissolved, is prohibited from making dividends or distributions in property to its members or officers. Articles, Art. III. (Ct. Exh. # 1, ¶ 38)
14 C. The marketing assistance activities are not engaged in for the production of income. (Ct. Exh. # 1, ¶ 43)
14 D. NFO's By-Laws prohibit it from engaging "in any business in behalf of or in the name of the organization, of the sort commonly engaged in by corporations for profit." (Ct. Exh. # 1, ¶ 44)
14 E. NFO has no net earnings and it makes no distributions of any kind from net earnings to its members. (Ct. Exh. # 1, ¶ 46)
15. NFO has engaged in some limited marketing services and assistance in its milk bargaining program while confining its activities in other commodities to strictly bargaining for the price and terms of sale. (Stip. 54, 47, 70, 30)
16. At the time NFO developed its collective bargaining approach, a membership agreement was adopted and since 1957 or 1958, those persons desiring to become a member of NFO have signed the membership agreement. (Stip. 26, 146, 148)
17. In pursuing its collective bargaining for its members NFO requires the participants to sign what are called supplemental agreements which documents are an indication of participation and gives NFO information concerning the amount of agricultural production which its member is authorizing NFO to bargain for. (P. Ex. 108)
18. Basic to the NFO bargaining concept are contracts with buyers which ultimately NFO hopes will reflect the farmer's cost of production plus a reasonable profit. (Stip. 27, 163, 164, 171, 204)
19. One of the purposes of NFO is to affect the price for which agricultural commodities are sold to processors, in all agricultural commodities. (Stip. 170)
20. In order to obtain contracts containing prices and terms which NFO desires, the NFO bargaining strategy includes the holding of products off the market ("holding actions") and picketing. Like a strike in the labor field, a holding action allows NFO and its members to proceed from a position of strength to bargain with buyers of farm commodities to establish favorable prices and other terms and conditions of sale. (Stip. 19, 20, 21, 25)
21. [Mid-Am's proposed finding of ultimate fact No. 21 was expressly denied by NFO. It stated:
21. In pursuing collective bargaining in milk, NFO commenced by soliciting dairy farmers to join NFO and sign an NFO membership agreement. (Stip. 188, 189)
In accordance with the procedure and practice described under paragraph 9, above, we make findings as agreed to in the stipulation in lieu of Mid-Am's proposed finding of ultimate fact No. 21. New paragraphs 21-188 and 21-189 need not, however, be inserted because our findings 32 and 33, infra, are in the precise language of paragraph 188 and 189 of the stipulation.]
22. In the early 1960's NFO developed what were known as "master contracts;" one contract to be entered into with buyers and processors of fluid grade (Grade A) milk and another contract to be entered into with milk plants receiving raw milk for conversion into manufactured products such as butter, milk powder and cheese. (Stip. 27, P. Ex. 93a and 93b, Tr. 68-71)
*390 23. NFO chose to negotiate master contracts in milk with what NFO considered to be the first buyer of raw milk. (Stip. 208, 200, 201, 259)
24. The first buyer might be a privately owned bottling plant or manufacturing plant, or a dairy cooperative comprised of dairy farmer members who owned the assets and shared earnings on a patronage basis. (Stip. 137, 138, 139, 140, 256, 259)
24 A. Milk is usually sold from the farm (whether sold as an independent producer or marketing association member) to either an independent bottler or manufacturer, or to a bottling or manufacturing facility operated by a cooperative association. (Ct. Exh. # 1, ¶ 137)
24 B. Immediately after it is collected from the farms, the raw (unpasteurized) milk is normally transported by the hauler to reloads, distributing plants, bottling plants or manufacturing plants for processing and packaging, manufacture or reshipment. (Ct. Exh. # 1, ¶ 138)
24 C. Independent fluid buyers ("handlers") customarily purchase their milk either from a milk cooperative or marketing association or from independent dairy farmers, and on occasion from another independent fluid milk business. (Ct. Exh. # 1, ¶ 139)
24 D. Fluid milk cooperatives dispose of their members' milk either by sales to handlers or cooperative fluid milk processors or to the cooperative's own manufacturing facilities or the manufacturing facilities of other independent or cooperative organizations. (Ct. Exh. # 1, ¶ 140)
25. NFO's ultimate goal and purpose is to bargain collectively for all farmers and all agricultural commodities. (Stip. 158)
26. In order to induce the dairy cooperatives, including plaintiff's predecessors, to execute master contracts guaranteeing NFO dairy farmer members a higher price for their milk irrespective of the profitability of the cooperative, NFO threatened the cooperatives with the withdrawal of NFO members and their milk if the contract wasn't signed. (Tr. 180, 237-348, 361)
27. Specific threats were made to Mid-Am predecessors, North Star-Lakes Region in Fergus Falls, Minnesota; Square Deal Milk Producers in Highland, Illinois; Producers Creamery Company of Springfield, Missouri; Nemaha Cooperative Creamery, Sabetha, Kansas, followed by a withdrawal of producers and their milk when the cooperatives refused to sign a master contract. (Tr. 347-348, 585)
28. During the mid 1960's, NFO sought to have dairy cooperatives that had signed master contracts join together in a common marketing agency known as Nation Wide Milk Products to jointly market milk and dairy products. (Stip. 150, 154, 190, 200, 284, 285, 286, 287, 290, 295)
29. In order to begin forming the marketing agency in common in milk, in the early 1960's NFO approached the larger milk cooperatives, including those in the Chicago, Twin Cities, Des Moines, Omaha, and Kansas City areas. (Stip. 184)
29 A. In the early 1960's, the marketing agency in common concept suggested by NFO was that the co-ops would establish one organization so that the milk of the organization's member co-ops could be marketed through one organization to gain bargaining strength. (Ct. Exh. # 1, ¶ 179)
29 B. In the early 1960's, the common marketing agency envisioned by NFO would itself determine what the price of its milk would be and when that milk would be sold. (Ct. Exh. # 1, ¶ 181)
30. In proposing a marketing agency in common to the larger cooperatives in 1959, or 1960, possibly 1961, there were two or three meetings between NFO personnel and dairy cooperative personnel. (Stip. 185)
31. In 1959 or 1960 none of the large cooperatives undertook to form or join a marketing agency in common. (Stip. 187)
32. As a result of statements made by the dairy leaders at their meeting in Minneapolis between NFO and the large dairy cooperatives in 1959 or 1960, Staley became convinced that NFO was going to have to organize in the milk field because he did not agree with the cooperatives and their leaders' *391 philosophy of pricing milk to buyers. (Stip. 188)
33. In the early 1960's, NFO meant by "organizing in the dairy field," getting membership agreements signed. (Stip. 189)
34. NFO met continued resistance from the dairy cooperatives to signing contracts guaranteeing some dairy farmers a specific price for their milk delivered to the cooperative. (Stip. 296, 186, 187)
35. In late 1962, NFO was attempting to negotiate a Master Contract for milk with TCMPA. (Stip. 222)
36. TCMPA declined to sign the Master Contract of NFO. (Tr. 168)
37. TCMPA began to receive pressure from its own patrons seeking to force TCMPA to sign the Master Contract of NFO. (Tr. 168)
38. During 1963 and 1964 Twin Cities had approximately 300 termination notices which stated that the reason the producer was terminating was that Twin Cities had not signed an NFO Master Contract. (Tr. 178)
39. In 1963 many members of the TCMPA Board of Directors were present at a meeting at the YMCA in Minneapolis with Albin Rust, Dairy Director of NFO, Erhard Pfingsten, Vice President of NFO, Leroy Swaber of NFO and TCMPA patron, and Leroy Lindenfelder, another TCMPA patron.
Rust stated at the meeting:
You so-and-so's (TCMPA) better sign an NFO contract or we're going to break TCMPA; you have given us the run-around long enough, we've had enough excuses from TCMPA, and if TCMPA does not sign an NFO Master Contract TCMPA is going to lose a lot of producers, because we have plenty of plants that we are signing. TCMPA's producers will be diverted to those plants and TCMPA will end up without any milk." (Tr. 180)[3]
40. The March, 1963 meeting of the TCMPA representatives at the YMCA was not an official Board meeting; a Board meeting was later held where the Rust presentation was reviewed and the decision was made that in view of what Rust had stated at the meeting, TCMPA was not going to attempt to proceed to negotiate further with NFO. (Tr. 180, 181)
41. In February, 1964 there was a meeting of the Square Deal Cooperative Board of Directors with NFO personnel, including Roland Waters, Dairy Commodity Director from Corning, Iowa, for NFO, Vincent Klosterman, local NFO representative and Clarence Korte of NFO. (Tr. 281-282)
42. The Square Deal Board of Directors meeting was in session, when Schaufelberger's secretary informed him that some people outside the office wanted to talk to Schaufelberger; Schaufelberger went to the door and Waters and Klosterman said *392 to Schaufelberger that they were presenting Square Deal with a list of names and the demand that Square Deal milk producers sign the NFO Master Contract. (Tr. 282-283)[4]
43. Klosterman and Korte were brought into the Board meeting and had a list which they said were names of NFO producers who were going to cancel from Square Deal if it did not sign an NFO Master Contract. (Tr. 347-348; 361)
44. Schaufelberger replied that he would present the request to the Board of Directors and give them an answer. (Tr. 283)
45. The Square Deal Board of Directors considered the demand of Waters and Klosterman that Square Deal sign an NFO Master Contract, both the Grade A Master Contract and the Manufacturing Grade Contract. (Tr. 283)
46. The Board of Directors at Square Deal considered the NFO Master Contracts for at least an hour, and decided that Square Deal could not sign the Contracts. (Tr. 284)
47. The NFO representatives were very unhappy that Square Deal would not sign the NFO Master Contract. (Tr. 284)
48. In addition to the three NFO representatives that presented the Master Contract to the Square Deal Board, a group gathered in the street in front of the Square Deal office. (Tr. 284)
49. After the Master Contract was presented to the Square Deal Board of Directors by Klosterman, Korte and Waters, the Board thanked them for being there and asked them to excuse themselves while the Board met in executive session; after the Board decided not to sign the NFO Master Contract, Schaufelberger and Hanman went to the front door where a large crowd congregated in the street, blocking traffic. (Tr. 364-365)
50. The crowd was milling around in the street. (Tr. 365-366)
51. Schaufelberger went back to the front door of the Square Deal plant and announced as a large group gathered in the street, that the Square Deal was not going to sign an NFO Master Contract. (Tr. 284)
52. When Schaufelberger announced that Square Deal was not going to sign the Contract, some members of the crowd jeered or booed. (Tr. 285)
53. After Schaufelberger announced that Square Deal would not sign the NFO Master Contract, Klosterman became angry and said that "NFO is going to continue to take away the members of Square Deal until Square Deal has to take the sign off the door." (Tr. 299-300; 362-366; 888)
54. In the months following that occurrence, approximately 250 producers did terminate their membership in Square Deal. (Tr. 370-371)
55. In 1963, NFO representatives, including Albin Rust, presented a Master Contract to the Nebraska-Iowa Co-op Board of Directors. (Stip. 239)[5]
*393 56. The Nebraska-Iowa Co-op Board members were asked to sign an NFO Master Contract in 1963. (Stip. 240)
57. The Nebraska-Iowa Board members rejected an NFO Master Contract in 1963. (Stip. 241)
58. Harold Johnson testified that "NFO was always threatening." (Tr. 585)
59. The Fergus Dairy Board of Directors voted to sign an NFO Master Contract for milk on May 18, 1964. (Stip. 246)
60. On April 27, 1964, Francis Henry and Don Henry, members of Nemaha County Dairy Committee of NFO, contacted the Nemaha Cooperative Creamery. (Stip. 247)
61. In April, 1964, Francis Henry and Don Henry attempted to negotiate an NFO Master Contract with Nemaha Cooperative Creamery. (Stip. 248)
62. Francis Henry and Don Henry threatened to pull NFO members' milk away from Nemaha Cooperative Creamery if the Co-op refused to sign a Master Contract. The NFO representatives indicated that the milk pulled away from Nemaha Co-op would be shipped to plants that had signed NFO contracts. (Trial Stipulation)
63. In 1964, Norbert Connor and some other NFO members ceased to deliver their milk to Viroqua Cooperative Creamery within about two months after Viroqua refused to discuss signing a Master Contract. (Stip. 278)
64. One of the reasons Norbert Connor ceased to deliver his milk to Viroqua in 1964 was because of its refusal to discuss signing a Master Contract with NFO. (Stip. 279)
65. Some time in the early 1960's, Brush Hollow Cheese signed an NFO Master Contract. (Stip. 280)
66. In 1964 Norbert Connor moved his milk from Viroqua to Brush Hollow Cheese because Brush Hollow had signed an NFO Master Contract. (Stip. 281)
67. Some other NFO members moved their milk to Brush Hollow Cheese from Viroqua Cooperative Creamery in 1964 at the same time Connor moved his milk. (Stip. 282)
68. Staley and Shafer met with co-op leaders in 1964 at the Fort Des Moines Hotel; present were representatives of Omaha-Nebraska Co-op; Pure Milk of Chicago; Twin City Milk Producers, Pure Milk of Kansas City, Sioux Valley Milk Producers, and Des Moines Cooperative Creamery. (Stip. 260)
69. Oran Lee Staley asked the cooperatives to sign Master Contracts with NFO during the meeting at the Fort Des Moines Hotel in 1964. (Stip. 262)
70. At the Fort Des Moines Hotel meeting in 1964, Staley discussed the general objectives of the NFO and his hope that cooperatives such as the Des Moines Cooperative Dairy would support these objectives. (Stip. 263)
71. Staley commented at the Fort Des Moines Hotel meeting in 1964 attended by NFO and various cooperatives that local cooperatives could not perform bargaining services well enough to obtain a reasonable price for milk at the producer level in the way an organization that was national in scope, like NFO, could. (Stip. 264)
72. At the Fort Des Moines Hotel meeting in 1964, Staley discussed the marketing agency in common, and indicated that NFO wanted all of the co-ops present to join the marketing agency in common, and that NFO would bargain for the price of the producers' milk, and the co-ops would continue to do the processing. (Stip. 265)
73. [Mid-Am's proposed finding of ultimate fact No. 73 was expressly denied by NFO. It stated:
73. In March, 1967 NFO called its milk holding action for the purpose of obtaining contracts for its dairy farmer members and for the purpose of encouraging dairy cooperatives to join the marketing agency in common proposed by NFO. (Stip. 319, 321, 317, 322, 341, 405)
In accordance with the procedures we have established above, in lieu of making the finding in the language proposed by Mid-Am, we find the facts as agreed to by the parties in the paragraphs of the stipulation which Mid-Am cited in support of its proposed finding No. 73.]
*394 73-319. On page 13 of the December, 1960 NFO Reporter, the following paragraph is found:
The purpose of this holding action must be to increase dairy prices at the farm level, prevent expected dairy price drops; establish contracts that would give stability in the future, and to hope that the pressure exerted would necessitate cooperatives joining in a marketing agency in common that could effectively bargain with big milk handlers nationwide at the processor level.
73-321. [See Finding 75, infra, which is a finding made in the exact language of paragraph 321 of the stipulation.]
73-317. In 1967, Oras Kanerva, Assistant to the NFO Dairy Department Director, believed that it would be easier to obtain Master Contracts during a period of time when buyers were short of milk as a result of a Milk Holding Action.
73-322. During the Milk Holding Action, Oras Kanerva was a member of the NFO Board of Directors. (Kanerva, p. 10-11)
73-341. Some NFO members presented Master Contracts for milk to some cooperative and proprietary companies during the course of the Milk Holding Action.
73-405. [See finding 86, infra, which is a finding made in the exact language of paragraph 405 of the stipulation.]
74. It was the belief of some members of NFO's dairy department in early 1967 the plants would be more anxious to sign master contracts if their milk supply diminished or increased as a result of NFO activity. (Stip. 316, 317, 268)
75. In 1967, it was Oras Kanerva's belief that it was the intent of the NFO Dairy Department, by diminishing volumes of milk, to put pressure on plants to sign Master Contracts and therefore become prospective members of NFO's proposed agency in common. (Stip. 321)
76. NFO dairy leaders in 1967 knew that if a dairy holding action was to have any effect in large portions of the country, a substantial volume of Grade A milk would have to be withheld from purchasers on the market. (Stip. 332)
77. NFO encouraged dairy farmers who were NFO members to withhold their milk from the market and encouraged other dairy farmers to sign an NFO membership agreement and then withhold their milk from the market. This latter encouragement was done even though the NFO membership agreement specifically excluded from its terms commodities which the farmer had under contract to others at the time of joining NFO. (Stip. 26, 327, 332, 333, 335, 336, 337, 338, P. Ex. 226)
78. Square Deal Milk Producers and Producers Creamery Company of Springfield, Missouri had written membership and marketing contracts with the dairy farmers delivering milk to them during 1967. These agreements committed the dairy farmer member to market all of his milk produced on his farm through the cooperative association. (D. Ex. 1083, Tr. 938, 953)
79. The NFO dairy department believed that the holding action would be more effective if NFO had a substantial number of its members in milk cooperatives. (Stip. 312)
80. NFO leaders knew in 1967 that some milk cooperatives in the Middle West had written membership and marketing agreements with some of their members. (Stip. 333, 249, 250, 251, 252)
81. During the 1967 milk holding action NFO members picketed some co-op and proprietary milk plants, and some NFO members and some non-members of NFO withheld their milk from the market. (Stip. 339, 377, 400, 402, 336)
82. [Mid-Am's proposed finding of ultimate fact No. 82 was expressly denied by NFO. It stated:
82. The milk holding action commenced on March 15, 1967 and lasted a month to six weeks. (Stip. 310, 311, 344)
In lieu of making the finding in the language proposed by Mid-Am, we make substitute findings in the language of the paragraphs of the stipulation relied upon by Mid-Am.]
*395 82-310. The Milk Holding Action was sponsored by the NFO, Inc.
82-311. The NFO Milk Holding Action commenced at 4:00 p. m., on March 15, 1967.
82-344. The NFO Holding Action of 1967 lasted a month to six weeks. (Shafer, p. 255)
83. During the milk holding action, milk was withheld from Twin City Milk Producers Association, Des Moines Cooperative, Nebraska-Iowa Cooperative, Sanitary Milk Producers, Nemaha Cooperative Creamery and Fergus Dairy, all predecessors of the plaintiff. (Stip. 348, 356, 364, 375, 388, 389)
84. Pickets were placed at Twin City Milk Producers Association and Producers Creamery Company's Cabool, Missouri plant during the NFO holding action. (Stip. 377, 400)
85. [Mid-Am's proposed finding of ultimate fact No. 85 was expressly denied by NFO. It stated:
85. During the holding action NFO representatives attempted to negotiate master contracts with Mid-Am predecessors. (Stip. 355)
In accordance with the procedure and practice described under paragraph 9, above, we make the findings agreed to in the stipulation in lieu of Mid-Am's proposed finding of ultimate fact No. 85.]
85-355. While milk was being withheld during the 1967 NFO Holding Action, NFO Master Contracts were presented to the Des Moines Milk Cooperative. (R. Nelson, p. 573, L. 9-13)
86. Some of the stated purposes of the 1967 Milk Holding Action were to raise the price of milk paid to dairy farmers and to strengthen NFO's bargaining position, which would help NFO to write contracts which would assure better milk prices for farmers in the future. (Stip. 405)
87. The purpose of the NFO Holding Action of 1967 was to hold milk until contracts which fixed the price of milk could be signed. (Tr. 87-88)
88. [Mid-Am's proposed finding of ultimate fact No. 88 was expressly denied by NFO. It stated:
88. NFO's own economic expert, Nathan, admitted that the NFO Holding Action of 1967 was a boycott if the purpose was to hold milk until contracts could be signed. (Tr. 1343)
NFO's denial, based on the ground that the witness was not competent to testify in regard to the legal conclusion stated, is sustained. NFO was given a continuing objection to all questions which called for the expression of a legal conclusion by this witness. (Tr. 1340) NFO's objection is sustained and we therefore refuse to make the finding of ultimate fact as proposed by Mid-Am in paragraph 88.]
89. At the time of the Milk Holding Action, NFO wasn't even engaged in marketing or selling milk. (Stip. 411)
90. Even though NFO did obtain a number of master contracts from proprietary and cooperative dairy plants during the period 1960 through the 1967 Holding Action, NFO did not attempt to activate these contracts as the required percentage of milk necessary to activate them was never achieved. (Stip. 193, 196, 197)
91. [Mid-Am's proposed finding of ultimate fact No. 91 was expressly denied by NFO. It stated:
91. While maintaining the goal of activating master contracts, NFO inaugurated a program after the 1967 holding action of Milk Supply Contracts whereunder NFO would encourage its dairy farmer members to deliver their milk to dairy plants signing such a contract. (Stip. 423, 430-435, 445, 447-451, 475)
In accordance with the procedure and practice described under paragraph 9, above, we make the findings agreed to in the stipulation in lieu of Mid-Am's proposed finding of ultimate fact No. 91.]
91-423. During the latter days of the 1967 NFO Milk Holding Action, Shafer, Sinclair and others began to prepare documents for the implementation of the NFO Phase II "Store and Hold" Program.
91-430. In order to effectuate the Phase II  Store and Hold Program, NFO members *396 were requested to sign a document known as the "Milk Processing & Sales Agreement," Form 7-3-39. (Ochsner p. 797-798)
91-431. The NFO Store and Hold Program was never implemented successfully. (Ochsner, p. 806)
91-432. The Milk Processing & Sales Agreement (Form 7-3-39) was signed by an NFO member and authorized NFO to negotiate on the member's behalf with a manufacturing plant for the receipt, manufacturing and storing of the finished product in conjunction with the NFO Store and Hold Program.
91-433. As part of the Store and Hold Program, the farmer members of NFO were asked to sign a document known as "Authorization to Plant Operator," Form 7-3-38.
91-434. The Authorization to Plant Operator was signed by the NFO member and delivered to a manufacturing plant for the purpose of indicating to the plant the willingness of the NFO member to participate in the Store and Hold Program and to indicate that the particular producer had authorized a deduction of $.03 per cwt. from any payment due him from the manufacturing plant to go to NFO, Inc.
91-435. NFO's dairy program immediately following the Store and Hold was known to some as "Phase II with a Plus."
91-445. In 1968 NFO went to a Supply Contract Program in milk.
91-447. In 1968 and 1969 in order for the NFO member who was shipping his milk to a plant that had signed an NFO Phase II Milk Supply Contract to participate in the contract price he had to sign some form of an NFO agreement  Milk Processing and Sales Agreement Form 7-3-39, Authorization to Plant Operator Form 7-3-38, Milk Sales Agreement Form 7-3-39A.
91-448. If an NFO member had not signed an NFO supplemental milk sales agreement, that member was not considered to be participating in a Phase II Milk Supply Contract and was not counted by a processor or handler under such a contract and no additional sum was paid for his milk.
91-449. In 1968 and early 1969, Henry Ochsner contacted milk processors in Wisconsin for the purpose of negotiating NFO Phase II Milk Supply Contracts. (Ochsner, p. 770)
91-450. Negotiation of Phase II Milk Supply Contracts commenced in or about 1968 after NFO decided to stop attempting to negotiate Master Contracts in Milk. (Ochsner, p. 775-76)
91-451. Most of the Supply Contracts negotiated by NFO in 1968 and early 1969 contained a provision stating that "for services rendered" buyers shall pay the sum of _____ cents per cwt. in addition to the base price under the contract. (Ochsner, p. 799)
91-475. It has been NFO's policy to encourage NFO members to support plants that have signed Phase II Milk Supply Contracts with NFO. (Connor, p. 1028-1031)
92. [Mid-Am's proposed finding of ultimate fact No. 92 was expressly denied by NFO. It stated:
92. Common to the milk supply contracts was a provision that the receiving plant would pay NFO members the same base amount for their milk as all other dairy farmers delivering to the plant, plus an additional sum of money per hundred weight of milk delivered under the guise of payment "for services rendered." (Stip. 479-560, 451)
Paragraph 451 of the stipulation is already set forth as finding 91-451, supra. Paragraphs 479 to 560 of the stipulation need not be set forth as separate findings. Those paragraphs of the stipulation simply reproduce particular paragraphs of numerous contracts which NFO negotiated in 1969 and 1970 (one contract, reproduced in paragraph 560, was negotiated in 1972).
We find and conclude that the provisions of those contracts do not support finding No. 92 as proposed by Mid-Am. The contracts say nothing about the price to be paid non-NFO members. Nor do they provide that NFO members be paid more for *397 their milk than non-NFO members. We find that all the other evidence relied upon by Mid-Am, including but not limited to the trial testimony of witnesses Powell and Nathan cited by Mid-Am in its reply to NFO's denial, is insufficient to support Mid-Am's proposed finding No. 92. We therefore refuse to make that proposed finding but incorporate paragraphs 479 to 560, inclusive, of the stipulation as a part of our findings of fact by this reference.]
93. In presenting these milk supply contracts to dairy cooperatives, NFO sought to have the cooperatives continue to market the milk either in fluid form or as manufactured dairy products and to recognize NFO as the bargaining agent for its members insofar as the price to be received by NFO members from the cooperative was concerned. (Tr. 931, 941) (Stip. 592, 598, 607)
94. [Mid-Am's proposed finding of ultimate fact No. 94 was expressly denied by NFO. It stated:
94. Many dairy cooperatives, including Mid-Am and some of its predecessors, resisted the NFO milk supply contracts on the basis that it caused them to discriminate among their dairy farmer patrons without reasonable justification, that such discriminatory payments would result in all members of the cooperative joining NFO solely for the purpose of obtaining a higher price than other patrons and on the further ground that the cooperative members had already granted bargaining rights to the cooperative for the dairy farmers' milk.
Mid-Am did not initially cite any portion of the record to support its proposed finding 94. When NFO denied that there was any factual basis for the proposed finding of discrimination, Mid-Am cited the portions of the contracts stipulated in paragraphs 481 to 560 of the stipulation. Mid-Am thereafter replied by citing the same pages of testimony of witnesses Powell and Nathan which Mid-Am cited in reply to its attempt to support its proposed finding 92, added a citation to page 167 of witness Birdsall's trial testimony, and directed attention to the Robinson-Patman portions of its post-trial brief.
We have reviewed the additional supporting data cited by Mid-Am and adhere to our similar finding made in regard to plaintiff's proposed finding 92, namely, that Mid-Am has not carried the burden of proving the fact of discrimination as proposed in Mid-Am's proposed finding of ultimate fact 94.]
95. Norbert Connor, Alan Skroch, Cletis Timmerman, and Henry Ochsner, NFO employees, attended the meeting with Mr. Schultz and other representatives of the Wisconsin State Department of Agriculture in June, 1969. (Stip. 593)[6]
96. The Wisconsin Department of Agriculture sent a letter dated October 1, 1969 to each dairy plant licensed in Wisconsin stating that payment under NFO Phase II Milk Supply Contracts of a sum "for services rendered" would probably constitute a violation of the plant operator's duties under Section 100.22, Wisconsin Statutes, and could therefore jeopardize their state license to operate a dairy plant. (Stip. 581)
97. The Wisconsin Department of Agriculture sent a letter to Mr. Kenneth L. Olsen, Manager, Western Wisconsin Dairies Cooperative, Blair, Wisconsin, on September 16, 1969, stating that the Department would take the position that payments made "for services rendered" pursuant to NFO Phase II Milk Supply Contracts would constitute a price discrimination by the dairy plants under Section 100.22, Wisconsin Statutes. (Stip. 582)
98. In September, 1969, the Wisconsin Department of Agriculture gave its opinion to NFO that the problem for the Wisconsin dairy plants with the NFO Phase II Milk Supply Contracts under the Wisconsin statutes could be remedied by a specific and *398 clear provision indicating that NFO was purchasing the milk from the producer and, in fact, taking legal title to the milk of its members prior to resale pursuant to the Phase II Milk Supply Contract. (Stip. 583)
99. In late 1969 and early 1970, several meetings were held between NFO representatives, including Ed Graf, and representatives of the Wisconsin Department of Agriculture concerning the possible effect of the NFO Phase II Milk Supply Contracts on the requirements for dairy plants licensed by the State of Wisconsin. (Stip. 594)
100. The matter under discussion between representatives of NFO and the Wisconsin Department of Agriculture related to the provisions of the NFO Phase II Milk Supply Contracts which provided for a sum to be paid for "services rendered," which provision, under the Department's interpretation of the contract, might result in an individual dairy plant paying different prices to NFO members and non-NFO members. (Stip. 595)
101. During meetings between NFO representatives and the Wisconsin Department of Agriculture prior to February 10, 1970, one proposal discussed and given tentative approval by the Department of Agriculture was the creation of a third party legal entity to purchase the milk from NFO producers pursuant to a specific purchase agreement. (Stip. 596)
102. Prior to February 10, 1970, possible solutions to the questions raised by the Wisconsin Department of Agriculture, including the possibility of establishing a third party legal entity to purchase and resell the milk of NFO member-producers, were discussed by NFO members and staff employees at various meetings including county meetings throughout the State of Wisconsin. (Stip. 597)
103. NFO considered the proposal for a third party legal entity to purchase and resell its members' milk in part because in 1969 and early 1970, the NFO did not want to purchase milk from its members but wanted to remain a bargaining association negotiating for the sale of its members' milk and other agricultural commodities. (Stip. 598)
104. In late 1969 and early 1970, NFO was discussing establishment of a third party legal entity to purchase and sell the milk from NFO members in Wisconsin because NFO was not a processing organization and did not want to go into business. (Stip. 599)
105. Ricardo Avila attended at least one of the conferences between NFO leaders and the Wisconsin Department of Agriculture relating to the NFO Phase II Milk Supply Contracts in Wisconsin. (Stip. 600)
106. The Attorney General of Wisconsin was of the opinion that dairy plants who had signed NFO Phase II Milk Supply Contracts might violate Wisconsin Statute 100.22 by paying without justification different prices to the producers supplying milk to the contracting plant. (Stip. 601)
107. On February 10, 1970, the Wisconsin Department of Agriculture advised NFO that the Attorney General of Wisconsin had concluded that even if a third party legal entity purchased NFO member milk and resold it to dairy plants operating under an NFO Supply Contract, in his opinion those dairy plants would still not be in compliance with the licensing provisions of Wisconsin law. (Stip. 590)
108. In September, 1969, it was the tentative opinion of the Minnesota Department of Agriculture pending completion of a legal investigation that performance by dairy plants under the NFO Phase II Milk Supply Contract might violate Minnesota Statute 32.11 pertaining to discrimination in the purchase of milk provided there had been economic injury to someone. (Stip. 602)
109. In April, 1969 MPI turned down the NFO Supply Contract and in June, 1969, Turtle Lake Co-op, Five Star Co-op and Mid-Am refused to sign a supply contract. (Stip. 603-612)
110. [Mid-Am's proposed finding of ultimate fact No. 110 was expressly denied by NFO. It stated:

*399 110. In late 1969 Ed Graf, director of the NFO Dairy Department, reported to the NFO Board of Directors that he had been unsuccessful in achieving NFO's goal of marketing NFO's members' milk through cooperative dairy associations and requested permission to set up milk reload stations to gain flexibility in bargaining. (Stip. 638, 650, 652)
In accordance with the practice above established, and in lieu of the proposed finding, we make supplemental findings of fact based on the cited paragraphs of the stipulation:]
110-638. Prior to January, 1970, Graf reported to the NFO Board of Directors that the NFO was unable to achieve its goal by marketing members' milk through existing cooperative dairy associations or its predecessors, and as a consequence, it was necessary for NFO to formulate a reload marketing system.
110-650. The principle of marketing milk through reloads was to establish the flexibility to ship milk outside the local area where it had previously been purchased.
110-652. As a result of the flexibility of being able to ship milk out of the local area, NFO, in establishing the Mountain Grove reload, had as one of its purposes to increase interest in bidding for the milk in the Missouri area where the milk was normally purchased.
111. The first NFO dairy reload was opened in Mountain Grove, Missouri in late January or early February, 1970. (Stip. 640, 651, 700)
112. NFO opened its Jefferson City, Missouri reload in February, 1970. (Stip. 641)
113. NFO opened its Springfield, Missouri reload in January, 1971. (Stip. 780)
114. In opening the Mountain Grove reload and the Jefferson City, Missouri reload and Springfield, Missouri reloads, NFO solicited dairy farmer members of Mid-Am in Central and Southwest Missouri to cease delivering their milk to Mid-Am and to permit NFO to direct the shipment and sale of their milk. (Stip. 669, 670, 671, 679, 694, 695, 698, 710, 711)
115. Numerous dairy farmers in Missouri and several in Illinois left Mid-Am in 1970 and early 1971 in order to move their milk under the NFO milk program. (P. Ex. 97, 98, 99, 201)
116. These dairy farmers commenced delivery of their milk to plants pursuant to NFO's direction.
117. Some of these dairy farmers may have failed to give timely notice of termination of their membership and marketing contracts with Mid-Am.[7]
118. In early 1971 a letter was prepared by NFO legal counsel and distributed by NFO employees among some of the dairy farmers who had left Mid-Am.
119. These letters of termination may have been ineffective as the dairy farmers involved may have already been in breach of their contracts with Mid-Am at the time the notices were mailed to Mid-Am.
120. The live witnesses Stacey, Douglas and Forbes testified that they left Mid-Am to go into the NFO milk program. Each was generally unconcerned about giving any notice of termination to Mid-Am. There is not sufficient factual data in the record to determine whether those three persons and, particularly, whether the unidentified "dairy farmers" mentioned in findings 115, 116 and 117 were or were not under legal duty to give Mid-Am any written *400 notice of termination before electing to ship their milk through NFO.
121. [Mid-Am's proposed finding of ultimate fact No. 121 was expressly denied by NFO. It stated:
121. NFO employees working in Missouri in 1970 and 1971 knew that virtually all of the grade A dairy farmers in Central and Southwest Missouri belonged to Mid-Am. (Stip. 670, 694, 698)
In lieu of Mid-Am's proposed finding of ultimate fact No. 121, we find the facts as agreed to by the parties in the paragraphs of the stipulation which Mid-Am cited in support of its proposed finding No. 121:]
121-670. In September, 1969, all of the NFO members producing Grade A milk in Wright County, Missouri that T. Forbes knew were shipping their milk through Mid-Am.
121-694. In late 1969 or early 1970 when Hills was contacting dairy farmers who were NFO members, Hills was aware that all Grade A dairy farmers in the Mountain Grove area were shipping their milk through Mid-Am.
121-698. In late 1969, Hills believed that most of the dairy farmers from the Mountain Grove area who attended the NFO organizational meetings had marketing commitments with Mid-Am.
122. [Mid-Am's proposed finding of ultimate fact No. 122 was expressly denied by NFO. It stated:
122. NFO's employees contacted these dairy farmers and encouraged them to deliver their milk to plants which NFO had agreements with and these same employees worked under the stated policy that they were not to bring up the question of whether or not these dairy farmers had membership and marketing agreements with Mid-Am or anyone else. (Stip. 685, 693, 696)
In lieu of Mid-Am's proposed finding of ultimate fact No. 122, we find the facts as agreed to by the parties in the paragraphs of the stipulation which Mid-Am cited in support of its proposed finding No. 122:]
122-685. In early 1970, Bruemmer did not initiate discussion concerning cooperative membership agreements with milk producers as long as the producer contacted by him had signed an NFO membership agreement prior to the time that Bruemmer contacted the producer.
122-693. In late 1969 or early 1970, Hills did not initiate discussion concerning cooperative membership agreements with milk producers as long as the producer contacted by him had signed an NFO membership agreement prior to the time that Hills contacted the producer.
122-696. From late 1969 through early 1971, Ralph Bruemmer and Herman Hills did not initiate discussion of cooperative membership agreements with milk producers whose milk was being sought for NFO's dairy program as long as the producer contacted had signed an NFO membership agreement prior to the time he was contacted.
123. Many dairy farmers were contacted by NFO employees and within a matter of days these same dairy farmers ceased delivering their milk to Mid-Am. (Stip. 1247, 1374, 1250, 1375, 1262, 1400, 1265, 1402, 1266, 1403, 720, 721, 1409) [The stipulated facts show that a matter of several weeks, rather than "a matter of days," was involved.]
124. NFO knew that Mid-Am had agreements of some kind with its producer members as even NFO developed a written contract for marketing milk under federal milk marketing orders. (Stip. 671, 694, 698, 870, 871, 872, 886)
125. NFO's purpose in setting up milk reload stations in Central and Southwest Missouri was to establish flexibility to ship milk out of the local area where it had previously been purchased and to increase interest in bidding for the milk where it was normally purchased. (Stip. 650, 652)
126. The normal purchaser of this milk had been Mid-Am.
127. [Mid-Am's proposed finding of ultimate fact No. 127 was expressly denied by NFO. It stated:

*401 127. NFO never changed its goal of bargaining with milk marketing cooperatives and the Missouri reloads were only a part of its plan to accomplish this goal. (Stip. 638, 47, 70, 163) (Tr. 930-931)
In lieu of Mid-Am's proposed finding of ultimate fact No. 127, we find the facts as agreed to by the parties in the paragraphs of the stipulation which Mid-Am cited in support of its rejected proposed finding No. 127. We further find that pages 930-931 of witness Hanman's testimony do not support Mid-Am's proposed finding.]
127-638. [See Finding 110-638 above.]
127-47. NFO's principal activity is collective bargaining, not marketing. (Tax Protest)
127-70. NFO's milk marketing activities take the form they do only because the Federal Milk Order program requires a qualified association of producers to conduct a specified degree of "marketing" activities; NFO performs only those marketing activities absolutely required by the government for qualified milk operations, and its marketing assistance activities are far less than those engaged in by most qualified associations representing milk producers; and milk operations represented only a small percentage of NFO's overall activities during the period 1970-1972.
127-163. A goal of NFO is contracts, such as are referred to in the Membership Agreement, Article VI, Section 1, which are contracts with processors.
128. In 1970 NFO offered to sell milk to customers of Mid-Am located in Springfield, Missouri and Fayetteville, Arkansas at lower prices than the then existing Mid-Am price. (Stip. 1197, 1198, 1199, 1200, 1201, 1202)
129 to 131. [Mid-Am's proposed findings of ultimate fact as proposed in paragraphs 129 to 131, inclusive, were expressly denied by NFO. Those three paragraphs, all of which relate to the October, 1970 meeting in John Gage's law office, state:
129. In October, 1970, after many members of Mid-Am had already breached their Membership and Marketing Agreements with Mid-Am, NFO and Mid-Am officials met to discuss the problem of contract breaches by Mid-Am producers. (Tr. 929-931, 736-740, 742)
130. At this meeting NFO indicated that it would get out of marketing and let Mid-Am market the milk of the Missouri NFO dairy farmers if Mid-Am would recognize NFO's bargaining rights by entering into a discriminatory milk supply contract paying NFO members more money for their milk than Mid-Am's non-NFO members. (Tr. 739-740, 930-932)
131. When Mid-Am refused to enter in such a contract with NFO, NFO's representatives indicated that they intended to destroy Mid-Am and pick up the pieces. (Tr. 739-741, 931)
Mid-Am's "post-trial proposed findings of fact" contained many more paragraphs relating to the October, 1970 meeting in John Gage's law office than were proposed in its "proposed findings of ultimate facts and proposed conclusions of law." NFO, in Appendix B to NFO's post-trial answer brief, admitted a substantial number of the findings of fact thus proposed by Mid-Am in its post-trial proposed findings of fact. We therefore make additional findings of undisputed fact in lieu of the rejected findings proposed in paragraphs 129 to 131.
Those facts will be numbered "129-1249;" "129-1250," etc., to indicate paragraph 129 of Mid-Am's proposed findings of ultimate fact and paragraphs 1249 and 1250, etc., respectively, of the paragraphs of Mid-Am's post-trial proposed findings of fact which were admitted by NFO. We make those additional findings before further footnote discussion of the October, 1970 meeting in John Gage's office.]
129-1249. In October, 1970, a meeting was held in John Gage's office in Kansas City; present were Graf and Shafer for NFO, Johnson, Hanman, Powell and Gage for Mid-Am.
129-1250. In 1970, Powell attended a meeting in the office of John Gage, attorney for Mid-Am, in which matters between NFO and Mid-Am were discussed. (Tr. 736)
*402 129-1251. Gage was attorney for Mid-Am. (Tr. 737)
129-1252. Graf was dairy Marketing Director of NFO or some title similar to that. (Tr. 737)
129-1253. Shafer was a representative of NFO. (Tr. 737)
129-1254. Mid-Am called the meeting. (Tr. 737, 738)
129-1255. Gage led off the meeting, explaining Mid-Am's mergers, and Mid-Am's policy in relation to marketing Grade A milk, which was to get the highest price possible for the producers at the farm. (Tr. 738)
129-1256. The meeting was called to discuss apparent conflicts between Mid-Am and NFO with respect to the marketing rights of certain dairy farmers located in central, southern, and southwest Missouri. (Tr. 930)
129-1257. One issue involved was whether or not those members had delegated their marketing and bargaining rights to Mid-Am or to NFO. (Tr. 930)
129-1258. The purpose of the October, 1970 meeting was to discuss the conflicting views of Mid-Am and NFO in regard to the marketing rights of certain dairy farmers who happened to be members of both organizations. (Tr. 982)
129-1259. Shafer did most of the talking for NFO, and explained NFO's goals. (Tr. 738, 739)
129-1260. A discussion in regard to what NFO was trying to do as far as marketing and bargaining took place. (Tr. 930, 931)
129-1261. There was a discussion as to what Mid-Am was trying to do in marketing and bargaining. (Tr. 931)
129-1266. At the Gage office meeting in October, 1970, Shafer took the position on behalf of NFO that NFO had "prior membership rights" by virtue of the fact that certain producers had signed NFO Membership agreements prior to the time they had signed their marketing Agreements with Mid-Am (Tr. 113); during the trial NFO did not attempt in any way to establish either the fact that any producer had a prior membership agreement with NFO, or that the NFO Membership Agreement granted any kind of marketing right in the milk of the individual producer.
129-1267. Gage stated that Mid-Am could not pay NFO members an additional fee for their milk and under the law, has to treat all producers alike. (Tr. 739)
129-1269. Mid-Am's "problem in the country" was the solicitation by NFO of Mid-Am membership to violate their Mid-Am agreements and immediately going with NFO. (Tr. 742)
129-1273. NFO's position at the October, 1970 meeting disputed Mid-Am's claim to the marketing rights on two grounds: first, that some particular dairy farmers had in fact terminated any legal obligation they had with Mid-Am and, secondly, that some dairy farmers had, in fact, entered into what NFO viewed as a prior contractual agreement with NFO before they had signed with Mid-Am. (Tr. 983, 984)
129-1274. At the October, 1970 meeting held at Gage's office the Mid-Am representatives refused to sign an NFO Supply Contract.
129-1275. At the October, 1970 meeting at the Gage office, Shafer cannot recall any discussion of Mid-Am wanting to find a way to get along with NFO. (Tr. 143)
129-1276. Shafer cannot recall but would not say specifically that an NFO Supply Contract was not mentioned at the meeting. (Tr. 121-122)
129-1277. Mid-Am's response was that Mid-Am couldn't legally follow NFO's suggestion. (Tr. 931)
129-1278. At the October, 1970 meeting held at Gage's office Shafer said that NFO had "been a burr under the saddle of the co-ops and it would just have to continue to be."
129-1279. Shafer admits at that meeting that he stated that NFO would continue to be a "burr under the saddle" of Mid-Am, but cannot remember any other kind of a statement made by him. (Tr. 114, 118, 119)
*403 129-1280. Shafer said that NFO had been a burr under the cooperatives saddle and NFO felt there was no alternative but to continue to be the burr under the saddle. (Tr. 740)
129-1281. Hanman recalls Shafer using the phrase "being a burr under the saddle." (Tr. 931, 932)
129-1282. Hanman believed that Shafer was referring to the co-op's saddle. (Tr. 931, 932)
129-1284. Shafer does not deny stating that if the regional cooperative marketing structure were torn into pieces, NFO would pick up the pieces. (Tr. 119)[8]
130. [Covered by findings under paragraph 129 above.]
131. [Covered by findings under paragraph 129 above.]
132. In early 1971 NFO began to offer milk to customers of Mid-Am located in St. Louis, Missouri at lower prices than the then existing Mid-Am price. (Stip. 1203, 1204, 1205, N/S 2563, 2564, 2573)
133. NFO's principal activity is collective bargaining, not marketing. (Stip. 47)
134. NFO's marketing activities are not an end in themselves, but rather the means by which it accomplishes its purpose. (Stip. 52)
135. [Mid-Am's proposed finding of ultimate fact No. 135 was expressly denied by NFO. It stated:
135. The NFO plan with respect to the dairy industry was designed to interrupt the existing business relationships of the cooperatives and their members and, ultimately, to eliminate the cooperatives from the market of representing dairy producers.
Mid-Am's proposed finding was not initially supported by any reference to the stipulation of the parties or by the citation *404 of any portion of the trial record. Mid-Am's suggestion in its reply brief that the argument Mid-Am presented in the first seven pages of its post-trial brief supports its finding of ultimate fact as proposed in paragraph 135 is untenable. We have considered all of the evidence in the case "as a whole" (p. 1 of Mid-Am's post-trial brief) and have examined all of "the pieces of the jigsaw." We find and conclude that the evidence adduced in the case does not support the proposed finding. We therefore refuse to make the finding as proposed.]
136. The NFO did not undertake itself to market or sell milk or milk products for its members, as functioning cooperatives do.
137 to 145. [Mid-Am's proposed findings of ultimate facts Nos. 137 to 145, inclusive, are all expressly denied by NFO. Those proposed findings state:
137. The accomplishment of the NFO objectives with respect to bargaining with dairy cooperatives over prices to be paid to cooperative members would have had profound effect on the dairy cooperatives involved.
138. The restriction or loss of their authority over the pricing and selling of the milk and milk products produced by their members and the manner in which the net proceeds were to be returned to their members concerned the very essence of their operations and organization as cooperative marketing associations.
139. Success by NFO in removing from cooperative associations authority over prices paid to producers and prices received for milk and milk products sold would have eliminated such associations as bargaining agents for producers, thereby achieving NFO's stated purpose with respect to bargaining for all producers of all agricultural commodities, i.e., "all farmers."
140. Since the NFO objective of obtaining contracts from dairy cooperatives would result in the elimination of such cooperatives as bargaining agents for dairy producers with substitution of the NFO as their bargaining agent, the 1967 Milk Holding Action was a coercive group boycott instigated by the NFO.
141. Such a planned purpose and effect of eliminating competitive bargaining agents for dairy producers renders this activity a per se illegal combination in violation of Sherman 1.
142. The 1967 Milk Holding Action was not a competitive effort.
143. NFO did not engage in the selling or marketing of milk in the Holding Action; the purpose of such movement or dumping and resulting non-delivery of milk during this period was to put greater pressure on certain cooperative associations to sign NFO Master Contracts and to join Nationwide.
144. The NFO 1967 Milk Holding Action did not constitute a reasonable and legitimate attempt by the NFO to develop its own marketing and bargaining program in the competitive field that existed among associations representing dairy farmers.
145. Instead it comprised a scheme for elimination of many such cooperatives, including predecessor cooperatives of Mid-Am, as bargaining agents in achieving what would obviously have been a takeover of the entire dairy bargaining field if NFO had been successful.
None of Mid-Am's proposed findings in paragraphs 137 to 145 were initially supported by any reference to the stipulation of the parties or by the citation of any portion of the trial record. In Appendix A to its reply brief Mid-Am cites the same seven pages of that reply brief upon which it relied in its effort to support its proposed findings 131 and 135. In addition, Mid-Am directed attention to some additional pages of its post-trial brief in support of its proposed findings No. 138 and 140 to 145 and suggests that the proposition stated in proposed finding No. 139 is "supported by the entire record." We have considered all the additional data and find and conclude that none of the findings proposed in paragraphs 137 to 145 are supported by the record. We therefore reject and refuse to make any of the findings of ultimate fact as proposed in those paragraphs.]
*405 146. NFO officials decided in late 1967 or early 1968 to commence a bargaining program which included the presentation to dairy cooperatives of a "Phase II NFO Milk Supply Contract."
147. The consequences of not signing such a Supply Contract was [sic] that should another dairy plant in the area sign such a contract, NFO would encourage NFO members to voluntarily withdraw and shift their milk from the non-signing cooperative and into the signing plant.
148. Cooperatives must be organized for the "mutual benefit" of their members and as such distribute all gains and losses among the total membership on a patronage basis.
149 and 150. [Mid-Am's paragraphs 149 and 150 are expressly denied by NFO. Those two paragraphs stated:
149. To agree to the terms of the NFO Phase II Milk Supply Contract required a departure from cooperative principles and the fiduciary relationship between the entity and its owner-members requiring mutuality and equality of treatment.
150. In attempting to negotiate NFO Supply Contracts with the dairy cooperatives, NFO was not trying to compete with the cooperatives, but rather to eliminate the cooperatives from their fundamental obligation of returning net proceeds equitably among members and to replace the cooperatives as bargaining agents.
Neither paragraph 149 nor 150, as originally proposed, cited or relied upon either the stipulation of the parties or the transcript of the trial. The pages of witness Powell's testimony cited in Appendix A of Mid-Am's reply brief to support those two paragraphs, in our judgment, fall far short of doing so. We therefore reject and refuse to make the findings as proposed in Mid-Am's paragraph 149 and 150.]
151. Whitmore Transport Company paid the rent on the NFO Mountain Grove Reload until February 16, 1971.
152. Billy Stacey, while a Mid-Am hauler and member, rented the NFO Springfield Reload in July, 1970. (Stip. 966, 978)
153. Pete Taves, an employee of Food Consultants, Inc., attended meetings in Central and Southwestern Missouri where dairy farmers were told about the NFO Dairy Program. (Stip. 673, 674, 675)
154 to 159. [Mid-Am's findings of ultimate facts as proposed in its paragraphs 154 to 159 commence with the language that "NFO combined with [various] outsiders" who allegedly shared and participated in NFO's alleged "concerted group boycott" and alleged "illegal price fixing." We refuse to make the proposed findings because we do not believe that the paragraphs of the stipulation cited to support those findings can fairly be said to do so. We therefore refuse to make the proposed findings. We shall, however, find as facts the paragraphs of the stipulation which Mid-Am cited in support. The findings we make from the stipulation will be made only once in connection with Mid-Am's proposed finding 154 in light of the fact that paragraphs 155 to 159 rely upon exactly the same paragraphs of the stipulation.
The findings of ultimate fact proposed by Mid-Am which we reject and refuse to make state:
154. NFO combined with other corporations, Southwest Milk Producers, Whitmore Transport Company, Food Consultants, Inc., and Midwest Creamery, Inc., to induce or attempt to induce members of Mid-Am to refuse to ship their milk to Mid-Am in violation of their milk marketing agreements, which constituted a concerted group boycott. (Stips. 673-679, 663-667, 634, 635, 629, 623-628, 823, 976)
155. NFO combined with other corporations, Southwest Milk Producers, Whitmore Transport Company, Food Consultants, Inc., and Midwest Creamery, Inc., to induce or attempt to induce Mid-Am members to breach their milk marketing agreement with Mid-Am, which constituted a concerted group boycott. (Stips. 673-679, 663-667, 634, 635, 629, 623-628, 823, 976)

*406 156. NFO combined with other corporations, Southwest Milk Producers, Whitmore Transport Company, Food Consultants, Inc., and Midwest Creamery, Inc., to induce or attempt to induce Mid-Am members to market their milk through NFO, which marketing constituted illegal price fixing. (Stips. 673-679, 663-667, 634, 635, 629, 623-628, 823, 976)
157. NFO combined with persons not agents or employees of NFO, including Harold Whitmore, Pete Taves and Billy Stacey, to induce or attempt to induce members of Mid-Am to refuse to ship their milk to Mid-Am in violation of their milk marketing agreements with Mid-Am, which constituted a concerted group boycott. (Stips. 673-679, 663-667, 634, 635, 629, 623-628, 823, 976)
158. NFO combined with persons not agents or employees of NFO, including Harold Whitmore, Pete Taves and Billy Stacey, to induce or attempt to induce members of Mid-Am to breach their milk marketing agreements with Mid-Am, which constituted a concerted group boycott. (Stips. 673-679, 663-667, 634, 635, 629, 623-628, 823, 976)
159. NFO combined with persons not employees of NFO, including Harold Whitmore, Pete Taves and Billy Stacey, to induce or attempt to induce Mid-Am members to market their milk through NFO, which marketing constituted illegal price fixing. (Stips. 673-679, 663-667, 634, 635, 629, 623-628, 823, 976)]
154-673. In 1969 Midwest hired Pete Taves to help Midwest obtain a supply of Grade A milk.
154-674. In July of 1969, an NFO dairy committee met with Wilbert Rackers, Doyle Keirn (Midwest) and Pete Taves in Springfield, Missouri. (W. Rackers, p. 17-18)
154-675. In July, 1969, the NFO Cole County Dairy Bargaining Committee and Ric Avila met with Doyle Keirn of Midwest Creamery in Jefferson City, Missouri. (Bruemmer II, p. 15)
154-676. The Midwest/NFO contract of July 19, 1969 was ratified by 39 of 44 NFO producers attending a meeting in July or August, 1969 at St. Thomas, Missouri.
154-677. Graf received a letter dated September 15, 1969 from the Texas Health Department indicating completion of farm inspections of NFO producers with an attached list of dairy producers whose farms had been inspected.
154-678. Henry Rackers, a former milk hauler, who had indicated a willingness to haul milk (farm pick up) for NFO members, was in attendance at a Cole County meeting in September, 1969.
154-679. On June 4, 1974, T. Forbes believed that at NFO organizational meetings held in September and November, 1969, in Cabool and Houston, Missouri, that NFO members having Mid-Am membership agreements and who were in attendance at those meetings were advised to cancel their Mid-Am agreements.
154-663. [See finding of fact 9, supra.]
154-664. Under the Midwest Creamery/NFO July 19, 1969 contract, Midwest could purchase between 3,225,000 pounds and 5,000,000 pounds of Grade A milk and any additional milk by mutual consent of both parties.
154-665. To the extent that Midwest Creamery was able to divert any Grade A milk beyond its Class I bottling needs from its plant to Page Dairy, Midwest Creamery was able to generate a profit of $.10 per cwt. on the diverted milk.
154-666. The Midwest/NFO contract of July 19, 1969 provided that the over-the-road hauler would receive $.50 per cwt. on all milk hauled under the contract.
154-667. The over-the-road hauler during 1970 hauling milk under the Midwest/NFO July 19, 1969 contract was Whitmore Transport, Inc.
154-634. Each National Commodity Trust is a separate entity from NFO., Inc.
154-635. NFO, Inc. is not a beneficiary of the National Commodity Trusts.
154-629. Some NFO officials, including President Oren Lee Staly, used the term "Trust Accounts" and "Custodial Accounts" interchangeably.
*407 154-623. The Dairy Trust of NFO is not marketing milk. (Staley p. 702) (Application for Exemption Tax Status, Document No. 974192-199)
154-624. The NFO Dairy Trust does not bargain for the sale of milk. (Staley p. 705) (Document No. 974192)
154-625. The NFO Dairy Trust does not process milk. (Staley p. 705) (Document No. 974192)
154-626. The NFO Dairy Trust does not handle or sell milk. (Staley p. 705) (Document No. 974192)
154-627. The NFO Dairy Trust was established solely for the purpose of receiving, managing and distributing funds resulting from collective bargaining sales by NFO, Inc. (Settler) on behalf of participating members, (Beneficiaries)
154-628. The trustees are authorized by Declaration of Trust to collect, receive, account for and manage all funds for the sale of dairy products, and after deducting marketing expenses, blending or reblending expenses and such additional authorized deductions by written agreement, remitting the net proceeds to the beneficiaries.
154-823. On some of the occasions where the NFO pay price to producers was not competitive with other groups paying farmers for raw milk, the General Fund of NFO paid some of the marketing expenses, thereby leaving more money available in the Dairy Trust to increase the producer pay price.
154-976. The equipment which was installed in the NFO Springfield reload station by Billy Stacey was purchased by an organization identified as the Southwest Milk Producers. (Stacey p. 75)
155 to 159, inclusive. [Paragraphs 155, 156, 157, 158 and 159 cite and rely upon the same paragraphs of the stipulation as those paragraphs identified in paragraph 154 and therefore are not here repeated.]

ULTIMATE FACTS REGARDING NFO MEMBERSHIP CONTRACT AS A TYING ARRANGEMENT
160. To implement the NFO collective bargaining program, NFO and its members enter into a Membership Agreement under which NFO is given the exclusive right to negotiate for and/or collectively bargain in respect to members' commodities (except for those under contract at the time of signing) for contracts with processors covering selling price and other conditions of disposal. (Stip. 26)
161. NFO does not collectively bargain for, or give marketing assistance to, anyone other than its members. (Stip. 45)
162. NFO is one of the very few bargaining agencies for farmers producing wheat, corn, milo, soybeans, and other major cash grains. (Stip. 75)
163. NFO is active in every major grain producing area of the country, with bargaining programs for its members in those areas; NFO's procurement area for grain is co-extensive with the main grain producing areas of the country; NFO's sales area, as a bargaining agent is world-wide, NFO having represented its members in sales to such diverse countries as Libya, Japan, and Saudi Arabia. (Stip. 76)
164. The functions performed by NFO under the Supply Contract arrangements for meat and grain consisted primarily of negotiating the terms of the Collective Bargaining Agreement. (Stip. 30)
165. Because of the requirements for qualification under the Federal Milk Order programs, when NFO began to move its members' milk, it operated differently from the way it operated in grain or livestock and in so doing performed a considerably broader range of functions than in grain or livestock. (Stip. 1153)
166. Staley Deposition Exhibit 6, NFO Membership Agreement of Oren Lee Staley, is the same form of Membership Agreement that NFO has used since autumn, 1958; except that the provision for dues and fees has increased from $25 annually to $75 annually. (Stip. 1165)
167. Even though the dairy farmer who is not a member of NFO has a cooperative marketing contract for his milk with another *408 organization, NFO will still ask that individual to become a member of NFO by signing a Membership Agreement. (Stip. 159)
168. In 1974 at the NFO National Convention, President Staley, in a speech to the membership, stated that NFO was out to block or unite enough production, 30%, under control of NFO members, so that those members can hold meetings across the nation, and name their price, and if the price wasn't paid, to hold the production. (Stip. 162)
169. Since 1958, NFO has stated that its underlying and primary purpose has been to obtain for producers of agricultural products their cost of production plus a reasonable profit, and NFO has sought, among other things, to get enough producers to join NFO and put together enough production to realize this purpose. (Stip. 164)
170. In 1968 and to date, it was and is a goal of NFO to contact every farmer, including every dairy farmer, in the United States and ask him or her to become a member of NFO. (Stip. 173)
171. Since the early 1970's it has been NFO's belief that in order to fulfill its purpose of collective bargaining for agriculture, its members must block their production together in NFO and move their commodities through the NFO Nationwide Collection, Dispatch and Delivery System. (Stip. 440)
172. In late 1969, either Avila or Scott told Forbes that the NFO membership agreement took precedence over the Mid-Am membership agreement as far as the right to market milk if the NFO agreement had been signed first. (Stip. 671)
173 to 183. [Each of the paragraphs in this group of proposed Mid-Am findings are stated in the exact language of the paragraph of the stipulation cited in support. NFO therefore admits, as it must, the truth of each paragraph but objects that such admitted factual data is irrelevant. While we agree that the proposed findings do not establish a factual basis which supports Mid-Am's tying arrangement claim, we shall make the findings as proposed in this group of proposed findings in the language of the stipulation so that the record is clear that we have considered the factual data stated in those paragraphs of the stipulation, together with all other facts and circumstances in our process of finding and concluding that Mid-Am's tying arrangement arguments are untenable.
We shall make additional "tying arrangement" findings of fact as proposed by NFO in paragraphs 105 to 113 of its proposed finding of fact in the course of our discussion of what conclusions of law should be made in regard to Mid-Am's tying arrangement claim.]
173-1155. NFO, as bargaining agent, has arranged for the sale of in excess of $100,000,000 grain for its members annually since 1969. (Tax protest)
174-1156. NFO, as bargaining agent, has arranged for the sale of members' livestock in amounts no less than $100,000,000 annually. (Tax protest)
175-91. NFO reported on Form DA-24 to the United States Department of Agriculture that as of September 30, 1973, NFO had the following number of Grade A producers pooled on the following Federal Orders:

 Order No. Market A Producers
 1 Boston 218
 2 New York-New
 Jersey 185
 4 Middle Atlantic 45
 15 Connecticut 9
 30 Chicago 565
 32 Southern Illinois 38
 33 Ohio Valley 407
 Wisconsin 71
 36 Eastern Ohio and
 Western
 Pennsylvania 366
 40 Southern Michigan 100
 46 Louisville-Lexington-Evansville 173
 49 Indiana 27
 62 St.
 Louis-Ozarks-Wisconsin 84
 Minnesota 50
 Missouri 146
 64 Greater Kansas City 4
 68 Minneapolis-St. Paul
 (MN) 496
 98 Nashville 114
 106 Oklahoma-Nebraska 10

*409
 Order No. Market A Producers
 Missouri 33
 126 North Texas 25
 136 Great Basin 8
 (Unregulated) 7
 137 Eastern Colorado 14
 (Unregulated) 21
 ___
 Total Grade A Producers
 DA-24 Form, Sept. 30,
 1973 3,216

176-92. NFO reported on Form DA-24 for the fiscal year ended September 30, 1973 to the United States Department of Agriculture that, in addition to the Grade A active producers by individual markets set out on that DA-24 Form, NFO had other members in 134 plants who were participating in its dairy program.
177-1157. The service of NFO in bargaining for the sale of meat and grain is unique. (Staley p. 720)
178-1158. NFO's service in bargaining for the sale of grain and meat is beneficial to farmers. (Staley p. 720)
179-1159. NFO's service in bargaining for the sale of grain and meat is desirable for farmers. (Staley p. 720)
180-1160. In NFO's opinion, NFO activities have contributed to increasing the producer's proceeds in the sale of grain.
181-1161. In NFO's opinion, NFO activities have contributed to increasing the producers' proceeds in the sale of hogs.
182-1162. In NFO's opinion, NFO activities have contributed to increasing the producers' proceeds in the sale of cattle.
183-1170. NFO has on occasion had an upward effect on the price for meat received by producers.
184. The NFO "Think Thirty" program is an attempt by NFO to organize the producers who control 30% of all agricultural production in the United States, including dairy production, and to get those producers to move that production through the NFO collection, dispatch and delivery system. (Stip. 160)
185. In December, 1974, or January, 1975, the NFO instituted its THINK 30 program. (Stip. 161)
186. The primary purpose of NFO is to give farmers an opportunity to unite so that they can compete with large companies and achieve cost of production plus a reasonable profit. (Stip. 165)
187. NFO now believes that it would take about 30% of total national production in order for farmers to be able to price their products. (Stip. 169)
188. Since the early 1970's, NFO has believed that in order for its members to obtain the cost of production plus a reasonable profit a sufficient number of producers of agricultural commodities must block their production together in NFO and move that production through the NFO Nationwide Collection, Dispatch and Delivery System. (Stip. 439)
189. If a farmer member of NFO doesn't market all of his commodities which he can market through NFO, he is not doing all that he can to help attain the ultimate purpose of NFO, cost of production plus a reasonable profit. (Stip. 441)
190. If a dairy farmer member of NFO doesn't market all of his dairy commodities which he can market through NFO, he is not doing all that he can to help attain the ultimate purpose of NFO, cost of production plus a reasonable profit. (Stip. 442)
191. NFO did not act as a principal in 1968 sales of its members' grain and livestock; in connection with such sales, NFO performed, among other services, the service of bargaining for the contractual price at which the members' commodities would be sold. (Stip. 1151)
192. In connection with the sale of an NFO members' grain or livestock, NFO, acting as agent and not as principal, negotiates the terms of the sale and otherwise assists the farmer who owns the grain or livestock. (Stip. 1152)
193. NFO did not bargain for the sale of grain for non-members; in order to become a member, a producer must sign an NFO Membership Agreement. (Stip. 1163)
*410 194. NFO does not bargain for the sale of livestock for non-members; in order to become a member, a producer must sign an NFO Membership Agreement. (Stip. 1164)
195. Between May 15, 1969 and November 10, 1969, NFO claims to have raised the Minnesota-Wisconsin series price from four dollars and twenty-eight cents ($4.28), when the first Supply Contract was signed, to four dollars and fifty-eight cents ($4.58) with no raise in government support price during that time, i.e., a raise in the general price level of thirty cents in less than six months. (Shafer, p. 2750-276) (Stip. 1169)

ULTIMATE FACTS REGARDING NFO'S UNFAIR TRADE PRACTICES
196 to 201. [Mid-Am's proposed findings of ultimate facts as proposed in paragraphs 196 to 201 are expressly denied by NFO. Those paragraphs state:
196. NFO conspired with other corporations, persons and entities to eliminate Mid-Am.
197. NFO induced and intimidated other corporations, persons and entities to join in its plot to destroy Mid-Am.
198. NFO employees and employers of Food Consultants, Inc. (Pete Taves) and representatives of Midwest Creamery called on dairy farmer members of Mid-Am and persuaded them to change and ship their milk with NFO.
199. Non-NFO members conspired with NFO to participate in the 1967 NFO holding action which was an attempt by NFO to force predecessors of Mid-Am to relinquish their bargaining rights to NFO.
200. Between 1962 and 1966, numerous meetings between NFO employees and members were held with cooperatives (predecessors of Mid-Am), the purpose of which were to force those cooperatives into signing NFO Master Contracts. The Master Contracts had as their sole purpose and function eliminating cooperatives from bargaining for their members' milk and inserting NFO as the collective bargaining agent for the producers, with their cooperative. (Tr. 390-395)
201. In 1967 NFO instigated the Milk Holding Action, the purpose of which was to get cooperatives to sign NFO Master Contracts. (Tr. 87-88)
Mid-Am did not initially cite or rely upon any portion of the stipulated facts to support any of the findings proposed in paragraphs 196 to 201. We have read and considered all other data elsewhere cited and relied upon by Mid-Am in support of those proposed findings. We find and conclude that the other data cited is insufficient to support Mid-Am's proposed findings and therefore refuse to make the findings as proposed.]
202. In 1968 and 1969 NFO signed numerous NFO Supply Contracts with manufacturing plants. (Stip. 927, 934, 937, 942, 953, 959, 964, 969, 971 and 977)
203. [Mid-Am's proposed finding of ultimate fact No. 203 was expressly denied by NFO. It stated:
203. The purpose of the Supply Contracts was to force plants to allow NFO to be the bargaining agent. The NFO Supply Contracts resulted in producers switching their milk from the plants to which they had previously shipped to plants signing the NFO Milk Supply Contracts. (Stip. 911 [471], 1080 [566], 1095-1095a [574-575])
In accordance with the procedure and practice above established, in lieu of the findings proposed by Mid-Am in rejected paragraph 203, we make additional findings in the language of the paragraphs of the stipulation cited and relied upon by Mid-Am in support of the findings proposed in that paragraph. It is to be noted that we have added the stamped paragraph numbers in brackets after Mid-Am's citation to the typewritten paragraph numbers in order to avoid apparent confusion:]
203-911 [471]. The signing of the Phase II NFO Milk Supply Contracts in early 1969 caused some movement of milk to contracting plants from producers who previously shipped to other processors. (Scott, p. 921-922)
*411 203-1080 [566]. NFO personnel believed that the implementation of the Phase II Supply Contracts in Minnesota and Wisconsin would cause a general rise in the prices paid to producers by contracting processors and that such a price rise would attract additional supplies of milk to the contracting processor.
203-1095 [574]. In negotiating Phase II Milk Supply Contracts, it was intended that NFO members would supply the contracting processor with milk as provided by the Contract.
203-1095a [575]. In those instances where NFO was successful in negotiating a Phase II Milk Supply Contract with a processor, other processors located nearby who had not signed an NFO Phase II Supply Contract might lose the milk of NFO members previously being shipped to them to the contracting processor.
204. In mid-1969, Mid-Am refused to sign an NFO Supply Contract. (Stip. 1151, 1155) [Ct. Exh. # 1, ¶¶ 601, 612]
205. [Mid-Am's proposed finding of ultimate fact No. 205 was expressly denied by NFO. It stated:
205. In order to force Mid-Am to sign the NFO Milk Supply Contracts, NFO decided to move into the marketing of milk. NFO's marketing activities are not an end in themselves, but rather the means by which NFO accomplished its purposes. (Stip. 98)
In accordance with the procedure and practice above established, in lieu of the findings proposed by Mid-Am in rejected paragraph 205, we make additional findings in the language of the paragraph of the stipulation cited and relied upon by Mid-Am in support of the finding proposed in that paragraph:]
205-98. [See finding 9, supra.]
206. NFO's purpose and principal activity is collective bargaining. (Stip. 91, 92) [Ct. Exh. # 1, ¶ 47]
207. [Mid-Am's proposed finding of ultimate fact No. 207 was expressly denied by NFO. It stated:
207. NFO's move into "marketing" was not done for the purpose of becoming a marketing competitor of Mid-Am, but solely to force Mid-Am to sign an NFO Supply Contract, the sole and only purpose of which was to eliminate Mid-Am from the marketing of representing producers.

Mid-Am did not initially cite or rely upon any portion of the stipulated facts to support the findings proposed in paragraph 207. We have read and considered all data cited by Mid-Am in Appendix A to Mid-Am's reply brief in support of that proposed finding. We find and conclude that the data to which reference was made are insufficient to support Mid-Am's proposed finding and therefore refuse to make the finding as proposed.]
208. [Mid-Am's proposed finding of ultimate fact No. 208 was expressly denied by NFO. It stated:
208. As part of its "marketing" program, NFO engaged in a program of solicitation of Mid-Am's producer members, inducing them to breach their marketing contracts with Mid-Am, in violation of Section 1, Sherman Act, and state law of various states. (Stip. 1243 [669]; 1244 [670]; 1286 [703]; 1275 [694]; 1275(a) [695]; 1361(a) [741]; 1293 [706]; 1296 [709]; 1300 [711]; 1301 [712]; 1302 [713]; 1303 [714]; 1304 [715]; 1308 [719]; 1310 [720]; 1312 [722]; 1314 [724]; 1315 [725]; 1316 [726]; 1318 [728]; 1319 [729]; 1576 [814]; 1577 [815]; 1578 [816]; 1579 [817]; 1583 [818]; 2685 [1248]; 2693 [1253]; 2714 [1267]; 2715 [1268]; 2716 [1269]; 2717 [1270]; 2718 [1271]; 2719 [1272]; 2633 [1221]; 2635 [1222]; 2637 [1223]; 2639 [1224]; 2641 [1225]; 2643 [1226]; and many more).
In accordance with the procedure and practice above established, we reject the finding proposed by Mid-Am in paragraph 208, and in lieu thereof, we make additional findings in the language of the paragraphs of the stipulation cited and relied upon by Mid-Am in support of the finding proposed. The stamped paragraph numbers have been added in the same pattern as paragraph 203, above:]
*412 208-1243 [669]. In the fall of 1969, in Missouri, T. Forbes contacted dairy farmers who were shipping their Grade A milk through Mid-America concerning the proposed NFO marketing program.
208-1244 [670]. In September, 1969, all of the NFO members producing Grade A milk in Wright County, Missouri, that T. Forbes knew were shipping their milk through Mid-Am.
208-1286 [703]. Between the fall of 1969 and March of 1970, T. Forbes called on some NFO producers and attempted to persuade them to market their milk with NFO.
208-1275 [694]. In late 1969 or early 1970 when Hills was contacting dairy farmers who were NFO members, Hills was aware that all Grade A dairy farmers in the Mountain Grove area were shipping their milk through Mid-Am.
208-1275(a) [695]. In late 1969 or early 1970, Herman Hills believed that most Grade A dairy farmers shipping their milk through Mid-Am had membership agreements with Mid-Am.
208-1361(a) [741]. From July, 1969 until July, 1970, on behalf of the NFO Dairy Department, Welch estimated that approximately 25 NFO members who were milk producers in Central Missouri had milk available, some of whom were probably shipping through Mid-Am.
208-1293 [706]. Some time between July, 1970 and December, 1971, T. Forbes talked with some milk producers who were shipping milk through Mid-Am.
208-1296 [709]. Some of the producers T. Forbes called on as a field man for NFO were not NFO members and were shipping their milk through Mid-Am.
208-1300 [711]. On August 31, 1970, T. Forbes, as a field man for NFO, called on five milk producers who were shipping their milk through Mid-Am on that date, the purpose being to acquire more milk to be shipped in the NFO Dairy Program.
208-1301 [712]. On August 31, 1970, Leonard Grimes, who on that date was shipping with Mid-Am told T. Forbes he would be willing to ship with NFO.
208-1302 [713]. On August 24, 1970, T. Forbes called on two producers shipping through Mid-Am, the purpose being to acquire more milk to be shipped in the NFO Dairy Program.
208-1303 [714]. On August 27, 1970, T. Forbes called on Ray Hobbs, a Grade A milk producer shipping with Mid-Am, the purpose being to acquire more milk to be shipped in the NFO Dairy Program.
208-1304 [715]. On August 28, 1970 Forbes called on Messrs. Sparlin, Clouse, Dudley, Houseley and Turner, all milk producers who were marketing through Mid-Am on that date, to tell them what the NFO milk marketing program had to offer, in the way of price. (Forbes, p. 188-189)
208-1308 [719]. On September 8, 1970 T. Forbes called on Leonard Grimes, who on that date was shipping his milk with Mid-Am.
208-1310 [720]. On September 8, 1970, T. Forbes called on George Duerney, who on that date was shipping his milk with Mid-Am.
208-1312 [722]. On September 8, 1970, T. Forbes called on Lefal Brown, who on that date was shipping his milk with Mid-Am.
208-1314 [724]. On September 8, 1970, T. Forbes called on Ronald Hanby, and asked him to ship milk with NFO.
208-1315 [725]. On September 8, 1970, Hanby was shipping his milk with Mid-Am.
208-1316 [726]. The week of September 14 through 18, 1970, T. Forbes called on Messrs. Short, Freeman, Cantrell and Nichols, all of whom were shipping milk with Mid-Am at that time.
208-1318 [728]. The week of September 14 through 18, 1970, T. Forbes called on Robert Cager, who on that date was shipping his milk through Mid-Am.
208-1319 [729]. The week of September 21 through 26, 1970, T. Forbes called on Freeman, Adams, Lawrence, and Riley, who were all at that time shipping their milk through Mid-Am.
*413 208-1576 [814]. During the week of March 21, 1970, Bruemmer called on Ed and Anton Kempher about shipping their milk through NFO Dairy Program.
208-1577 [815]. During the week of May 9, 1970, Bruemmer contacted milk producers Ed Kempher, Anton Kempher, Lawrence Wiebers, Stanley Bernskoetter and Clarence Wiebers. (Bruemmer, p. 403)
208-1578 [816]. During the week of May 9, 1970, Bruemmer visited farmers Lawrence Scheullen, Jerome Leubbring, Frank Swartzer and Lo-Mo Guernsey Farm.
208-1579 [817]. During the week ending May 30, 1970, Bruemmer visited farmers Victor Bruemmer, Leonard Kempher, Lawrence and Leo Leubbring, Jerome Leubbring, Fred Swartzer, Pat Hirtges and Wisted.
208-1583 [818]. During the week ending June 6, 1970, Bruemmer contacted Ed Kempher, Lawrence Wilbur and Stanley Bernskoetter about the start of shipping milk the following week in the NFO program. (Bruemmer, p. 416)
208-2685 [1248]. During the week of March 21, 1970, Breummer took Texas Health Inspectors around to inspect Jerry Voss for the health certificates required for shipping milk to Texas. (Breummer, p. 374)
208-2693 [1253]. During the week of March 21, 1970, Breummer took Texas Health Inspectors around to inspect William Schullen for shipment of milk to Texas through the NFO. (Breummer, p. 374)
208-2714 [1267]. During the week of March 14, 1970, Breummer got a commitment from Anton Kempher to move milk to Texas through the NFO. (Breummer, p. 370-371)
208-2715 [1268]. During the week of March 21, 1970, Breummer contacted Ed and Anton Kempher about moving their milk to NFO. (Breummer, p. 376)
208-2716 [1269]. During the week of May 9, 1970, Breummer contacted Ed and Anton Kempher. (Breummer, p. 403)
208-2717 [1270]. During the week ending June 20, 1970, Breummer contacted Ed Kempher about moving milk. (Breummer, p. 414-415)
208-2718 [1271]. During the week ending June 6, 1970, Breummer contacted Ed Kempher about the start, the following week, of milk shipments through the NFO. (Breummer, p. 416)
208-2719 [1272]. Breummer met with Ed and Anton Kempher during the week ending June 27, 1970 about moving milk in the NFO program. (Breummer, p. 418)
208-2633 [1221]. On January 21, 1970, Hills talked to John Watterson, Mansfield, Missouri, Wright County. (Hills, Exh. 42)
208-2635 [1222]. On January 23, 1970, Hills talked to John Lee Ellis, Hartville, Missouri, Wright County. (Hills, Exh. 44)
208-2637 [1223]. On January 22, 1970, Hills talked to Billy Clouse, Mansfield, Missouri, Wright County. (Hills, Exh. 43)
208-2639 [1224]. On January 21, 1970, Hills talked to Ray McCrite, Mansfield, Missouri, Wright County. (Hills, Exh. 42)
208-2641 [1225]. On January 22, 1970, Hills talked to Ted Forbes, Mansfield, Missouri, Wright County. (Hills, Exh. 43)
208-2643 [1226]. On January 24, 1970, Hills talked to Dean Ellis, Hartville, Missouri, Wright County. (Hills, Exh. 45)
[209. Mid-Am's proposed finding of ultimate fact No. 209 was expressly denied by NFO. It stated:
209. NFO engaged in price-cutting activities in selected Mid-Am markets. (Tr. 932-936; 1011-1022; 1050-1055)
NFO implicitly conceded that the evidence shows that NFO cut prices in the St. Louis-Ozarks market. We accordingly find, without, however, finding or concluding that such action was illegal under the circumstances, that:]
209. NFO engaged in price-cutting activities in the St. Louis-Ozarks market.
210. NFO, in order to obtain qualification as a recognized cooperative by USDA, submitted an application to the Dairy Division in March, 1970. (Stip. 1708, 1713, 1713(a) [Ct.Exh. # 1, ¶¶ 859, 863, 864]
*414 211. [Mid-Am's proposed finding of ultimate fact No. 211 was expressly denied by NFO. It stated:
211. NFO submitted a substantial amount of false and misleading evidence in order to obtain the qualification from the USDA. (Stip. 1742-1743 [880-881], 1752 [886], 1755 [888], 1757 [889])
In accordance with the procedure and practice described above, including the paragraph numbering problem, we make the findings agreed to in the stipulation in lieu of Mid-Am's proposed finding of ultimate fact No. 211:]
211-1742 [880]. The Milk Sales Agreements which had been signed by NFO members prior to the time of NFO's 1970 Application for Qualification did not contain a provision giving "NFO full power and authority in its own name to collect the entire amount due for milk delivered."
211-1743 [881]. NFO has never collected in its own name and commingled with its own funds amounts due from the sale of its members' milk.
211-1752 [886]. At the time of the initial filing of NFO's March, 1970 Application for Qualification of Cooperative Milk Marketing Association with the United States Department of Agriculture, NFO cited and submitted only NFO Form 7-3-39AR in response to question C-1 as the document giving NFO the "full authority in the sale of its members' milk."
211-1755 [888]. Section 7 C.F.R. § 900.353 provides, among other things, that: "The association must: ... (c) have full authority in the sale of its members' milk."
211-1757 [889]. The U.S.D.A. Dairy Division Application for Qualification Form DA-25 in Section C, question 1, requests the applicant association to identify the document or documents which give the association full authority in the sale of its members' milk.
212. NFO never reported to the IRS that NFO had begun to engage in marketing milk in 1970. (Stip. 1663, 1838-1841)[9] [Ct. Exh. # 1, ¶¶ 838, 936-939]
213. Graf, head of the NFO Dairy Department, welcomed accusations of destroying Mid-Am because it showed NFO was achieving its goal. (Ex. 31)
214. Mid-Am Board President Bill Powell testified at the 1970 confrontation between representatives of NFO and Mid-Am in John Gage's office that Gordon Shafer of NFO stated clearly and unequivocally NFO's intent was to destroy Mid-Am. (Tr. 740, 741)
215. As far back as 1963, NFO was trying to get Mid-Am predecessor TCMPA to sign an NFO Master Contract.
216. [Mid-Am's proposed finding of ultimate fact No. 216 was expressly denied by NFO. It stated:
216. Another threat of destruction of a Mid-Am predecessor was made in 1964, when Mid-Am [sic] representatives evidenced a clear intent to destroy Square Deal. (Tr. 284, 285, 299-300, 362-366)
We reject the finding proposed by Mid-Am because it assumes that there was a "threat of destruction" and "a clear intent to destroy Square Deal in 1964." The evidence, in our judgment, does not support such a finding.]

ROBINSON-PATMAN FACTUAL FINDINGS
217. [See finding 91, supra.]
218. [Mid-Am's proposed finding of ultimate fact No. 218 was expressly denied by NFO. It stated:
218. NFO Milk Supply Contract provisions were stipulated between the parties and they included a provision requiring the purchaser to pay NFO dairy farmers the same price for milk as other dairy farmer sellers delivering to the contracting plant, plus an additional sum characterized as being "for services rendered." (Stip. 451, 454, 455, 927)
*415 In accordance with the procedure and practice above established, in lieu of the findings proposed by Mid-Am in rejected paragraph 218, we make additional findings in the language of the paragraphs of the stipulation cited and relied upon by Mid-Am in support of the findings proposed in those paragraphs:]
218-451. [See finding 91, supra.]
218-454. In some instances the Phase II Milk Supply Contracts were negotiated by Marketing Area Dairy Bargaining Committees comprised of NFO members themselves producers and in negotiating the sum of money to represent payment for "services rendered" the Committee would negotiate for as large a sum as they could reasonably expect to receive for the services intended to be performed. (Ochsner, p. 783)
218-455. In some instances members of the NFO Dairy Department staff together with NFO dairy farmers or NFO Area Dairy Bargaining Committees attempted to negotiate Milk Supply Contracts and in such negotiations attempted to obtain as large a sum of money for "services rendered" as they could reasonably expect to get for the services intended to be performed.
218-927. In making the determination of qualification of NFO, the Dairy Division found that the NFO as an organization was selling milk to handlers rather than the individual producers who were marketing milk through the NFO.
219. Payments were made to NFO producers pursuant to the terms of some of the NFO Milk Supply Contracts. (Stip. 461, 567, 579)
220. The sum charged "for services rendered" was not a cost justified sum. (Tr. 105; Stip. 456, 457, 458)
221. The amount charged "for services rendered" was negotiated in each instance between NFO and the contracting buyer. (Tr. 105; Stip. 473)
222. The additional amount "for services rendered" went to the individual dairy farmer supplying milk under the NFO contract rather than to NFO. (Tr. 108; Stip. 468)

ULTIMATE FACTS

NFO VIOLATION OF MISSOURI LAW
223. Mid-Am had valid milk marketing agreements with its members. (P. Ex. 200)
224 through 226. [Mid-Am's proposed findings of ultimate fact No. 224 through 226 were expressly denied by NFO. Those paragraphs stated:
224. NFO solicited members of Mid-Am to breach their milk marketing agreements with Mid-Am. (P. Ex. 104, 107; Tr. 729-730, 691-694; 700-705)
225. NFO solicited members of Mid-Am to withhold their milk from Mid-Am in violation of their milk marketing agreements with Mid-Am. (Tr. 694, 704-705, 717, 730)
226. NFO solicited members of Mid-Am to market their milk through NFO instead of Mid-Am in violation of their milk marketing agreements with Mid-Am. (Tr. 694, 704-705, 717, 730)
Mid-Am initially cited and relied only on deposition and trial testimony to support the findings proposed in its paragraphs 224 to 226. In Appendix A to its reply brief, however, Mid-Am cited and relied upon various pages of its post-trial brief which, in turn, cited and relied upon various paragraphs of the stipulation.
On pages 62-63 of its post-trial brief, for example, Mid-Am argued that "NFO solicited numerous Mid-Am dairy farmers in Missouri to breach their Mid-Am contracts, in absolute, clear violation of Missouri law (Mo.Rev.Stat. § 274.260)." To support that argument, Mid-Am cited exactly the same paragraphs of the stipulation which we found as additional facts in connection with Mid-Am's rejected paragraph 208 above. We find and conclude that the cited testimony and the cited paragraphs of the stipulation, all of which we have carefully considered, do not support the findings of ultimate fact proposed in Mid-Am's paragraphs 224, 225, and 226. We therefore reject those findings as proposed.]
*416 227. NFO engaged in solicitation of members of Mid-Am in part through the use of form letters prepared by NFO, distributed by NFO, collected by NFO, and mailed en masse by NFO, which implicitly recognized the existence of milk marketing agreements with Mid-Am. (Stip. 760-788, 1290-1306)
228. NFO engaged in solicitation of members of Mid-Am in part by conducting mass meetings throughout the State of Missouri, at which any and all dairy farmers in attendance, most of whom had milk marketing agreements with Mid-Am, were urged to cease doing business with Mid-Am and to instead market their milk through NFO. (Stip. 657, 658, 659, 679, 691, 698)
229. NFO engaged in solicitation of members of Mid-Am in part through individual meetings with dairy farmers, most of whom had milk marketing agreements with Mid-Am, at which the farmer was urged to cease doing business with any marketing organization, including Mid-Am, and to begin marketing milk through NFO. (Stip. 694, 695, 698, 669, 811-818)
230. NFO knew that many of the dairy farmers solicited by NFO members and employees to market their milk through NFO had milk marketing agreements with Mid-Am. (Stip. 698, P. Ex. 104, 107)
231. [Mid-Am's proposed finding of ultimate fact No. 231 was expressly denied by NFO. It stated:
231. NFO induced the following Missouri dairy farmers to break their marketing contracts with Mid-Am:
John Watterson, Billy Clouse, Ray McCrite, Johnnie Lee Ellis, Ray Watterson, Jim Watterson, Ted Forbes, Cogdill Dairy Farm, Russell Hamby, Victor Wells, H. H. Dold, Charley Clinton, Mason Johnson, J. E. Ragain, Edna and Stafford Bennet, Fay and John Ellis, Charles Allen, Kenneth Schrader, Dude Degase, Joe Tabor, Raymond Homer, Jim Frye, Clarence Goldsberry, Bill Buhler, T. L. Jordan, Carl Ray, Bryan Prock, Audie Evans, Oscar and Elsa Denny, Noland Turner, R. J. and Helen Clary, Wallace G. Thornhill, Walter Stephenson, Harold Welch, George Durney, L. M. Chapman, Earl Shaddy, Allen Mallonee, Richard McLaughlin, H. A. Crumpley, Harley Blansit, Faye Hyder, Paul and Nina Burnett, John E. Atkinson, Virgil Thompson, Robert N. Leeper, L. V. Cobb, Irwin H. Baker, Bob L. Aleshire, K. L. Duckworth, J. E. Whitner & Son, Dale and John Short, Frank Tompkins, Morris Harker, E. E. McCowan, Carol Ann Freeman, Larry Dennis, Dean Ellis, Lewis Comstock, Reid Heathman, Charles Heathman, Keith Heathman, Lowell Skinner, Hershel Coats, Donald Wayne Allen, Lloyd and Larry Skelley, Gary and Dane Lewis, and Homer Bates.
We reject Mid-Am's proposed finding of ultimate fact as proposed in paragraph 231. Additional findings of fact as to the subject matter of paragraph 231 will be made in connection with our discussion of the reasons why we reject Mid-Am's proposed conclusions of law in regard to NFO's alleged violation of State law.]
232. Mid-Am was incorporated under the Kansas Cooperative Marketing Act on July 1, 1968 and qualified to do business in the State of Missouri. (Stip. 1, 3, P. Ex. 211)

ULTIMATE FACTUAL FINDINGS IN SUPPORT OF THE PLAINTIFF'S DAMAGES
233. Mid-Am is an agricultural marketing cooperative incorporated under the laws of the State of Kansas and therefore has the capacity to sue in its own name.
234 through 239. [Mid-Am's proposed findings of ultimate fact Nos. 234 through 239 were expressly denied by NFO. They stated:
234. Mid-Am was damaged in its property as a result of NFO's interference with the valid milk marketing agreements of Mid-Am's members.
235. Mid-Am was damaged in its business or property as a result of the diversion of milk of Mid-Am members to NFO.
236. Mid-Am was damaged in its business or property as a result of its failure *417 to receive the 4 cents per hundredweight "capital retain" fee and the 6 cents per hundredweight administrative fee due to Mid-Am under the valid milk marketing agreements of Mid-Am's members.
237. The amount of damages caused to Mid-Am as a result of lost capital retain and administrative fees is not less than $252,786.00.
238. Mid-Am was damaged in its business or property as a result of having to meet NFO's prices in NFO's sales of milk illegally obtained from Mid-Am's members.
239. The amount of damages caused to Mid-Am from profits lost as a result of having to meet NFO's predatory prices is in excess of $1,736,564.00.
We reject the findings proposed by Mid-Am in paragraphs 234 through 239 for the reason that we have found and concluded that Mid-Am failed to adduce sufficient evidence to carry the burden of proof on the issues of liability presented in Phase I of this case. Had we been required to reach the question of damage we would have found and concluded that Mid-Am's damage evidence was insufficient to support the findings proposed in paragraphs 234 through 239 of its proposed findings of ultimate fact.]

PHASE I CONCLUSIONS OF LAW

Discussion of Mid-Am's Proposed Conclusions of Law In Regard to NFO's Alleged Illegal Boycott
Mid-Am set forth 35 separate conclusions of law on pages 25 to 30 of plaintiff's proposed findings of ultimate facts and proposed conclusions of law, which it proposed in connection with the issues of alleged illegal boycott. Mid-Am's separate proposed conclusions were not numbered. We shall therefore make reference to the various conclusions proposed by Mid-Am by referring to the first conclusion proposed in the first paragraph on page 25 as "25-1;" the conclusion proposed in the second paragraph on page 25 as "25-2;" etc.
The first conclusion proposed by Mid-Am stated:
25-1. Evidence of other acts of a kindred character of a party may establish the party's intent or motive in the particular act directly in question.
That abstract principle of law was, as Mid-Am's post-trial brief suggests, recognized by the Eighth Circuit in Kansas City Star v. United States, 240 F.2d 643 (8 Cir. 1957). Mid-Am's second proposed conclusion, based upon language from Judge Wyzanski's opinion in Union Leader Corp. v. Newspapers of New England, Inc., 180 F.Supp. 125 (D.C.Mass.1959), stated:
25-2. In a situation where it is inevitable that only one competitor can survive, the evidence which shows the use, or contemplated use, of unfair means is the very same evidence which shows the existence of an exclusionary intent.
Both of the first two conclusions of law proposed by Mid-Am accurately state abstract principles of law. But the conclusion proposed in 25-1 assumes that Mid-Am has carried the burden of proving some sort of "acts of a kindred character" by NFO against persons other than Mid-Am which should be considered in support of Mid-Am's claim that NFO acted with illegal intent or motive against Mid-Am. And the conclusion proposed in 25-2 assumes that Mid-Am has carried the burden of proving that "only one competitor can survive" in the various competitive situations involved in this case.
We shall not state either of the two abstract conclusions of law proposed by Mid-Am in 25-1 and 25-2 because we do not believe that either principle of law has any application to the factual circumstances established by the evidence adduced in Phase I of this case.
Mid-Am, in a somewhat similar manner, proposed two abstract conclusions relating to boycotts and one in regard to price-fixing. Those three abstract conclusions proposed by Mid-Am state:
25-4. Group boycotts or joint refusals to deal are illegal per se under Section 1 of the Sherman Act.
29-27. Concerted group boycotts which have as their purpose forcing a *418 party to accede to desired trade practices are illegal per se under Section 1 of the Sherman Act.
27-17. Price-fixing is per se illegal under Section 1 of the Sherman Act, whether the agreement has been put into effect or not.
NFO does not dispute the general proposition that boycotts and price-fixing, if proven, violate Section 1 of the Sherman Act. The real dispute between the parties is a factual dispute and presents the question of whether Mid-Am carried the burden of proving factual circumstances in regard to which the abstract principles of law accurately stated in Mid-Am's proposed conclusions 25-4, 29-27, and 27-17 should be applied. The remainder of Mid-Am's 35 proposed allegedly illegal boycott conclusions are based upon similar factual assumptions which reflect what Mid-Am believes it established by the greater weight of the credible evidence. The same sort of question is presented in regard to whether Mid-Am carried the burden of proving the facts assumed in regard to those proposed conclusions of law.
The first section of Mid-Am's post-trial brief is devoted to what is essentially a factual argument in regard to how Mid-Am would have the Court consider "NFO's entire course of conduct." Mid-Am commenced that argument with the assertion that "[t]he primary goal of NFO, the purpose for which it was organized, was to establish a monopoly in bargaining for the sale of agricultural products for farmers" and that "NFO recognized at the outset that this meant the control or replacement of any effective dairy competition." Mid-Am would have this Court find and conclude that NFO actually knew what it was doing when it somewhat belatedly became interested in dairy farmers and in the marketing of milk.
Mid-Am's basic factual argument is that "the evidence viewed as a whole clearly establishes the one concept of NFO and the unified course of conduct" of NFO was designed to "eliminate the cooperatives from being the collective bargaining agent for their own members" and that such action would, in turn, cause the cooperatives to "be eliminated from bargaining and be replaced by NFO." Mid-Am's general and quite basic factual theory is contained in Mid-Am's proposed conclusion 25-3 which states that:
25-3. NFO leaders intended that only NFO would survive as the bargaining agent for dairy farmers and that this meant elimination of dairy cooperatives from bargaining as a direct result if NFO succeeded in signing and activating its Master Contracts.
In its post-trial brief, Mid-Am summarized its "course of conduct" argument by stating that "from the very early '60's NFO's entire course of conduct in dairy has been directed at one goal ... the elimination of all cooperatives" and that such alleged conduct was consistent with the purpose stated in NFO's By-Laws, namely, "To unite into one organization, regardless of religion, race, creed, color or nationality, all farmers engaged in the production of agricultural commodities." [Mid-Am's emphasis]
The By-Law relied upon by Mid-Am is contained in paragraph 158 of the stipulation of facts. That stipulation, however, contains many other paragraphs which establish that NFO's course of conduct in regard to the dairy cooperatives was not at all directed toward their elimination. For example, paragraph 152 of the stipulation states that "In the early 1960's, the concept of a marketing agency in common was designed by NFO for the marketing of milk and dairy products, because dairy producers were organized in co-ops to a significant degree." It was further stipulated in paragraph 157 that "In the early and mid-1960's NFO sought the formation by the existing dairy cooperatives of a marketing agency in common that would be effective in marketing and pricing their products." Paragraph 177 of the stipulation stated that "[I]n the early 1960's NFO proposed that the existing milk cooperatives get together and form a marketing agency in common" (emphasis ours).
*419 NFO's purpose in proposing that the existing cooperatives get together was made clear by paragraphs 179 and 180 of the stipulation. The parties agreed in paragraph 179 that "[i]n the early 1960's the marketing agency in common concept suggested by NFO was that the co-ops would establish one organization so that the milk of the organization's member co-ops could be marketed through one organization to gain bargaining strength." Paragraph 180 of the stipulation provided "[I]n the early 1960's NFO recommended the marketing agency in common because dairy farmers had organized so many bargaining groups that they were dividing, rather than uniting, their bargaining power."[10]
The parties further stipulated that "none of the large cooperatives undertook to form or to join a marketing agency in common" (paragraph 187 of the stipulation) as NFO had proposed. The basic underlying factual circumstances concerning NFO's quite unsuccessful efforts to persuade existing dairy cooperatives to sign NFO Master Contracts; NFO's abandonment of that effort; NFO's sponsorship of the 1967 Milk Holding Action; NFO's 1968 attempt to develop an effective Supply Contract program; and, finally, NFO's establishment and operation of its "reload stations," are not in factual dispute. Mid-Am would have this Court view the quite chaotic history of NFO's various and separate efforts "to raise the price of milk paid to dairy farmers and to strengthen NFO's bargaining position," as the parties stipulated was one of the purposes of the 1967 Holding Action (see paragraph 405 of the stipulation), as "different expedients" to accomplish NFO's alleged primary goal of elimination of all existing dairy cooperatives. Mid-Am argues that "although different expedients were adopted from time to time when it was found one particular expedient would not accomplish the overall purpose, ... NFO engaged in a single course of conduct to accomplish this one purpose ... to impair, control or eliminate effective competition."
We quite agree that the record establishes that NFO adopted what Mid-Am would call "different expedients" in its uncharted adventure into the field of marketing the milk of its members. And we agree that the record shows that the various "expedients" may not have accomplished the purpose NFO had in mind when a particular "expedient" was adopted. But we do not believe that it can fairly be said that there is any real factual dispute about the purposes of the various "expedients."
We have already made reference to paragraph 405 of the stipulation in which it was agreed that one of the purposes of the 1967 Holding Action was "to raise the price of milk to dairy farmers ... which would help NFO to write contracts which assure better milk prices for farmers in the future." In a quite similar manner, the parties stipulated in paragraph 204 of the stipulation that "through 1967, NFO believed that its Master Contracts were tools through which dairy farmers could obtain the cost of production plus a reasonable profit for their milk."
NFO's stipulated expectation that the 1967 Holding Action would actually raise *420 the price of milk was never realized. Nor was its stipulated belief that its Master Contract program would actually enable dairy farmers to obtain "the cost of production plus a reasonable profit" ever confirmed. But those facts do not support Mid-Am's proposed finding that both those separate efforts  or "expedients," to use Mid-Am's language  were but parts of a "single course" of NFO conduct, all of which was directed to an alleged "primary goal" to eliminate all existing dairy cooperatives.
Indeed, the record would come closer to supporting a set of findings that NFO became a victim of its own propaganda and that its ignorance and inexperience in the dairy field required it to experiment with one unsound idea after another in its effort to keep and save face with those of its members who may have read the overly optimistic articles which were quite regularly published in the NFO Reporter.
It is, of course, not necessary to make any finding or state any conclusion other than to state our considered view that Mid-Am did not carry the burden of proving the factual assumptions upon which its proposed conclusion 25-3 is based; namely, that "NFO leaders intended that only NFO would survive" and that this meant "elimination of dairy cooperatives from bargaining as a direct result if NFO succeeded in signing and activating its Master Contracts."
We have stated our reasons for refusing to make Mid-Am's proposed conclusion 25-3 in considerable detail because what we have stated in connection with that proposed conclusion is generally applicable to the substantial number of additional conclusions of law which Mid-Am proposed in regard to the 1967 Milk Holding Action which, of course, took place before Mid-Am was even organized.
Mid-Am's proposed conclusion of law 25-6 and 25-7 stated:
25-6. The NFO Milk Holding Action constituted a concerted group boycott.
25-7. The activities of NFO, its members and employees in persuading, forcing, or coercing dairy farmers to boycott predecessors of Mid-Am during the 1967 Milk Holding Action constituted a concerted group boycott.[11] Mid-Am presented three conclusions of law, 26-12, 25-5, and 26-15, which are based on the factual assumption that NFO designed the 1967 Milk Holding Action to force then existing cooperatives to sign NFO Master Contracts in order "to eliminate predecessors of Mid-Am from the market of representing their members." Mid-Am's proposed conclusion 26-12 stated:
26-12. The activities of NFO, its members and employees in attempting to induce predecessors of Mid-Am to sign NFO Master Contracts during the 1967 Milk Holding Action constituted a concerted group boycott to eliminate predecessors of Mid-Am from the market of representing their members.[12]
*421 Mid-Am proposed three additional conclusions of law in connection with the 1967 NFO Milk Holding Action, Mid-Am's 28-19 stated:
28-19. NFO, with its members and employees, in the 1967 NFO Milk Holding Action, created and participated in a concerted group boycott and group refusal to deal in persuading milk producers to fail to perform their contracts and to refuse to have normal business relations with their milk marketing cooperatives, including predecessors of Mid-America, and thereby violated Section 1 of the Sherman Act.[13]
All of the conclusions of law proposed in connection with the 1967 Milk Holding Action relate to alleged acts and conduct of NFO that took place before Mid-Am came into existence. Mid-Am contends that evidence of NFO's sponsorship of the 1967 Milk Holding Action is relevant and significant under the "acts of kindred character" principle stated in Kansas City Star v. United States, 240 F.2d 643 (8 Cir. 1957).
We find and conclude that the conclusions of law proposed by Mid-Am in the 1967 Milk Holding Action group of proposed conclusions of law under discussion may not properly be made for the reason that even if it be assumed that the "kindred character" theory should be applied in this case, we are satisfied that Mid-Am failed to adduce sufficient evidence to support the factual findings which the trier of the facts must find before the various proposed 1967 Milk Holding Action conclusions of law may properly be made.
The unidentified "dairy farmers" mentioned in this group of proposed conclusions of law had the right, in the absence of an illegal agreement, to sell or to refuse to sell their milk to anyone or to no one, for good cause or for no cause whatever. The evidence does not establish that the dairy farmers who withheld their milk from the market during the relatively short period of time involved in the 1967 Milk Holding Action did so because they were either "forced" or "coerced" to do so. And certainly the evidence adduced does not support any inference that the purpose of the 1967 Milk Holding Action was "to eliminate the cooperatives." Rather, it must be said in this case, as the Eighth Circuit said of the group of defendants in Johnson v. J. H. Yost Lumber Co., 117 F.2d 53, 62 (8 Cir. 1941), who were described as the "supplier defendants," that there was no substantial evidence adduced in this case that the dairy farmers went "beyond the simple refusal to sell their goods for reasons which were sufficient to them and which appeal to one as having a substantial basis in reason."
The same thing must be said about Mid-Am's failure to adduce sufficient evidence to prove that the dairy farmers were induced or that NFO attempted to induce those dairy farmers to fail to perform their contracts or to refuse to deal with predecessors of Mid-Am. In short, we find and conclude that Mid-Am's 1967 Milk Holding Act group of proposed conclusions of law should and will not be made.
Mid-Am proposed four additional conclusions of law in regard to the NFO Master Contracts. Those four, Mid-Am's 26-13, 26-14, 27-16, and 27-18, are based on the implicit factual assumptions (1) that the NFO Master Contracts were, in fact, price fixing agreements and (2) that cooperatives which actually signed an NFO Master Contract did so involuntarily. The four proposed conclusions of law stated:
26-13. The NFO Master Contracts were agreements which actually stated a fixed price to be paid to NFO Members (i. *422 e., $6.05 per CWT for Grade A milk and $5.00 per CWT for manufacturing grade milk), and were therefore illegal price fixing agreements.
26-14. NFO induced or attempted to induce predecessors of Mid-Am to sign NFO Master Contracts.
27-16. Cooperatives that signed NFO Master Contracts did not do so voluntarily.
27-18. The fact that the NFO Master Contracts were never activated has no bearing upon whether these contracts were illegal price-fixing agreements.
We find and conclude that the NFO Master Contracts which the record shows were in fact signed by particular cooperatives were not, in fact, price fixing agreements. We further find and conclude that the evidence adduced does not support any finding of fact or legal conclusion that any cooperative did not voluntarily sign any particular NFO Master Contract.
Mid-Am proposed a large number of conclusions of law in regard to the NFO Supply Contract. The first four of those conclusions, 28-21, 28-22, 28-23, and 28-24, include and are based on factual assumptions which relate to both "Mid-Am and some of its predecessor cooperatives." Those proposed conclusions of law stated:
28-21. NFO attempted to induce Mid-Am and some of its predecessor cooperatives to sign an NFO Supply Contract.
28-22. The means used by NFO to induce or attempt to induce Mid-Am and some of its predecessor cooperatives to sign NFO Supply Contracts included threats of withdrawal of milk, actual withdrawal of milk and solicitation of cooperative members to breach their contracts.[14]
We find and conclude that the means used by NFO to induce or to attempt to induce Mid-Am and some of its predecessors (including but not limited to Fergus Dairy Cooperative) did not violate the antitrust laws of the United States.
Five of Mid-Am's proposed conclusions, 29-28 to 29-33, inclusive, relate directly to alleged NFO activities directed solely to Mid-Am.[15] Those proposed conclusions stated:
29-28. The activities of NFO, its members and employees in inducing dairy farmer members of Mid-Am to refuse to ship milk to Mid-Am was for the purpose of persuading or inducing Mid-Am to sign an NFO Supply Contract.
29-29. The activities of NFO, its members and employees in inducing dairy farmer members of Mid-Am to breach their milk marketing contracts with Mid-Am constituted a concerted group boycott.
29-30. The activities of NFO, its members and employees in inducing dairy farmer members of Mid-Am to refrain from normal business relations with Mid-Am constituted a concerted group boycott.

*423 29-31. The actions of NFO, its members and employees in inducing dairy farmer members of Mid-Am to boycott Mid-Am constituted a concerted group boycott.
29-32. The activities of NFO, its members and employees in attempting to induce Mid-Am to sign an NFO Supply Contract constituted a concerted group boycott, the purpose of which was to force, persuade or coerce Mid-Am to accede to trade practices desired by NFO, that is, to sign an NFO Supply Contract.
29-33. The activities of NFO, its members and employees in attempting to induce Mid-Am to sign an NFO Supply Contract constituted a concerted group boycott, the purpose of which was to eliminate Mid-Am from the market of representing its members.
The five proposed conclusions relating specifically to Mid-Am may not properly be made because the record, in our judgment, does not contain a sufficient factual basis to support the conclusions of law as proposed.
The remainder of Mid-Am's proposed conclusions of law, four in number, are reiterations of other proposed conclusions already discussed. They stated that:
30-34. The refusal of NFO and its members to deal with Mid-America and the threat and actual withdrawal by NFO and its members of milk from Mid-Am in an effort to force Mid-Am to sign an NFO Supply Contract and the combination and conspiracy by NFO with other cooperatives which signed NFO Supply Contracts, to fix the price at which milk was sold and to allocate markets and to jointly refuse to deal with Mid-Am to sign an NFO Supply Contract, violated Section 1 of the Sherman Act.[16]
30-35. The actions of NFO, its members and employees in an unlawful combination with each other and with non-exempt, proprietary corporations including haulers, milk brokers, bottling plants, and manufacturing plants in persuading and attempting to persuade Mid-Am constituted a combination and conspiracy to induce a group boycott and group refusal to deal in violation of Section 1, Sherman Act (15 U.S.C. § 1).
Mid-Am's proposed conclusion 30-34 is based upon the assumption that the evidence supports a finding that a "combination and conspiracy" in fact existed between NFO "and other cooperatives which signed NFO Supply Contracts." Mid-Am's proposed conclusion 30-35 is based on the factual assumption that the undisputed factual circumstances concerning NFO's relationship with such "outsiders," as Harold Whitmore of Whitmore Transport Company, Pete Taves, Billy Stacey, Southwest Milk Producers, and Midwest West Creamery, Inc., constituted "a group boycott and group refusal to deal in violation of Sherman 1." We find and conclude that Mid-Am failed to carry the burden of proving a sufficient factual basis for the proposed conclusions of law and therefore conclude that neither may properly be made under all the facts and circumstances of this case.

Discussion of NFO's Proposed Conclusions of Law Regarding Its Alleged Antitrust Exemption
While NFO followed the pattern established by Mid-Am's proposed findings of ultimate facts and proposed conclusions of law by responding directly to Mid-Am's proposed findings and conclusions in regard to "Illegal Boycott;" the alleged "Tying Arrangement;" and the other headings originally suggested by Mid-Am, NFO's first section of its proposed findings of fact and conclusions of law were submitted under a *424 "General" heading. That heading proposed 34 findings of fact which, for the most part, were accurate paraphrases of the various paragraphs of the stipulation of facts agreed to by the parties. The first two general conclusions of law proposed by NFO under its "general" heading presented questions in regard to NFO's claim of exemption from the antitrust laws under the Capper-Volstead and Clayton Acts. Similar claims of antitrust exemption were presented by Mid-Am, CMPC, and ARSPC in Phase II of this case and were again presented by NFO in Phase III.
Application of other principles of law to the facts and circumstances of each claim involved in each of the three Phases of this litigation makes it unnecessary for this Court to reach and therefore to decide whether any of the parties would be entitled to claim an antitrust exemption under the Capper-Volstead and Clayton Acts. Because each and every party has presented their respective claims of antitrust exemption with equal vigor, we deem it appropriate to indicate our view of the rationale which we believe we would have been under duty to apply had we found it necessary to reach and decide the merits of any claim of antitrust exemption made by any of the parties in any of the three Phases of this litigation. Indeed, the various stipulations of fact and various of the responses to proposed findings of fact made in connection with the various claims of antitrust exemption in each Phase of this case establish that the factual base upon which each party predicates its respective claim of exemption is virtually undisputed. This Court's indication of its view of the legal question presented may therefore be helpful to any appellate court which might determine that the merits of the antitrust exemption question presented should be reached and decided.
In order to get the questions of law presented in appropriate focus, we note that NFO proposed as its first two conclusions of law the following:
1. NFO is an association of producers of agricultural commodities as defined by the Capper-Volstead Act, 7 U.S.C. §§ 291-292 and Section 6 of the Clayton Act, 15 U.S.C. § 17, and is entitled to the exemption from the antitrust laws conferred by those acts.
2. NFO did not lose its status as an association of producers under the Capper-Volstead and Clayton Acts merely by accepting dues from one religious organization and 25 individuals who allegedly were not farmers during the entire period of time covered by their dues payments, and allowing its full-time employees to remain as active members.[17]
The Supreme Court had not handed down National Broiler Marketing Assn. v. United States, 436 U.S. 816, 98 S.Ct. 2122, 56 L.Ed.2d 728 (1978), at the time the parties filed their principal Phase I post-trial briefs and their respective Phase I proposed findings *425 of fact and proposed conclusions of law. Both sides, however, recognized before National Broiler Marketing Assn. was decided that there was language in Case-Swayne Co. v. Sunkist Growers, Inc., 389 U.S. 384, 88 S.Ct. 528, 19 L.Ed.2d 621 (1967), particularly when that case is read in light of the result reached in the earlier case of Sunkist v. Winckler & Smith Co., 370 U.S. 19, 82 S.Ct. 1130, 8 L.Ed.2d 305 (1962), which suggested that questions of fact concerning the membership of an organization which claims a Capper-Volstead exemption could be of great, if not controlling, importance.
If this Court were reading and applying the principles stated in the two Sunkist cases on a totally clean slate, we would have, of course, paid appropriate attention and given appropriate weight to footnote 6 on page 390 of 389 U.S., footnote 6 on page 532 of 88 S.Ct. of Sunkist II, which concluded that the majority of the Court of Appeals for the Ninth Circuit had erroneously held that any question of non-grower participation had been "resolved sub silento in favor of Sunkist in Sunkist Growers, Inc. v. Winckler & Smith Citrust Products Co., 370 U.S. 19 [82 S.Ct. 1130, 8 L.Ed.2d 305] (1962)."[18] Had we reached the merits of the antitrust exemption question presented, however, we would not be writing on a clean slate.
We are convinced that lower federal courts would be required to recognize that both the majority and concurring opinions in National Broiler Marketing Association, supra, made almost talismanic application of what Case-Swayne Co. v. Sunkist Growers said about the impact that non-producer members had on an otherwise exempt organization. In express reliance upon that case, the majority opinion in National Broiler Marketing Assn. concluded that in order for a cooperative "to enjoy the limited exemption of the Capper-Volstead Act, and, as a consequence, to avoid liability under the antitrust laws for its collective activity, all its members must be qualified to act collectively." 436 U.S. at 822, 98 S.Ct. at 2127. [Emphasis the Court's]. The Court held that a cooperative organization that included only one member who was not a "farmer" as a member of the cooperation was "not entitled to the limited protection of the Capper-Volstead Act." Id. at 828-829, 98 S.Ct. at 2130-2131.[19]
Until National Broiler Marketing Assn. was decided in 1978, we believe that NFO probably would have had the best of any argument that would have sustained NFO's Capper-Volstead exemption. Except for that most recent Supreme Court decision, we believe that NFO would have been able to successfully argue that Mid-Am's argument against exemption was "factually predicated upon mere record-keeping formalitiesthe mere presence on the membership list of names of individuals who, by express by-law provision, had been stripped of all vestiges of membership" (NFO's post-trial brief, page 9).
In spite of the fact that the evidence established that NFO did little to keep an accurate list of its members and in spite of the fact that NFO apparently attempted to collect dues from persons who may have been ineligible for membership, there is no evidence in this case that any of the non-producer members of NFO had anything to do with the establishment of NFO's general policies or with NFO's involvement in the marketing of milk. Except for National Broiler Marketing Assn., we probably would have given favorable consideration to NFO's argument that the factual circumstances *426 presented in this case, when viewed from an economic viewpoint, are distinguishable from Sunkist II and that the principles stated in Sunkist I were applicable to this case.
We have concluded, however, and not without considerable reluctance, that we would not have been free to distinguish National Broiler Marketing Assn. in light of the apparent rationale of that case. We believe that National Broiler Marketing Assn. requires that the Capper-Volstead exemption be narrowly construed by all lower federal courts and that such narrow construction further requires that a cooperative association which wishes to claim a Capper-Volstead exemption must take appropriate action to police its membership to the end that not "even one," 436 U.S. at 828, 98 S.Ct. at 2130, of its members is a non-producer, i. e., a person who is not engaged in the production of agricultural products.
Under the undisputed factual circumstances, NFO made no effective effort to enforce its by-law with the result that a small number of non-producers were in fact considered as members of NFO. Under the strict and narrow construction we believe is required by the most recent and controlling Supreme Court case, had we reached and decided the merits of the question presented, we would have rejected NFO's proposed Capper-Volstead Act conclusions of law.

Discussion of NFO's Proposed Conclusions of Law Regarding Alleged Illegal Boycott
Our discussion of Mid-Am's proposed conclusions of law forecast our agreement with a number of conclusions of law proposed by NFO. Our rejection of Mid-Am's proposed conclusions of law reflected our view that Mid-Am failed to carry the burden of proof in regard to the factual assumptions upon which Mid-Am's proposed conclusions of law were based.
Our express acceptance of a particular conclusion of law proposed by NFO will further reflect our view of the facts and circumstances established by all the evidence and make explicit the rationale of our ruling against Mid-Am on the ultimate issues of fact and the conclusions of law which Mid-Am proposed in connection with Mid-Am's claim in regard to an illegal boycott.
On the issue of liability in regard to Mid-Am's illegal boycott claim, we therefore state the following conclusions of law, keyed to paragraph numbers proposed by NFO:
6. Mid-Am has not proven the involvement of any "non-exempt, proprietary corporations," such as "haulers, milk brokers, bottling plants, and manufacturing plants" in a combination or conspiracy with NFO to conduct or induce a boycott.
8. In the absence of proof that a contract, combination or conspiracy with non-farmers was involved, interference by one agricultural marketing association with contractual relationships between a competing agricultural marketing association and its members is no violation of Section 1 of the Sherman Act.
9. NFO's efforts to become the exclusive bargaining agent for dairy-producer members of Mid-Am did not violate Section 1 of the Sherman Act.
10. NFO's conduct in soliciting producer members of Mid-Am to market milk through NFO, NFO offers of milk sales to Mid-Am customers, and NFO sales of milk to Mid-Am customers increased competition in the procurement and sales of milk and furthered the purposes of the Sherman Act.
11. NFO's persuading and attempting to persuade Mid-Am milk producer members to market milk through NFO was not a combination or conspiracy to induce a group boycott or a group refusal to deal or predatory practice in violation of Section 1 of the Sherman Act.
13. NFO's and its members' threats to withhold, and actual withholding, if any, of milk from Mid-Am in an unsuccessful attempt to induce Mid-Am to sign a supply contract is no more a Section 1 Sherman Act violation than any other seller's refusal *427 to sell except on terms he regards as satisfactory.
14. NFO's supply contracts are ordinary buy-and-sell arrangements that do not constitute illegal price fixing.
19. Mid-Am has not, in any event, met its burden of proof that any of NFO's conduct was unreasonable, and only unreasonable restraints of trade violate Section 1 of the Sherman Act.
In light of our findings of fact and conclusions of law in regard to the liability questions presented in connection with Mid-Am's illegal boycott claim, we need not and therefore do not reach the questions presented by additional conclusions of law proposed by NFO in regard to damages in connection with that claim.

Conclusions of Law Regarding NFO Membership Agreement as a Tying Arrangement
The conclusions of law proposed by Mid-Am and those proposed by NFO in connection with Mid-Am's claim that the NFO membership agreement must be considered as a tying arrangement are poles apart. Mid-Am proposed that we conclude as a matter of law that "[t]he NFO membership agreement clearly represents a tying contract ...." Indeed, Mid-Am argued that "there can be no question that the NFO Membership Agreement is a tying arrangement ...." (Mid-Am's post-trial brief, page 5; Mid-Am's emphasis). NFO proposed as its conclusion of law 20 that "[t]he `exclusive representative' clause in NFO's membership agreement is not a tying arrangement violative of Section 1 of the Sherman Act."
The parties are in general agreement that principles of law applicable to tying arrangements are enunciated in International Salt Co. v. United States, 332 U.S. 392, 68 S.Ct. 12, 92 L.Ed. 20 (1947); Northern Pacific Ry. Co. v. United States, 356 U.S. 1, 78 S.Ct. 514, 2 L.Ed.2d 545 (1958); Times-Picayune Publishing Co. v. United States, 345 U.S. 594, 73 S.Ct. 872, 97 L.Ed. 1277 (1953); Fortner Enterprises, Inc. v. U. S. Steel Corp., 394 U.S. 495, 89 S.Ct. 1252, 22 L.Ed.2d 495 (1969); and U. S. Steel Corp. v. Fortner Enterprises, Inc., 429 U.S. 610, 97 S.Ct. 861, 51 L.Ed.2d 80 (1977).
All of Mid-Am's conclusions of law proposed in connection with its tying arrangement claim are based on the proposed findings of ultimate facts as proposed by Mid-Am in its paragraphs 160 to 195, inclusive.[20] *428 Those paragraphs either accurately paraphrase or quote the particular paragraphs of the stipulation of facts upon which they are based. It is thus clear that there is no substantial dispute about the underlying factual base upon which Mid-Am attempts to rely to support its tying arrangement argument.
NFO, of course, argues that Article I of the NFO membership agreement must be read in light of the exception stated in that article and in light of Article VII, Section 1 and Article XII, Section 3 of that agreement.[21] NFO further argues that Mid-Am has recognized that the NFO dairy program is voluntary and that Mid-Am, in fact, requested an admission from NFO which would agree that "the NFO dairy program is voluntary." That argument is based on NFO's proposed finding of fact 108. NFO bases an additional argument on its proposed findings of fact 105 to 113, inclusive. As we earlier noted in connection with paragraphs 173 to 183 of our findings of fact, we make the following findings of fact proposed by NFO in those nine paragraphs which read as follows:
105. Mid-Am's claim that NFO has engaged in an illegal tying arrangement is based solely upon the terms of the NFO membership agreement and the availability of NFO bargaining services for grain and livestock, as well as for milk.
106. In the NFO membership agreement, each member authorizes NFO to act as his "exclusive representative in collective bargaining in respect to all commodities marketed from my farm, with the exception of those commodities presently covered by other marketing contracts." (PX 226)
107. However, an NFO member is not bound to market his milk through NFO solely on the basis of his membership agreement. (Mid-Am Narrative ¶ 164, Tr. 1352)
108. The NFO dairy program is voluntary. (Mid-Am Narrative ¶ 1106, Tr. 1352; Mid-Am Responsive Narrative ¶ 2450, Tr. 1353)
109. Many NFO members who produce more than one commodity market some of their commodities through NFO and some through other channels. (Mid-Am Responsive Narrative ¶ 2448, Tr. 1353)
110. It is the policy of NFO that, when a farmer executes an NFO membership agreement, he is not precluded from participating in a cooperative. (Mid-Am Narrative ¶ 1563, Tr. 1353)
111. There is no evidence that any dairy farmer who switched from Mid-Am to NFO ever actually marketed any commodity other than milk through NFO.
112. There is no evidence of the extent of NFO's market power in grain or livestock bargaining or marketing in central and southwestern Missouri or southern Illinois at any time.
113. There is not even any evidence of record that NFO offered grain or livestock bargaining services in the geographic areas relevant to this litigation.
We conclude that four out of the five conclusions of law proposed by NFO in connection with Mid-Am's tying arrangement *429 claim are supported by the undisputed evidence in this case. We therefore state the following conclusions of law in regard to Mid-Am's tying arrangement claim:
20. The "exclusive representative" clause in NFO's membership agreement is not a tying arrangement violative of Section 1 of the Sherman Act.
21. [NFO proposed in this paragraph that we conclude a Capper-Volstead Act exemption is applicable. We need not and do not reach that question for the reasons we have already stated.]
22. Mid-Am's concession that the NFO dairy program is voluntary for NFO members precluded judgment for Mid-Am on its claim that farmers who wished to use NFO's livestock and grain-marketing services must market their milk through NFO.
23. Failure to prove the strength of NFO's market position in grain or livestock marketing or a causal relationship between the "exclusive representative" clause and Mid-Am producers' switch to NFO or even the existence of NFO grain and livestock marketing services in Missouri and southern Illinois bars judgment for Mid-Am on its tying arrangement claim.
24. Failure to prove that the "exclusive representative" clause in NFO's membership contract is unreasonable bars judgment for Mid-Am on this portion of its Section 1 Sherman Act claim.

Conclusions of Law Regarding NFO's Alleged Unfair Trade Practices
Mid-Am's proposed conclusions of law regarding NFO's alleged unfair trade practices were based upon the assumption that findings of fact as stated in paragraphs 196 to 216 of its proposed findings of ultimate fact would be made in substantially the same form as proposed by Mid-Am. Comparison of the findings of fact as proposed by Mid-Am with those actually found by this Court reflects our view that Mid-Am has not carried the burden of proof in regard to the requisite factual circumstances necessary to support its legal theory in regard to NFO's alleged unfair trade practices.
Of at least equal, and perhaps even greater, importance is the fact that Mid-Am's post-trial brief reflects that part IX of that brief, entitled "N.F.O. conspired with others to use unfair trade practices to eliminate Mid-Am from bargaining for producers," was based primarily on the rationale of Albert-Pick-Barth Co. v. Mitchell Woodbury Corp., 57 F.2d 96 (1st Cir. 1932), cert. den. 286 U.S. 552, 52 S.Ct. 503, 76 L.Ed. 1288 (1932), and the progeny of that case. Mid-Am concluded the argument made in that section of its brief by stating (on page 64) that: "Clearly, under the Pick-Barth doctrine and the later decisions recognizing and following the Pick-Barth doctrine, N.F.O. conspired and combined to use `unfair trade practices' to eliminate Mid-Am from bargaining."
While the Pick-Barth rule had been cited and discussed in many of the district courts in the Eighth Circuit at the time the Phase I briefs were filed in this case, the Court of Appeals for the Eighth Circuit did not render any definitive decision in regard to that rule until it decided Stifel, Nicolaus & Co. v. Dain, Kalman & Quail, 578 F.2d 1256 (8 Cir. 1978) on June 15, 1978. In that case, after approving Chief District Judge McManus's detailed and comprehensive discussion of the present status of the Pick-Barth rule in his excellent district court opinion, see D.C. 430 F.Supp. 1234 at 1237-42, the Court of Appeals concluded that:
We do not consider that this circuit has categorically either accepted or rejected the rule of Pick-Barth, either as originally announced or as modified. As a matter of policy, we decline to adopt it in present context. We do not think that the type of unfair competition charged here should be characterized as a per se violation of § 1 of the Act....
Where, as here, an antitrust plaintiff alleges nothing more than ... unfair business practices ... but does not allege any public injury resulting from the defendant's conduct, plaintiff must seek relief at common law and not under § 1 of the Sherman Act. Id. at 1260-61
*430 In footnote 6 on page 1261, the Court of Appeals added:
Allegations that the predator is a significant factor in the market and has acted with intent to destroy plaintiff as a competitor do not transform such unfair business practices into per se Sherman Act § 1 violations.
We reject the seven conclusions of law proposed by Mid-Am in connection with its unfair practices claim.[22]
Mid-Am's proposed conclusions are rejected because they are not supported by the weight of the evidence and because those proposed conclusions are inconsistent with the view most recently stated by our Court of Appeals in regard to the Pick-Barth rule in Stifel, Nicolaus & Co. v. Dain, Kalman & Quail, supra.
We accept the following conclusions of law as proposed by NFO in regard to Mid-Am's claims regarding NFO's alleged unfair practices:
25. NFO's procurement of USDA qualification as a milk-marketing association under the Agricultural Marketing Agreement Act, regardless of how it was accomplished, had the effect of enhancing competition in federal-order markets and is therefore wholly consistent with the policy and purposes of Section 1 of the Sherman Act.
26. The absence of proof that a reduction in taxes or some other financial benefit resulted in NFO's claim of tax exemption under Section 501(c) of the Internal Revenue Code, regardless of the propriety or purpose of such claim, bears no relationship to competition and therefore cannot be the basis for finding a Section 1 Sherman Act violation.
27. In the absence of proof that a reduction in interest rates or some other financial benefit resulted from those aspects of NFO's fund-raising or financing activities that Mid-Am attacks as securities law violations, those activities bear no relationship to competition and therefore cannot be the basis for finding a Section 1 Sherman Act violation.
28. Milk handlers, processors, haulers, and brokers who entered into normal business relationships with NFO as it pursued the NFO program for collectively marketing milk of its dairy-farmer members did not thereby become co-conspirators in any course of conduct intended by NFO to injure Mid-Am or interfere with the contractual relationships between Mid-Am and its members.
29. The record of evidence as to the involvement of outsiders in the various activities *431 Mid-Am attributes to NFO is not sufficient to establish a combination or conspiracy violating Section 1 of the Sherman Act.
30. Milk haulers, milk brokers, bottling plants, manufacturing plants, and any other persons who entered into normal business relationships with NFO and its members in their marketing of milk did not thereby conspire or combine with NFO in violation of Section 1 of the Sherman Act.
31. Mid-Am has not sustained its burden of proving that the purpose behind NFO's dairy program was to eliminate Mid-Am from the market of representing dairy farmers.
32. Mid-Am has not, in any event, met its burden of proving that any of NFO's conduct was unreasonable, and only unreasonable restraints of trade violate Section 1 of the Sherman Act.

Conclusions of Law In Regard to Mid-Am's Robinson-Patman Claim
Mid-Am's Robinson-Patman claim, for which it seeks no specific damages, is based upon paragraphs 217 to 222, inclusive, of its proposed findings of ultimate fact. Our findings of fact show that we found only the facts as they had been stipulated and that we rejected the inferences which Mid-Am would have this Court make from the undisputed factual data. Mid-Am's proposed conclusions of law are set forth in the footnote below.[23]
We find and conclude that the stipulated factual circumstances of this case, when considered in light of all other facts and circumstances established by the additional evidence at trial, do not support Mid-Am's Robinson-Patman claim. See Federal Trade Com'n. v. Broch & Co., 363 U.S. 166, 168-169, 80 S.Ct. 1158, 4 L.Ed.2d 1124 (1960).
While we do not believe that Waters v. National Farmers Organization, Inc., 328 F.Supp. 1229 (S.D.Ind.1971), can be said to support NFO's Capper-Volstead exemption argument (for the reason that, as Sunkist II said about Sunkist I, the question of non-producer members was not in focus in the earlier case), we agree with Chief Judge *432 Steckler's conclusion and discussion in that case in regard to § 2(c) of the Clayton Act as amended by the Robinson-Patman Act.
We therefore state the four following Robinson-Patman Act conclusions of law, keyed to the conclusions proposed by NFO:
33. The "services rendered" fee provided for in NFO's supply contracts does not violate Section 2(c) of the Clayton Act.
34. The "services rendered" fee is not a Section 2(c) violation in any event since Mid-Am has not shown that the purchasing processors and bottlers failed to make the same or similar payments or benefits available to non-NFO members or their organizations.
35. Mid-Am failed to prove that processors and bottlers signing NFO supply contracts in fact discriminated against other producers or producer organizations.
36. Failure to claim or prove damages attributable in any way to NFO's supply contracts deprives Mid-Am of a cause of action under Section 2(c) and Section 4 of the Clayton Act against NFO on the basis of such supply contracts.

CONCLUSIONS OF LAW IN REGARD TO NFO'S ALLEGED VIOLATION OF MISSOURI LAW
Mid-Am proposed the following two conclusions of law in regard to NFO's alleged violation of Missouri law:
50-1. NFO through its officers and employees knowingly induced members of Mid-Am, a Kansas Cooperative Marketing Association, duly qualified to do business in Missouri, to break their marketing contracts with Mid-Am in violation of Section 274.260, R.S.Mo.1969, and is liable to Mid-Am in these proceedings for a civil penalty of $500 for each such offense.[24]
50-2. This Court has jurisdiction over this matter due to diversity of citizenship of the parties, 28 U.S.C. 1332, and by virtue of pendant [sic] jurisdiction resulting from the original jurisdiction claims of plaintiff alleging defendants violation of 15 U.S.C. 1.
Mid-Am argues that the evidence "clearly establishes" that NFO violated Mo.Rev. Stat. § 274.260. Mid-Am's argument that NFO "knowingly induced members of Mid-Am ... to break their marketing contracts with Mid-Am," as proposed in conclusion 50-1, is based on the theory that such an inference should be drawn from the undisputed fact that when NFO employees solicited dairy farmers in central and southwest Missouri to get a supply of milk for the NFO reload program, those NFO employees knew of facts which indicated the probability that those dairy farmers may have had existing marketing agreements with Mid-Am.
Mid-Am further argues that the stipulated fact that over sixty dairy farmers who were contacted by NFO employees ceased to market with Mid-Am some two months after such a contact supports an inference that what may have been said by the NFO employees in fact induced the dairy farmer to break his marketing agreement with Mid-Am and the further inference that a breach of contract did in fact occur.
NFO argues that § 274.260 is a penal statute and that Mid-Am's claim based on that statute must be dismissed because the Court lacks jurisdiction over the subject matter. NFO relies upon language and principles stated in State of Wisconsin v. Pelican Ins. Co., 127 U.S. 265, 8 S.Ct. 1370, 32 L.Ed. 239 (1888) and Huntington v. Attrill, 146 U.S. 657, 13 S.Ct. 224, 36 L.Ed. 1123 (1892), to support its jurisdictional argument. NFO further argues that "quite aside from having a jurisdictional problem, Mid-Am simply has not put together a case under the State statute."
*433 We are not impressed with and do not accept NFO's argument that § 274.260 is a penal statute and that this Court has no jurisdiction to enforce the same. Section 274.260 was adopted by the State of Missouri in 1923 at a time when similar statutes were being passed by many of the other States. See Warehouse Co. v. Tobacco Growers, 276 U.S. 71, 48 S.Ct. 291, 72 L.Ed. 473 (1928), in which the Supreme Court concluded that §§ 26 and 27 of the Bingham (or Standard) Cooperative Marketing Act of Kentucky did not violate the Constitution. Section 26 of the Kentucky Act contained in substance the same provisions as does Missouri 274.260. The Court observed in Tobacco Growers that "cooperative marketing statutes substantially like the one under review have been enacted by forty-two States."[25]
We are satisfied that most courts would label such legislation to be "remedial" rather than "penal" and, after an appropriate attachment of label, would thereafter permit enforcement of the civil remedy therein provided. So far as this case is concerned, the question is moot because we do not believe that the evidence adduced by Mid-Am is sufficient to support the factual assumptions upon which its proposed conclusions of law rely. Our findings of fact show that we rejected Mid-Am's proposed findings of fact that "NFO solicited members of Mid-Am (224) to breach their milk marketing agreements with Mid-Am;" (225) "... to withhold their milk from Mid-Am in violation of their milk marketing agreements;" and (226) "... to market their milk through NFO instead of Mid-Am in violation of their milk marketing agreements with Mid-Am." (emphasis ours). We also rejected Mid-Am's proposed finding of fact 231 which stated that "NFO induced the following Missouri dairy farmers to break their marketing contracts with Mid-Am: [naming 68 Missouri dairy farmers]." [emphasis ours]
The names of the 68 dairy farmers listed in Mid-Am's proposed finding 231 were taken from Plaintiff's Exhibit 99 (Exhibit A of plaintiff's damage summary), Plaintiff's Exhibit 98 (Exhibit B of plaintiff's damage summary), and Plaintiff's Exhibit 97 (Exhibit B-2 of plaintiff's damage summary). In its effort to support paragraph 231 of its proposed finding of ultimate fact, Mid-Am directed attention to the paragraphs of the stipulation of facts which stated in regard to some but not all the dairy farmers listed in paragraph 231, that, for example, "on January 21, 1970, Hills [an NFO employee] talked to John Watterson, Mansfield, Missouri, Wright County (Hills Exhibit 42)" [emphasis ours]. Other evidence in the case would support a finding that John Watterson, for further example, did, in fact, cease shipping with Mid-Am on March 10, 1970.
Examination of Mid-Am's Exhibit 99 establishes that most of the persons listed on that exhibit were "talked to" by Hills on some date in the month of January, 1970 and that most of those persons ceased shipping with Mid-Am sometime during the month of March, 1970. There is no direct evidence, however, that Hills attempted to induce Watterson to break his marketing agreement with Mid-Am. Indeed, there is no substantial evidence that Watterson may have in fact breached his contract when he ceased shipping with Mid-Am. The same thing is true of the other persons listed in Mid-Am's paragraph 231.
The evidence further shows that some of the dairy farmers listed on Mid-Am's three damage exhibits never executed any marketing agreement with Mid-Am at any time and that a substantial number of the dairy farmers listed had signed agreements with Square Deal Milk Producers Association, Producers Creamery Company, and Sanitary Milk Producers, all predecessors of Mid-Am. Each of the four different kinds *434 of contracts attached to Mid-Am's damage exhibits contain different termination provisions.
The prime difficulty with Mid-Am's proof lies in the fact that with the possible exception of one producer, there simply is no substantial evidence of breach of any contract. The stipulated fact that NFO solicited members of Mid-Am to market their milk through NFO, standing alone, simply does not support a finding of fact or a conclusion of law that NFO's solicitation was for the purpose of inducing all dairy farmers marketing through Mid-Am to break their contracts within the meaning of § 274.260. We therefore reject Mid-Am's proposed conclusions of law for the reasons stated.
NFO proposed nine conclusions of law contained in its paragraphs 37 to 45, inclusive, in regard to Mid-Am's violation of Missouri law claim. We reject all of NFO's proposed conclusions of law except those proposed in paragraphs 39 and 40. Those paragraphs, as modified, are as follows:
39. The evidence does not support a finding that NFO knowingly induced Mid-Am members to breach their marketing contracts with Mid-Am in violation of Missouri Rev.Stat. 274.260.
40. Mid-Am's evidence regarding the departure of its members who shifted to NFO does not establish that they in fact breached their contracts.

CONCLUSIONS OF LAW IN REGARD TO PLAINTIFF'S DAMAGES
The findings of fact made and the conclusions of law heretofore stated require that judgment be entered for NFO on all of the claims asserted by Mid-Am in connection with Phase I of this litigation. It is therefore obvious that we need not and therefore do not reach the merits of Mid-Am's claim for damages.
In order, however, that our memorandum opinion in regard to Phase I reflect all conclusions of law proposed by both parties, we set forth in the footnote below the single conclusion of law on damages proposed by Mid-Am and the single conclusion of law on damages proposed by NFO.[26]
An appropriate order therefore will be entered in regard to Phase I of this case which will direct the Clerk to enter judgment against Mid-Am in regard to its Phase I claim and in favor of NFO.

PHASE II FINDINGS OF FACT REGARDING NFO'S COUNTERCLAIM

Introduction
We have carefully considered all of the proposed findings of fact and all of the proposed conclusions of law submitted by the parties in connection with Phase II of this litigation. It is our ultimate determination that under all the facts and circumstances, NFO failed to carry the burden of proof in regard to all Phase II issues necessary to establish liability on the part of the counterclaim defendants. In order that this Court's findings and conclusions in that regard may be subject to meaningful appellate review, we have used NFO's proposed findings of fact as the basis for making our detailed findings of fact on the issue of liability. Our acceptance, modification, and rejection of each paragraph of NFO's proposed findings of fact in regard to liability *435 will clearly reveal our resolution of the various areas of factual dispute and our view of what inferences may properly be drawn from factual circumstances which were established either by the stipulations or admissions of the parties or by the weight of all the evidence adduced at trial as we viewed it.
Under our view of Phase II of this litigation, it is necessary that we consider and state our findings of fact only in regard to Parts I through X, inclusive (paragraphs 1 to 2017) of NFO's proposed findings of fact. The record should therefore show that we reject all of NFO's proposed findings of fact as contained in Parts XI to XV, inclusive (paragraphs 2018 to 2488), for the reason that all those findings are proposed in connection with NFO's claims of damages, issues which we need not and therefore do not reach in light of our determination of the liability issues presented in Phase II of this case.[27]
It should also be noted that our determination that NFO has failed to carry the burden of proof on the issues of liability makes it unnecessary to reach a number of other questions presented in Phase II of this case. Although many of the findings of fact proposed by Mid-Am, AMPI, and CMPC in Parts I to XII (paragraphs 1 to 8423, inclusive) of their joint proposed findings of fact reiterate those parties' detailed view of the evidence as stated, for the most part, in their joint response to NFO's proposed findings of fact, it is neither necessary nor appropriate to deal separately with the 8,423 paragraphs of those jointly proposed findings of fact.
ARSPC separately proposed the relatively small number of 305 findings of fact. Although a very substantial number of ARSPC's proposed findings are either expressly admitted by NFO in its response or are based upon documentary evidence, neither is it necessary to make the findings of fact proposed by ARSPC. Our Phase II conclusions of law will make clear that we agree with the findings proposed by ARSPC in its paragraphs 301 to 304 of the "Conclusions" section of its proposed findings of fact which actually present mixed findings of fact and conclusions of law in regard to whether NFO carried the burden of proving the particular matters discussed in each of those proposed findings.
Our view and determination of the liability issues of Phase II also makes it unnecessary to reach various other legal questions which include the questions (1) whether venue is proper in regard to CMPC; (2) whether NFO lacks standing under Section 4 of the Clayton Act; (3) whether NFO should be precluded from asserting its claims for damages for various alleged losses because of alleged violations of Pretrial Orders Nos. 10, 11, and 12; and (4) whether, in any event, NFO's damage evidence was so conjectural and speculative as to be inadmissible. Nor is it necessary to reach the Capper-Volstead and Clayton Act antitrust exemption claims made by Mid-Am, CMPC, and ARSPC in defense of NFO's Phase II counterclaim.
*436 It is for the reasons above stated that our findings of fact in regard to Phase II of this litigation will be keyed to the paragraphs 1 to 2017, inclusive, of NFO's proposed findings of fact. After making our findings of fact, we shall state our Phase II conclusions of law, keyed to those conclusions proposed by the respective parties.

I. The Case and the Parties

1. This action was brought by The National Farmers' Organization, Inc. (NFO), as counterclaim plaintiff, against Mid-America Dairymen, Inc. (Mid-Am), Associated Milk Producers, Inc. (AMPI), Central Milk Producers Cooperative (CMPC), and Associated Reserve Standby Pool Cooperative (ARSPC).
2. NFO claims that Mid-Am, AMPI, CMPC and ARSPC, in combination with others, have violated Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 and 2, and Sections 3 and 7 of the Clayton Act, 15 U.S.C. §§ 14 and 18, and seeks treble damages and injunctive relief as authorized by Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26.
3. NFO was formed in 1955 as a not-for-profit, non-stock corporation under Iowa law and has its principal office in Corning, Adams County, Iowa.
4. NFO is a national membership organization, having as its members farmers who produce all kinds of farm commodities. NFO, during relevant periods of time, had a small number of non-producer members.
5. Mid-Am is an agricultural cooperative organized in 1968 under the laws of the State of Kansas.
6. Mid-Am's headquarters is at Springfield, Missouri, and its principal states of operation are Minnesota, Wisconsin, Iowa, Nebraska, Kansas, Missouri, Illinois, Arkansas and Texas.
7. AMPI is an agricultural cooperative organized in 1969 under the laws of Kansas.
8. AMPI's headquarters is at San Antonio, Texas, and its principal states of operation are Wisconsin, Minnesota, Nebraska, South Dakota, Iowa, Kansas, Indiana, Illinois, Oklahoma, Arkansas and Texas.
9. CMPC is an agricultural cooperative organized in 1968 and existing under the laws of the State of Wisconsin.
10. CMPC's headquarters is at Chicago, Illinois, and its principal states of operation are Wisconsin and Illinois.
11. ARSPC is an agricultural cooperative organized in 1970 under the laws of Nebraska.
12. ARSPC's members consist of most of the major farmer cooperatives throughout the area generally referred to as the South and Midwest.
13. NFO claims that the defendants, with others, have jointly combined and conspired to fix, raise, or stabilize prices, restrain trade, monopolize, and attempt to monopolize the marketing of raw Grade A milk in the Midwestern United States and various sections thereof in violation of Sections 1 and 2 of the Sherman Act.
14. NFO also claims that AMPI and Mid-Am have engaged in mergers or acquisitions, the effect of which has been to substantially lessen competition or tend to create a monopoly in the marketing of raw Grade A milk in various sections of the Midwestern United States in violation of Section 7 of the Clayton Act.
15. NFO also apparently claims, but did not brief such claim, that AMPI, Mid-Am, CMPC and ARSPC have made sales or contracts for sale of raw Grade A milk, the effect of which has been to substantially lessen competition or tend to create a monopoly in the marketing of raw Grade A milk in various parts of the Midwestern United States in violation of Section 3 of the Clayton Act.

II. Trade and Commerce: Milk Marketing In General

A. Grade A Milk

16. Grade A milk is milk approved by individual state and/or local governmental authorities for sale as fluid milk for human consumption.
17. Unless milk is produced under sanitary conditions sufficient to meet the requirements *437 of local public health authorities for fluid consumption and classified as Grade A, the milk is classified as Grade B and may be used only in manufactured products.
18. Grade A milk is ultimately sold to consumers either in the form of fluid milk or as processed manufactured milk products, such as butter, cheese or powdered milk.
19. Grade A milk loses its Grade A status if it is commingled with Grade B milk.
20. Grade A milk is the only milk regulated and priced under the Federal Order System, administered pursuant to the Agricultural Marketing Agreement Act of 1937, 7 U.S.C. § 601, et seq.
21. Different and more strict sanitary conditions are needed for the production of Grade A milk, as compared to Grade B milk. Federal regulations apply only to Grade A milk. Grade A and Grade B milk may be put to different uses. Grade A milk which is not disposed of for fluid purposes, however, has the same value and is used to produce the same products as Grade B milk.

B. Supply and Assembly Patterns

22. Dairy cows are milked twice daily and their milk, if Grade A, is collected and stored in refrigerated "bulk tanks" on the farm until it is picked up by milk haulers, either daily or every other day.
23. Because fluid milk is highly perishable even when refrigerated, milk cannot be stored for extended periods of time and must be quickly transported to market.
24. Raw milk may be transported from the farm either to a "reload" or "receiving station" for reshipment to a "distributing" plant, or to a manufacturing plant either for processing into "hard products" or for reshipment in the form of fluid milk to "distributing" plants.
25. A distributing plant receives raw milk for processing into and subsequent distribution as fluid milk products.
26. In the states of Minnesota, Wisconsin, Iowa, Illinois, Missouri and Nebraska, the general practice is for a "milk hauler," operating on a "route," to pick up milk at farms every day in "farm tank trucks" which range in capacity from 15,000 pounds to approximately 30,000.
27. In the states of Minnesota, Wisconsin, Iowa, Illinois, Missouri and Nebraska, milk of several hauling routes may be combined or "reloaded" at a "reload plant" into an over-the-road tank truck of approximately 48,000 pound capacity for delivery to a plant distant from the point of production.
28. Generally, milk is delivered from a supply plant  i. e., a reload or manufacturing plant that reships the milk  to a regulated distributing plant in an over-the-road tank truck in order to minimize the unit cost of transporting milk.
29. Using large tank trucks, milk may be transported to markets over 1,000 miles from the production area.
30. Since at least 1950, large quantities of milk have been shipped daily from farmer-producers in one state to distributing or manufacturing plants ("handlers") in other states.
31. There is substantial interstate commerce involved in the production, assembly, shipment, sale, and processing of milk.
32. The quantity of milk produced, and therefore the supply of milk available to the bottler or manufacturer, fluctuates seasonally with the reproductive cycle of the dairy cow.
33. Milk production generally increases after calving season in the spring and early summer when pastures are most abundant.
34. Milk production generally declines during the summer and reaches the lowest point during the fall months.
35. In most areas of the United States, the demand for fluid milk is greatest in the early fall when milk production is near its lowest point.
36. As a result of the non-complementary patterns of supply and demand fluctuations, a milk production level sufficient to ensure an adequate supply of fluid milk in periods of maximum demand tends to create *438 surpluses, or reserves, of fluid milk during much of the remainder of the year.
37. As a result of climatic and topographical factors, dairy farms are most numerous and milk production is greatest in Minnesota and Wisconsin, which together account for approximately 25 percent of the nation's total annual milk production.
38. In the mid-1960's increasing numbers of producers in Minnesota and Wisconsin were converting from Grade B to Grade A milk production.
39. In the mid-1960's producers in the North who made the expenditures for conversion to Grade A expected to receive higher prices for their milk.
40. In order to receive a higher price for their Grade A milk, Northern producers have usually sought to have their milk associated with federal order markets and to receive federal order minimum prices.
41. The supply of Grade A milk in Minnesota and Wisconsin has been increasing since 1965 at a rate faster than the demand for fluid milk in the federal order areas that include any part of those states.
42. The production of Grade A milk in Minnesota, Wisconsin, and Iowa exceeds the demand for fluid milk in nearby metropolitan areas.

C. Federal Milk Marketing Regulations in General

43. A federal milk marketing order is an order issued by the U. S. Department of Agriculture (USDA) pursuant to the provisions of the Agricultural Marketing Agreement Act of 1937, as amended (7 U.S.C. § 601, et seq.) and applicable rules of practice and procedure relating to the handling of milk.
44. Federal milk marketing orders establish classes of, and minimum prices to be paid for, milk according to the form in which or the purpose for which milk is used or sold by a "handler" in a regulated marketing area.
45. A milk marketing order is established by the Secretary upon the petition of farmer-producers, after a hearing.
46. After receiving a petition, the Secretary of Agriculture makes a preliminary investigation to determine whether regulation of the proposed marketing area would tend to effectuate the declared policy of the Act.
47. If, after preliminary investigation, the Secretary determines that a milk marketing order would promote the purposes of the Act, a rule-making hearing is convened for the purpose of receiving evidence as to the appropriate provisions that should be included in the order.
48. A milk marketing order cannot become effective unless it is approved in a referendum vote by at least two-thirds ( 2/3 ) of the dairy farmers who are determined by the Secretary to be eligible to vote as "producers" under the proposed order.
49. The bloc-voting provisions of the Agricultural Marketing Agreement Act permit farmer cooperatives to cast the votes of their members as a bloc, and a proposed order or an amendment is approved upon the affirmative vote of cooperatives representing at least two-thirds ( 2/3 ) of the producers pooled under the order.
50. The Market Administrator is a USDA employee appointed by the Dairy Division to administer a federal milk marketing order.
51. A federal milk order regulates "handlers;" a "handler" generally is defined as the operator of a plant which receives Grade A milk: (a) for sale or distribution as fluid milk products in the regulated marketing area; or (b) for resale as raw milk to a regulated handler who sells or distributes fluid milk products.
52. A producer marketing association or cooperative may also qualify as a "handler" with respect to the milk of its members which the association causes to be delivered to the pool plant of another handler even though the association is not itself the operator of a pool plant.
53. Prior to 1974, most federal milk market orders had two use classifications for milk: Class I and Class II.
*439 54. In two-class orders, milk used to produce "fluid" products such as whole milk, low-fat milk, skim milk, buttermilk and sweet cream, was generally classified as Class I.
55. In two-class orders, milk used to produce "manufactured" products, such as ice cream, condensed and evaporated milk, milk powder, butter and cheese, was generally classified as Class II.
56. Federal orders establish minimum prices for each use classification of milk.
57. For Grade A milk that is not used for fluid consumption, a lower minimum Class II or Class III price is established at levels which approximate the value of Grade B or manufacturing grade milk used to produce dairy products such as powdered milk, butter and cheese.

D. Class II Pricing: The M-W Series

58. Consistently, over half of the manufacturing grade (Grade B) milk marketed in the United States is produced in Minnesota and Wisconsin.
59. Prices paid by manufacturing plants for Grade B milk in Minnesota and Wisconsin are not regulated.
60. Prices paid by manufacturing plants for Grade B milk in Minnesota and Wisconsin reflect conditions of supply, demand and competition.
61. Since dairy products manufactured from Grade A surplus milk (Class II milk in two-class orders) compete in the same national market with products manufactured from unregulated Grade B milk, almost all federal milk orders provide that the Class II price shall be the Minnesota-Wisconsin (M-W) Series price for the month.
62. The M-W Series price is calculated by the U. S. Department of Agriculture each month by sampling the prices paid by manufacturing plants for manufacturing grade milk in the Minnesota and Wisconsin production area.
63. The M-W price sample taken by the USDA does not include prices paid for Grade A milk diverted to manufacturing uses.
64. The first step in calculating the M-W Series price is estimation of the average price for the "base month," which is the month preceding that to which the M-W price estimate relates.
65. In the M-W sample used to estimate "base month" price, the USDA obtains reports from about 200 plants in Wisconsin and 120 in Minnesota, which plants purchase approximately 60 percent of the manufacturing grade milk sold in these states.
66. To obtain the current month's M-W Series price, USDA estimates the price change from the base month to the current month by reference to reports from 110 plants (about 40 in Minnesota and 70 in Wisconsin).
67. The average price derived from the sampling conducted by the USDA is referred to as the Minnesota-Wisconsin Series price, or M-W price, and serves as the basic formula price for establishing Class I, Class II and Class III minimum prices in most federal orders.

E. Class I Prices

68. The Class I price, for any month, in a federal milk order is established by adding a "Class I fluid differential" to the basic formula, or M-W price, for the second preceding month.
69. The higher Class I price is designed to compensate a producer for the extra cost of producing Grade A milk and to ensure an adequate supply of wholesome milk for the fluid market.
70. The "Class I fluid differential" in federal milk orders is ordinarily set at a level which is designed to reflect Grade A milk production costs, supply and demand for fluid milk, and the cost of transporting Grade A milk from the surplus production area of Minnesota and Wisconsin.
71. Class I minimum prices are lowest in the Minnesota and Wisconsin federal order markets and increase, with distance, from those markets at the rate, approximately, of 1.5 cents per cwt. for each 10 miles.
72. The amount by which Class I prices increase with distance (1.5 cents per cwt. for each 10 miles) may or may not be sufficient *440 to offset the cost of transporting the milk.
73. The "Class I fluid differentials" increase with distance from the surplus production area of Minnesota and Wisconsin to reflect the cost of transporting milk from those areas to markets to the South, Southeast and Southwest.

F. Blend Prices

74. "Reblending" is the process whereby a cooperative combines the proceeds from the sale of its members' milk in one or more markets and establishes a uniform pay price for all those members different from the federal order blend price in any market for any month.
75. Farmer-producers whose milk is pooled under a federal order receive, as a minimum, a "blend price" for their milk which is the weighted average of the Class I and Class II prices for the month.
76. As a simplified example of the blend price calculation: where the Class I price is $8.00 per cwt. and 1,000,000 pounds of milk is sold for fluid use during the period; and where the Class II price is $5.00 per cwt. and 500,000 pounds of milk is sold for use in manufactured products during the period, the blend price equals:

 8(10,000) + 5(5,000) = $7.00 per cwt.
 ____________________
 15,000

77. If the M-W or Class II price remains constant, the blend price in any federal milk order will fluctuate in direct relation with the relative quantity of milk sold under the order for Class I or fluid use.
78. When the amount of milk classified as Class I or fluid use in a federal order increases relative to the total quantity of milk priced under that order, the blend price increases.
79. When the amount of milk classified as Class I or fluid use in a federal milk order decreases relative to the total quantity of milk priced under that order, the blend price decreases.
80. The Class I minimum price is always higher than the announced federal milk order blend price.
81. In an order with two classes of milk, the Class II minimum price is almost always lower than the federal milk order announced blend price.
82. Federal order blend prices are usually higher than prices paid by unregulated plants for Grade B or manufacturing grade milk, except that, in Minnesota and Wisconsin, prices paid for manufacturing grade milk sometimes have exceeded the federal order blend prices at certain locations.

G. Class I Utilization

83. The amount of milk classified as Class I under a federal milk order expressed as a percentage of all milk classified and priced under that order during a month is referred to as the "Class I utilization" of that market for the month.
84. As a simplified example of the Class I utilization calculations: where 1,000,000 pounds of milk are classified as disposed of for Class I or fluid use during the period; and where 500,000 pounds of milk are classified as used to produce manufactured products during that same month, the Class I utilization is expressed as follows:

 1,000,000 = .66 or 66%
 _________
 1,500,000

H. The Pooling and the Producer-Settlement Fund

85. Each regulated handler in a federal milk order must account to the Market Administrator for the milk used in each classification on the basis of the minimum price for that classification and must pay his producer suppliers the federal order announced blend price; differences are eliminated through a Producer Settlement Fund administered by the Market Administrator.
86. The Producer Settlement Fund eliminates differences by requiring handlers who have a greater than average Class I utilization to pay into the fund the difference between the blend price which they paid their producer suppliers and the classified value of the milk they received while the fund pays handlers who have a lower than average Class I utilization the difference between the blend price which they paid their producer suppliers and the classified value of the milk they received.
*441 87. The operation of the producer settlement fund is illustrated as follows:

PRODUCER SETTLEMENT FUND CALCULATION
 FOR A GIVEN MONTH
 ASSUMPTIONS[*]
 A: Class I Price = $8.00
 B: Class I Quantity = 10,000 cwt.
 C: Class II Price = $5.00
 D: Class II Quantity = 5,000 cwt.
 E: Beatrice uses 10,000 cwt. of milk;
 7,000 cwt. in Class I and
 3,000 cwt. in Class II
 F: Foremost uses 5,000 cwt. of milk;
 3,000 cwt. in Class I and
 2,000 cwt. in Class II

 CALCULATIONS
Step 1: Beatrice pays its producer suppliers for: its
 Quantity (10,000 cwt.) × Blend Price
 ($7.00) = $70,000
Step 2: Beatrice owes the producer settlement fund:
 a) its Class I Quantity (7,000 cwt.) × Class I
 Price ($8.00) = $56,000
 b) its Class II Quantity (3,000 cwt.) × Class II
 Price ($5.00) = $15,000
 _______
 $71,000
 c) $56,000 + $15,000 = $71,000 - the amount
 paid producers ($70,000) = $1,000
Step 3: Foremost pays its producer suppliers for:
 its Quantity (5,000 cwt.) × Blend Price
 ($7.00) = $35,000
Step 4: Foremost owes the producer settlement fund:
 a) its Class I Quantity (3,000 cwt.) × Class I
 Price ($8.00) = $24,000
 b) its Class II Quantity (2,000 cwt.) × Class II
 Price ($5.00) = 10,000
 _______
 $34,000
 c) $24,000 + $10,000 = $34,000 - the amount
 paid producers ($35,000) = $1,000
Step 5: Beatrice pays the Fund $1,000 and the Fund
 pays Foremost $1,000

88. An individual producer who does not ship his milk through a qualified cooperative marketing association is entitled to receive the federal order blend price for his milk if it is deemed to have been received at a pool plant and pooled in the manner prescribed by the applicable federal milk order.
89. Milk received from a producer in any month at a plant which is regulated by a federal milk order is referred to as "pooled milk," and the plant operated by a regulated handler is referred to as a "pool plant."
90. The milk produced by an individual producer is included in a federal milk order pool for a relevant accounting period if some portion of the milk, as specified in each federal milk order, is deemed to have been received during the month at a "pool plant."
91. In quantities and in the manner specified by the provisions of the various federal market orders, Grade A milk may be diverted by a cooperative or regulated handler from the "pool plant" at which it is pooled, without being physically received at that plant, to unregulated manufacturing plants for non-fluid Class II or Class III uses.
92. Grade A milk properly diverted to an unregulated manufacturing plant (known as diverted milk) is pooled on a federal order as Class II or Class III milk by the cooperative or the diverting regulated handler, and the producers delivering diverted milk, or their marketing organization, will be entitled to receive federal order blend price for the diverted milk.
93. Grade A milk which is shipped by a handler regulated under one federal order to a handler regulated on a different federal order is "pooled" under the federal milk marketing system on the order from whose area it is shipped and is classified in the second order as "other order milk."
94. "Other order milk" is classified in accordance with the use to which it is put in the area to which it is shipped, but the farmer-producers of such milk (or their marketing organization) receive the blend price established under the federal order for the area in which the milk was first pooled.

I. Cooperative Qualification

95. A qualified cooperative marketing association is entitled to receive the order blend price for the milk of those members of the association whose milk qualified for pooling and for whom the association is marketing the milk, all as determined by the Market Administrator of the applicable federal milk order.
*442 96. A cooperative marketing association which is qualified as such by the USDA is entitled to receive the order blend price for the milk only for those members of the cooperative association for whom the cooperative association is actually marketing the milk, as determined by the Market Administrator.
97. [Rejected][28]
98. Statistics are available from the Market Administrators of the several orders to show the number of producers and the pounds of milk pooled by a cooperative marketing association on a given order in a specific month.

J. Geographic Marketing Areas

99. A precise geographic area is established for regulation by the order and, although federal milk marketing orders vary in size, many orders include portions of two or more states.
100. The determination of the geographic marketing area to be covered by a federal order is based, but only in part, on the area in which handlers compete for sales of fluid products.
101. The determination of the geographic marketing area covered by a federal order is based, but again only in part, on the location of the producers. The location of the producers is not, however, particularly significant because producers in Wisconsin, for example, may be pooled in Federal Order markets located as far away as New Jersey and New York.
102. Because the expense of transporting fluid milk to a market is usually borne by the producer, the net price that he receives for his milk is affected by the distance and the price level of the market to which his milk is delivered.
103. [Rejected]
104. The evidence in the case establishes that general movement of milk is in a southerly direction from Minnesota and Wisconsin to federal order areas located to the south of those States.
105. [Rejected]
106. [Rejected]
107. [Rejected]
108. Some local health inspection laws, which did not accept reciprocal inspections, have acted as barriers to the movement of milk from producers located distant from the inspecting jurisdiction to handlers regulated by an order in the inspecting jurisdiction.
109. [Rejected]
110. Other things being equal, most fluid milk processors prefer to purchase locally produced milk.
*443 111. Organizations of milk producers try to sell their milk to handlers for the highest possible price and at the lowest possible cost. Such organizations are not always able to do so.
112. Minimum Class I prices are different in each of the Federal Orders 30, 60, 61, 62, 64, 65, 68, 73, 106 and 126.
113. Blend prices may or may not vary among Federal Markets in general, and in each of Federal Orders 30, 60, 61, 62, 64, 65, 68, 73, 106 and 126 in particular.
114. [Rejected]
115. Producers or their marketing organizations compete for sales of milk to regulated handlers.
116. [Rejected]
117. [Rejected]

K. Cooperatives and Premiums

118. Because the milk production of individual dairy farms is small in relationship to the size of milk markets, the individual farmer has no market power and cannot affect the market price which is paid for the milk produced on his farm.
119. By functioning as a marketing agent for its members, a cooperative may be able to bargain with handlers for payment of prices in excess of the minimum federal order price.
120. The amount by which the cooperative-negotiated price exceeds the federal milk order minimum class prices paid by handlers to producers or associations of producers for milk sold to handlers is called a "premium."
121. Premiums negotiated by producer marketing associations are generally limited to milk disposed of for Class I uses and, when not so limited, are generally higher than those applied to milk disposed of for Class II uses.
122. A premium price may be eroded if other producers or associations of producers are willing to sell milk in the market at a lesser price.
123. Premium income is not a part of the federal milk market pool and is not computed into the blend price formula for the order.
124. Neither the obtainment nor the distribution of premium income is regulated by the federal milk marketing orders.
125. [Rejected]
126. The demand for fluid milk is relatively inelastic or unresponsive to changes in price.
127. Demand for Grade A milk to be used to make fluid milk products is relatively inelastic or unresponsive to changes in price.

III. Early Days of the Alleged Conspiracy

A. The Formation, Scope and Purposes of Associated Dairymen, Inc.

128. In the mid-1960's, increasing numbers of producers in Minnesota and Wisconsin were converting from Grade B to Grade A milk production.
129. In the mid-1960's, producers in the North who made expenditures for conversion to Grade A expected to receive higher prices for their milk.
130. In order to receive higher prices for their Grade A milk, northern producers have usually sought to have their milk associated with federal order markets and to receive federal order minimum prices.
131. The United States Supreme Court's Lehigh Valley Coop. v. United States, 370 U.S. 76, 82 S.Ct. 1168, 8 L.Ed.2d 345 (1962), decision may have resulted in changes in various Market Order provisions and may have made it easier for Northern milk to become pooled on Midwestern federal orders.
132. Associated Dairymen, Inc. (ADI) was formed as a common marketing agency in 1964.
133. Among the cooperatives which joined ADI in 1964 were AMPI predecessors:
Central Arkansas Milk Producers Association
Central Oklahoma Milk Producers Association
Central West Texas Milk Producers Association

*444 Madison Milk Producers Cooperative (Madison, Wisconsin)
Mid-Texas Milk Producers Association
North Texas Producers Association
Pure Milk Association (Chicago, Illinois)
Pure Milk Producers Association (Tulsa, Oklahoma)
and Mid-Am predecessors:
Des Moines Cooperative Dairy (Des Moines, Iowa)
Neosho Valley Cooperative Creamery Association (Erie, Kansas)
Nemaha Cooperative Creamery Association (Sabetha, Kansas)
Producers Creamery Company (Springfield, Missouri)
Pure Milk Producers Association (Kansas City, Missouri)
St. Joseph Milk Producers Association (St. Joseph, Missouri)
Sanitary Milk Producers (St. Louis, Missouri)
Shawnee County Milk Producers Association (Topeka, Kansas)
Sioux City (Iowa) Milk Producers Cooperative Association
Square Deal Milk Producers Association (Highland, Illinois)
Sunflower Dairy, Inc. (Valley Falls, Kansas)
134. Joining ADI sometime after June, 1964 were AMPI predecessors:
Pure Milk Products Cooperative (Fond du Lac, Wisconsin)
Mid-South Milk Producers Association (Memphis, Tennessee)
Cedar Valley Cooperative Milk Association (Waterloo, Iowa)
Producers Association of San Antonio (later known as South Central Texas Milk Producers Association)
Rochester Dairy Cooperative (Rochester, Minnesota)
Boyceville (Wisconsin) Farmers Cooperative Creamery Association
Five-Star Dairyland Cooperative (New Ulm, Minnesota)
Turtle Lake (Wisconsin) Cooperative Creamery Association
New Prague Dairy Products, Inc., (New Prague, Minnesota)
and Mid-Am predecessors:
Twin Cities Milk Producers Association (St. Paul, Minnesota)
Goodhue Cooperative Creamery Association (Goodhue, Minnesota)
St. Croix Valley Cooperative (Glenwood City, Wisconsin)
Lamar Creamery Company (Sulphur Springs, Texas)
North Star Dairy (St. Paul, Minnesota)
Bertha Cooperative Creamery Association (Bertha, Wisconsin)
Albert Lea Cooperative Creamery (Albert Lea, Minnesota)
135. [Rejected]
136. ADI functioned as a common marketing agency in Federal Orders which cover the geographic areas in which the Twin Cities, Des Moines, Eastern Iowa, Cedar Rapids, Iowa City, Omaha, Kansas City, Southern Illinois, St. Louis-Ozarks, Wichita, Neosho Valley, Oklahoma Metropolitan, Fort Smith, Central Arkansas, Memphis, North Texas, South Texas, Red River Valley, Central West Texas and Corpus Christi, respectively, were located. [This is not to be construed as a finding that those Federal Market Orders are "markets" within the meaning of the antitrust laws.]
137. The principal purpose of ADI was to get milk producers a higher price for their milk.

B. Mergers

138. ADI, from time to time, sought the advice of various agricultural economists, many of whom were professors at various land grant universities. Such a group, known as the Dairy Marketing Advisory Committee (DMAC) suggested courses of action for dairy farmers to follow.
139. Among other recommendations, DMAC recommended ADI member cooperatives to merge and thereby to achieve unity.
140. ADI, like NFO, encouraged dairy farmers to band together.
*445 141. On July 1, 1967, the original or "first" Mid-America Dairymen, Inc. was formed by the consolidation or merger of:
Pure Milk Producers Association of Greater Kansas City
Shawnee County Milk Producers Association
Nemaha Cooperative Creamery Association
Bennett Creamery Company (Ottawa, Kansas)
142. Prior to July 1, 1968, Producers Creamery Company of Springfield, Missouri had consolidated with, merged with, or acquired the following organizations:
Neosho Valley Cooperative Creamery Association Erie, Kansas
Des Moines Cooperative Dairy, Des Moines, Iowa
Lamar Creamery Company, Sulphur Springs, Texas
143. Prior to July 1, 1968, Square Deal Milk Producers, Highland, Illinois, had merged with, consolidated with, or acquired Greene County Milk Producers, Springfield, Missouri.
144. On July 1, 1968 Mid-America Dairymen, Inc. of Springfield, Missouri, was formed by the merger, consolidation, or acquisition of:
Producers Creamery Company, Chillicothe, Missouri
Producers Creamery Company, Spring-field, Missouri
Sanitary Milk Producers, St. Louis, Missouri
Square Deal Milk Producers, Highland, Illinois
Mid-America Dairymen, Inc., Kansas City, Missouri
145. During 1969, and on the dates indicated, Mid-America Dairymen, Inc. merged with, acquired, or consolidated with, the following:
2/1/69 Harrison County Dairy Producers Association, Inc. Bethany, Missouri
3/1/69 Standard Milk Company, Aurora, Missouri
4/1/69 St. Joseph Milk Producers St. Joseph, Missouri
4/1/69 Major Cheese Company, Ozark, Missouri
7/1/69 Sunflower Dairy, Inc., Valley Falls, Kansas
146. During 1970 and on the dates indicated, Mid-Am merged with, acquired, or consolidated with, the following:
4/1/70 Central States Dairy Cooperative, Omaha, Nebraska
4/1/70 Twin City Milk Producers Association St. Paul, Minnesota
5/1/70 North Star Dairy, St. Paul, Minnesota
5/1/70 Pure Milk Products Company, Winstead, Minnesota
5/1/70 Wilsey-Bennett of Oklahoma, Inc., Oklahoma City, Oklahoma
7/1/70 Crofton Cooperative Creamery, Crofton, Nebraska
7/1/70 Red Oak Grove Cooperative Creamery Association Austin, Minnesota
7/1/70 Welcome Creamery Company, Welcome, Minnesota
7/1/70 Hutchinson Creamery Association Hutchinson, Minnesota
7/1/70 Tri-County Dairy Cooperative, Winthrop, Minnesota
7/1/70 North Star Dairy-Lakes Region Fergus Falls, Minnesota
7/1/70 Zumbro Valley Dairy Association Goodhue, Minnesota
8/1/70 Benson Cooperative Creamery, Benson, Minnesota
8/1/70 Bertha Cooperative Creamery, Bertha, Minnesota
8/1/70 West Side Cooperative Creamery Association Little Falls, Minnesota
8/1/70 Essig Cooperative Dairy Association Essig, Minnesota
8/1/70 Winthrop Cooperative Creamery Association Winthrop, Minnesota
8/1/70 Whetstone Valley Dairy Producers Twin Brooks, South Dakota
9/1/70 Northfair Dairy, Winthrop, Minnesota
9/1/70 Sigel Cooperative Creamery, New Ulm, Minnesota
9/1/70 Gaylord Cooperative Creamery Association Gaylord, Minnesota

*446 9/1/70 Farmers Cooperative Creamery Association Lafayette, Minnesota
10/1/70 Klossner Cooperative Creamery Association Klossner, Minnesota
11/1/70 Vining Cooperative Creamery Association Vining, Minnesota
12/1/70 Dent Cooperative Creamery Association Dent, Minnesota
147. Prior to its April, 1970 merger with Mid-Am, Twin Cities Milk Producers Association consolidated with, merged with, or acquired the following organizations:
St. Croix Valley Cooperative Dairies, Glenwood City, Wisconsin
Centra-Sota Dairy Association, Monticello, Minnesota [which had previously consolidated with, merged with, or acquired the following organizations:]
Buffalo Cooperative Creamery Association Santiago, Minnesota
Farmers Cooperative Creamery Association Sauk Rapids, Minnesota
Monticello Cooperative Association, Monticello, Minnesota
148. Prior to its April, 1970 merger with Mid-Am, Central States Dairy Cooperative had previously been formed by merger of:
Nebraska-Iowa Non-Stock Cooperative Milk Association [which had picked up Sioux City Milk Producers Association]
Farmers Union Cooperative Creamery, Superior, Nebraska
Farmers Cooperative Creamery, Fullerton, Nebraska
149. Prior to its merger with Mid-Am, North Star Dairy-Lakes Region had previously consolidated with, merged with, or acquired the following organizations:
Fergus Falls Dairy, Fergus Falls, Minnesota
Lakes Dairy Cooperative, Detroit Lakes, Minnesota
150. Prior to its merger with Mid-Am, Red Oak Grove Cooperative Creamery Association had previously consolidated with, merged with or acquired the following organizations:
Albert Lea Cooperative Creamery Association Albert Lea, Minnesota
151. During 1971, and on the dates indicated, Mid-Am acquired, merged with, or consolidated with the following:
1/1/71 St. James Creamery Association St. James, Minnesota
1/1/71 Frazee Creamery Company, Frazee, Minnesota
1/1/71 Hawley Creamery Association, Hawley, Minnesota
2/1/71 Home Town Dairies, Inc., Iowa City, Iowa
4/1/71 Ulen Cooperative Creamery, Ulen, Minnesota
4/1/71 Ashby Cooperative Creamery Association Ashby, Minnesota
4/1/71 Evansville Cooperative Creamery Association Evansville, Minnesota
5/1/71 Elbow Lake Cooperative Creamery Association Elbow Lake, Minnesota
5/1/71 Erhard Cooperative Creamery Company Erhard, Minnesota
6/1/71 Battle Lake Cooperative Creamery Association Battle Lake, Minnesota
10/1/71 Emma Creamery Company, Emma, Missouri
152. On September 1, 1967, MPI was formed by the merger, acquisition, or consolidation of:
Central Arkansas Milk Producers Association Little Rock, Arkansas
Pure Milk Producers Association of Eastern Oklahoma Tulsa, Oklahoma
South Texas Producers Association, Houston, Texas
North Texas Producers Association, Arlington, Texas
Mid-Tex Milk Producers Association, Austin, Texas
153. Between September, 1967 and prior to October 1, 1969, and on the indicated dates, MPI merged with, consolidated with, or acquired the following:
11/1/67 Central Oklahoma Milk Producers Association Oklahoma City, Oklahoma
11/1/67 Southwest Dairymen, Inc., Wichita, Kansas
12/1/67 Central West Texas Milk Producers Association Abilene, Texas
12/1/67 Gold Star Dairy, Mangum, Oklahoma

*447 1/1/68 South Central Texas Milk Producers Association San Antonio, Texas
1/1/68 Golden Spread Independent Dairymen's Association, Inc., Booker, Texas
4/1/68 Dairy Farmers Association, Inc. Albuquerque, New Mexico
4/1/68 Gold Spot Dairy, Inc., Enid, Oklahoma
9/1/68 Mid-South Milk Producers Association Memphis, Tennessee
Spring, 1969 Jere Dairy, Grand Prairie, Texas
7/1/69 Five Star Dairyland Cooperative, Inc. New Ulm, Minnesota
8/1/69 South Shore Cooperative Creamery South Shore, South Dakota
8/1/69 Minn Valley Milk, Belle Plaine, Minnesota
9/16/69 Washington County Cooperative Creamery Company Linn, Kansas
154. During October and November, 1969 AMPI was formed by merger, consolidation, or acquisition of the following organizations on the indicated dates:
10/1/69 Boyceville Farmers Cooperative Creamery Boyceville, Wisconsin
10/1/69 Milk Producers, Inc., San Antonio, Texas
10/1/69 Rochester Dairy Cooperative, Rochester, Minnesota
10/1/69 Turtle Lake Cooperative Creamery Association Turtle Lake, Wisconsin
11/1/69 Albion Cooperative Creamery Company Albion, Wisconsin
11/1/69 Antigo Milk Products Cooperative Antigo, Wisconsin
11/1/69 Burlington Cooperative Pure Milk Association Burlington, Wisconsin
11/1/69 Madison Milk Producers Cooperative Dairy Madison, Wisconsin
11/1/69 Pure Milk Association, Chicago, Illinois
155. During 1969 and on the dates indicated, AMPI merged with, acquired, or consolidated with, the following:
10/1/69 Farmers Cooperative Creamery Association Deer Creek, Minnesota
10/1/69 Farmers Cooperative Dairy Association Howard Lake, Minnesota
10/15/69 Grey Eagle Cooperative Creamery Association Grey Eagle, Minnesota
11/1/69 Delano Cooperative Creamery Association Delano, Minnesota
12/1/69 Cedar Valley Cooperative Milk Association Waterloo, Iowa
12/1/69 Farmers Dairy & Produce Cooperative Freeman, South Dakota
12/1/69 Lafayette Cooperative Creamery Lafayette, Wisconsin
12/1/69 Le Center Cooperative Creamery Le Center, Minnesota
12/1/69 Ludington Cooperative Creamery Association Fall Creek, Wisconsin
12/1/69 New Prague Dairy Products, Inc. New Prague, Minnesota
12/1/69 Osceola County Cooperative Creamery Association Sibley, Iowa
12/1/69 Southern Dairy Association, Owatonna, Minnesota
156. During 1970, and on the dates indicated, AMPI merged with, consolidated with, or acquired the following:
1/1/70 Blakely Cooperative Creamery Association Belle Plaine, Minnesota
1/1/70 Central Indiana Dairymen's Association Indianapolis, Indiana
1/1/70 Farmers Cooperative Creamery, Hull, Iowa
1/1/70 O'Brien County Cooperative Creamery Sanborn, Iowa
1/1/70 O'Brien-Osceola Cooperative Creameries Odebolt, Iowa
1/1/70 Webster Cooperative Dairy Association Webster, Minnesota
1/15/70 Arlington Cooperative Creamery Association Arlington, Minnesota
2/1/70 Alamo Milk Producers, San Antonio, Texas
4/1/70 Farmers Cooperative Creamery Association Pelican Rapids, Minnesota
4/1/70 Otisco Cooperative Creamery Association Otisco, Minnesota
4/1/70 Stark-Sleepy Eye Farmers Creamery Association Sleepy Eye, Minnesota
5/1/70 Audubon Cooperative Creamery Association Audubon, Minnesota

*448 5/1/70 Farmers Cooperative Creamery Association Grasston, Minnesota
6/16/70 Hartland Creamery Association Hartland, Minnesota
6/16/70 Range Cooperative Creamery Association Amery, Wisconsin
7/1/70 Cornland Milk Products Cooperative, Lytton, Iowa
8/1/70 Pure-Vac Dairy Products Corporation Memphis, Tennessee
9/1/70 Adams Cooperative Creamery Association Adams, Minnesota
9/1/70 Twin Dairies Association of Courtland and Nicollet, Nicollet, Minnesota
10/1/70 Marathon-Clark Cooperative Dairy Association Abbottsford, Wisconsin
11/25/70 Wilsey-Bennett (half interest from Mid-Am)
157. During 1971 and on the dates indicated, AMPI merged with, acquired, or consolidated with the following:
1/1/71 Maquoketa Valley Cooperative, Arlington, Iowa
1/14/71 Kenosha Milk Producers Cooperative, Inc. Kenosha, Wisconsin
2/1/71 Rushford Cooperative Creamery Association Rushford, Wisconsin
4/1/71 Brownsdale Creamery Association Brownsdale, Minnesota
5/1/71 Plainview Farmers Cooperative Creamery Plainview, Nebraska
5/1/71 Pure Milk Products Cooperative Fond du Lac, Wisconsin
9/1/71 Buffalo Center Cooperative Creamery Association Buffalo Center, Iowa
9/1/71 Humboldt Cooperative Creamery Association Humboldt, Iowa
9/1/71 Tri-County Cooperative Drying Association Whittemore, Iowa
11/1/71 Western Wisconsin Dairies Cooperative Blair, Wisconsin

Percentages of Milk Pooled by AMPI and Mid-Am on Various Federal Orders
158-167. [NFO based the group of findings proposed in its paragraphs 158-167 on NFO Exh. 860, an exhibit not designated in accordance with Pre-Trial Order No. 12. That exhibit, however, purports to set forth data compiled by the USDA. NFO described NFO Exh. 860 as "merely a demonstrative exhibit computing what percentages of the total milk pooled on each federal order was pooled by AMPI and Mid-Am." Because we do not consider that the data contained in NFO Exh. 860 adds any substantial weight to NFO's proof, we set forth some of the data from that exhibit in our findings as stated in paragraphs 158 to 167. As was true in regard to our finding in paragraph 136 above, our findings in paragraphs 158 to 167 are not to be construed as findings that the various Market Orders referred to are "markets" within the meaning of the antitrust laws.]
158. From 1969 to 1975, AMPI pooled the following percentages of milk pooled on Order 30:

1969 25%
1970 26%
1971 50%
1972 49%
1973 46%
1974 44%
1975 41%

159. From 1969 to 1975, Mid-Am pooled the following percentages of the total milk pooled on Order 60:

1969 0%
1970 5%
1971 17%
1972 25%
1973 28%
1974 31%
1975 29%

160. From 1969 to 1975, AMPI and Mid-Am pooled the following percentages of the total milk pooled on Order 61:

 AMPI % Mid-Am %
1969 15 0
1970 48 6
1971 52 13
1972 65 11
1973 67 11
1974 81 10
1975 97 0

*449 161. From 1969 to 1975, AMPI and Mid-Am pooled the following percentages of the total milk pooled on Order 62:

 Mid-Am % AMPI %
1969 93 1
1970 91 1
1971 94 1
1972 92 0
1973 92 0
1974 88 0
1975 88 0

162. From 1969 to 1975, AMPI and Mid-Am pooled the following percentages of the total milk pooled on Order 64:

 AMPI % Mid-Am %
1969 2 82
1970 2 86
1971 2 84
1972 2 82
1973 1 80
1974 1 79
1975 4 76

163. From 1969 to 1975, AMPI and Mid-Am pooled the following percentages of the total milk pooled on Order 65:

 AMPI % Mid-Am %
1969 0 0
1970 15 81
1971 16 82
1972 19 80
1973 23 76
1974 27 72
1975 29 67

164. From 1969 to 1975, AMPI and Mid-Am pooled the following percentages of the total milk pooled on Order 68:

 AMPI % Mid-Am %
1969 0 0
1970 1 59
1971 2 54
1972 1 48
1973 1 42
1974 2 36
1975 4 30

165. From 1969 to 1975, AMPI and Mid-Am pooled the following percentages of the total milk pooled on Order 73:

 AMPI % Mid-Am %
1969 96 0
1970 98 0
1971 97 0
1972 96 0
1973 85 10
1974 69 27
1975 70 26

166. From 1969 to 1975, AMPI and Mid-Am pooled the following percentages of the total milk pooled on Order 106:

 AMPI % Mid-Am %
1969 88 0
1970 87 1
1971 91 2
1972 93 2
1973 80 6
1974 89 5
1975 88 0

167. From 1969 to 1975, AMPI and Mid-Am pooled the following percentages of the total milk pooled on Order 126:

 AMPI % Mid-Am %
1969 69 11
1970 66 9
1971 61 8
1972 58 9
1973 61 10
1974 68 7
1975 71 5

168. [Rejected]
168(a). [Rejected]
169. [Rejected]
170. [Rejected]
171. [Rejected]
172. [Rejected]
173. [Rejected]

C. ADI Establishes a Standby Pool

174. ADI established a standby pool on September 1, 1967.
*450 175. On September 1, 1967, 50 cents per cwt. Class I premiums were established by ADI member cooperatives throughout most of the Midwest.
176. [Rejected]
177. The ADI standby pool was established to provide an adequate supply of milk for deficient markets and to permit suppliers of that milk to share in the Class I sales of the market.
178. ADI executed standby pool contracts with various milk plants in Minnesota and Wisconsin, which gave ADI an exclusive option to purchase all milk handled by those plants and required the plants to use any milk not purchased by ADI to make manufactured products.
179. Many of the standby pool plants may have had milk associated with the Chicago order at some time prior to their joining the ADI standby pool.
180. Sanna, Inc. (Menominee, Wisconsin), a subsidiary and later a division of Beatrice Foods Company, and Falls Dairy (Jim Falls, Wisconsin), two of the original signatory ADI standby pool plants, were proprietaries.
181. [Rejected]
182. [Rejected]
183. [Rejected]
184. As ADI general manager Harold Nelson reported at a March 18, 1966 ADI Committee meeting, a time prior to the formation of CMPC, AMPI, Mid-Am and ARSPC, it was "necessary to establish some sort of standby pool, with payments from Southern markets in order that the increased Chicago Class I price will not result in drowning of the Chicago market with added milk now in unregulated plants."
185. All those in attendance at the March 18, 1966 ADI Committee meeting, called for the purpose of discussing action necessary for USDA to adopt a Class I price of $5.30 in Chicago, agreed, among other things, that ADI should "start now in Grade A milk only in standby pool" and should "deduct from all orders amount necessary to pay Chicago blend at location to standby plants." It was further agreed that a delegation would confer with "U.S. authorities" in Washington the following Tuesday, March 22, 1966.
186. [Rejected]
187. [Rejected]
188. Federated Dairy Cooperative (Federated), a common marketing agency for Chicago Order 30, was formed in 1959 by about 20 cooperatives, including Pure Milk Association (PMA), AMPI's principal predecessor in Order 30.
189. In 1966, Outagamie, Hillpoint, Columbus, Alto and Lake-to-Lake cooperatives, which were supplying Wanzer Dairy in Chicago, formed Chicagoland Dairy Sales, Inc. (Chicagoland).
190. The Chicago Market Order was terminated by the Secretary of Agriculture in early 1966 because producers representing at least 66 2/3 % of the total producers failed to approve amendments proposed for that Market Order.
191. After the Chicago Market Order was voted out, Chicagoland joined with others in the formation of Central Milk Sales Agency (CMSA) in 1967.
192. CMSA supported the ADI standby pool from September, 1967 on.
193. [Rejected]
194. CMPC, after it was organized, supported the standby pool.
195. CMPC contributed to the standby pool even though it was not a member.
196. [Rejected]
197. Every member of Associated Milk Dealers, Inc. (AMDI), an association comprising nearly all Chicago area milk bottlers, was a proprietary.
198. The following proprietaries were members of AMDI:
Country's Delight Milk Products, Inc. (a subsidiary of Certified Grocers, Inc.)
Borden, Inc.
Hawthorn-Mellody, Inc.
Dean Foods Company
Meadowmoor Dairy, Inc.
199. [Rejected]
*451 200. [Rejected]
201. [Rejected]
202. [Rejected]
203. [Rejected]
204. [Rejected]
205. [Rejected]
206. [Rejected]
207. [Rejected]
208. [Rejected]
209. [Rejected]
210. [Rejected]
211. ARSPC was formed on March 31, 1970 as a new cooperative whose sole function was to operate a standby pool.
212. ARSPC held its first meeting in St. Louis on April 16, 1970, and Joe Westwater was named general manager.
213. Of the 46 ARSPC directors, eleven were dairy farmer members of AMPI, six were dairy farmer members of Mid-Am, and six were dairy farmer members of DI.
214. Robert Alexander, a dairy farmer member of Mid-Am, became president of ARSPC.
215. Elbrege Sullivan and Avery Vose, who were also dairy farmer members of AMPI, became first vice-president and treasurer, respectively, of ARSPC.
216. The minutes of the organization meeting of ARSPC show that only two dairy farmer members of AMPI and only two dairy farmer members of Mid-Am were named to the original nine member executive committee of ARSPC.
217. J. Moser, a farmer member of DI, held one position on ARSPC's executive committee.
218. The minutes of the April 16, 1970 ARSPC Executive Committee meeting showed that Hanman and Wosje were named as members of ARSPC's twelve-man Operating Committee.
219. McWilliams (or Cope), Andy Anderson (AMPI North) and Keiffer Howard (or Joe Murphey) were also named on ARSPC's Operating Committee.
220. Morgan, Frank McDowell and Ross Buckley were also named as members of ARSPC's Operating Committee.
221. The organization meeting of ARSPC voted to approve and adopt a committee recommendation "that the Board now continue the 1¼ cent cwt. payment on Class I sales." The ARSPC Board, at a meeting immediately following the Organization Meeting, adopted a resolution which provided that "ARSPC collect the assessments on April milk sales of contributing members and commence payment to Standby Pool plants for milk receipts in May under contracts to be effective May 1st."
222. ARSPC used employees of AMPI's Chicago office as the milk routing agent of members of ARSPC.
223. [Rejected]
224. [Rejected]
225. [Rejected]
226. ARSPC was the successor to the ADI standby pool operation.
227. [Rejected]
228. [Rejected]
229. By fall, 1970 ARSPC increased its Class I assessment rate from 1¼ cents per cwt. to 2¼ cents per cwt.
230. [Rejected]
231. [Rejected]
232. During the years 1972 through 1974, the volume of Grade A milk eligible for fluid use which was delivered to plants and dealers in Wisconsin, Minnesota, and Iowa, excluding deliveries to handlers regulated under federal market orders, was as follows:

 (In Million Pounds)
 Wisc. Minn. Iowa Total
1972 1,090.3 566.3 0 1,656.6
1973 947.0 289.4 178.5 1,414.9
1974 1,213.0 141.4 0 1,354.5

233. During the years 1972 through 1974, ARSPC shipped the following amount of milk from standby pool plants to out-of-area plants:

*452
 (In Million Pounds)
1972 126.3
1973 233.8
1974 82.2

234. [Rejected]
235. During the years 1972 through 1974, the net volume of milk in the ARSPC standby pool was as follows:

 (In Million Pounds)
1972 1,376.1
1973 1,490.5
1974 1,304.1

236. [Rejected]
237. [Rejected]

D. AMPI/Mid-Am Alleged Agreements Not to Compete

238. [Rejected]
239. [Rejected]
240. [Rejected]
241. [Rejected]
242. [Rejected]
243. [Rejected]
244. [Rejected]
245. [Rejected]
246. [Rejected]
247. [Rejected]
248. [Rejected]
249. [Rejected]
250. [Rejected]
251. [Rejected]
252. [Rejected]
253. AMPI became a member of Mid-Am.
254. Mid-Am became a member of AMPI.
255. In June, 1970, AMPI and Mid-Am executed consignment agreements for marketing their respective members' milk as a common marketing agency in the Oklahoma Metropolitan, South Texas, Central Arkansas, and Wichita Federal Orders. AMPI Exh. 4546 establishes that a similar agreement was at one time executed in 1970 in regard to the North Texas Federal Order.
256. In June, 1970, pursuant to those agreements and common market agency, Mid-Am consigned some of its members' milk to AMPI for sale in the Oklahoma Metropolitan, North Texas, South Texas, Central Arkansas and Wichita Federal Order markets.
257. Mid-Am and AMPI entered into the consignment agreement covering the Wichita market in June, 1970 because there was a possibility that Mid-Am was going to begin making sales in Wichita.
258. In July or August, 1970, AMPI and Mid-Am extended their common marketing agency by executing consignment agreements covering the St. Louis-Ozarks, Nebraska-Western Iowa, Des Moines, Kansas City, Neosho Valley and Twin Cities Federal Order markets.
259. In January, 1971 under a similar arrangement, Mid-Am consigned some of its members' milk to AMPI for sale in Dairyland Order 61.
260. In April, 1971, and in a similar manner, Mid-Am consigned some of its members' milk to AMPI for sale in Oklahoma Order 106.
261. The Mid-Am/AMPI common market agency and their consignment agreements were actually implemented, with Mid-Am marketing AMPI milk in some areas and AMPI marketing Mid-Am milk in others.
262. Pursuant to a Mid-Am/AMPI common market agency and the applicable consignment agreement, Mid-Am offered to supply Grade A milk to Page Milk Company at Coffeyville, Kansas, and AMPI offered to supply Grade A milk to Page's Tulsa, Oklahoma plant.
263. [Rejected]
264. [Rejected]
265. The AMPI/Mid-Am consignment agreements referred to ARSPC in a "Whereas" clause which, in general, called upon the Association and Association member to give "uniform support" to ARSPC.
*453 266. It was ARSPC's cooperative policy to sell Reserve Pool milk only to participating member cooperatives.
267. [Rejected]
268. [Rejected]
269. [Rejected]
270. [Rejected]
271. [Rejected]
272. [Rejected]
273. AMPI and Mid-Am entered into a common marketing agency and activated a consignment agreement in the Nebraska-Western Iowa Order.
274. Mid-Am and AMPI agreed to allow the Order 65 Market Administrator to release to each of them the other's statistical data concerning pounds of milk pooled on the Order.
275. Beginning in 1970, and continuing until 1974, the Order 65 Market Administrator released AMPI's statistical data to Mid-Am and Mid-Am's to AMPI.
276. [Rejected]
277. [Rejected]
278. [Rejected]
279. [Rejected]
280. In 1971 Mid-Am, AMPI, and eight other dairy cooperatives were members of the M-W Association, a common marketing agency which announced prices for the sale of M-W Association members' milk to handlers regulated by Twin Cities Order 68.
281. [Rejected]
282. [Rejected]

E. Additional Merger Data

283. [Rejected]
284. As of April, 1969, it had been "the expressed goal of Associated Dairymen, Inc., for several years to have all dairy farmers (in the Mississippi Valley) in one organization."
285. [Rejected]
286. [Rejected]
287. In November, 1969, Alamo Milk Producers Association (Alamo) requested that Mid-Am merge with Alamo.
288. [Rejected]
289. Mid-Am refused to merge with Alamo.
290. AMPI merged with Alamo on February 1, 1970.
291. [Rejected]
292. As early as 1969, AMPI and Mid-Am discussed merger developments in Minnesota and Wisconsin.
293. The document which circulated the plan and agreement of the merger of Mid-Am, CSDC, and Twin City for approval (NFO Exh. 203, p. 31) stated that "the quickened pace of developments within the dairy industry necessitates prompt and immediate restructuring of the coops throughout the Midwest."
294. [Rejected]
295. [Rejected]
296. [Rejected]
297. [Rejected]
298. [Rejected]

F. CACF

299. AMPI, Mid-Am, and DI decided to form a common marketing association to be known as Central American Cooperation Federation (CACF) in late 1970.
300. CACF, with AMPI, Mid-Am and DI as incorporators and members, was incorporated in Kentucky in February, 1971.
301. AMPI, Mid-Am and DI were the only members of CACF at the time of incorporation.
302. [Rejected]
303. [Rejected]

G. Some Alleged Early Efforts Allegedly to Eliminate Outsiders

1. ADI Allegedly Tackles the Iowa Non-Member Problem

304. [Rejected]
305. In late 1967 there were substantial numbers of independent milk producers in Iowa.
306. In November, 1967 ADI attempted to encourage those independent producers to join a cooperative.
*454 307. [Rejected]
308. [Rejected]
309. [Rejected]
310. [Rejected]
311. [Rejected]
312. [Rejected]
313. On February 1, 1971, Mid-Am acquired Home Town Dairies.
314. After Mid-Am acquired Home Town, some of the independent farmers who had been shipping to Home Town became members of Mid-Am.

2. Mid-Am Allegedly Helps to Plug Rat Holes in MPI Territory

315. [Rejected]
316. [Rejected]
317. [Rejected]
318. [Rejected]
319. [Rejected]
320. [Rejected]
321. [Rejected]
322. [Rejected]
323. [Rejected]
324. [Rejected]
325. [Rejected]
326. [Rejected]

3. ADI Standby Pool Allegedly Works to Protect Mid-Am Premium

327. Hiland Dairy of Springfield, Missouri, obtained 100 percent of its supplies from Mid-Am after July 1, 1968.
328. In the late fall of 1969, Mid-Am instituted a Class I price increase of milk sold to Hiland Dairy.
329. Hiland Dairy objected to this Mid-Am price increase.
330. When Hiland refused to accept the price increase, Mid-Am refused to supply Hiland.
331. When Mid-Am refused to supply Hiland at Christmas, 1969, Hiland attempted to obtain milk from other sources.
332. [Rejected]
333. [Rejected]
334. [Rejected]
335. [Rejected]
336. Foremost at Springfield also objected to the Mid-Am premium in December, 1969 and attempted to obtain alternative supplies.
337. [Rejected]
338. [Rejected]
339. No standby pool milk has ever been shipped to Missouri.
340. [Rejected]

IV. NFO's Alleged Capability in Dairy

A. NFO Formation and Purpose

341. NFO was organized in 1955 as a farm protest group.
342. NFO is a membership organization.
343. By 1958, NFO members decided that NFO should start collective bargaining for all major farm commodities.
344. NFO operates nationwide and bargains for all major farm commodities.

B. NFO's Recruiting Efforts

345. Once NFO decided in 1958 to alter its purpose and start bargaining instead of protesting, NFO began soliciting dairy, meat and grain farmers and other persons to sign the NFO membership agreement.
346. [Rejected]
347. [Rejected]
348. From 1958 to 1965, NFO's primary activity was soliciting farmers to join NFO.
349. [Rejected]
350. [Rejected]
351. NFO is the only farm organization in the United States that markets milk, meat and grain.
352. [Rejected]
353. NFO at some times and in some places discussed its cull-cow program when it attempted to enlist dairy farmers to market milk through NFO.
354. [Rejected]

C. NFO Membership Structure

355. NFO is subdivided into (1) state organizations, (2) congressional district organizations; and (3) county organizations.
*455 356. NFO claimed to have state, congressional district and county organizations in Illinois, Iowa, Kansas, Minnesota, Missouri, Nebraska, Oklahoma, Texas and Wisconsin by at least 1969.
357. NFO claimed at the time of trial to have about 1,500 county organizations in 45 states but did not offer any documentary evidence to support its claim.
358. [Rejected]
359. The NFO county organizations were supposed to work directly with the NFO commodity departments.
360. Some of the NFO county organizations had separate county bargaining committees for dairy, meat and grain.
361. Some NFO county organizations held monthly meetings.
362. NFO employees appear at some county meetings from time to time and explain NFO commodity programs to farmers.
363. NFO county organizations were supposed to aid NFO employees in soliciting new production and new members.
364. Non-members of NFO are invited to and do attend some NFO county meetings.

D. NFO Marketing Structure

365. NFO now has commodity departments for dairy, meat, grain and specialties.
366. [Rejected]
367. NFO has had Meat, Grain, Specialty, Field Staff, and Public Information Departments since at least 1967.
368. The NFO Field Staff Department (1) recruits new members and (2) collects dues.
369. NFO also has an Accounting Department.
370. [Rejected]
371. [Rejected]
372. [Rejected]
373. [Rejected]
374. [Rejected]
375. [Rejected]
376. [Rejected]

E. Master Contracts

377. NFO developed master contracts for dairy, grain, cattle and hogs in about 1961.
378. In dairy, NFO had two types of master contracts  one for Grade A milk and one for manufacturing grade milk.
379. From about 1963 to 1967, NFO signed some milk processors up to NFO master contracts. The NFO Master Contract, however, was never activated.
380. [Rejected]
381. NFO interested a number of Midwestern dairy farmers in its master contract program.

F. The Holding Action

382. In late 1966, the NFO members voted to stage a milk holding action.
383. Prior to 1966, NFO had organized and staged holding actions in hogs, cattle and grain.
384. In March, 1967, NFO organized and staged a milk holding action which lasted about two weeks.
385. NFO's holding actions, insofar as they demonstrated the ability of NFO to influence farmers to hold their products for a higher price and to control the supply of farm commodities reaching the market, tended to strengthen the organization's position in collective bargaining.
386. An unidentified number of Midwestern dairy farmers supported the 1967 NFO milk holding action.

G. NFO Revamps Dairy Department

387. Ed Graf has been director of NFO's Dairy Department since 1968.
388. NFO hired Avila and Berkhahn as assistant directors of the NFO Dairy Department in 1968 and Scott in 1969.
389. The focus of the NFO dairy program in 1968 and 1969 was on the heavy dairy producing states in the Midwest: Wisconsin, Minnesota and Missouri.
390. NFO may have organized some Kansas and Nebraska dairy farmers as early as 1969.
*456 391. In 1968 and 1969, an unidentified number of farmers turned out for NFO organizational meetings in the heavy dairy producing areas in Minnesota, Wisconsin and Missouri.
392. [Rejected]

H. Supply Contracts

393. NFO began soliciting processors to sign NFO milk supply contracts in about 1969.
394. [Rejected]
395. NFO offered these milk supply contracts to processors in the Midwest, principally in Minnesota and Wisconsin.
396. [Rejected]
397. Many NFO members moved their milk to plants which signed NFO milk supply contracts.
398. [Rejected]
399. The Dairy Marketing Advisory Committee (DMAC) was a group of agricultural economists from land grant colleges and representatives from the producer segment of the milk industry, including MPI/AMPI and Mid-Am, initially organized by Associated Dairymen, Inc. (ADI).
400. DMAC and MPI officials participated in "Think Tank" meetings from time to time.
401. A DMAC-MPI Think Tank memorandum stated in July, 1969 that NFO's propaganda had both an intellectual and emotional appeal to farmers.
402. The same DMAC-MPI Think Tank memorandum stated the view of its unknown authors that "[t]he disenchantment with General farm organizations and dairy cooperatives created a vacuum for occupancy by NFO."
403. The unidentified author of the DMAC-MPI Think Tank document further stated vaguely that "NFO packed enough upper Midwest dairy coop boards to get some managers fired, to make others lose their health, and to scare all the rest of them."
404. The DMAC-MPI Think Tank document expressed an opinion that NFO had gained support from a substantial [but unidentified] number of farmers who were larger, younger and better educated than the average farmer.
405. The same DMAC-MPI Think Tank document expressed an opinion that NFO's strength was to be found in its "membership relations and communications" and in "the Intellectual fabric upon which their membership was built." The document also expressed an opinion that "NFO is clever in taking credit for what is good, and letting others take the blame for what is bad."
406. [Rejected]
407. [Rejected]

I. NFO Decides to Enter Direct Marketing of Milk

408. [Rejected]
409. In 1968, NFO first applied to the USDA for qualification as a handler under federal milk marketing orders.
410. In 1969, NFO began making plans for the direct marketing of Grade A milk,
411. Because NFO relies heavily on volunteer help provided by its members, NFO decided to meet with and ask those members whether they wanted NFO to market Grade A milk.
412. By 1969 some NFO dairy farmer members had indicated substantial interest in NFO's marketing their Grade A milk.
413. By mid-1969 a number of NFO Grade A dairy farmer members were on established NFO hauling routes in southeastern Wisconsin.
414. [Rejected]
415. Because NFO dairy farmer members in southwest Missouri and Wisconsin expressed the most interest in having NFO market their milk, NFO decided to start a Grade A marketing program in those two spots.
416. NFO Dairy Department employees began their attempt to find markets for Grade A milk and for the location of reloads and various NFO members began organizing milk on truck routes and helping to establish the reloads.

*457 J. NFO Allegedly Calls Upon Experience Marketing Hogs, Cattle, Grain

417. [Rejected]
418. [Rejected]
419. [Rejected]
420. [Rejected]
421. [Rejected]
422. [Rejected]

K. NFO Milk Allegedly Attractive to Handlers

423. [Rejected]
424. In May, 1970 some NFO members were selling Grade A milk in Chicago at prices below the AMPI price and this cheaper price appealed to some bottling handlers.
425. [Rejected]
426. [Rejected]
427. One handler testified at trial that he preferred to have at least two different raw milk suppliers.
428. Mid-Am at one time owned bottling plants at Iowa City, Iowa (Home Town), and Minneapolis, Minnesota (Nicollet).
429. As of 1970, AMPI had bottling plants at Enid, Oklahoma (Gold Spot) and Hillsboro, Kansas (Tip Top).
430. Land O' Lakes, Inc. (LOL), a large Minnesota cooperative, at one time had bottling plants at Cedar Rapids, Iowa (Sanitary Farms) and St. Paul, Minnesota (Sanitary Farms).
431. [Rejected]
432. [Rejected]
433. NFO has never operated a bottling plant.
434. When attempting to sell milk to bottlers, NFO emphasizes that it does not compete with them.
435. [Rejected]

L. NFO Focuses Grade A Dairy Program in Midwest

436. [Rejected]
437. [Rejected]
438. After starting out in southwest Missouri and Wisconsin, NFO hoped to expand its Grade A milk marketing program into Minnesota, Iowa, Illinois, Kansas and Nebraska as soon as it found buyers there.
439. [Rejected]
440. NFO hoped that its Grade A milk marketing program would spread from southwest Missouri and Wisconsin through the Midwest within about six months.
441. NFO established milk reloads in southwest Missouri and Wisconsin in 1969.
442. [Rejected]
443. [Rejected]

M. NFO Allegedly Preaches Gospel to Non-Members

444. In its attempt to develop a dairy program in Missouri, Wisconsin and Minnesota, NFO held dairy meetings which were attended by non-members and those nonmembers were urged to join NFO and to participate in its dairy program.
445. Some non-members joined NFO and some shipped through NFO's dairy program in 1970 and 1971.

N. Interest in NFO Grade A Milk Marketing Allegedly Grows

446. After NFO opened its three Missouri reloads in 1970 and early 1971, an unidentified number of central and southwest Missouri Grade A dairy farmers expressed interest in marketing their milk through NFO.
447. [Rejected]
448. [Rejected]
449. [Rejected]
450. Approximately 20 per cent of AMPI's Tri-State, later Mid-States, Region producers were NFO members.
451. [Rejected]
452. [Omitted by NFO]
453. As of October, 1970, Mid-Am regarded NFO as a competitor in the raw milk supply business.
454. Mid-Am official Hanman expressed an opinion that NFO had a cost advantage over Mid-Am and other Midwest dairy cooperatives in the sense of not having to pay for the full service operations of a traditional dairy cooperative.
*458 455. As of October, 1970, Mid-Am viewed NFO as a substantial threat to Mid-Am's maintenance of its membership.
456. [Rejected]

O. NFO's Claims Regarding "Poisoning NFO's Well And Trying to Get It to Join the Club"
457. On March 27, 1970, John C. Gage, counsel for Mid-Am, wrote the Director of the Dairy Division of USDA complaining that NFO was marketing Missouri milk in alleged violation of Mid-Am membership agreements by selling milk to an Oklahoma bottler regulated under the North Texas Order.
458. John Gage, counsel for Mid-Am, asked the USDA not to recognize NFO as a qualified handler under federal orders because NFO was not, in his opinion, a cooperative.
459. John Gage, counsel for Mid-Am, sent copies of his March 21, 1970 letter to the USDA to AMPI's manager and to its attorney.
460. In July, 1970, counsel for Mid-Am, AMPI and DI presented a legal argument to the Director of the Dairy Division of USDA in an effort to see that NFO was not qualified as a handler under federal milk marketing orders.
461. In 1970, Berde informed the USDA that CMPC also opposed NFO's federal order qualification.
462. In 1970 CMPC invited NFO to join CMPC.
463. [Rejected]
464. [Rejected]
465. In December, 1970, Mid-Am, AMPI, CMSA, PMPC and DI jointly proposed an amendment to the definition of "cooperative association" in all federal milk marketing orders.
466. The purpose of Mid-Am's, AMPI's, DI's and CMPC's approaches to the USDA was to foreclose NFO from the marketing of Grade A milk under Federal Orders as a qualified cooperative.
467. [Rejected]

P. Conclusion

468. [Rejected]

V. The Southwest

A. Texas

1. AMPI'S Alleged Control of the Texas Markets

469. Until the merger of the Texas federal milk marketing orders in 1975, the following federal milk marketing orders were in Texas: Lubbock-Plainview Order 120, South Texas Order 121 (Houston area), North Texas Order 126 (Dallas-Fort Worth area), San Antonio Order 127, Central West Texas Order 128, Austin-Waco Order 129, Corpus Christi Order 130, and Texas Panhandle Order 132.
470. In 1967, several Texas cooperatives consolidated with others to form MPI. [See finding 152, above].
471. [Rejected]
472. [Rejected]
473-480. [NFO based this group of findings proposed in its paragraphs 473-480, inclusive, on NFO Exh. 860. Our comment on NFO Exh. 860 as it appears in connection with the NFO findings proposed in its paragraphs 158 to 167 is applicable here. Although NFO's findings as proposed in its paragraphs 473-480 do not state exactly the data contained on NFO Exh. 860, we shall set forth the findings as proposed by NFO with the caveat that we do not consider the data is either relevant or material and because, in any event, we do not believe that such data adds any substantial weight to NFO's proof.]
473. From 1969 to 1975, AMPI pooled about 94 per cent of all milk pooled on Order 120.
474. From 1969 to 1975, AMPI pooled about 73 per cent of all milk pooled on Order 121.
475. From 1969 to 1975, AMPI pooled about 65 per cent of all milk pooled on Order 126. [See finding 167, supra]
476. From 1969 to 1975, AMPI pooled about 88 per cent of all milk pooled on Order 127.
*459 477. From 1969 to 1975, AMPI pooled about 95 per cent of all milk pooled on Order 128.
478. From 1969 to 1975, AMPI pooled about 98 per cent of all milk pooled on Order 129.
479. From 1969 to 1975, AMPI pooled about 62 per cent of all milk pooled on Order 130.
480. From 1969 to 1975, AMPI pooled about 100 per cent of all milk pooled on Order 132.
481. [Rejected]
482. From 1969 through 1975, about nine per cent of all milk pooled on North Texas Order 126 was Mid-Am member milk. [See comment on NFO Exh. 860 at 473-480 above, and see finding 167, supra]

2. Mid-Am/AMPI Alleged Agreements Not To Compete

483. [Rejected]
484. [Rejected]
485. Mid-Am and MPI, later AMPI, had Class I base plans in effect with Texas members from 1968 until at least 1972.
486. In Mid-1970, Mid-Am and AMPI formed common market agencies for consignment of the milk of their members to be shipped into the South Texas and North Texas federal order markets.
487. [Rejected]
488. [Rejected]

3. The Alleged Non-Member Problem in Texas

489. As early as 1968, and at other times before NFO moved any milk to Texas, MPI, later AMPI, was selling 50 cent premium milk to handlers while other groups of producers were selling for less.
490. [Rejected]
491. Alamo Milk Producers (Alamo), Independent Dairymen's Cooperative (IDC) and Marketing Assistance Plan (MAP) were among those selling milk to handlers in Texas in competition with MPI and later AMPI.
492. In 1968, Alamo was the supplier of some milk to the Carnation Company (Carnation) plant at San Antonio, Texas.
493. A Carnation inter-office memorandum dated August 16, 1968 stated that Carnation officials were aware that MPI was "naturally disturbed over the fact that we [Carnation] are now bringing Iowa milk down into San Antonio and that the Alamo Milk Producers Cooperative is also supplying San Antonio."
494. Carnation continued to buy milk for its San Antonio plant from Alamo into 1969.
495. Foremost Foods Company (Foremost) at Dallas, Texas began to buy some milk from Alamo in March or April, 1969.
496. This Alamo milk purchased by Foremost at Dallas beginning in March or April, 1969 displaced MPI milk.
497. In early 1969, Foremost was concerned that, if it bought non-MPI milk, MPI might not service the Foremost account as well as it had in the past.
498. Schepps Dairy began buying milk from Alamo and IDC in 1969 and consequently cut back on its purchases from MPI.
499. Other Texas handlers  Beatrice and Borden  complained to MPI, later AMPI, about having to pay a fifty cent premium while competing handlers were not.
500. By early 1969, all cooperatives and other milk suppliers were well aware of the competition problems in Texas.

4. AMPI/Mid-Am Alleged Solutions for the Alleged Non-Member Problem

a). The Alleged Planning Stage

i). Generally

501. [Rejected]
502. [Rejected]
503. [Rejected]

ii). Alleged Cut-Offs

504. On June 7, 1969 MPI Marketing Specialist Joe Murphey wrote a memorandum to MPI North Texas Division manager J. G. Anderson on the subject: "Possible *460 solution to receipt of non-member milk at certain Dallas plants."
505. The possible solution proposed by Murphey in June, 1969 was that MPI, after flush production season ended in July or August, "not have milk available to supply the full demand placed upon us by Schepps and Foremost and that over a period of time we continue to gradually shorten their supply." There is no evidence that anyone acted on the recommendation proposed by Murphey.
506. [Rejected]

iii). Alleged Competing with Handlers

507. [Rejected]

iv). Alleged Pool Loading

508. [Rejected]
509. [Rejected]
510. [Rejected]
511. [Rejected]
512. [Rejected]
513. The July 11, 1969 minutes of an MPI committee meeting stated that Mid-Am had lost a total of 40 of its Texas producers.
514. The July 11, 1969 document stated that MPI had lost several members to retirement and to IDC and MAP and that MPI had lost a considerable amount of milk sales to Schepps to IDC and Alamo.
515. At the July 11, 1969 committee meeting MPI delegated Tom Townsend to work with Bill Blakeslee of Mid-Am in "their efforts to qualify three million pounds of milk in the Mid-American area for shipment into MPI short markets this fall and winter."
516. An August, 1969 memorandum indicated that Mid-Am had agreed to make two to three million pounds of milk per month available "to meet Fall shortages in MPI."

v). Base Plans

517. Base plans were conceived and developed in the operation of ADI.
518. Effective August 1, 1968 MPI established a Class I base plan.
519. The MPI Class I base plan in essence allocated all MPI Class I sales on a particular federal order among MPI Grade A farmers on that order in proportion to their historical production and provided that the farmers be paid more for their base milk than for their excess milk.
520. MPI base became a transferable and salable asset.
521. An MPI farmer selling his MPI base had to agree not to produce Grade A milk for Class I sales in any MPI market for five years.
522. After consolidating, AMPI had a Class I base plan in its MPI Region.
523. AMPI's Class I base plan provided that an AMPI farmer who sold his base had to agree not to produce and offer for sale milk for human consumption in fluid form in the MPI area for five years, until that period was shortened by the final judgment and decree entered by this Court in United States v. AMPI, April 31, 1975.
524. Mid-Am established a Class I base plan as amended October 1, 1968, for its members whose milk was pooled on the North Texas and Neosho Valley Orders.
525. The Mid-Am Class I base plan in essence allocated all Mid-Am Class I sales in a particular federal order among all Mid-Am Grade A farmers whose milk was pooled on that order in proportion to their historical production and provided that the farmers be paid no more for their base milk than their excess milk.
526. A Mid-Am base became a transferable and saleable asset.
527. As of September, 1968, Mid-Am required a member who sold all of his base to agree not to produce and offer Grade A fluid milk for sale in the Neosho Valley, Ozarks, St. Louis, Kansas City, Wichita or Tulsa markets.
528. Mid-Am continued its Class I base in effect for its Sulphur Springs, Texas and Neosho Valley, Kansas producers until at least 1971.
*461 529. As of late 1971, a Mid-Am North Texas producer selling all of his base agreed not to produce and offer for sale for five years milk for human consumption in fluid form on the North Texas, South Texas, Austin-Waco, Central West Texas, Red River Valley, Northern Louisiana, Central Arkansas or Fort Smith markets.
530. As of late 1971, a Mid-Am producer in the Erie, Kansas area selling all his base agreed not to produce and offer for sale for five years milk for human consumption in fluid form on the Neosho Valley, South Texas, North Texas, St. Louis-Ozarks, Kansas City, Wichita or Oklahoma Metropolitan markets.
531. [Rejected]
532. The July 11, 1969 meeting of MPI's Marketing Committee considered a suggestion that the North Texas and perhaps the South Texas and San Antonio federal orders be amended to include a seasonal base plan.
533. The minutes of that July 11, 1969 meeting showed that "it was the unanimous consensus of the group that a seasonal base plan might make the competitive situation even more intense."

b). The Alleged Implementation Stage

i). The Buying and Closing of Jere Dairy

534. In spring, 1969, MPI merged or consolidated with Jere Dairy of Grand Prairie, Texas.
535. [Rejected]
536. [Rejected]

ii). The Alleged Cutting Off Carnation

537. From at least 1965 to June, 1968, Carnation Company bought some milk for its Sulphur Springs, Texas evaporated milk plant from MPI or its predecessors.
538. In June, 1968, Carnation Sulphur Springs bought 838,609 pounds of milk from Alamo and 121,970 pounds of milk from North Texas Producers Association, of its total purchases of 3,143,569 pounds of milk that month.
539. [Rejected]
540. In the 1968-1969 period, Carnation Company had milk bottling plants at San Antonio, Houston, and Wichita Falls, Texas and at Tulsa, Oklahoma.
541. [Rejected]
542. MPI shipped no milk at all to Carnation's Sulphur Springs, Texas plant from June, 1968 through October, 1969.
543. [Rejected]
544. On October 16, 1969, Carnation signed an agreement with MPI (AMPI).
545. [Rejected]
546. [Rejected]

iii). Alleged Shorting of Foremost

547. In early December, 1969, Foremost considered increasing its purchases of milk from Alamo for its San Antonio plant.
548. [Rejected]
549. [Rejected]
550. [Rejected]
551. [Rejected]
552. [Rejected]

iv). Competing with Schepps

553. AMPI's Vandervoorts' bottling operation competed with Schepps Dairy, a proprietary bottling plant, in the Dallas-Fort Worth market.
554. [Rejected]
555. [Rejected]
556. [Rejected]
557. [Rejected]
558. In early 1970, AMPI sold its Vandervoorts plant to Kroger Company.

v). Alleged Pool Loading in San Antonio

559. Prior to January, 1970, AMPI pooled milk on the San Antonio federal order market.
560. In fall 1969 and early 1970, Mid-Am made milk available to MPI (AMPI) and some of it was shipped into Texas.
561. [Rejected]
*462 562. In November, 1969, Alamo's president appeared before Mid-Am's Board of Directors and discussed whether Mid-Am and Alamo should merge.
563. [Rejected]

c). Alamo and IDC Fold

564. [Rejected]
565. Mid-Am did not merge with Alamo.
566. AMPI merged with Alamo on February 1, 1970.
567. [Rejected]
568. [Rejected]

5. The Alleged New Non-Member Problem in Texas

569. By early 1970, MAP had increased its membership in Texas.
570. In March, 1970 MAP agreed to supply Schepps with its full requirements of raw milk.
571. [Rejected]
572. [Rejected]
573. [Rejected]
574. [Rejected]
575. [Rejected]
576. [Rejected]
577. [Rejected]

6. Continued Efforts Allegedly To Eliminate Other Non-Members in Texas

578. [Rejected]
579. [Rejected]
580. [Rejected]
581. [Rejected]
582. [Rejected]
583. [Rejected]
584. [Rejected]
585. [Rejected]
586. [Rejected]

7. The Beatrice, Fort Worth Incident

587. NFO sold some of its members' Missouri Grade A milk to Beatrice Foods Company at Fort Worth, Texas, from July, 1970 through March, 1971.
588. Beatrice, Fort Worth, notified NFO to discontinue all milk shipments from Springfield, Missouri supply plant effective 12:01 a. m., March 26, 1971, for reasons stated in a letter dated March 24, 1971.

8. Alleged Long Run Effect of Losing Beatrice

589. NFO did not thereafter make any substantial sales of its members' milk to Texas handlers until spring, 1973, when it began marketing the milk of some Texas NFO members to Borden at Dallas.
590. [Rejected]

9. Base Plans Allegedly Inhibited NFO's Growth in Texas

591. [Rejected]

10. Recent AMPI Alleged Full-Supply Tactics

592. [Rejected]
593. [Rejected]
594. [Rejected]
595. [Rejected]
596. [Rejected]

11. Conclusions

597. [Rejected]
598. [Rejected]
599. [Rejected]
600. [Rejected]

MEMORANDUM OPINION, FINDINGS OF FACT AND CONCLUSIONS OF LAW OF PHASE I, PHASE II AND PHASE III AND ORDERS TO CLERK
VOLUME II OF TWO VOLUMES, containing:
Pages 462 to 528, inclusive; Footnote pages: (i) to (xiv), inclusive, (containing all footnotes for both volumes)

B. Oklahoma

1. AMPI Control

601. Oklahoma had two federal milk marketing orders: Oklahoma Metropolitan Order 106, which encompassed the cities of Tulsa and Oklahoma, among other places; and Red River Valley Order 104, which straddled Texas and Oklahoma.
*463 602. One Oklahoma cooperative was a part of the original formation of MPI and two other Oklahoma cooperatives became a part of MPI in 1967.
603. [Rejected]
604. [Rejected]
605. [See finding 166, supra.]
606. In every year from 1969 to 1975, AMPI pooled at least 75 per cent of all milk pooled on Order 104. [But see note in re: findings 473-480, supra.]

2. The Alleged "Non-Member Problem" in Oklahoma

607. In September, 1967 several Oklahoma bottling plants were buying some or all their milk from independent producers.
608. By September, 1967 Beatrice at Tulsa agreed to buy milk from MPI.
609. [Rejected]
610. [Rejected]
611. As early as 1967, Carnation Company's milk bottling plants at Tulsa, Oklahoma and Wichita Falls, Texas, were buying milk from independent farmers.
612. [Rejected]
613. Colvert's Dairy at Ardmore, Oklahoma, also was buying milk from independent producers.
614. Gold Spot Dairy, Inc., an operating cooperative at Enid, Oklahoma, was buying from its own producer members.
615. Beatrice and other handlers competing with Carnation in Oklahoma complained to AMPI about paying the 50 cent premium while Carnation was buying non-premium milk.
616. [Rejected]

3. Early Efforts by MPI Allegedly To Eliminate the Non-Members

a). Alleged 1967 Pressure Pooling

617. The Oklahoma Metropolitan Order 106 Market Administrator had information on September 1, 1967 that MPI intended to pool milk on the Oklahoma Order.
618. In fall, 1967, MPI pooled excess milk on the Oklahoma Order and several Texas Orders.
619. [Rejected]
620. Gold Spot merged with or was acquired by MPI in April, 1968.

b). MPI Alleged Refusal to Deal With Carnation at Sulphur Springs

621. [See finding 537, supra.]
622. [Rejected]
623. [Rejected]
624. [Rejected]
625. [Rejected]
626. [Rejected]
627. [Rejected]

4. Mid-Am Alleged Knowledge of the Carnation "Non-Member Problem"

628. [Rejected]
629. [Rejected]
630. [Rejected]
631. [Rejected]
632. [Rejected]
633. [Rejected]

5. NFO Arrives on the Scene

634. In February, 1970, Midwest Creamery at Ponca City, Oklahoma, began buying milk from NFO Missouri producers.
635. Midwest Creamery was a milk bottling plant which, from July, 1970 on, was regulated by the Oklahoma Metropolitan Order.
636. As early as March, 1970, both AMPI and Mid-Am had knowledge of NFO's marketing Missouri milk to Midwest Creamery.
637. By May, 1970, Beatrice had told NFO that it was looking for milk to supply its Tulsa and Oklahoma City plants.

6. AMPI Allegedly Plans to Straighten Out the Tulsa Market

638. [Rejected]
639. [Rejected]
640. [Rejected]
641. [Rejected]
642. [Rejected]
643. Keiffer Howard was an employee of AMPI at least during the period 1970 through February, 1972.
*464 644. During the period 1970 through February, 1972, Keiffer Howard was the AMPI employee in charge of milk movements in AMPI's Southern or MPI Region, which encompassed Texas and Oklahoma among other states.
645. [Rejected]
646. [Rejected]
647. [Rejected]

7. AMPI and Mid-Am Allegedly Begin Loading the Oklahoma Pool

648. In the fall of 1970, someone from AMPI called Mid-Am and asked whether Mid-Am had milk available to ship to Oklahoma.
649. [Rejected]
650. A June 5, 1970 USDA memorandum stated that Mid-Am had consigned Mid-Am Nebraska milk to AMPI for pooling on the Oklahoma Order.
651. On June 1, 1970, Mid-Am and AMPI executed a consignment agreement in regard to milk to be pooled on Oklahoma Order 106.
652. AMPI pooled some Mid-Am consigned milk on the Oklahoma order.
653. The Nebraska-Western Iowa Order 65 Market Administrator, in a June 5, 1970 memorandum to USDA in Washington, discussed the pooling of Mid-Am Central States Division milk on Oklahoma Order 106.
654. That report said that unidentified "local representatives" of Mid-Am Central States Division had said to him that they did not feel that the pooling of Mid-Am Central States milk on Oklahoma Order 106 in summer 1970 was good marketing.
655. Beginning in June, 1970, AMPI pooled quantities of AMPI Iowa milk on the Oklahoma Order.
656. AMPI's Sibley, Iowa milk was pooled on the Oklahoma Order at a loss each month.
657. An Assistant Secretary of USDA expressed his opinion in a June 8, 1970 memorandum that the goal AMPI and Mid-Am had in their pooling activity on "Texas and Oklahoma Orders" was "to increase the spread between member and non-member prices, forcing these producers to join MPI or handlers of their milk to increase their pay prices; and thereby reinforce their ability to exact substantial premiums on Class I milk." There is no evidence that anyone agreed with that opinion.

8. AMPI Attempts to Buy Midwest, Two Other Plants Allegedly to Save the 50 Cent Premium

658. [Rejected]
659. [Rejected]
660. [Rejected]
661. [Rejected]
662. [Rejected]
663. [Rejected]
664. [Rejected]
665. [Rejected]
666. [Rejected]
667. [Rejected]

9. AMPI Allegedly Offers a Carrot to Carnation

668. [Rejected]
669. [Rejected]

10. ARSPC Allegedly Gets Involved in the Pool Loading

670. In September, 1970, Mid-Am ceased pooling any of its Central States Division member's milk on Oklahoma Order 106 pursuant to its common marketing arrangement with AMPI because a shortage of milk required that the milk be delivered to Order 65 plants.
671. Gary Hanman of Mid-Am once proposed that ARSPC members who pool reserve supply milk be allowed to retain "reserve supply" status for that milk as a means to increase financial support of the pool.
672. [Rejected]
673. [Rejected]
674. On August 31, 1970, Joseph Westwater, general manager of ARSPC, announced a meeting of ARSPC's Operations Committee to consider a proposal that ARSPC members who desired to associate *465 with a Federal Order milk that is under option, be able to do so and still retain standby pool status and receive the standby pool payment for that milk.
675. According to Westwater, under this technique of pooling standby pool milk on federal order markets, non-member producers would help defray some of the cost of standby pool operations.
676. [Rejected]
677. [See finding 674, supra.]
678. At a September 11, 1970 meeting, the ARSPC Operations Committee approved submission of the proposal to the full ARSPC Board.
679. [Rejected]
680. On October 19, 1970, the ARSPC Board approved the proposal to permit pooling of standby pool milk on federal order markets and appointed a special committee, which included Westwater of ARSPC, Hanman and Gage of Mid-Am and Russell and Murphey of AMPI, to implement it.
681. [Rejected]
682. [Rejected]
683. [Rejected]
684. [Rejected]
685. Milk from standby pool plants in Minnesota and Wisconsin was pooled by AMPI on the Oklahoma Metropolitan Order each month from October, 1970 to the end of January, 1972.
686. [Rejected]
687. [Rejected]
688. [Rejected]
689. [Rejected]
690. [Rejected]
691. [Rejected]
692. [Rejected]
693. [Rejected]
694. [Rejected]
695. No mention of a report by Howard appears in the minutes of a December, 1970 AMPI Board meeting.
696. [Rejected]
697. [Rejected]
698. In February, 1971, ARSPC general manager Westwater reminded AMPI official Joe Murphey that he had been delegated the responsibility of writing up a justification for pooling milk of the Oklahoma Federal market.
699. [Rejected]
700. [Rejected]
701. [Rejected]
702. [Rejected]
703. [Rejected]

11. AMPI Allegedly Acquires Then Sells Gilt Edge

704. [Rejected]
705. [Rejected]
706. [Rejected]
707. [Rejected]
708. [Rejected]

12. AMPI Allegedly Sells at Below Cost To Wrest A Military Contract Away from Carnation

709. [Rejected]
710. [Rejected]
711. [Rejected]
712. [Rejected]
713. [Rejected]
714. [Rejected]
715. [Rejected]

13. AMPI's Gold Spot Division Competes With Carnation in Oklahoma

716. [Rejected]
717. [Rejected]
718. [Rejected]
719. [Rejected]
720. [Rejected]
721. [Rejected]
722. [Rejected]

14. AMPI Acquires Then Allegedly Uses Pure-Vac to Solve Market Problems with Customers Including Carnation

723. In 1970, AMPI acquired Pure-Vac Dairy Products Corporation, an ice cream processor in Memphis, Tennessee.
724. [Rejected]
*466 725. [Rejected]
726. After AMPI acquired Pure-Vac, Ed Charlton, manager of the Pure-Vac plant, reported to Richard McDougal, AMPI's Director of Fluid Milk Marketing.
727. [Rejected]
728. Pure-Vac was not a profitable operation for AMPI.
729. In April, 1971, Pure-Vac began selling ice cream products to Hale-Halsell, a wholesale grocery concern with a warehouse in Tulsa, Oklahoma.
730. Pure-Vac operation solicited the business of ice cream customers in Tulsa, Oklahoma, in April, 1971.
731. [Rejected]
732. AMPI's Gold Spot competed with Beatrice, Carnation, Page and others for sales of fluid milk and ice cream in Tulsa, Oklahoma.
733. [Rejected]
734. [Rejected]
735. [Rejected]
736. [Rejected]
737. [Rejected]

15. Pressure Pooling Allegedly Persists

738. [Rejected]
739. [Rejected]
740. [Rejected]

16. Carnation Allegedly Surrenders

741. [Rejected]
742. W. J. Moore of Carnation Company suggested to the Market Administrators of Oklahoma Order 106 and Red River Valley Order 104 that those two orders should be merged.
743. [Rejected]
744. Carnation Company believed that AMPI was interested in getting the Carnation non-member producers to join AMPI.
745. In early 1971, Carnation Company acquired a new customer in Texas and needed substantial additional raw milk to supply that customer.
746. Carnation believed that AMPI was its only practicable source of substantial additional milk to supply this new customer in Texas.
747. Carnation met with AMPI officials Byford Bain and Harold Nelson on or about March 8, 1971 to talk about the additional milk it needed.
748. [Rejected]
749. [Rejected]
750. [Rejected]
751. [Rejected]
752. [Rejected]
753. [Rejected]
754. [Rejected]
755. [Rejected]
756. By early June, 1971, AMPI had signed up all but about 12 to 14 of the approximately 160 non-member producers who had been shipping to Carnation at Tulsa and gave each an AMPI base under the "base plan."
757. AMPI official S. F. Howe stated in a company memorandum dated June 3, 1971 that AMPI produced unrest over AMPI's giving base to the former Carnation nonmembers should be viewed as "a small price to pay for the solution to this problem."
758. In July, 1971 AMPI agreed to supply Carnation's Sulphur Springs, Texas plant with some of its requirements of raw milk.
759. [Rejected]

17. Alleged Effects of Pressure Tactics on NFO

760. On only one or two occasions in the fall of 1970 did NFO make any effort to sell milk in Tulsa.
761. [Rejected]
762. Beatrice-Tulsa talked with NFO in late 1970 or early 1971 about buying milk from NFO but NFO did not have any Texas inspected milk available for sale to Beatrice-Tulsa at that time.
763. [Rejected]
764. [Rejected]
765. [Rejected]
766. [Rejected]
*467 767. [Rejected]
768. [Rejected]
769. [Rejected]
770. [Rejected]
771. [Rejected]
772. [Rejected]
773. At times during 1971, NFO supplied Midwest Creamery with Wisconsin milk pooled on Order 30.
774. At times in late 1970 and in 1971 NFO supplied Midwest Creamery with Missouri milk pooled on Order 106.
775. [Rejected]
776. [Rejected]
777. NFO became a qualified cooperative on Order 106 effective May 1, 1971.
778. AMPI pooled some milk on Oklahoma Order 106 from May, 1971 to the end of January, 1972.
779. In 1971, the USDA suspended the pooling provisions of Oklahoma Order 106 and Red River Valley Order 104.
780. AMPI ceased pooling out-of-order milk on Order 106 February, 1972 after changes were made in the diversion provisions of Oklahoma Order 106.
781. [Rejected]
782. [Rejected]
783. In spring, 1971, NFO was contacted by a group of about 20 Oklahoma dairy farmers who had been selling as independents to Carnation at Tulsa.
784. These Oklahoma producers were concerned that they would no longer be able to ship to Carnation as independents.
785. [Rejected]
786. [Rejected]
787. NFO never marketed the milk of these former Carnation Tulsa producers.
788. [Rejected]

18. AMPI Base Plan Allegedly Inhibited NFO Growth in Oklahoma

789. MPI, later AMPI, had a Class I base plan with its Grade A members in Oklahoma.
790. In summer 1970, about 14 NFO Oklahoma farmers, some of whom were then shipping through AMPI, approached NFO about marketing their milk.
791. [Rejected]
792. [Rejected]
793. [Rejected]
794. In late 1971, some northeastern Oklahoma farmers shipped some milk through NFO for a short period of time.

19. Recent AMPI Full-Supply Alleged Tactics

795. [Rejected]

20. Conclusions

796. [Rejected]
797. [Rejected]
798. [Rejected]
799. [Rejected]
800. [Rejected]
801. [Rejected]

C. Missouri

1. Mid-Am Missouri Mergers

802. The original Mid-American Dairymen, Inc. was formed on July 1, 1967 by consolidation or merger of four cooperatives.
803. On July 1, 1968, the current Mid-American Dairymen, Inc. was formed by merger of Mid-Am of Kansas City with Producers Creamery Company of Chillicothe, Missouri; Producers Creamery Company of Springfield, Missouri; Sanitary Milk Producers of St. Louis, Missouri; and Square Deal Milk Producers of Highland, Illinois.
804. Prior to July 1, 1968 Producers Creamery of Springfield, Sanitary and Square Deal competed for farmer-members and sales accounts in the Order 62 area of central and southern Missouri and southern Illinois.
805. [Rejected]
806. [Rejected]
807. In January, 1969, Mid-Am had actual competing milk marketers in parts of Missouri.
*468 808. [Rejected]
809. [Rejected]
810. On February 1, 1969, Harrison County [Cooperative] was acquired by Mid-Am.
811. On April 1, 1969, St. Joseph [Milk Producers Cooperative, St. Joseph, Missouri] was acquired by Mid-Am.
812. On July 1, 1969, Sunflower Dairy [Inc., Valley Falls, Kansas] was acquired by Mid-Am.
813. [Rejected]
814. [Rejected]
815. [Rejected]
816. On March 1, 1969, Mid-Am purchased the Standard Milk Company of Aurora, Missouri.
817. On April 1, 1969, Mid-Am purchased the Major Cheese Company of Ozark, Missouri.
818. [Rejected]
819. [Rejected]
820. [Rejected]
821. [Rejected]
822. On October 1, 1971, Mid-Am purchased the Emma Creamery Company, an Emma, Missouri manufacturing plant.

2. The Missouri Markets in 1970

823. Order 62 in 1970 encompassed St. Louis and its Missouri suburbs and certain Illinois suburbs and the southwestern Missouri area of Springfield and surrounding counties and northeastern Arkansas, including Fayetteville. [Neither this finding nor the finding in paragraph 824 to follow are to be construed as findings that either of the geographical areas described are "markets" for antitrust purposes.]
824. Order 64 in 1970 encompassed the Greater Kansas City and St. Joseph, Missouri areas.
825. Southwest Missouri is a surplus milk production area, and is referred to by some persons in the industry as "Little Wisconsin."
826. [Rejected]
827. [Rejected]
828. [Rejected]
829. [Rejected]
830. In 1970 there were only three distributing plant (Class I) handlers in the southern portion of Order 62  Hiland and Foremost in Springfield and College Club in Fayetteville,  and all were supplied exclusively by Mid-Am.
831. [Rejected]
832. [See finding 161, supra.]
833. [See finding 161, supra.]
834. [See finding 162, supra.]
835. [See finding 162, supra.]
836. [Rejected]

3. NFO Missouri Membership Base

837. NFO had a cull cow program in Missouri prior to 1970.
838. There were a number of dairy farmers in southwest Missouri.
839. Some dairy farmers in southwest Missouri were NFO members.
840. In the late 1960's in southern Missouri, NFO had some county chapters, some of which held monthly meetings.
841. Non-members of NFO may have attended some monthly NFO county meetings in Missouri in the late 1960's.
842. NFO had somewhere between 25 to 120 dairy farmer members in Wright County, Missouri, in 1968-70. An accurate list of members was not adduced in evidence.
843. [Rejected]
844. NFO had a number of dairy farmer members in the Mountain Grove area in 1969-70.
845. [Rejected]

4. NFO's Entry into Milk Marketing in Missouri

846. In late 1969 or early 1970 NFO started a Grade A dairy program in central and southwest Missouri.
847. In about January or February of 1970, NFO began moving producer milk to Midwest Creamery, Ponca City, Oklahoma, from the reloads established by NFO at Mountain Grove and Jefferson City, Missouri.
*469 848. [Rejected]
849. Some of those producers had formerly been delivering their milk to Mid-Am.
850. Prior to NFO's entry into Grade A marketing in Missouri in 1970, some of the Grade A milk producers in southern Missouri had no practicable alternative other than to ship through Mid-Am.
851. [Rejected]
852. In 1969 some NFO members in southwest and central Missouri were interested in having NFO market their milk.
853. In 1969, both employees and members of NFO helped to set up a dairy program in central and southwest Missouri.
854. The NFO dairy farmer members in central and southwest Missouri complained to NFO in 1969 about the price of milk.
855. In 1969 and 1970, NFO had four employees who worked daily in central and southwest Missouri contacting both members and non-members of NFO in an attempt to get them to ship milk through NFO.
856. NFO member Ted Forbes attempted to recruit non-NFO members.
857. After the Mountain Grove reload opened, the NFO Dairy Bargaining Committee in Wright County, Missouri, was active in contacting producers to ship through the reload.
858. NFO's first Class I outlet for producers milk from central and southwest Missouri was Midwest Creamery (Midwest) at Ponca City, Oklahoma.
859. Beginning in February and continuing until the summer of 1970, NFO marketed what one witness estimated to be one to one and one-half million pounds of the milk of central and southwest Missouri producers per month to Midwest.
860. From February until June, 1970, Midwest was regulated by North Texas Order 126.
861. In mid-1970, there were a number of producers shipping through NFO's Mountain Grove reload.
862. Later in 1970, the number of producers at Mountain Grove may have increased to some extent.
863. From summer 1970 on, Midwest Creamery was regulated by Oklahoma Order 106.
864. NFO could not pool the milk from Missouri producers until qualified to do so by USDA. After that USDA qualification was obtained, NFO was able to pool milk shipped to Midwest on North Texas Order 126.
865. [Rejected]
866. [Rejected]

5. Alleged Response to the Midwest Marketing

867. Both Mid-Am and AMPI were concerned about NFO's milk program and their officials discussed that concern.
868. In March, 1970, counsel for Mid-Am wrote a letter to the USDA Dairy Division about NFO's marketing Missouri farmers' milk to Midwest and asked the USDA not to recognize NFO as a qualified cooperative.
869. Copies of Mid-Am's letter to the USDA were sent to Nelson and Russell at AMPI.
870. [Rejected]
871. [Rejected]
872. [Rejected]
873. [Rejected]

6. Alleged Attempts to Develop Other Markets for Missouri Milk

874. On January 29, 1970, the Mid-Am St. Louis Division Board of Directors received a report on NFO activity in Missouri.
875. It was the feeling of the Mid-Am St. Louis Division Board that handlers should be reminded that regular customers would receive priority on available supplies of milk.
876. [Rejected]
877. There has never been a shortage of milk for Class I use in southwest Missouri.
878. Early in 1970, NFO made repeated offers to supply Hiland and Foremost in *470 Springfield with milk at prices below Mid-Am's.
879. In about mid-1970, Hiland Dairy bought several spot loads of NFO milk for Class II uses.
880. [Rejected]
881. [Rejected]
882. [Rejected]
883. In June, 1970 the Mid-Am Board adopted a new pricing program.
884. Hiland was informed that its price from Mid-Am would be raised if any rearrangement of hauling routes was required.
885. [Rejected]
886. [Rejected]
887. [Rejected]
888. [Rejected]
889. In about summer, 1970, Putman of Hiland at Springfield, Missouri, told Hanman of Mid-Am that NFO had offered Hiland milk at a price lower than Mid-Am's.
890. Putman of Hiland asked Mid-Am to reduce its price to meet the NFO price and told Mid-Am that even if it met NFO's price, Hiland still might buy some NFO milk.
891. Mid-Am reduced its price but Hiland still bought some milk through NFO.
892. [Rejected]
893. [Rejected]
894. [Rejected]
895. [Rejected]
896. [Rejected]
897. [Rejected]
898. [Rejected]
899. [Rejected]
900. [Rejected]
901. [Rejected]
902. [Rejected]
903. [Rejected]
904. In summer 1970, NFO offered to sell Missouri milk to Foremost at Springfield, Missouri, and/or Dallas, Texas.
905. Foremost refused to buy NFO milk at Springfield or Dallas in 1970.
906. NFO in 1969 and 1970 made some contact with the following Order 62 handlers about selling them NFO milk; Kroger, Sealtest, Pevely, and Quality in St. Louis; Hiland and Foremost in Springfield; and College Club in Fayetteville, Arkansas.
907. [Rejected]
908. [Rejected]

7. The Beatrice-Fort Worth Market

909. In July, 1970, NFO obtained a second Class I market for its Missouri members' milk at the Beatrice Foods plant in Fort Worth, Texas.
910. The Beatrice plant in Fort Worth was a subsidiary of Beatrice Foods, Inc., known as Boswell Dairy, Inc., and traded under the Beatrice "Meadow Gold" Label.
911. Beatrice Fort Worth had for the months January, 1970 through April 1970, inclusive, purchased 100 percent of its supply from AMPI.
912. In March, 1970, Beatrice Fort Worth was dissatisfied with payment of a 50 cent Class I premium and a Class II premium when certain of its competitors such as Midwest Creamery and Carnation at Tulsa had cheaper sources of supply.
913. In March, 1970 Beatrice was also displeased at AMPI's sale of eggnog from its Vandervoorts' plant in Dallas during Christmas, 1969.
914. On May 7, 1970, Beatrice Fort Worth officials met with AMPI officials in regard to producer milk problems.
915. [Rejected]
916. At a May 7, 1970 meeting, Beatrice agreed not to purchase from sources other than AMPI until AMPI had a chance to explain its plans for assuring Beatrice "equity."
917. Prior to May 7, 1970, NFO had met with Beatrice and offered Beatrice a supply of some milk for its Tulsa, Oklahoma and Fort Worth, Texas plants.
918. In 1970 Beatrice was also buying some of its requirements of milk from AMPI for its Tulsa, Oklahoma plant.
*471 919. On July 7, 1970, Beatrice and AMPI officials again met to discuss the raw milk supply situation in Oklahoma and Texas.
920. [Rejected]
921. [Rejected]
922. [Rejected]
923. [Rejected]
924. [Rejected]
925. Beatrice Tulsa complained to AMPI in December, 1970 that AMPI's Gold Spot division was constantly causing Beatrice to lower its product prices and that Beatrice resented very much paying AMPI a premium for raw milk when faced with such competition.
926. [Rejected]
927. [Rejected]
928. [Rejected]
929. Beatrice Fort Worth paid the NFO Custodial Account a 40 cent premium on some Class I milk of NFO's Missouri producers.
930. During some months in 1970, AMPI was charging Beatrice Fort Worth a Class I premium averaging about 50 cents and a Class II premium of about 10 cents.
931. Beatrice Fort Worth's purchases of NFO milk increased from 990,632 pounds in July, 1970 to 2,209,832 pounds during February, 1971. Beatrice Fort Worth purchased an additional 1,073,880 pounds of raw milk from the operator of the NFO Springfield Receiving Station as bulk milk in the month of February, 1971.
932. [Rejected]
933. [Rejected]
934. [Rejected]

8. Alleged Bad Faith Use of Membership Contracts

935. [Rejected]
936. In and after August, 1970, members of NFO began readying a facility in Springfield, Missouri, for use as a milk reload.
937. [Rejected]
938. [Rejected]
939. Mid-Am refused to divulge contract termination dates to Reid Heathman on March 22, 1971.
940. After the filing of this lawsuit, Mid-Am refused to honor any termination notices from members known to be related to NFO activities.
941. At a Board meeting on January 29, 1970, Mid-Am allowed a producer named Lyman Creed to transfer membership from Mid-Am to Prairie Farms Dairy, Inc., in the southern Illinois area.
942. Mid-Am refused to honor some producers' termination requests made by known NFO members after litigation between the parties was commenced.
943. [Rejected]
944. [Rejected]
945. [Rejected]
946. Mid-Am had continued in force the membership agreements signed by dairy farmers with some of its predecessor organizations, including Square Deal Milk Producers Association.
947. Beginning in late 1970, Meinerz Creamery in Iowa solicited Mid-Am members to terminate or breach their contracts with Mid-Am.
948. As of late 1970 Prairie Farms Dairy was soliciting Mid-Am members to breach their contracts with Mid-Am.
949. Mid-Am never sued Meinerz Creamery nor Prairie Farms for soliciting Mid-Am members to breach their contracts with Mid-Am.
950. [Rejected]
951. [Rejected]

9. Springfield Plant and Billy Stacey

952. [Rejected]
953. Al Scott asked Billy Stacey, an NFO member from Elkland, Missouri, to lease the Springfield facility on behalf of NFO.
954. In July, 1970, Stacey was a dairy farmer, shipping through Mid-Am, and also a contract hauler for Mid-Am.
955. In July through August, 1970, Billy Stacey was attempting to sell his hauling route.
*472 956. Stacey had been hauling milk in southwest Missouri since about 1962.
957. [Rejected]
958. [Rejected]
959. [Rejected]
960. [Rejected]
961. [Rejected]
962. Effective September 1, 1970 Stacey was terminated as a Mid-Am trucker because of his activities in helping to establish an NFO Springfield reload.
963. [Rejected]

10. The Mid-Am Beatrice Initiative

964. In the fall of 1970, NFO increased shipments to Beatrice Fort Worth.
965. In October, 1970, Mid-Am and NFO officials met in John Gage's office in Kansas City in an unsuccessful effort to work out mutually agreeable milk marketing arrangements.
966. At some time in late 1970, Beatrice reported to Mid-Am that it could get milk cheaper from NFO.
967. After the October 2, 1970 meeting and before Mid-Am filed suit against NFO, Mid-Am learned that NFO was going to enter the Twin Cities market order.
968. The alarming thing to Mid-Am about NFO's activity in the fall of 1970 was that it was increasing, being stepped up and, from Mid-Am's viewpoint, "becoming progressively worse with intense solicitation."
968A. [Rejected]
969. [Rejected]
970. In late 1970 or early 1971, Mid-Am instructed its attorney Gage to advise Beatrice Fort Worth of Mid-Am's claim that NFO was illegally marketing the milk of some producers who were, according to Mid-Am's claim, legally obligated to market through Mid-Am.
971. [Rejected]
972. [Rejected]
973. In January, 1971, NFO began operations at its Springfield, Missouri reload.
974. In December, 1970, the Market Administrator for the North Texas Federal Order 126 advised AMPI, MAP and Mid-Am that, in cases that involved dual cooperative membership, the Market Administrator would resolve for order purposes on the basis of which cooperative was actually marketing the producer's milk.
975. Mid-Am attorney Gage was informed of this policy.
976. [Rejected]
977. In the fall of 1970, NFO again requested that the USDA approve NFO as a qualified Marketing Association of Federal Orders 106 and 126. The USDA was advised that the milk would be shipped through the Mountain Grove and Jefferson City reloads in Missouri.
978. On February 5, 1971, John Gage flew to confer with Beatrice Fort Worth plant manager Palitti about Beatrice's purchasing NFO milk from Missouri.
979. Gage followed up his February 5, 1971 meeting with a letter on February 15, 1971 to Palitti, with a copy to Dunham, the North Texas Market Administrator.
980. Gage, on February 5, 1971, had telephoned Dunham that he was going to Fort Worth to meet with Palitti.
981. Gage, in his February 15, 1971 letter to Beatrice Fort Worth, demanded that Beatrice pay Mid-Am for the milk of any Missouri producer who Mid-Am claimed had breached Mid-Am contracts.
982. [Rejected]
983. Gage advised Beatrice that Mid-Am would take legal action against any party who might act "in violation of Mid-America Dairymen's rights."
984. On February 17, 1971 NFO sent Beatrice a telegram that NFO was "becoming handler on North Texas market. Will get qualifications as an association of farmers at same time."
985. On February 22, 1971, Gage as General Counsel for Mid-Am, wrote NFO, attention Oren Lee Staley, President, a letter in which Gage stated Mid-Am's legal position in regard to a list of Mid-Am members forwarded with that letter.
*473 986. On February 22, 1971 Gage again wrote Beatrice Fort Worth, with a copy to Dunham.
987. On February 22, 1971 Gage wrote to Herbert Forest, Director of the Dairy Division at USDA, and Clifford Hardin, Secretary of Agriculture.
988. Gage sent copies of the letters to Forest and Hardin to Stuart Russell, Sydney Berde and the Texas and Oklahoma Market Administrators Arnold and Dunham.
989. [Rejected]
990. NFO responded to Gage's February 22, 1971 letter by letter of March 2, 1971, which stated in part that NFO had "notified thirteen producers that they cannot market their production through the NFO program while their agreement with Mid-America is in effect."
991. NFO, in its letter of March 2, 1971, invited Gage to meet with NFO to discuss what NFO believed "may develop into a serious problem."
992. On March 5, 1971 Gage declined NFO's invitation to meet with NFO officials.
993. On March 2, 1971, the Mid-Am Board of Directors authorized the filing of the original Complaint in this case.
994. [Rejected]
995. [Rejected]
996. [Rejected]
997. [Rejected]
998. Prior to filing the lawsuit against NFO, counsel for Mid-Am told counsel for AMPI of Mid-Am's intention to sue NFO.
999. [Rejected]

11. NFO's Missouri Program Prior to March 25, 1971

1000. [Rejected]
1001. [Rejected]
1002. By March, 1971, NFO had added some additional producers at Jefferson City and Mountain Grove and opened a new reload at Springfield.
1003. The volume of milk going through NFO's Missouri program had increased from 1.4 million pounds in March, 1970 to 4.7 million pounds in March, 1971.
1004. [Rejected]
1005. [Rejected]
1006. Before producers in Missouri could ship to a handler in Texas, they had to be approved by Texas health authorities.
1007. [Rejected]
1008. [Rejected]
1009. [Rejected]
1010. [Rejected]

12. Missouri Milk Allegedly Checkmated by Mid-Am and AMPI

1011. At approximately the same time that Beatrice at Fort Worth ceased buying NFO milk, Kraft at Springfield notified NFO that it would no longer buy NFO milk.
1012. NFO already had loads scheduled to Kraft when Kraft told NFO it was ceasing purchases.
1013. [Rejected]
1014. [Rejected]
1015. [Rejected]
1016. [Rejected]
1017. [Rejected]
1018. In late March and early April, 1971, Scott and Avila of NFO contacted some other Texas handlers in an effort to get them to buy NFO milk.
1019. NFO offered the Missouri milk to Southland in Texas but Southland did not buy the milk.
1020. [Rejected]
1021. [Rejected]
1022. [Rejected]
1023. NFO tried, but unsuccessfully, to sell the Missouri milk to Borden in Texas both in summer, 1970 and March, 1971.
1024. In April, 1971, NFO offered its Missouri milk to Kroger's Vandervoorts plant in Texas at minimum federal order prices but Kroger refused to buy the NFO milk.
*474 1025. AMPI had sold the Vandervoorts plant to Kroger in early 1970.
1026. Al Scott of NFO contacted Rudy of Foremost in late March, 1971 and offered to sell Foremost the NFO southwest Missouri milk which Beatrice had ceased buying.
1027. Rudy of Foremost refused to buy the NFO milk.
1028. [Rejected]
1029. Gandy Dairy was a milk bottler in San Angelo, Texas, in 1971.
1030. Gandy Dairy was a regulated handler on Central West Texas Order 128 in 1971.
1031. Prior to May 1, 1971, Gandy Dairy purchased its full requirements of Grade A milk from AMPI.
1032. In March or April, 1971, Gandy Dairy arranged to begin taking part of its requirements from a group of independent dairy farmers, none of whom were in any way affiliated with NFO.
1033. In April, 1971, J. G. Anderson, the AMPI North Texas Division Manager, met with Gandy Dairy officials and discussed with them their contemplated purchases of milk from those independent producers.
1034. [Rejected]
1035. Gandy Dairy received its first delivery of milk from the independent producers on May 1, 1971.
1036. AMPI failed to deliver some milk to Gandy Dairy on May 1 and 2, 1971, and the milk that was delivered on May 1 arrived at Gandy later than usual.
1037. Gandy Dairy assumed that AMPI had not delivered certain milk and was late with other milk because Gandy had begun buying milk from independent producers.
1038. At or about the time that Gandy Dairy began buying milk from independent producers, an AMPI Gold Spot Division employee contacted Gandy's customers concerning sales of Gold Spot milk to such customers.
1039. AMPI's intent in contacting Gandy's customers was to get Gandy to return to AMPI for its full requirements of milk.
1040. In May, 1971, several of Gandy's customers advised Gandy that a Gold Spot representative had contacted them concerning possible sales of milk.
1041. [Rejected]
1042. [Rejected]
1043. [Rejected]
1044. [Rejected]
1045. Two of Gandy's four independent producers ceased shipping to Gandy in 1971.
1046. In spring 1971, after Beatrice Fort Worth stopped taking NFO southwest Missouri milk, NFO offered that milk to Gandy.
1047. [Rejected]
1048. Gandy never bought milk from NFO.
1049. In May, 1971, NFO began selling the milk of some of its Missouri members to Marigold Dairy in Fort Worth, Texas.
1050. [Rejected]
1051. Marigold Dairy at Fort Worth, Texas, ceased buying NFO Missouri milk in late May, 1971.
1052. In late March and April, 1971, Scott of NFO made some efforts to sell NFO producers Missouri milk to Hiland, Foremost, and Kraft at Springfield, Missouri; Fairmont Foods in Oklahoma; Sealtest and Kroger in St. Louis; College Club in Arkansas; and Page Milk Company at Coffeyville, Kansas and Tulsa, Oklahoma.
1053. [Rejected]
1054. On April 23, 1971, other Mid-Am personnel were instructed to follow Northern Division producers in regard to cancellation notices from Mid-Am producers who were also NFO members. Those procedures were "to do nothing."
1055. In late April, 1971 and early May, 1971 Mid-Am's Northern Division refused to acknowledge cancellation requests from three Mid-Am members who were or had been NFO members. Mid-Am's inter-office memoranda showed that Mid-Am recognized that each producer was "entirely free to ship his milk elsewhere at the end of 30-days."
*475 1056. [Rejected]
1057. Mid-Am refused to reveal the termination date of one of its producers contracts to one NFO member in Missouri.

 1058. [Rejected] 1065. [Rejected]
 1059. [Rejected] 1066. [Rejected]
 1060. [Rejected] 1067. [Rejected]
 1061. [Rejected] 1068. [Rejected]
 1062. [Rejected] 1069. [Rejected]
 1063. [Rejected] 1070. [Rejected]
 1064. [Rejected] 1071. [Rejected]

13. Alleged Impact of the Inability to Place the Missouri Milk

 1072. [Rejected] 1082. [Rejected]
 1073. [Rejected] 1083. [Rejected]
 1074. [Rejected] 1084. [Rejected]
 1075. [Rejected] 1085. [Rejected]
 1076. [Rejected] 1086. [Rejected]
 1077. [Rejected] 1087. [Rejected]
 1078. [Rejected] 1088. [Rejected]
 1079. [Rejected] 1089. [Rejected]
 1080. [Rejected] 1090. [Rejected]
 1081. [Rejected] 1091. [Rejected]

14. Kansas City Area Producers

 1092. [Rejected] 1095. [Rejected]
 1093. [Rejected] 1096. [Rejected]
 1094. [Rejected] 1097. [Rejected]

15. Southern Illinois Producers

1098. In early 1970, there were NFO members in central and southern Illinois interested in marketing milk through NFO.
1099. Beginning in 1970, NFO attempted to sell the milk of these southern Illinois producers to St. Louis handlers, including Sealtest and Kroger.
1100. [See Finding 1103, infra.]
1101. [Rejected]
1102. [Rejected]

16. The Packet Market

1103. NFO began sales to Packet in St. Louis in January, 1972.
1104. [Rejected]
1105. [Rejected]
1106. NFO still sells to Packet.
1107. In January, 1972, NFO pooled 3.3 million pounds of milk on Order 62.
1108. In January, 1973, NFO pooled 6.3 million pounds of milk on Order 62.

17. Foremost Springfield 1975

1109. [Rejected]
1110. [Rejected]
1111. Springfield, Missouri, was a very important market to NFO because the majority of its producers in Missouri were located in and around the Springfield area.
1112. [Rejected]
1113. In 1975, beginning in May, Joe Paris, Assistant Director of the NFO Dairy Department for the State of Missouri, called regularly on Bob Quinn, manager of the Foremost plant at Springfield, in an attempt to sell Foremost milk.
1114. On some occasions Al Scott accompanied Paris to Foremost.
1115. In late June or early July, 1975, Foremost agreed to buy some milk from NFO at Springfield.
1116. [Rejected]
1117. Foremost agreed to begin receiving 40 to 100,000 pounds daily, direct shipped from NFO producers' farms in and around Springfield on July 8, 1975.
1118. NFO initially shipped about 40,000 pounds per day to Foremost and gradually increased to about 100,000 pounds per day.
1119. NFO added some producers to supply the Foremost account.
1120. [Rejected]
1121. Shortly after NFO began supplying Foremost, Mid-Am stated in its Southwest `A' Pool Market Information bulletin that "So, NFO has done it again. NFO has entered the market by cutting prices on farmers' milk; and is putting considerable pressure on prices at a time when a higher farm price is indicated and by all rights should be expected."
1122. [Rejected]
1123. [Rejected]
1124. [Rejected]
*476 1125. [Rejected]
1126. [Rejected]
1127. On October 15, Quinn notified NFO that it would cease purchases from NFO at Springfield effective October 25, 1975.
1128. After that notification NFO continued to try to sell Foremost milk.
1129. [Rejected]
1130. [Rejected]
1131. [Rejected]
1132. [Rejected]
1133. [Rejected]
1134. [Rejected]
1135. [Rejected]

18. Conclusions

1135A. [Rejected]
1135B. [Rejected]

VI. Chicago

A. CMPC/AMPI Alleged Market Power

1136. Chicago Regional Order 30, covering large parts of southern and eastern Wisconsin, as well as most of northern Illinois, went into effect on July 1, 1968 and has covered essentially that same area from July 1, 1968 down to the present.
1137. In order for milk to be sold by an Order 30 handler in Chicago, that milk must be inspected and approved by the Chicago Department of Health.
1138. From 1968 to the present, approximately 70 per cent of all fluid milk sales in the Chicago Regional Order 30 were accounted for by bottlers in the Chicago metropolitan area.
1139. In 1968 about 75 per cent of all milk sold to bottlers in Chicago came from Wisconsin.
1140. On July 1, 1967, Pure Milk Association (PMA), an AMPI predecessor, and several plant-operating cooperatives, came together to form Central Milk Sales Agency (CMSA), a common marketing agency.
1141. PMA acted as CMSA's marketing agent.
1142. [Rejected]
1143. On July 1, 1968, the same day Chicago Regional Order went into effect, CMSA and several other Wisconsin and Illinois cooperatives came together to form Central Milk Producers Cooperative (CMPC), a common marketing agency.
1144. CMSA designated CMPC as its marketing agent.
1145. CMPC, in turn, designated PMA, later AMPI, as its marketing agent.
1146. [Rejected]
1147. CMSA members constituted two-thirds of the Board of Directors of CMPC before CMPC was reorganized in fall, 1970.
1148. [Rejected]
1149. From 1968 through 1979, CMPC's members have been:

 Members Dates
Alto Cooperative Creamery 1968-1979
 Waupun, Wisconsin
Associated Milk Producers, Inc. 1969-1978
Antigo Milk Products Cooperative 1968 until merger
 Antigo, Wisconsin with AMPI in 1969
Central Wisconsin Cooperative Dairies 1968-1969
 Westfield, Wisconsin
Consolidated Badger Cooperative 1968-1979
Fox River Milk Transfer Cooperative 1970-1979
 Green Bay, Wisconsin
Genoa City Cooperative Milk Association 1968-1974
 Genoa City, Wisconsin
Golden Guernsey Dairy Cooperative 1969-1979
 Milwaukee, Wisconsin
Hampshire Milk Producers Association 1968-1976
 Hampshire, Illinois
Hiawatha Valley Dairies Cooperative 1968-1979
 Sparta, Wisconsin
Independent Milk Producers Cooperative 1972-1977
 Slinger, Wisconsin
Kenosha Milk Producers Cooperative 1968 until merger
 Kenosha, Wisconsin with AMPI in 1971
Lake to Lake Dairy Cooperative 1968-1979
 Manitowoc, Wisconsin
Madison Milk Producers Cooperative 1968 until merger
 Madison, Wisconsin with AMPI in 1969
Manitowoc Milk Producers Cooperative 1968-1979
Mid-West Dairymen's Cooperative 1970-1979
 Rockford, Illinois
Milwaukee Cooperative Milk Producers 1968-1979
 Brookfield, Wisconsin
North Central Dairy Cooperative 1970-1971
Outagamie Producers Cooperative 1968-1979
 Black Creek, Wisconsin
Pure Milk Association 1968 until merger
 Chicago, Illinois with AMPI in 1969
Pure Milk Products Cooperative 1968 until merger
 Fond du Lac, Wisconsin with AMPI in 1971
Racine Milk Producers Cooperative 1968-1975
 Association, Racine, Wisconsin
Wisconsin Dairies Cooperative 1968-1979
 Baraboo, Wisconsin
Woodstock Progressive Milk Products 1968-1979
 Woodstock, Illinois

1150. [Rejected]
1151. [Rejected]

*477 B. Chicago as the Alleged Linchpin Market

1152. [Rejected]
1153. [Rejected]
1154. [Rejected]

C. AMDI'S Involvement in the Alleged Conspiracy

1155. Among the Chicago metropolitan area bottlers regulated by Chicago Order 30 were the following:
Country Delight Milk Products, Inc. A subsidiary of Certified Grocers, Inc.
Borden, Inc.
Hawthorn-Mellody, Inc.
Dean Foods Company
Meadowmoor Dairy, Inc.
Those handlers and many others were members of Associated Milk Dealers, Inc. (AMDI), a trade association.
1156. Every member of AMDI was a proprietary.
1157. [Rejected]
1158. A superpool price in Order 30 was, by definition, higher than the minimum order price.
1159. After CMPC's formation, the Price Development Committee of CMPC and AMDI's Producer Relations Committee met from time to time.
1160. [Rejected]
1161. CMPC published monthly price announcements reflecting superpool prices established by CMPC.
1162. [Rejected]

D. The Standby Pools

1163. CMPC contributed funds to support a reserve pool of Grade A milk available to all contributing buyers at a uniform charge all year long.
1164. One reason that CMPC contributed to the standby pool was to prevent a reduction in blend price of the Chicago market.
1165. [Rejected]
1166. CMPC operated a "standby pool" consisting of Chicago-inspected proprietary manufacturing plants.

E. NFO's Early Efforts in Wisconsin

1167. As early as 1967, NFO was selling memberships to dairy farmers in Wisconsin.
1168. In late 1967 and throughout 1968, NFO's dairy program in Wisconsin was generally limited to signing dairy farmers up to NFO membership agreements.
1169. By June, 1968, two assistant directors of the NFO Dairy Department began spending some of their time working in Wisconsin.
1170. As early as 1968, some NFO members in Wisconsin wanted NFO to market their milk.
1171. Beginning in early 1969, NFO negotiated milk supply contracts with a number of manufacturing plants in Wisconsin.
1172. NFO began organizing in Wisconsin milk truck routes composed of NFO members in 1969.
1173. [Rejected]
1174. NFO began its efforts to establish a Grade A dairy program in Wisconsin in early 1969.
1175. North Central Dairymen's Cooperative (NCDC) of Owen, Wisconsin, had been formed in 1964.
1176. NCDC members, many of whom were NFO members from the time it was formed, wanted NFO to market their milk.
1177. By mid-1969, a number of NFO Grade A dairy farmer members were on NFO hauling routes in southeastern Wisconsin.
1178. In early 1969, NCDC officials considered opening a reload station at Hartford in southeastern Wisconsin.
1179. [Rejected]
1180. [Rejected]
1181. In 1969, NFO asked some of its members to ship their milk to NCDC's Hartford plant.
1182. In fall, 1969, after Antigo Milk Producers Cooperative in Wisconsin merged into AMPI, a number of NFO producers at Antigo indicated their desire to market milk through NFO.
*478 1183. [Rejected]
1184. [Rejected]
1185. By late 1969, NFO had established truck routes of a number of dairy farmers in a number of places in Wisconsin. Many of those farmers were also members of NFO.
1186. [Rejected]
1187. As early as 1969, NFO sought qualification from USDA in federal milk marketing orders.
1188. In 1969, Ricardo Avila, assistant director of the NFO Dairy Department, familiarized himself with the various requirements of Chicago Order 30 and the Chicago health regulations and procedures for transferring producers from other organizations to NFO.
1189. [Rejected]
1190. In June, 1969, Sidney Wanzer & Sons, Dairy (Wanzer) in Chicago, an Order 30 regulated handler, began buying NCDC milk.
1191. Soldwedel of Wanzer testified that one reason he purchased NCDC milk for Wanzer was that he preferred to have at least two suppliers. Soldwedel's primary reason, however, for buying milk from any source was price.

F. The Alleged Reaction of the Alleged Co-Conspirators

1192. [Rejected]
1193. [Rejected]
1194. In November, 1969, counsel for CMPC directed Wanzer Dairy's attention to § 185.42 of the Wisconsin Statutes.
1195. [Rejected]
1196. On January 6, 1970 representatives of CMPC and AMDI met to discuss certain marketing problems, including the cost of hauling.
1197. At the January 6, 1970 CMPC/AMDI meeting, some AMDI members indicated to the CMPC representatives present that they were upset about Wanzer's buying NCDC milk at below the CMPC price.
1198. [Rejected]
1199. CMPC, among other actions, terminated its superpool premium effective February 16, 1970.
1200. [Rejected]
1201. [Rejected]
1202. From February 16, 1970 through February 14, 1971, CMPC charged no superpool premiums on Class I milk sold in Order 30.
1203. Beginning March, 1970 and continuing through February 14, 1971, CMPC announced a 5 cent (6 cent beginning October, 1970) market service charge applicable to any Order 30 buyer who received milk from any source for which CMPC was the authorized marketing agent.
1204. This service charge was in addition to the basic 18½ cent plant handling charge.
1205. [Rejected]
1206. [Rejected]
1207. [Rejected]
1208. [Rejected]
1209. [Rejected]
1210. On or about April 20, 1970, CMPC announced service charges which would go into effect May 1, 1970.
1211. The service charges announced by CMPC on April 20, 1970 included a 36¼ cent per cwt. service charge applicable to any buyer "who accounts to and settles with CMPC for less than 100% of his Class I requirements" on "all purchases in other months in excess of 110% of average purchases May through June."
1212. [Rejected]
1213. [Rejected]
1214. [Rejected]
1215. Wanzer's purchases of raw milk were generally greatest in the months of September through November.
1216. NCDC member production was at its highest level in May and June, 1970.
1217. [Rejected]

*479 G. Mid-Am Alleged Involvement

1218. Gary Hanman has been Mid-Am's liaison with AMPI since 1969 "to eliminate problems which may develop" between the two organizations.
1219. During the period 1969 through 1971, Gary Hanman kept aware of the pricing situation in the Chicago Order by reading CMPC price announcements.
1220. Mid-Am was interested in pricing in Chicago because of the effect Chicago pricing might have on pricing in other areas where Mid-Am operated, including Missouri.
1221. [Rejected]
1222. [Rejected]
1223. [Rejected]
1224. [Rejected]
1225. [Rejected]
1226. [Rejected]
1227. [Rejected]
1228. [Rejected]

H. NFO's Dairy Program in Wisconsin

1229. In early 1970, NFO began to plan for the possible opening of reload stations and the establishment of a dairy marketing program.
1230. After getting Wanzer to agree to buy more NFO milk in early 1970, NFO recruited additional dairy farmers for its dairy program in Wisconsin.
1231. In 1970, NFO convened various meetings attended by a number of dairy farmers in Wisconsin to discuss the NFO dairy program.
1232. The dairy farmers attending these 1970 NFO meetings were interested in the NFO Grade A dairy program in Wisconsin.
1233. Some of the dairy farmers at these 1970 NFO meetings in Wisconsin may not have been members of NFO.
1234. In 1970, many farmers in Wisconsin were unhappy with the prices they were receiving for milk.
1235. Approximately 18 to 21% of AMPI's Tri-States Region members  some 2,000 dairy farmers  were or had been members of NFO, beginning in 1955.
1236. [Rejected]
1237. The first Wisconsin reload was opened in June, 1970 at Stoughton. So far as inspection was concerned, the Stoughton reload was considered as an extension of the Wanzer plant.
1238. In June, 1970 Wanzer Dairy began buying milk from dairy farmers, many of whom were NFO members, who delivered their milk to the Stoughton reload which was operated by dairy farmers who were NFO members.
1239. [Rejected]
1240. NFO became qualified by the USDA to act as a cooperative under Order 30 in July, 1970 with respect to those members of NFO whose milk was received at the Stoughton reload and thereafter marketed under Order 30.
1241. [Rejected]
1242. [Rejected]
1243. [Rejected]
1244. In July, 1970, AMPI Mid-States Region divisional manager McKee recommended that AMPI marketing personnel develop a program aimed at selling milk on a year round full supply basis to all handlers, whether Grade A or B.
1245. AMPI was concerned that NFO price cutting would undermine the premiums being paid on the Chicago market.
1246. [Rejected]
1247. [Rejected]

I. CMPC Allegedly Tries to Get NFO to Join the Club

1248. After NFO became qualified on Order 30 (see finding 140, supra) in July, 1970, CMPC offered a membership and marketing agreement to NFO with respect to the milk of those producers for whom it was marketing on Order 30.
1249. [Rejected]
1250. [Rejected]
1251. [Rejected]
1252. [Rejected]
1253. NFO refused to join CMPC.
*480 1254. [Rejected]
1255. Effective October 15, 1970, NCDC signed a Membership and Marketing Agreement with CMPC.

J. CMPC Allegedly Considers Suing NFO To Reestablish Superpool Premiums

1256. [Rejected]
1257. [Rejected]
1258. [Rejected]
1259. [Rejected]
1260. [Rejected]
1261. [Rejected]
1262. [Rejected]
1263. [Rejected]
1264. [Rejected]

K. The October 19, 1970 Announcement

1265. At its October 15, 1970 meeting, the CMPC Board approved of CMPC's sending out a new announcement concerning service charges to be effective December 1, 1970 in District I (Chicago) only.
1266. The minutes of the October 15, 1970 CMPC Board meeting show that one CMPC member asked about the legality of the CMPC price announcement to be effective December 1, 1970 and that he was advised that its legality had been approved by CMPC counsel and "outside counsel at the request of the President."
1267. [Rejected]
1268. On October 19, 1970, CMPC issued that new schedule of service charges to be effective December 1, 1970.
1269. The October 19, 1970 CMPC announcement provided that "for milk to supply a dealer who does not report to or settle with CMPC for his total Class I requirements," the effective CMPC service charge would be 37¼ cents "for milk supplied through a supply plant or other receiving center for which CMPC is the authorized marketing agent" and that "any buyer may select one of the ... options" set forth in the announcement.
1270. [Rejected]
1271. [Rejected]
1272. [Rejected]
1273. [Rejected]
1274. [Rejected]
1275. [Rejected]
1276. [Rejected]

L. The October 19, 1970 Alleged Cabal

1. The Meeting

1277. On October 19, 1970, Mid-Am representatives Hanman and Gage met with AMPI representatives Russell, McWilliams, Jim Hill and Andy Anderson, as well as Westwater of DI at the Sheraton Motor Inn at Bloomington, Minnesota.
1278. McWilliams was chairman of CMPC's Price Development Committee.
1279. McWilliams occasionally attended ARSPC meetings.
1280. Westwater of DI was general manager of ARSPC.
1281. Anderson, Hanman and Gage were on the ARSPC Operations Committee in fall, 1970.
1282. Hanman, Russell and Gage were members of a special ARSPC pooling committee appointed on October 19, 1970.
1283. This October 19, 1970 meeting was held in the Bloomington, Minnesota Sheraton Inn, the same place where ARSPC held a meeting that day.
1284. The purpose of this October 19, 1970 meeting between representatives of AMPI, Mid-Am and DI was to discuss similar experiences that these three cooperatives had relative to NFO's solicitation of their members and NFO's marketing milk in their markets at cut-rate prices.
1285. [Rejected]

2. The Alleged Aftermath

a). The Alleged Poisoning of NFO's Well

1286. On October 9, 1970, counsel for Mid-Am wrote a letter to the Director of Marketing Services of the Wisconsin Department of Agriculture, inquiring whether his department had reviewed the question of NFO's legal status with the Attorney General of Wisconsin.
*481 1287. Counsel for Mid-Am sent counsel for AMPI and counsel for CMPC carbon copies of that letter.
1288. On November 5, 1970 the Order 30 Market Administrator sent a report to the Director of the Dairy Division of the Department of Agriculture in Washington concerning a meeting he had with representatives of AMPI and CMPC in regard to NFO status under Order 30.
1289. That report stated that at a meeting held October 26, 1970 CMPC and AMPI representatives raised questions concerning NFO's qualification on Order 30.
1290. Subsequent to the October 26, 1970 meeting, counsel for AMPI wrote the USDA for a copy of NFO's application for qualification in connection with a USDA Notice of Hearing to consider a definition of the term "cooperative association."
1291. On October 27, 1970 counsel for CMSA wrote the Wisconsin Department of Agriculture about NFO's marketing the milk of Wisconsin dairy farmers. That letter, written at the request of the Director of Marketing Services, raised a number of legal questions and stated, among other things, that the "Wisconsin cooperatives which I represent have no quarrel with the legitimate activities of any responsible farm organization." It also stated that "We believe that the unregulated activities of a purported `cooperative' operating without corporate responsibility could, unless corrected, undermine the cooperative structure built so carefully in Wisconsin over the past half century."
1292. In November, 1970 counsel for Mid-Am wrote the Missouri State Attorney General concerning various aspects of NFO's milk marketing activities.
1293. Herbert Forest, the Director of the Dairy Division at the USDA, discussed NFO's qualification with the Missouri Attorney General's office.
1294. Mid-Am prompted the Missouri Attorney General's office inquiry to the USDA concerning NFO's qualification.
1295. The Wisconsin Department of Agriculture also contacted the USDA concerning NFO's operations at Stoughton.

b). Publicizing NFO's Price Cutting

1296. On November 6, 1970, CMPC established a Press Relations Committee to disseminate information about CMPC through the press, radio and television.
1297. Mid-Am disseminated information to Mid-Am members to publicize NFO's price cutting in Chicago.

M. NFO Wisconsin Dairy Program in Fall, 1970

1298. [Rejected]
1299. By September, 1970, various individual members of NFO established five reloads in Wisconsin (Stoughton, Hartford, Cuba City or Dickeyville, Menasha and Taylor) and one in northern Illinois (Harvard).
1300. Less than one hundred producers shipped their milk through the Stoughton reload in June and July, 1970.
1301. By the end of 1970, a larger number of producers were participating in the NFO Order 30 Grade A dairy program.
1302. Each reload that NFO members established in Wisconsin was eventually equipped to handle at least two hundred producers' milk.
1303. [Rejected]
1304. [Rejected]
1305. In fall, 1970 Wanzer was willing to take all the NFO Order 30 reload milk that NFO could deliver at the minimum federal order price.
1306. NFO sales in pounds to Wanzer from June, 1970 through December, 1970 were as follows:

 Percentage
 Allocation to
Month/Year Class I Class II Total Class I
 6/70 1,055,940 159,960 1,215,900 86.8
 7/70 1,018,431 426,819 1,445,250 70.5
 8/70 3,724,563 1,026,987 4,751,550 78.4
 9/70 8,472,276 2,435,894 10,908,170 77.7
 10/70 8,582,716 1,461,544 10,044,260 85.4
 11/70 7,231,946 2,159,599 9,391,545 77.0
 12/70 9,742,973 2,040,229 11,783,202 82.7

1307. [Rejected]
1308. [Rejected]
*482 1309. In late 1970 NFO dairy farmers were able to get premiums of 25 to 60 cents per cwt. over the M-W Series price for Wisconsin Grade A milk which Wanzer did not receive and which NFO diverted to manufacturing plants.

N. CMPC Alleged Pressure Allegedly Gets to Southland

1310. [See finding 1312, infra].
1311. As of November, 1970 there was no practical alternative supply source for all of Wanzer's requirements other than CMPC.
1312. On November 10, 1970, Wanzer advised NFO by letter that Wanzer would discontinue the purchase of raw milk from receiving stations at Stoughton, Hartford, and Harvard, Wisconsin, for the Wanzer plant in Chicago, effective midnight November 30, 1970.
1313. [Rejected]
1314. [Rejected]
1315. [Rejected]
1316. [Rejected]
1317. [Rejected]
1318. On November 27, 1970 NFO wrote Wanzer a letter that stated that "NFO will in behalf of its members guarantee additional plant handling charges after December 1, 1970 up to 37¼ cents per cwt. until January 1, 1971."
1319. On November 23, 1970, Wanzer notified CMPC that it would comply with the terms of CMPC's October 19, 1970 price announcement.

O. AMPI Allegedly Uses Leverage in the South

1320. [Rejected]
1321. [Rejected]
1322. [Rejected]
1323. [Rejected]
1324. While employed by Southland from 1969 to 1971, Reeves negotiated with AMPI for milk for Southland's plants in Texas, Oklahoma and Memphis.
1325. [Rejected]
1326. [Rejected]
1327. [Rejected]
1328. [Rejected]
1329. ARSPC held a Board of Directors meeting in Las Vegas, Nevada on November 30, 1970.
1330. [Rejected]

P. Southland Agrees to Participate for a Month

1331. [Rejected]
1332. On November 30, 1970, Wanzer agreed that it "would pay CMPC 6 cents per cwt. on all Class I sales as per [CMPC's] announcement of November 6, 1970" pursuant to the option provided in CMPC's October 19, 1970 price announcement.
1333. On December 2, 1970 Southland directed its subsidiary Wanzer to purchase milk from NFO and CMPC during the month of December, 1970, and thereafter until further notice, on the same pro rata basis as it had during November, 1970. Henry Soldwedel of Wanzer was advised that any change in those instructions would have to be personally approved by Cochran of Southland.
1334. [Rejected]

Q. AMDI Allegedly Insists on a Six-Month Contract

1335. On December 2, 1970, officials of CMPC and AMDI met to discuss CMPC's policy of meeting competition.
1336. The question of whether Wanzer was going to pay the 6 cent service charge on milk purchased and used for Class I purposes was discussed.
1337. AMPI officials told Hawthorn-Mellody that Southland-Wanzer had agreed for December.
1338. As early as December, 1970 some AMDI members objected to paying more for milk than the price paid by other dealers with whom they were in competition.
1339. Particular dealers stated that they objected to paying any CMPC superpool premium as long as their competitors were receiving milk at a lower price.
1340. [Rejected]
1341. [Rejected]
1342. [Rejected]

*483 R. CMPC Allegedly Threatens Cut-Off to Force Southland to Sign One-Year Contract

1343. In early December, 1970, AMPI officials, including McWilliams and Dave Parr (D.P.), were attempting to meet with Southland officials.
1344. On December 7, 1970 Wanzer rescinded an earlier letter dated November 10, 1970 and notified NFO that it would continue to purchase milk from the NFO Wisconsin reloads on a day-to-day basis only.
1345. On December 8, 1970, AMPI had a hearsay report that NFO had recently been given another month to obtain a full supply for Wanzer.
1346. On December 10, 1970, CMPC wrote Wanzer a letter which stated that CMPC would not deliver any milk to Wanzer after December 15, 1970 because "we have become aware that you have been engaged with others in unlawful attempts to interfere with producers whose milk is subject to effective marketing agreements with CMPC and its members."
1347. [Rejected]
1348. CMPC informed Cochran of Southland of its December 10, 1970 letter.
1349. [Rejected]
1350. On December 15, 1970, counsel for CMPC advised Wanzer that in light of pending discussions between representatives of Wanzer and CMPC to effect an amicable settlement of their differences, CMPC would continue to deliver milk to Wanzer on a day-to-day basis pending further discussions and mutual agreement on future terms of sale.
1351. On December 16, 1970, Southland executed a one-year milk supply agreement with CMPC to buy certain of its Class I requirements from CMPC commencing January 1, 1971. That agreement was executed by CMPC on December 22, 1970.
1352. [Rejected]
1353. [See finding 1351, supra].
1354. [Rejected]
1355. In December, 1970 Southland advised NFO and Wanzer that throughout 1971, Wanzer would need to purchase six to six and a half million pounds of milk per month from the three NFO Wisconsin receiving stations.
1356. In early 1971, Graf, Avila and Scott of NFO met with Reeves of Southland at Des Moines, Iowa, to discuss NFO's supply arrangement with Wanzer, among other things.
1357. [Rejected]

S. CMPC and AMDI Allegedly Agree to Reestablish Superpool Premiums

1358. In late December, 1970, CMPC met with a number of Chicago members of AMDI and showed those dealers the one-year CMPC-Southland contract.
1359. [Rejected]
1360. [Rejected]
1361. Wanzer was apparently a member of AMDI in January, 1971.
1362. On January 11, 1971, CMPC representatives met with various milk dealers in Chicago.
1363. [Rejected]
1364. [Rejected]
1365. On January 12, 1971, CMPC announced a Zone I, Class I price increase of 50 cents/cwt. to $6.59, effective February 15, 1971, later modified on February 1, 1971 to $6.39/cwt., Zone I, Class I.
1366. The January 13-14, 1971 AMPI Board meeting received a report from McWilliams on the Superpool in Chicago.
1367. [Rejected]
1368. On February 1, 1971 CMPC announced a 30 cent/cwt. over order Class I price of $6.39 effective February 15, 1971.
1369. [Rejected]

T. Alleged Effect of CMPC-Wanzer Contract on NFO

1. The Alleged Cutback

1370. The December 22, 1970 CMPC-Southland contract went into effect on January 1, 1971.
1371. [Rejected]
*484 1372. Beginning January, 1971, Wanzer bought more than the estimated 15.4 million pounds of Class I milk from CMPC called for in the December 22, 1970 contract.
1373. [Rejected]
1374. NFO sales in pounds to Wanzer from January, 1971 through July, 1971 were as follows:

 Percentage
 Allocation to
 Month/Year Class I Class II Total[1] Class I
 1/71 1,885,575 3,651,974 5,537,549 34.1
 2/71 1,413,935 4,294,945 5,708,660 24.8
 3/71 3,138,583 5,266,537 8,405,120 37.3
 4/71 2,475,727 4,158,633 6,634,360 37.3
 5/71 2,378,243 4,989,867 7,368,110 32.3
 6/71 784,102 4,204,548 4,988,650 15.7
 7/71 211,591 3,159,029 3,370,620[2] 6.6

2. NFO Allegedly Forced to Sell to Cheese Plants

1375. Any Wisconsin Grade A milk that NFO did not deliver to Order 30 bottling plants, including Wanzer, was sold to Wisconsin manufacturing plants generally, at prices which returned more money per cwt. to the NFO dairy farmer member than if that milk had been sold to Wanzer.
1376. [Rejected]
1377. The NFO dairy farmers received premiums on the milk shipped to northern Wisconsin manufacturing plants in spring, 1971.

3. AMDI Allegedly Boycotts NFO

1378. Beginning in January, 1971, NFO looked for other Order 30 Class I outlets so that it could qualify its producers' milk in the fall, 1971 qualifying season.
1379. NFO experienced difficulty finding buyers for its Wisconsin milk in spring, 1971.
1380. Throughout the first half of 1971, Avila and Kanerva of NFO contacted a number of Class I handlers in Order 30 in an attempt to find an outlet for NFO Wisconsin milk for the fall, 1971 qualifying season.
1381. In January, 1971, NFO unsuccessfully attempted to sell NFO members' Wisconsin milk to Dean Foods.
1382. [Rejected]
1383. After January, 1971, NFO again offered NFO Wisconsin milk to Dean Foods, but received the same response as it had in January.
1384. [Rejected]
1385. Dean Foods had an agreement with CMPC that it would buy CMPC milk provided CMPC would meet any competitive price in the market.
1386. [Rejected]
1387. Hawthorn-Mellody's Chicago Division received most of its milk from CMPC.
1388. [Rejected]
1389. Hawthorn-Mellody bought some milk from suppliers other than CMPC. It did not, however, agree, to buy any milk from NFO producers.
1390. NFO made some attempt to sell NFO Wisconsin milk to the following Order 30 handlers who were AMDI members: Jewel Tea and Borden.
1391. [Rejected]
1392. [Rejected]
1393. NFO managed to qualify all of the Order 30 reloads as pool supply plants during August, 1971.
1394. In some instances, NFO producers had to ship their milk into Chicago, have it pumped through an Order 30 handler's facility and then reloaded and reshipped to a manufacturing plant in upstate Wisconsin.
1395. NFO received no plant handling charge on this "put through" milk.
1396. [Rejected]
1397. [See footnote 2, finding 1374, supra.]

4. Producer Growth Allegedly Slows to a Crawl

1398. By August, 1971 various individual members of NFO established milk reloads at Tomah, Sauk City and Marathon *485 City to bring the total of similar Order 30 reloads up to nine.
1399. [Rejected]
1400. [Rejected]
1401. [Rejected]
1402. [Rejected]
1403. [Rejected]
1404. [Rejected]

U. AMPI Allegedly Moves to Take NFO Producers

1405. A January 18, 1971 memorandum relaying "reports" concerning two of the NFO reloads caused two AMPI employees to believe that "NFO's house of cards may be on the verge of tumbling down."
1406. In a January 25, 1971 memorandum to its fieldmen in Wisconsin, AMPI instructed those field men to contact all Wisconsin dairy farmers who formerly shipped through AMPI and others active in NFO for a good will return visit.
1407. AMPI field service personnel may have solicited NFO dairy farmer members after receipt of that memorandum.
1408. [Rejected]
1409. [See Finding 1405, supra.]
1410. On January 8, 1971, AMPI counsel wrote NFO a letter in which AMPI's legal position was stated.
1411. Mid-Am and CMPC received copies of AMPI's counsel's letter of January 8, 1971 to NFO.
1412. Wanzer and Southland received copies of AMPI's counsel's letter of January 8, 1971 to NFO.

V. The PMPC Merger

1413. By late 1970 or early 1971, PMPC had about 11,000 members in Wisconsin, 6,000 Grade A and 5,000 Grade B.
1414. PMPC had explored the possibility of a merger with PMA, later AMPI, prior to 1971 but PMA was not interested.
1415. In a letter dated September 16, 1970 McWilliams of AMPI stated to Parr of AMPI that part of AMPI's "game plan" to be followed in discussing merger was the idea that the market power of a combined AMPI/PMPC would far outstrip that of any other group.
1416. [Rejected]
1417. [Rejected]
1418. [Rejected]
1419. [Rejected]
1420. [Rejected]
1421. Effective May 1, 1971, PMPC merged into AMPI.
1422. PMPC published and circulated a Special Merger Edition of its news publication in April, 1971.
1423. [Rejected]

W. NFO Breaks into Kraml

1424. NFO first began negotiating with Kraml Dairy (Kraml) in Chicago in spring, 1971.
1425. [Rejected]
1426. NFO reduced its plant handling charge to 12 cents for Kraml.
1427. NFO agreed on August 19, 1971 to supply Kraml Dairy in Chicago with milk from September 1 to July 31, 1972 at a price based on CMPC's announced price plus a 5 cent per cwt. plant handling charge on Class I milk and a 17 cent per cwt. handling charge on milk allocated to Class II, together with some further adjustments relating to hauling charges.
1428. NFO's Class I price to Kraml was below what NFO had been charging Wanzer.
1429. [Rejected]
1430. [Rejected]
1431. From September, 1971 through November, 1976, NFO sold milk to Wanzer and Kraml below CMPC's price.
1432. The 1971 Kraml contract, although providing members of NFO living in Wisconsin with a market, did not reflect favorably on NFO's dairy marketing ability.
1433. [Rejected]
1434. NFO began shipping milk of its members to Kraml around the first of September, 1971.

*486 X. AMPI Sues NFO in Wisconsin State Court

1435. On August 30, 1971, CMPC learned that Wanzer had elected to cancel the one year contract it had signed with CMPC in December, 1970.
1436. [Rejected]
1437. On August 31, 1971, AMPI and PMPC sued NFO in Wisconsin State court for allegedly inducing producers to terminate or breach their AMPI and PMPC contracts.
1438. [Rejected]
1439. [Rejected]
1440. [Rejected]
1441. [Rejected]
1442. [Rejected]
1443. [Rejected]
1444. [Rejected]
1445. [Rejected]
1446. [Rejected]
1447. [Rejected]
1448. [Rejected]
1449. [Rejected]
1450. [Rejected]
1451. [Rejected]
1452. Arent, Fox, Kintner, Plotkin & Kahn, the law firm representing AMPI in both Alexander and PMPC v. NFO, represented NCDC in the Alexander case and the Wisconsin State court case.

Y. AMPI Allegedly Resorts to Credits To Keep NFO Threat in Check

1453. [Rejected]
1454. [Rejected]
1455. [Rejected]
1456. [Rejected]
1457. [Rejected]
1458. On January 3, 1972, Southland was advised that there was going to be a meeting of the CMPC Price Committee on Wednesday, January 5, 1972.
1459. On or about January 6, 1972, CMPC notified all CMPC buyers that it would issue a 6½ cent per cwt. credit on CMPC Class I premium milk sold in Cook and DuPage Counties in Illinois for the months of September through December, 1971.
1460. The 6½ cent per cwt. CMPC credit in Cook and DuPage Counties was designed to meet competition.
1461. After Kraml learned of CMPC's January, 1972 retroactive credit, it sought a retroactive price adjustment from NFO in accordance with its August 19, 1971 agreement with NFO.
1462. NFO refused to give Kraml a retroactive price adjustment on advice of NFO's counsel.
1463. On or about March 14, 1972, CMPC notified all CMPC buyers that it would issue a 6½ cent per cwt. retroactive credit on all CMPC Class I premium milk sold in Cook and DuPage Counties in Illinois for the months of January and February, 1972.
1464. On August 7, 1975 CMPC announced that all competitive price credits to meet competition from producers who sell milk for prices lower than CMPC would be terminated on September 1, 1975.
1465. [Rejected]
1466. [See finding 1464, supra.]
1467. [Rejected]
1468. [Rejected]
1469. In fall 1975 Kraml deducted some $45,000 from what it owed NFO because CMPC had announced a 12, then 13½ cent per cwt. retroactive credit (in addition to the 6½ cent basic credit) covering the months of May through August, 1975.
1470. NFO sought to recover the $45,000 from Kraml but was unsuccessful because NFO felt that it could not force the issue of the $45,000 retroactive credit with Kraml because Kraml was really the only Order 30 market that NFO had and, if it lost it during the fall of 1975, it might not be able to pool its producers' milk on Order 30 until the next fall qualifying season.
1471. [Rejected]
1472. [Rejected]
*487 1473. [Rejected]
1474. [Rejected]

Z. Conclusions

1475. [Rejected]
1476. [Rejected]
1477. [Rejected]

VII. The Minnesota Experience

A. AMPIMid-Am Northern Mergers, 1969-1970

1478. In early 1969 there were a number of independent milk manufacturing plants in Minnesota, some operated by farmer cooperatives and some by independent entrepreneurs ("proprietaries").
1479. AMPI, Mid-Am and ADI were interested in the manufacturing facilities as they existed in Minnesota.
1480. AMPI and Mid-Am in 1969 began to merge with, acquire or consolidate with particular Minnesota proprietary plants and cooperatives.
1481. [Rejected]
1482. [Rejected]
1483. Plants in Minnesota and Wisconsin which had signed contracts with NFO were loosely referred to by some persons in the industry as "NFO plants."
1484. During the 1960's, particular NFO members in Minnesota and western Wisconsin directed their milk to plants which had signed contracts with NFO.
1485. [Rejected]
1486. [Rejected]
1487. [Rejected]
1488. [Rejected]
1489. [Rejected]
1490. In 1969, Five Star Dairyland Cooperative was one of the larger cooperatives in the State of Minnesota with more than 2,500 member producers.
1491. Five Star had manufacturing plants at Clarkfield, Paynesville, and New Ulm.
1492. Five Star had signed milk supply contracts with NFO in April, 1969.
1493. MPI merged with the Five Star Dairyland Cooperative of New Ulm, Minnesota on July 1, 1969.
1494. In August, 1969, merger with MPI was approved by the producers of the Turtle Lake Cooperative Creamery Association, Turtle Lake, Wisconsin, and Boyceville Cooperative, Boyceville, Wisconsin.
1495. The vote for consolidation of the producers serving both the Turtle Lake and Boyceville plants was considered significant in that the producers serving both plants had substantial NFO membership.
1496. MPI merged or consolidated with Minnesota Valley Milk Cooperative at Belle Plaine, Minnesota (Belle Plaine), on September 1, 1969.
1497. [Rejected]
1498. The Belle Plaine plant had 900 patrons  500 direct members and 400 producers delivering through three feeder cooperatives  independent associations operating receiving plants of their own.
1499. [Rejected]
1500. MPI's regional manager reported that MPI, on January 16, 1970 closed down the Belle Plaine manufacturing plant because of its high cost of operation.
1501. [Rejected]
1502. [Rejected]
1503. [Rejected]
1504. The Owatonna Cooperative (Southern Dairy Association) of Owatonna, Minnesota; New Prague; and Rochester Dairy, another cooperative, were all competitors of Belle Plaine when it was acquired.
1505. [Rejected]
1506. [Rejected]
1507. [Rejected]
1508. New Prague, which had 455 patrons, was recognized by AMPI (which replaced MPI October 1, 1969) as an "all NFO plant."
1509. During the 1960's NFO had directed particular NFO members in the New Prague area to ship their milk to the New Prague Dairy Products, Inc. plant.
*488 1510. The New Prague plant had a capacity for manufacturing 800,000 pounds of milk daily.
1511. AMPI acquired New Prague December 1, 1969.
1512. [Rejected]
1513. [Rejected]
1514. The following Minnesota-Western Wisconsin cooperatives became a part of AMPI effective October 1, 1969: Rochester Dairy Cooperative, Rochester, Minnesota; Turtle Lake Cooperative Creamery Association, Turtle Lake, Wisconsin; Boyceville Cooperative, Boyceville, Wisconsin; and Farmers' Cooperative Dairy Association of Howard Lake, Minnesota.
1515. On November 1, 1969 AMPI acquired the Delano Cooperative Association of Delano, Minnesota.
1516. Delano was a bottling plant on Twin Cities Federal Order 68.
1517. [Rejected]
1518. Twin Cities Milk Producers agreed on December 2, 1969 to merge with Mid-Am.
1519. On December 1, 1969 AMPI acquired the Southern Dairy Association of Owatonna, Minnesota, a large cooperative butter-powder facility with a capacity of 800,000 pounds per day.
1520. Owatonna purchased from approximately 375 direct patrons and seven cooperatives.
1521. [Rejected]
1522. Effective January 1, 1970, AMPI acquired and shut down the St. Charles Condensary Company of St. Charles, Minnesota.
1523. On October 1, 1969 AMPI acquired the Farmers Cooperative Creamery Association of Deer Creek, Minnesota.
1524. [Rejected]
1525. In 1969 North Star [Dairy, St. Paul, Minnesota] was an independent cooperative federation which marketed the hard manufactured dairy products produced by its members, which were Minnesota dairy cooperatives.
1526. On October 15, 1969, AMPI acquired the Grey Eagle Cooperative Creamery Association of Grey Eagle, Minnesota.
1527. [Rejected]
1528. [Rejected]
1529. [Rejected]
1530. [Rejected]
1531. Twin Cities Milk Producers was the dominant cooperative in the Twin Cities market area in 1969.
1532. Twin Cities merged with Mid-Am effective April 1, 1970.
1533. Twin Cities had 3,000 members in 1969-1970.
1534. Effective May 1, 1970, the North Star Dairy of St. Paul, Minnesota, merged with Mid-Am.
1535. The North Star-Mid-Am merger was followed by the merger with Mid-Am of eight member cooperatives of North Star Dairy: Zumbro Valley Dairy Association, North Star Dairy-Lakes Region; Tri-County Dairy Cooperative; Hutchinson Creamery Association; Welcome Creamery Association; Benson Cooperative Creamery; Bertha Cooperative Creamery; and West Side Cooperative Creamery.
1536. [Rejected]
1537. The North Star merger added more than 3,000 members to Mid-Am.
1538. The North Star Dairy-Lakes Region at Fergus Falls, Minnesota was loosely described by some persons in the industry as an "NFO plant," having entered into both master contract and supply contracts with NFO.
1539. [Rejected]
1540. Mid-Am acquired North Star at Fergus Falls shortly after May 1, 1970.
1541. [Rejected]
1542. [Rejected]
1543. Benson Cooperative had a master contract with NFO prior to its acquisition by Mid-Am.
1544. [Rejected]
*489 1545. The Pure Milk Products Company at Winsted, Minnesota, was a privately-owned, large-volume cheese manufacturing operation, located just west of metropolitan Minneapolis-St. Paul.
1546. Mid-Am's 1970 Annual Report stated that the dairy farmers who supplied milk to the Pure Milk plant before its purchase by Mid-Am were not members of any cooperative but that all but a few joined Mid-Am after the purchase.
1547. The Pure Milk plant at Winsted had 500 direct patrons in early 1970 who supplied 60 percent of its receipts.
1548. Pure Milk received the other 40 percent of its needs from eight cooperatives.
1549. In April, 1970 the Pure Milk plant at Winsted had capacity to handle up to one million pounds of milk per day.
1550. [See finding 1546, supra].
1551. Subsequent to its purchase of the Pure Milk Winsted plant, Mid-Am planned new equipment which would double the plant's cheese-producing capacity.
1552. [Rejected]
1553. [Rejected]
1554. The Red Oak Grove Cooperative Creamery of Austin, Minnesota, operated butter-powder manufacturing plants at Twin Lakes and Austin, Minnesota.
1555. Mid-Am acquired the Red Oak Grove Cooperative Creamery on July 1, 1970.
1556. Red Oak Grove had a master contract with NFO.
1557. [Withdrawn]
1558. [Rejected]
1559. Western Wisconsin Dairies Cooperative at Blair, Wisconsin, was a large, independent, cheese plant in 1971.
1560. AMPI acquired Western Wisconsin Dairies at Blair effective November 1, 1971.
1561. [Rejected]
1562. [Rejected]
1563. [Rejected]
1564. In 1973 AMPI purchased Theil's Milk Products, Inc., a large proprietary manufacturing plant in Wisconsin which had been an NFO customer.
1565. NFO lost Theil's as a customer after AMPI acquired it.
1566. AMPI has continued to the present day to purchase cooperative and proprietary plants.
1567. [Rejected]
1568. [Rejected]

B. The Order 68 Market in 1970

1569. There were four federal milk marketing orders in the State of Minnesota in 1970:
a) Order 60  The Minnesota-North Dakota Order in the Fergus Falls-Moorhead, Minnesota, and Fargo, North Dakota area;
b) Order 61  the Southeastern Minnesota-Northern Iowa Order which took in the Rochester, Minnesota, area and surrounding counties in northern Iowa and southeastern Minnesota;
c) Order 68  The Twin Cities Order which encompassed Minneapolis, St. Paul and outlying counties;
d) Order 69  the Duluth-Superior Order, a small order covering Duluth, Minnesota; Superior, Wisconsin, and adjoining counties. [Our finding in regard to the geographical location of the above Orders is not to be construed as a finding that those areas are "markets" under the antitrust laws.]
1570. [Rejected]
1571. Order 68 was geographically central among the Minnesota orders in 1970.
1572. In 1969 the simple average number of producers as reported in the USDA Statistical Bulletin No. 470 as delivering milk to handlers regulated on the Minnesota orders was Order 60  1,489; Order 61 781; Order 69  665; Order 68  4,416.
1573. The northwestern Wisconsin area has been part of the Twin Cities (Order 68) market milkshed.
1574. The M-W Association was a group of cooperatives including Mid-Am, AMPI, Land O'Lakes and several smaller organizations; it sold milk to Twin Cities' bottlers.
*490 1575. [Rejected]
1576. [Rejected]
1577. The M-W Association, when it began, was an association of competing raw milk supplying organizations on the Twin Cities market.
1578. [Rejected]
1579. In 1970 Mid-Am was an important member of the M-W Association.
1580. [Rejected]
1581. In 1970 several Order 68 handlers were purchasing 100 percent of their milk from Mid-Am.
1582. In 1970 or 1971 the following Order 68 bottling plants were owned and operated by cooperatives: Sanitary Dairy  Land O'Lakes; Nicollet plant  Mid-America; Beaver Falls  Land O'Lakes; Clear Lake  Minnesota Milk Cooperative.

C. NFO Marketing in Minnesota  Order 68

1583. NFO started direct marketing of some manufacturing grade milk in Minnesota in 1969.
1584. Early in 1970 NFO decided to begin exploring the possibility of Class I markets in Minneapolis and St. Paul, the Twin Cities, for its members' milk.
1585. [Rejected]
1586. In 1969 a number of Grade A dairy farmers in Minnesota were also NFO members.
1587. In 1970 or early 1971 there were a number of Grade A producers in the Order 61 area interested in marketing their milk production through NFO.
1588. In 1970 or early 1971 there were a number of Grade A producers in the Order 60 area interested in marketing their milk production through NFO.
1589. In 1970 or early 1971 there were a number of Grade A producers in the Order 68 area interested in marketing their milk through NFO.
1590. [Rejected]
1591. Meetings called by NFO were attended by both NFO members and non-members.
1592. [Rejected]
1593. In 1970 some NFO members in Minnesota wanted NFO to go into direct marketing of milk.
1594. In 1970 NFO had members who were spread over a very broad area surrounding Minneapolis-St. Paul.
1595. In putting together a supply of milk for the Order 68 market, NFO faced the handicap of a lack of independent manufacturing plants in Minnesota for "balancing" NFO's Class I markets  i. e., disposing of Grade A milk not needed for Class I uses.
1596. [Rejected]
1597. NFO was aware of the Minnesota surplus disposal handicap from the beginning.
1598. [Rejected]
1599. NFO contacted an Order 68 handler regarding supplying Grade A milk in May, 1970.
1600. [Rejected]
1601. In May, 1970 NFO approached Ewald Brothers Dairy in Minneapolis, an Order 68 handler, about supplying it with milk.
1602. [Rejected]
1603. [Rejected]
1604. [Rejected]
1605. [Rejected]
1606. [Rejected]
1607. [Rejected]
1608. [Rejected]
1609. After any deal with Ewald fell through, NFO contacted Schroeder Brothers Dairy of St. Paul in regard to a supply of NFO milk.
1610. Schroeder was also being supplied by Mid-Am at the time.
1611. [Rejected]
1612. [Rejected]
1613. NFO arranged to supply Schroeder with skim milk through the Hastings Cooperative.
*491 1614. NFO's initial supply for Schroeder came from the NFO supply plant at Chetek, Wisconsin, 70-80 miles northeast of the Twin Cities.
1615. The Chetek NFO supply plant opened in May, 1971.
1616. Some NFO dairy farmers around Chetek wanted to market through NFO.
1617. [Rejected]
1618. In 1970 during the same time NFO was talking with Ewald, NFO was holding discussions with the Cloverleaf Creamery of Minneapolis about milk sales.
1619. Cloverleaf was a large handler on Order 68.
1620. Mid-Am supplied Cloverleaf with some milk in 1970.
1621. [Rejected]
1622. [Rejected]
1623. [Rejected]
1624. [Rejected]
1625. [Rejected]
1626. [Rejected]
1627. Cloverleaf did not agree to purchase any milk from NFO in late 1970 or early 1971.
1628. NFO again approached Cloverleaf in the latter part of 1971 after it had begun supplying Schroeder.
1629. NFO began supplying Cloverleaf with some of its requirements in December, 1971.
1630. [Rejected]
1631. NFO supplied the Cloverleaf account from supply plants or reloads at Albertville, Minnesota, and Sauk Center, Minnesota, west and northwest of the Twin Cities; and St. Charles, Minnesota, south of Minneapolis, near Rochester.
1632. [Rejected]
1633. NFO's Albertville, Sauk Center, and St. Charles facilities were opened after Chetek.
1634. Some of the milk of NFO producers which went through those reloads went to Schroeder and Cloverleaf.
1635. In 1972 NFO was contacted by Ewald about obtaining a supply of NFO milk.
1636. In December, 1972 Ewald began purchasing some milk from NFO.
1637. [Rejected]
1638. [Rejected]
1639. In 1973 NFO had three bottling customers in the Twin Cities area  Schroeder, Cloverleaf and Ewald.
1640. [Rejected]
1641. In 1972 through 1973, Chetek was used by NFO to supply milk to handlers on Order 68.
1642. [Rejected]
1643. [Rejected]
1644. [Rejected]
1645. [Rejected]
1646. In February, 1972 NFO opened its Albertville, Minnesota supply plant.
1647. In May, 1972 NFO advised the Market Administrator that its supply plant at Appleton, Minnesota would serve 50 producers.
1648. [Rejected]
1649. The Appleton plant is located on or near U.S. Highway 59 in western Minnesota, approximately 150 miles west from the Twin Cities and 25 miles east of the Dakota border.
1650. NFO's milk supply at Albertville increased from 275,833 pounds in February, 1972 to 2,644,559 pounds in December, 1972.
1651. NFO's total direct-shipped producer sales on Order 68 increased during 1972 from 4,434,333 pounds in January to 11,711,748 pounds in December, 1972.
1652. [Rejected]
1653. [Rejected]
1654. In 1973 NFO opened another pool supply plant at Sebeka, Minnesota.
1655. NFO entered Order 68 at a price 15 cents under the M-W Association price.
1656. [Rejected]
1657. [Rejected]
1658. [Rejected]
*492 1659. [Rejected]
1660. [Rejected]
1661. [Rejected]
1662. [Rejected]

D. Alleged Shut Out of Order 60

1663. In 1970 the Moorhead and Fergus Falls, Minnesota areas were covered by Order 60, the Minnesota-North Dakota order. [This is not a finding that Order 60 was a "market" within the meaning of the antitrust laws.]
1664. In 1970 the North Star Dairy-Lakes Region operated a large milk processing plant or plants at Fergus Falls, Minnesota, which conducted fluid milk bottling, butter processing, and milk powder manufacturing and was an Order 60 supply plant.
1665. NFO had a number of dairy farmers in membership in the Fergus Falls area in the 1960's and early 1970's.
1666. In 1964 NFO signed a master contract with Fergus Dairy, one of the predecessors of North Star Dairy-Lakes Region.
1667. In 1969 NFO entered into a milk supply contract with North Star Dairy-Lakes Region.
1668. In 1970 a substantial number of the producers supplying North Star Dairy-Lakes Region at Fergus Falls were NFO members.
1669. The Fergus Falls plant had about 1,500 farmer-suppliers in 1970, about 600 of these suppliers were direct members of the cooperative and the remainder were members of feeder cooperatives.
1670. July 1, 1970, Mid-Am acquired the North Star-Lakes Region.
1671. [Rejected]
1672. Fairmont Foods Company, Inc., operates a milk bottling plant at Moorhead, Minnesota, as well as plants in other locations through the Midwest.
1673. Fairmont's Moorhead, Minnesota, plant was regulated under Order 60.
1674. Prior to November, 1971, Fairmont-Moorhead obtained its supply of raw Grade A milk from more than 200 dairy farmers who were not members of any cooperative.
1675. Fairmont-Moorhead was the major handler on Order 60.
1676. [Rejected]
1677. In 1970, Mid-Am and Fairmont-Moorhead were negotiating a possible deal whereby Fairmont would agree to take a full supply of milk at Moorhead from Mid-Am for the next five years.
1678. [Rejected]
1679. [Rejected]
1680. [Rejected]
1681. [Rejected]
1682. [Rejected]
1683. [Rejected]
1684. [Rejected]
1685. NFO attempted to make sales on Order 60 to Fairmont-Moorhead.
1686. NFO also attempted to sell milk to Mid-Am Fergus Falls, but Mid-Am refused to buy until about 1977.
1687. [Rejected]
1688. [Rejected]

E. Alleged Foreclosure from Order 61

1689. Federal Order 61, the Southeastern Minnesota-Northern Iowa Order, regulated the marketing of milk in the Rochester, Minnesota, and certain specified surrounding counties in 1969 through 1976. [This is not a finding that Order 61 was a "market" within the meaning of the antitrust laws.]
1690. During the period 1969 through 1976, the Marigold Foods, Inc., bottling plant in Rochester, Minnesota, was the major Class I handler on Order 61 and as of March 25, 1976, processed approximately 90 per cent of the Order's Class I milk.
1691. Marigold at Rochester operated its milk bottling in a facility owned by Rochester Dairy Cooperative, a cooperative, until October 1, 1969, when AMPI acquired Rochester.
1692. On May 2, 1969 NFO had entered into a Phase II milk supply contract with Rochester Dairy Cooperative.
1693. [Rejected]
*493 1694. In 1969 a number of NFO members were selling milk to the Rochester Dairy Cooperative.
1695. The Rochester Dairy Cooperative became a part of AMPI on October 1, 1969.
1696. Rochester Dairy Cooperative, besides operating manufacturing facilities, also distributed fluid milk products under the "Polly Meadows" brand label.
1697. The St. Charles Condensary operated a milk manufacturing plant in the geographic area encompassed in the Order 61 area in 1969.
1698. Subsequent to the AMPI acquisition of Rochester Dairy Cooperative, some NFO members who were also members of Rochester began shipping their milk to the St. Charles Condensary.
1699. In late 1969 or early 1970, NFO was negotiating to sell milk of its members to the St. Charles Condensary.
1700. In 1970, while NFO was negotiating with the St. Charles Condensary, AMPI acquired the plant owned by the St. Charles Condensary and thereafter closed that plant.
1701. [Rejected]
1702. AMPI was a competitor of Marigold Foods in the sales and distribution of fluid milk products in Order 61.
1703. [Rejected]
1704. Beginning in January, 1971, AMPI and Mid-Am formed a common marketing agency for marketing their members' milk on Order 61.
1705. [Rejected]
1706. [Rejected]
1707. [See finding No. 1704, supra.]
1708. [Rejected]
1709. [Rejected]
1710. In 1971, AMPI licensed Marigold-Rochester to distribute fluid milk products under the "Polly Meadows" label.
1711. [Rejected]
1712. [Rejected]
1713. [Rejected]
1714. [Rejected]
1715. In late 1971 NFO began marketing milk of its members through another reload which was opened in St. Charles, Minnesota.
1716. [Rejected]
1717. [Rejected]
1718. In 1974 NFO shipped some milk of its farmer members to Packet Dairy in St. Louis from the St. Charles reload.
1719. Effective June 1, 1976 old Order 61 was abolished and the former Order 61 area became a part of new Order 68.
1720. [Rejected]
1721. [Rejected]
1722. [Rejected]
1723. [Rejected]
1724. NFO's St. Charles, Minnesota producers received a lower pay price for milk sold through that reload.
1725. [Rejected]

F. The Defendants' Alleged Response

1726. On August 11, 1971 the M-W Association wrote a letter to the Minnesota Department of Agriculture, requesting an investigation as to the price charged for the milk being supplied to Schroeder Milk Company.
1727. [Rejected]
1728. In December, 1971 the M-W Association had a meeting.
1729. [Rejected]
1730. [Rejected]
1731. The M-W Association agreed at that meeting that the $6.20 level for Class I price milk would be maintained until further notice.
1732. In January, 1972 and for some time previously, John Gage and Mid-Am marketing personnel had been working on a written Milk Sales Agreement to use with handlers "to combat situations like NFO where they bring small amounts of milk to the market but are not willing to help handle a reserve supply of milk or to give other services that we do."
1733. [Rejected]
*494 1734. Mid-Am in May, 1972 initiated a supply contract program for its Order 68 handlers.
1735. [Rejected]
1736. The Mid-Am contracts, mailed to its Order 68 handlers in May, 1972, were for a six-month period beginning June 1, 1972, and were automatically renewed for 12-month periods thereafter.
1737. [Rejected]
1738. [Rejected]
1739. [Rejected]
1740. [Rejected]
1741. In 1971 Mid-Am owned and operated the second largest bottling plant in the Order 68 market, known as the Nicollet plant, which had better than 10 percent of the Order 68 Class I sales.
1742. [Rejected]

G. Alleged Decline in Order 68

1743. In about November, 1973 Ewald ceased its purchases from NFO.
1744. In losing the Ewald account, NFO lost more than one million pounds of Class I sales per month.
1745. In about March, 1974 Schroeder ceased purchases from NFO.
1746. In losing the Schroeder account, NFO lost about 3.5 million pounds of Class I sales per month.
1747. [Rejected]
1748. NFO contacted Superior, Summit Farms, Norris, and Meyer Brothers.
1749. [Rejected]
1750. [Rejected]
1751. [Rejected]
1752. NFO in 1972 had made a study of all milk manufacturing facilities available in Minnesota.
1753. [Rejected]
1754. [Rejected]
1755. [Rejected]
1756. [Rejected]
1757. [Rejected]
1758. [Rejected]
1759. [Rejected]
1760. [Rejected]
1761. [Rejected]
1762. [Rejected]
1763. [Rejected]
1764. [Rejected]
1765. [Rejected]
1766. [Rejected]
1767. [Rejected]
1768. In the spring and summer of 1974 NFO shipped some milk from Sauk Center and Sebeka, Minnesota to Idaho and Montana for manufacturing purposes.
1769. The increased hauling expenses for marketing such milk caused a drastic decline in NFO producer pay prices.
1770. NFO fell behind as much as 40 cents on its pay price.
1771. When NFO fell behind in its pay price, some of its producers left and began delivering to Cloverleaf as independents.
1772. In 1974 some of the milk from NFO's St. Charles, Minnesota producers began to be delivered to Packet Dairy at O'Fallon, Illinois.
1773. [Rejected]
1774. [Rejected]

H. Alleged Conclusions

1775. [Rejected]
1776. [Rejected]
1777. [Rejected]
1778. [Rejected]

VIII. Nebraska Order 65

1779. Federal Milk Market Order 65 was promulgated in 1968 and regulated certain handlers in the Nebraska-Western Iowa area. [This is not a finding that Order 65 was a "market" within the meaning of the antitrust laws.]
1780. [Rejected]
1781. Some milk to supply Order 65 bottlers comes from farms in eastern Nebraska, western and northwestern Iowa, southwestern Minnesota and southeastern South Dakota.
1782. [Rejected]
*495 1783. [Rejected]
1784. [Rejected]
1785. In 1967 a new independent cheese plant, the Ravenna Cheese Company, was opened at Ravenna, Nebraska by Leroy Wadzinski.
1786. [Rejected]
1787. [Rejected]
1788. [Rejected]
1789. [Rejected]
1790. In 1970 Mid-Am merged with Central States Dairy Cooperative.
1791. In July, 1970 AMPI and Mid-Am entered into a consignment agreement providing for the coordination of their marketing of milk in Order 65.
1792. [Rejected]
1793. [Rejected]
1794. [Rejected]
1795. [Rejected]
1796. NFO had in 1970 some dairy farmer members in Nebraska, western Iowa, southwestern Minnesota and southeastern South Dakota interested in marketing milk through NFO.
1797. [Rejected]
1798. [Rejected]
1799. On December 18, 1970 Leroy Wadzinski called a meeting of interested producers to discuss putting together a milk supply from Nebraska producers for the Wichita market.
1800. The meeting was held at the Country Club in Ravenna, Nebraska and was attended by some 20 producers.
1801. [Rejected]
1802. Flynn was a member of Mid-Am's Board of Directors, third vice-president of Mid-Am, and president of Central States Dairy Cooperative at the time it merged with Mid-Am.
1803. Flynn, in his capacity of president of CSDC, signed ARSPC's articles of incorporation on behalf of CSDC and later became a director of ARSPC.
1804. Flynn was not invited to Wadzinski's meeting.
1805. Flynn, however, attended the meeting and advised the producers at the meeting not to go ahead with any plan to supply the Wichita market.
1806. Flynn spoke from prepared written materials at this meeting.
1807. [Rejected]
1808. [Rejected]
1809. [Rejected]
1810. [Rejected]
1811. [Rejected]
1812. On December 31, 1970 a group of 13 NFO members shipping through Mid-Am in Nebraska submitted termination notices to Mid-Am management.
1813. Mid-Am refused to honor the notices because they were one day late.
1814. [Rejected]
1815. In December, 1971 another group of 14 or 15 NFO producers in Nebraska terminated their Mid-Am Grade A contracts effective May 1, 1972.
1816. In May, 1972 NFO began marketing some of its members Nebraska Grade A milk to Midwest Creamery in Ponca City, Oklahoma and to local cheese plants in Nebraska.
1817. NFO Nebraska operating costs were as high as $1.00 per cwt. when milk was going to Oklahoma.
1818. NFO was not able to return a competitive pay price to its Nebraska members for marketing their milk to Midwest Creamery and pooling it on Order 106.
1819. In September, 1973 Mid-Am proposed a raw milk sales agreement to all handlers in Nebraska.
1820. The Mid-Am contract introduced in Nebraska in 1973 was a one-year contract which was automatically renewed unless terminated 90 days before the anniversary date.
1821. The Mid-Am contract called for the handler to commit to purchase a given volume or percentage of its requirements from Mid-Am.
1822. [Rejected]
*496 1823. [Rejected]
1824. At least four Order 65 distributing plant handlers signed Mid-Am contracts for 95 per cent of their requirements on or after September 15, 1973.
1825. In December, 1973 the United States filed suit against Mid-Am under the antitrust laws.
1826. In June, 1974 Ravenna Cheese Company began to ship Grade A milk to Robert's Fairacres Dairy at Grand Island, Nebraska.
1827. Robert's Fairacres purchased Grade A milk from non-Mid-Am sources in 1974.
1828. [Rejected]
1829. [Rejected]
1830. Marketing problems in Minnesota, Wisconsin and elsewhere diverted Berkhahn's efforts from the Nebraska Order 65 area during 1971 through 1975.
1831. [Rejected]
1832. [Rejected]
1833. [Rejected]
1834. [Rejected]
1835. [Rejected]

IX. Kansas and Northwest Missouri Orders 73, 71 and 64

A. AMPI and Mid-Am Alleged Cooperation

1836. Federal Milk Marketing Order 73 encompassed the geographical area in and around Wichita, Kansas. [This is not a finding that Order 73 was a "market" within the meaning of the antitrust laws.]
1837. Each year from 1969 to 1972, AMPI pooled at least 96 per cent of all milk pooled on Wichita Federal Order 73.
1838. MPI, later AMPI, charged a 50 cent Class I premium in Wichita beginning in fall of 1967 and continuing until at least 1972.
1839. Neosho Valley Order 71 encompassed the southeastern part of Kansas. [This is not a finding that Order 71 was a "market" within the meaning of the antitrust laws.]
1840. Each year from 1969 to 1972, AMPI pooled about 25 per cent of all milk pooled on Neosho Valley Order 71.
1841. Each year from 1969 to 1972, Mid-Am pooled about 75 per cent of all milk pooled on Neosho Valley Order 71.
1842. Mid-Am and AMPI both charged 50 cent premium on Class I milk sold to Neosho Valley Order 71 handlers from September, 1967 to at least 1970.
1843. Kansas City Order 64 encompassed the northeastern part of Kansas and the northwestern part of Missouri. [This is not a finding that Order 64 was a "market" within the meaning of the antitrust laws.]
1844. In 1969 Mid-Am acquired three dairy farmers' cooperatives in the Kansas City area.
1845. Each year from 1969 to 1975 Mid-Am pooled about 80 per cent of all milk pooled on Kansas City Order 64.
1846. Mid-Am charged a 50 cent premium in Kansas City beginning in fall 1967.
1847. Each year from 1969 to 1975, about two per cent of all milk pooled on Order 64 was AMPI milk.
1848. [Rejected]
1849. [Rejected]
1850. [Rejected]
1851. [Rejected]
1852. In September, 1969 Washington County Cooperative merged with MPI.
1853. [Rejected]
1854. Mid-Am and MPI, later AMPI, had Class I base plans in effect in Kansas.
1855. Mid-Am and MPI exchanged information about the net prices each was paying its farmer members in the Neosho Valley and Kansas City Federal Orders.
1856. [Rejected]
1857. On June 1, 1970 Mid-Am and AMPI entered into a consignment agreement under which Mid-Am consigned to AMPI for sale any Mid-Am member milk delivered to Wichita Order 73 bottlers.
1858. On July 13, 1970 AMPI and Mid-Am entered into two separate consignment *497 agreements under which AMPI consigned to Mid-Am for sale AMPI member milk delivered to Kansas City Order 64 and Neosho Valley Order 71 handlers.
1859. Mid-Am and AMPI were both members of the Milk Sales Cooperative Federation (MSCF) which announced prices at which MSCF members would sell milk in the Kansas City Federal Order.
1860. Mid-Am marketed AMPI milk in the Kansas City market under the consignment agreement dated July 13, 1970.
1861. [Rejected]
1862. [Rejected]
1863. [Rejected]
1864. [Rejected]
1865. [Rejected]

B. AMPI and Mid-Am Alleged Coercion of Buyers and Producers

1. Steffen's and Hyde Park in Wichita

1866. Hyde Park Dairy and Steffen's Dairy were two of the bottlers regulated by Wichita Order 73.
1867. In 1970 Steffen's Dairy in Wichita was buying its full requirements of raw milk from AMPI.
1868. AMPI operated a milk bottling plant at Hillsboro, Kansas prior to June, 1970.
1869. [Rejected]
1870. Steffen's did not like the fact that it had to pay AMPI a 50 cent per cwt. premium on Class I milk because it had to compete with AMPI's bottling plant.
1871. In the spring of 1969, NFO had some members in and around Wichita, Kansas who were prepared to ship milk through NFO if NFO could get them a market.
1872. [Rejected]
1873. In spring or summer, 1970 Al Scott of NFO offered to sell Grade A milk to Steffen's Dairy.
1874. L. A. Deck was the executive vice-president in charge of operations of Steffen's Dairy in 1970.
1875. [Rejected]
1876. [Rejected]
1877. Steffen's Dairy continued to buy its full requirements of raw milk from AMPI in and after 1970.
1878. Steffen's Dairy never bought milk from NFO.
1879. [Rejected]
1880. NFO's Wichita, Kansas area members never shipped milk through NFO.
1881. In late 1970 Hyde Park Dairy told Wadzinski of Ravenna Cheese Company, Ravenna, Nebraska, that Hyde Park would buy milk from some Nebraska farmers if Wadzinski could assemble one million pounds of milk per month.
1882. [See finding 1799, supra.]
1883. [See finding 1800, supra.]
1884. Wadzinski told Nebraska producers that the Wichita Order 73 blend price was about 40 cents per cwt. greater than the Nebraska Order 65 blend price they were currently receiving.
1885. [Rejected]
1886. [See finding 1805, supra.]
1887. [Rejected]
1888. NFO commenced marketing the milk of NFO producers to Hyde Park Dairy in August, 1973.

2. Page Milk in Neosho Valley

1889. Prior to November, 1972 Page Milk Company at Coffeyville, Kansas, was regulated by Neosho Valley Order 71.
1890. Page Coffeyville was the major Order 71 handler.
1891. Page Milk Company operated a milk bottling and evaporating plant at Coffeyville, Kansas, from the 1930's to at least 1974.
1892. The Page Coffeyville plant was regulated by Neosho Valley Order 71 until November, 1972.
1893. The Page Coffeyville plant became regulated by Oklahoma Order 106 in November, 1972 and remained regulated by that Order until at least 1974.
1894. From 1966 to June, 1973 Page Coffeyville bought most of its Grade A milk *498 from Mid-Am (and its predecessors) and AMPI (and its predecessors).
1895. Over the years, Page Coffeyville also bought some milk from Carnation's Tulsa plant.
1896. From March through September, 1970 Page Coffeyville also bought some NFO Grade A milk diverted by Midwest Creamery.
1897. Page Coffeyville also bought manufacturing grade milk.
1898. Jim Page was the manager of the Page Coffeyville plant from 1937 until at least 1974.
1899. Page Milk Company also operated a milk bottling plant at Tulsa, Oklahoma, from 1961 to November, 1972.
1900. The Page Tulsa plant was regulated by Oklahoma Metropolitan Order 106 from the late 1960's until October 15, 1972, at which time it discontinued its bottling operation in Tulsa.
1901. Page Tulsa bought its full requirements of Grade A milk from AMPI from at least 1969 to October, 1972, with the exception of several months from spring to fall, 1970, when it purchased some milk from Carnation Company's Tulsa plant and some NFO milk diverted by Midwest Creamery.
1902. Bill Page was the manager of the Page Tulsa plant from 1963 until at least 1974.
1903. Jim Page was responsible for procurement of Grade A milk for both the Tulsa and Coffeyville plants.
1904. [Rejected]
1905. In 1966 and 1967, Page Coffeyville had been receiving from MPI most of its monthly requirements of approximately three and one half million pounds to approximately four million pounds of Grade A milk, except for a million pounds bought from Producers Creamery and others.
1906. [Rejected]
1907. Shortly after January, 1968 Producers Creamery began supplying more milk to Page Coffeyville and MPI began supplying less.
1908. [Rejected]
1909. [Rejected]
1910. [Rejected]
1911. Beginning March, 1970 Page Coffeyville bought Missouri Grade A milk diverted from Midwest Creamery that had been supplied by NFO to Midwest.
1912. On or about July 3, 1970 Page Coffeyville entered into a contract with NFO member producers to sell Grade C (manufacturing grade) milk to Page Coffeyville from June 1, 1970 to November 30, 1970.
1913. [Rejected]
1914. [Rejected]
1915. [Rejected]
1916. [Rejected]
1917. [Rejected]
1918. On August 6, 1970 Page, as requested by AMPI and Mid-Am, presented a supply proposal to them covering both Tulsa and Coffeyville.
1919. In his August 6, 1970 supply proposal, Page requested that Mid-Am and AMPI agree to permit him to purchase cheaper milk from Carnation, for example, whenever he desired.
1920. On August 28, 1970 AMPI proposed to supply all of Page Tulsa's Grade A requirements pursuant to the membership and consignment agreements between AMPI and Mid-Am and notified Page that Mid-Am would make an offer to supply Page Coffeyville.
1921. AMPI sent Mid-Am a copy of AMPI's August 28, 1970 letter to Page.
1922. On September 1, 1970 Mid-Am proposed, in accordance with consignment agreements between AMPI and Mid-Am, to supply all of Page Coffeyville's requirements, with the exception of those presently being supplied by Page's own Grade C producers.
1923. On September 9, 1970 Page repeated its proposal that it be permitted to buy cheaper milk from Carnation, for example, whenever it desired.
*499 1924. On September 17, 1970 Mid-Am responded to Page's September 9, 1970 letter, requesting comment and explanation of that letter.
1925. On September 21, 1970 Page Coffeyville responded to Mid-Am's letter of September 17, 1970 and agreed to commit itself to an agreement with Mid-Am.
1926. [Rejected]
1927. [Rejected]
1928. In March or April, 1971 Scott of NFO tried unsuccessfully to sell one load of Grade A milk a month to Page.
1929. [Rejected]
1930. [Rejected]
1931. [Rejected]
1932. [Rejected]
1933. [Rejected]
1934. [Rejected]
1935. In July, 1973 Page Coffeyville began purchasing part of its Grade A requirements from NFO.
1936. Page Coffeyville bought Grade A milk from NFO at 10 cents per cwt. under the prevailing premium until April, 1974, when a new pricing basis was established.

3. Alleged Pressure in Kansas City

1937. In 1971 NFO began marketing the milk of some NFO member dairy farmers in and around Clinton, Missouri, just south of Kansas City, by shipping their milk to the Springfield reload.
1938. Hawthorn-Mellody, Inc., a proprietary corporation, had a bottling plant in Kansas City Order 64.
1939. NFO contacted Hawthorn-Mellody in early 1971 to see whether it would buy NFO's Jefferson City reload milk at its Kansas City plant.
1940. [Rejected]
1941. [Rejected]
1942. Fairmont Foods has a plant in Kansas City Order 64.
1943. Fairmont Foods Company operated bottling plants in various cities in the Midwest.
1944. [Rejected]
1945. [Rejected]
1946. [Rejected]
1947. [Rejected]
1948. [Rejected]
1949. [Rejected]
1950. [Rejected]
1951. NFO did not begin selling milk in Order 64 until mid-1974. By 1977 NFO sold some Kansas and Missouri NFO members' milk to three Order 64 plants: Meyer Dairy at Bashore, Kansas; Beatrice at St. Joseph, Missouri; and Beatrice at Topeka, Kansas.

C. Base Plans

1952. [Rejected]

D. Recent Alleged AMPI Full Supply Tactics

1953. [Rejected]

E. Conclusions

1954. [Rejected]
1955. [Rejected]
1956. [Rejected]

X. Alleged Suppression of Evidence

A. The Little Rock Bonfire

1957. [Rejected]
1958. [Rejected]
1959. [Rejected]
1960. [Rejected]
1961. [Rejected]
1962. Joe Murphey destroyed at least twelve documents from his AMPI Little Rock files.
1963. [Rejected]
1964. Several boxes of Dave Parr files were removed from the AMPI Little Rock office in spring 1971. The documents in those files related to Parr's personal financial matters, political matters, and possibly other matters.
1965. Lynn Elrod removed documents from his office files in spring 1971.
1966. [Rejected]
1967. The basic function of David Parr of the AMPI Little Rock, Arkansas divisional office was to do AMPI corporate planning.
*500 1968. ADI had a "Think Tank" composed of MPI, later AMPI, personnel, agricultural economists, and university professors.
1969. Most of the MPI/AMPI personnel involved in the "Think Tank"  Dave Parr, Tom Townsend, Lynn Elrod and Joe Murphey  worked out of the Little Rock, Arkansas divisional office.
1970. [Rejected]
1971. [Rejected]
1972. [Rejected]

B. Alleged Suppression Elsewhere in AMPI

1973. [Rejected]
1974. [Rejected]
1975. [Rejected]
1976. [Rejected]

C. Mid-Am's Alleged Attempt to Destroy Evidence

1977. [Rejected]
1978. [Rejected]
1979. [Rejected]

D. AMPI and Beatrice Allegedly Concoct Fictitious Evidence

1980. On August 31, 1971 AMPI (and PMPC) sued NFO in Wisconsin State Court, alleging that NFO had induced farmers to breach their AMPI (and PMPC) contracts.
1981. [Rejected]
1982. [Rejected]

E. AMPI Allegedly Hides the Ball

1. The Complete AMPI Minutes were Allegedly Hidden, The "Official" Ones Allegedly Sanitized

1983. NFO on August 19, 1971 requested, under F.R.Civ.P. 34, that AMPI produce all minutes of Board of Directors meetings.
1984. AMPI Chicago office secretary Marge Reynolds attended, took shorthand notes at and later transcribed her notes of AMPI Board of Directors meetings.
1985. [Rejected]
1986. [Rejected]
1987. [Rejected]

2. 1972 Document Reconnaissance and Production

1988. During February, 1972 NFO conducted document reconnaissance at AMPI's San Antonio, Texas, headquarters.
1989. When Harold Nelson ceased being the general manager of AMPI, he left certain files in AMPI's possession.
1990. Prior to the time of the February, 1972 reconnaissance of AMPI files and documents in San Antonio, Texas, Stuart H. Russell was informed that there were Harold Nelson files located in a closet in AMPI headquarters.
1991. Neither the existence nor the location of those particular Nelson files was made known to the NFO reconnaissance team.
1992. In August, 1972 AMPI attorney Stuart Russell instructed Roger Hooper, an AMPI San Antonio, Texas home office employee, to remove three boxes of the Harold Nelson files from the closet in AMPI's headquarters to an outside storage facility.
1993. The three boxes of Nelson files were removed from the San Antonio office of AMPI in August, 1972 and stored in an outside mini-warehouse facility under the name of Roger Stewart, another AMPI employee. All these files were eventually produced during the Joe Rose deposition.
1994. Prior to the time of the NFO reconnaissance in February, 1972 at the AMPI headquarters in San Antonio, Texas, some files of Bob Lilly, an AMPI employee at San Antonio, were moved from the offices where they were normally maintained and placed in a closet.
1995. NFO counsel were not shown these Lilly files.
1996. During the February, 1972 reconnaissance of the AMPI headquarters, NFO counsel were taken to Lilly's office and were told that for all practical purposes he had no AMPI documents.
1997. Subsequent to the time of the original NFO reconnaissance in February, 1972 of AMPI headquarters at the GPM Life Building in San Antonio, Texas, the *501 Lilly files were returned to the AMPI offices at the GPM Life Building in San Antonio, Texas, where they were normally maintained.
1998. During the reconnaissance at AMPI's corporate headquarters in February, 1972 NFO counsel requested access to the files maintained by Joe Murphey.
1999. NFO production request No. 2056 called for the production of "the correspondence files prepared or maintained by or under the direction of Mr. Joe Murphey." AMPI produced only documents from the files of Joe Murphey during the June and July, 1972 document production period which had been shipped from AMPI's Little Rock office to AMPI's San Antonio office. All of the Joe Murphey files had not at that time been shipped to San Antonio.
2000. By late summer 1972, however, at least 31 boxes of Joe Murphey's files had been shipped from Little Rock and were in AMPI's headquarters in San Antonio, Texas.
2001. At some time in 1972, the 31 boxes of Joe Murphey's files were removed from AMPI's headquarters in San Antonio, Texas and stored in the mini-warehouse under a name other than AMPI. All 31 boxes were eventually produced to all parties in the fall of 1973.

3. The Isham List of Irregularities

2002. Robert Isham, who was AMPI's controller from 1969 to mid-1972, was one of AMPI general manager Harold Nelson's principal assistants at that time.
2003. In about January, 1972 Isham prepared for AMPI employee George Mehren a "list of irregularities" having to do with Harold Nelson's management of AMPI.
2004. NFO Exhibit 162 is a copy of paragraphs 4 to 29, inclusive, of the Isham prepared "list of irregularities."
2005. Isham, Mehren and AMPI president John Butterbrodt had copies of NFO Exh. 162 in 1972.
2006. NFO Exhibit 162 was not produced by AMPI to NFO during discovery in this case. It was introduced in evidence during the trial of United States v. Russell, in September, 1975, during the testimony of Robert O. Isham.
2007. [Rejected]

F. The McDougal Incident

2008. [Rejected]

G. Mid-Am and ARSPC Allegedly Trump Up Testimony about ARSPC

2009. On November 8, 1971 Gary Hanman of Mid-Am wrote a letter to Joe Westwater, the general manager of ARSPC, who was about to be deposed by NFO.
2010. [Rejected]
2011. [Rejected]
2012. [Rejected]
2013. Westwater received Hanman's November 8, 1971 letter on November 10, 1971.
2014. [Rejected]
2015. By letter dated November 11, 1971, Westwater responded to Hanman's November 8 letter.
2016. [Rejected]

H. Conclusion

2017. [Rejected]

PHASE II CONCLUSIONS OF LAW
While hundreds upon hundreds of pages of briefs were filed in connection with Phase II of this case, the conclusions of law proposed by NFO, those proposed jointly by Mid-Am, AMPI, and CMPC, and those separately proposed by ARSPC were mercifully short and concise.
The parties are agreed, however, only in regard to a conclusion of law which would state that this Court has jurisdiction of the subject matter of NFO's counterclaim. The rationale of our determination of the remaining legal questions presented in Phase II of this case can be most clearly reflected by a formal rejection of all conclusions of law proposed by NFO, except the portion of the conclusion proposed in paragraph 1 of NFO's proposed conclusions relating to the subject matter jurisdiction of this Court and by keying our formal conclusions of law to those jointly proposed by Mid-Am, *502 AMPI, and CMPC as we believe those proposed conclusions should be modified.[29]
The adoption of such a procedure will show, for example, that NFO's proposed conclusions of law in regard to alleged violations of Section 1 of the Sherman Act as contained in various of the conclusions of law proposed by NFO are both expressly rejected by a formal statement of record and by this Court's formal conclusion 8 which expressly states that "NFO failed to carry the burden of proving, and the evidence adduced does not otherwise establish, that defendants, or any of them, combined or conspired to restrain trade in violation of Section 1 of the Sherman Act (15 U.S.C. § 1)."
Accordingly, we expressly reject for the record all 36 paragraphs of the conclusions of law proposed by NFO in connection with Phase II of this case, excepting only that portion of paragraph 1 relating to the subject matter jurisdiction of this Court.
We make and state the following conclusions of law for Phase II of this case:
1. This Court has jurisdiction of the subject matter of this action.
2. This Court has in personam jurisdiction as to NFO, AMPI and Mid-Am. For purposes of determining the facts, we have assumed that this Court also has in personam jurisdiction as to CMPC and ARSPC.
3. Under our view of the case, it is not necessary to determine whether venue herein is improper as to CMPC and ARSPC.
4. NFO failed to carry the burden of proving, and the evidence adduced does not otherwise establish, that one relevant geographic market in this case is the composite of the 27 Federal Milk Market Order areas located in the States of Wisconsin, Minnesota, Nebraska, Iowa, Illinois, Missouri, Kansas, Oklahoma, Arkansas and Texas.
5. NFO failed to carry the burden of proving, and the evidence adduced did not otherwise establish, that each federal market order in the ten states listed above constituted a relevant geographic market in this case.
6. It is not necessary to decide whether the relevant product/services market in this action consists of Grade A and Grade B (manufacturing grade) milk and all services of raw milk marketers associated with the procurement and marketing of both of these grades of milk or whether the relevant product/market in this case is the business of marketing raw Grade A milk. We need to and therefore conclude only that NFO's evidence is insufficient to prove the latter.
7. It is unnecessary to reach the question of whether AMPI, Mid-Am, CMPC and ARSPC were entitled to the exemptions and immunities granted cooperative milk marketing associations by the Capper-Volstead Act (7 U.S.C. § 291).
8. NFO failed to carry the burden of proving, and the evidence adduced does not otherwise establish that defendants, or any of them, combined or conspired to restrain *503 trade in violation of Section 1 of the Sherman Act (15 U.S.C. § 1.
9. NFO failed to carry the burden of proving, and the evidence adduced does not otherwise establish that defendants, or any of them, attempted to monopolize the marketing of milk in violation of § 2 of the Sherman Act (15 U.S.C. § 2).
10. NFO failed to carry the burden of proving, and the evidence adduced does not otherwise establish that defendants, or any of them, monopolized the marketing of milk in violation of § 2 of the Sherman Act (15 U.S.C. § 2).
11. NFO failed to carry the burden of proving, and the evidence adduced does not otherwise establish that defendants, or any of them, combined or conspired to monopolize the marketing of milk in violation of § 2 of the Sherman Act (15 U.S.C. § 2).
12. NFO failed to carry the burden of proving, and the evidence adduced does not otherwise establish that defendants, or any of them, instituted litigation in bad faith against NFO in violation of Sections 1 or 2 of the Sherman Act (15 U.S.C. §§ 1, 2).
13. NFO failed to carry the burden of proving, and the evidence adduced does not otherwise establish that defendants, or any of them, foreclosed NFO from access to any dairy farmers or milk markets in violation of Sections 1 or 2 of the Sherman Act (15 U.S.C. §§ 1, 2).
14. NFO failed to carry the burden of proving, and the evidence adduced does not otherwise establish that defendants, or any of them, eliminated competition between themselves, or between any one or more of them with other persons, in violation of Sections 1 or 2 of the Sherman Act (15 U.S.C. §§ 1, 2).
15. NFO failed to carry the burden of proving, and the evidence adduced does not otherwise establish that defendants, or any of them, wilfully acquired and maintained monopoly power in any relevant market in violation of § 2 of the Sherman Act (15 U.S.C. § 2).
16. It is not necessary to reach the question of whether NFO may not have been injured in its business or property on account of violations of Section 1 or 2 of the Sherman Act (15 U.S.C. §§ 1, 2) by defendants, or any of them.
17. It is not necessary to reach the question of whether NFO may not have standing to maintain this action.
18. It is not necessary to reach the question of whether NFO's "reduced price" and "market penetration" damage claims may be speculative, conjectural and not legally permissible.
19. NFO failed to carry the burden of proving, and the evidence adduced does not otherwise establish, that it is entitled to recover the attorneys' fees and costs of defending the claims instituted against it herein.
20. NFO failed to carry the burden of proving, and the evidence adduced does not otherwise establish, that it is entitled to recover the attorneys' fees and costs expended in prosecution of its counterclaim herein.
21. NFO failed to carry the burden of proving, and the evidence adduced does not otherwise establish, that it is entitled to injunctive relief against the defendants in this action.
22. It is not necessary to reach the question of whether the relief afforded to the United States in its suits against AMPI and Mid-Am renders NFO's claims for injunctive relief herein moot as to said parties.
23. NFO failed to carry the burden of proving, and the evidence adduced does not otherwise establish, that it is entitled to the relief of divestiture in this action.
An appropriate order therefore will be entered in regard to Phase II of this case which will direct the Clerk to enter judgment against NFO in regard to its Phase II counterclaim and in favor of Mid-Am, AMPI, CMPC, and ARSPC.

*504 I. PHASE III FINDINGS OF FACT[30]

A. Background and Parties

1. This is a suit under Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26, and 28 U.S.C. § 1337, wherein the Phase III defendants, The National Farmers Organization (hereinafter "NFO") and nineteen NFO members and/or employees, are charged with violations of Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 and 2, and certain provisions of the Agricultural Fair Practices Act of 1967, 7 U.S.C. § 2303(c), (e), and (f).
2. Counterclaimant Associated Milk Producers, Inc. (hereinafter "AMPI") was incorporated in 1969 under the Agricultural Cooperative Marketing Act of the State of Kansas with its principal place of business in San Antonio, Texas. AMPI's membership includes dairy farmers located in many midwestern states including Wisconsin and Illinois.
3. No question is presented in regard to venue or this Court's in personam jurisdiction over the National Farmers Organization or the individual Phase III defendants.
4. Phase III defendant Ricardo A. Avila was Assistant Director of the NFO Dairy Commodity Department and a former member of NFO.
5. Phase III defendants Tom Conrad, Jimmie Fuller, Glen Knode, Clarence Korte, Basil Michaels, Howard Murray, Willis Rowell, Frank Schwarzer, John Wahlin and DeVon Woodland are farmers and NFO members.
6. Counterclaim defendant Edwin Graf is director of the NFO Dairy Commodity Department.
7. Phase III defendant Rhea Hackler was a member of the NFO Board of Directors until 1974 and was a dairy farmer until 1965. He was in charge of the NFO Dairy Department in Missouri and was directly responsible to Al Scott.
8. Phase III defendant Oliver Hanna was an NFO Marketing Area Dairy Representative in Madison, Wisconsin.
9. Phase III defendant Erhard Pfingsten is a farmer, was an NFO Board member until December, 1971, and former NFO Vice-President.
10. Phase III defendant Gordon Shafer was assistant to NFO President Staley and has been an NFO member since 1955.
11. Phase III defendant Allen Skroch is a farmer, NFO Board member, and NFO employee.
12. Phase III defendant Oren Lee Staley, President of NFO from 1955 until 1979, is a farmer.
13. Phase III defendant Glenn Utley is a farmer and a part-time employee of NFO.
14. NFO is a not-for-profit membership corporation organized in 1955 under the laws of the State of Iowa and has its national office at Corning, Iowa.
15. NFO's original purpose was to be a protest movement to promote legislation and other governmental action favorable to farmers.
16. In 1957 the NFO members authorized development of a program of collective bargaining for farmers to put farmers in a position of sufficient economic strength to deal effectively with the concentrated power of buyers and processors of farm products.
17. NFO is a national membership organization with State, Congressional district, and county units throughout most of the United States.
18. NFO is presently organized in forty-eight states with marketing programs in dairy, livestock, grain, edible beans and potatoes.
19. NFO county units engage in enrolling new members in NFO, a procedure which is referred to as "organizing."
20. NFO county units are required to conform to general NFO policies.
*505 21. The NFO Reporter, prepared and published monthly by the NFO and sent to NFO members and many other subscribers, is the official voice of NFO, and has a circulation of about 220,000.
22. The basic premise of the NFO collective bargaining program is that the existing farm marketing system is unacceptable because the individual farmer has insufficient bargaining strength to deal with the concentrated power of the firms to which he sells his product.
23. NFO seeks to combine the production of farmers under collective bargaining agreements in a sufficient quantity so that the marketing system cannot meet its requirements without turning to NFO.
24. It is NFO policy that its programs must be nationwide and must reach all major commodities in order to be fully effective.
25. NFO has collective bargaining programs for all major agricultural commodities and many minor ones.
26. [Rejected][31]
27. Not all NFO members who sell Grade A milk participate in an NFO dairy program.
28. Marketing has never been NFO's principal activity; collective bargaining for a higher commodity price level is its principal activity.
29. [Rejected]
30. [Rejected]
31. [Rejected]
32. One of the factors NFO employees are directed to keep in mind in evaluating any transaction is whether that transaction will provide NFO with a bigger bargaining lever.
33. [Rejected]
34. To implement the NFO collective bargaining program, NFO and its members enter into a Membership Agreement, which covers all commodities and has a three year term.
35. Article VI of the NFO Membership Agreement states:
No contract consummated with a processor shall be effective or binding until it has been ratified by a two thirds' vote of members in a marketing area who have signed contracts with the NFO for the commodity, attending a meeting called for that purpose, and has been approved by the Board of Directors of the NFO.... If a marketing procedure is formulated for a marketing area, it will require the same ratification as contracts with processors.
36. Article VII of the NFO Membership Agreement states:
Until such time as a contract has been consummated with the processor for a commodity I own or control in accordance with the provisions of this agreement; or until a marketing procedure has been established for a commodity and ratified in accordance with the terms of this agreement, a member shall be free to market his commodity as he chooses.... When a contract has been consummated in accordance with the terms of this agreement covering a member's commodity, and he sells this commodity specified by the agreement, the member shall be assessed 10% of the gross sale of the commodity for liquidated damages.
37. [Rejected]
38. [Rejected]
39. [Rejected]
40. [Rejected]
41. If an NFO member does not terminate his agreement within a specified 10-day period, his Membership Agreement is automatically renewed for another three-year period.
42. [Rejected]
43. Even though NFO members have not paid their dues since 1958, they are still considered members by NFO.
*506 44. NFO has sometimes used supplemental agreements for members participating in NFO's voluntary programs.
45. The NFO obtains the authority to bargain for and make sales of its members' milk when the member signs a supplemental milk sales agreement.
46. [Rejected]

B. NFO Programs and Policies Before 1969

47. [Rejected]
48. [Rejected]
49. [Rejected]
50. [Rejected]
51. [Rejected]
52. [Rejected]
53. In a speech between April and August of 1967, Oras Kanerva, Assistant Dairy Department Directors, said: "... the coops control 85% of the marketed milk and they still haven't been able to realize that they can bargain together and that they can affect the price.... We cannot go direct to the buyer, that is the wholesale buyer of these commodities, that is we got to and we must work through our coops and our small independent buyers, so consequently you and I have got the ungrateful task of being the burr under the saddle. And we're a mighty nasty burr."
54. [Rejected]
55. [Rejected]
56. [Rejected]
57. [Rejected]
58. From at least 1961 until the Spring of 1969, NFO promoted and encouraged the formation of a common marketing agency to be made up of all of the major dairy cooperative organizations in the middle United States or, if possible, the entire United States.
59. [Rejected]
60. The purpose of the common marketing agency urged by NFO was to form an organization large enough that the milk buyers could not fill their needs without buying from that agency.
61. In and prior to early 1969 Ed Graf, Director of the NFO Dairy Department, stated in connection with the proposed common marketing agency that there should be just one voice for all dairy farmers.
62. [Rejected]
63. In or about 1961 NFO conducted approximately three conferences of cooperative leaders for the purpose of explaining its proposed marketing agency in common.
64. A number of major midwest dairy cooperatives and others attended these meetings, but none of the cooperatives undertook to form a marketing agency in common.
65. As a result of the failure of dairy cooperative leaders to act on NFO's proposals, NFO undertook an effort to sign dairy farmers as NFO members.
66. [Rejected]
67. During the period from 1960 to 1969 NFO also encouraged cooperatives to merge into larger regional units which would be more efficient and have more bargaining power to deal with the large regional and national milk buyers.
68. NFO believed that some dairy cooperative mergers were necessary because the organizations lacked sufficient size to bargain effectively.
69. NFO publicly took credit for the trend toward mergers of dairy cooperatives.
70. [Rejected]
71. [Rejected]
72. [Rejected]
73. In some instances NFO members constituted a majority of the Board of Directors of a dairy cooperative.
74. [Rejected]
75. NFO began attempting to obtain signed Master Contracts for milk in 1962.
76. Master Contracts were presented to cooperatives and proprietary plants that were the first buyers of producer milk.
77. It was the goal of NFO in 1963 to sign such contracts with buyers of all commodities to stabilize agricultural prices.
*507 78. NFO offered Master Contracts for both Class I fluid milk buyers and for buyers using milk for manufacturing purposes.
79. The NFO Master Contract for Class I milk would not take effect until NFO had obtained similar contracts with bottlers who bottled an amount of milk equal to 60% of the production in Michigan, Ohio, Indiana, Illinois, Wisconsin, Minnesota, Iowa, Missouri, Kansas and Nebraska.
80. The NFO Master Contract for manufacturing grade milk provided that it would not be operative until NFO had obtained similar contracts with processors who processed an amount of milk equal to 60% of the total pounds of milk manufactured in the entire United States as well as processors who bottled an amount of milk equal to 60% of the milk bottled in the ten state area.
81. [Rejected]
82. It was a goal of NFO in the 1960's to obtain control of 60% of the average annual number of pounds of milk manufactured in the entire United States.
83. [Rejected]
84. NFO advised NFO members to ship to plants that had signed an NFO Master Contract.
85. NFO members moved large volumes of milk out of the plants to which they had been shipping.
86. NFO advised members to move their milk to plants that had signed such Master Contracts and then approached the plants which members had abandoned and asked them to sign Master Contracts to get their milk back.
87. [Rejected]
88. In or about 1965 NFO again invited dairy cooperative leaders from 14 states to a meeting to discuss formation of a common marketing agency.
89. At that time Staley and Shafer met with leaders of Omaha-Nebraska Cooperative, Pure Milk Association, Twin City Milk Producers, Pure Milk Association of Kansas City, Sioux Valley Milk Producers, and Des Moines Cooperative Creamery at the Fort Des Moines Hotel in Des Moines, Iowa.
90. Staley stated at that meeting that NFO wanted all of the cooperatives present to join a marketing agency in common, that NFO would bargain with cooperatives for the price of the producers' milk, and that the cooperatives would continue to do the processing.
91. [Rejected]
92. NFO intended to enter into Master Contracts with the members of the common marketing agency.
93. [Rejected]
94. With the assistance of NFO a common marketing agency called Nationwide Milk Producers, Inc. made up of cooperatives in Minnesota and Wisconsin was formed in about 1964.
95. NFO envisioned that the Nationwide member cooperatives would all sign Master Contracts and sell their raw milk and dairy products through the marketing agency in common.
96. [Rejected]
97. Nationwide was viewed as an intermediate step toward implementation of the NFO Master Contracts.
98. In March of 1967 NFO conducted a dairy holding action lasting for at least 11 or 12 days.
99. [Rejected]
100. An objective of the 1967 Holding Action was to raise milk prices by one dollar per hundred weight.
101. In the milk holding action of 1967 NFO encouraged all members to withhold milk regardless of whether the members had contracts with cooperatives.
102. Prior to the 1967 NFO milk holding action, NFO disseminated instructions to its membership stating that NFO members and representatives may solicit non-members to join NFO and then, after having signed a membership agreement, to support the NFO efforts.
103. [Rejected]
104. The Department of Justice obtained a temporary injunction which ended the 1967 holding action.
*508 105. Immediately after the dairy holding action, NFO conducted its so-called "Store and Hold" program, which was a continuation of the holding action, by having members' milk made into hard product and stored until NFO determined that it should be sold.
106. The NFO Store and Hold program was an intermediate step to reach NFO's goal of procuring Master Contracts.
107. NFO, in 1967, desired to control enough of milk going to particular plants to be able to negotiate effectively with them.
108. NFO dairy farmer members signed their milk into the NFO Phase II Store and Hold program by executing NFO Form 7-3-39, "Milk Processing and Sales Agreement," and NFO Form 7-3-38, "Authorization to Plant Operator."
109. The NFO Form 7-3-38 entitled "Authorization to Plant Operator," authorized the purchaser of NFO member milk to deduct 3 cents from the price paid to the signatory NFO member for each hundred pounds of milk and to send the 3 cent checkoff to the NFO, Inc., Corning, Iowa and also informed the purchaser of the agreement between NFO and its member.
110. The Form 7-3-39 did not give NFO the authority to negotiate for the sale of all of a member's dairy production but only so much as he would deliver to the plant.
111. The sales authority was intended to be used for bargaining purposes.
112. The formation of a marketing agency in common was a purpose of the Phase II Store and Hold Dairy Program.
113. [Rejected]
114. The Store and Hold program was unsuccessful.

C. 1969 Meetings Between NFO and Cooperative Leaders

115. In or about 1964, a group of Midwestern dairy cooperatives, including Milk Producers, Inc., formed a common marketing agency called Associated Dairymen, Inc.
116. [Rejected]
117. [Rejected]
118. [Rejected]
119. NFO took credit for setting in motion the events which brought about the discussions concerning regional cooperatives in the Midwest.
120. NFO encouraged cooperatives to join the new regional organization which was to become AMPI until about 1969.
121. NFO wanted to enter into a supply contract with the new regional cooperative.
122. In or about October of 1968, representatives of NFO and of cooperatives considering participation in the regional cooperative met in Kansas City, at the suggestion of NFO, to discuss their signing milk supply contracts with NFO.
123. At this meeting the NFO representatives proposed a contract whereby NFO would agree on behalf of its members to supply milk to the proposed regional cooperative.
124. The Kansas City meeting did not result in any commitment by the group representing the proposed regional cooperative.
125. [Rejected]
126. [Rejected]
127. In April, 1969, representatives of NFO again met with the representatives of the proposed regional cooperative at the NFO offices in Corning, Iowa.
128. NFO again offered to supply the proposed regional cooperative large amounts of NFO member milk if the cooperative would sign a contract with NFO.
129. NFO insisted that any contract provide for "a services rendered fee of 10 cents to 20 cents per hundred weight to NFO," all or part of which would be passed back to the NFO members.
130. The representatives of the proposed cooperative indicated a willingness to pay a fee to NFO but stated that such a fee could not be paid to individual NFO members supplying their milk to the cooperative.
131. As a result of the impasse over this issue, negotiations broke down and no agreement was reached.
*509 132. [Rejected]
133. [Rejected]
134. [Rejected]
135. Supply contracts were only intermediate steps to the Master Contracts.
136. As late as October or November of 1969, NFO was continuing to try to get AMPI to sign a supply contract with NFO.

D. NFO's Alleged Efforts to Coerce or Destroy Regional Cooperatives

137. [Rejected]
138. [Rejected]
139. Immediately after negotiations broke down between NFO and representatives of the proposed cooperative, NFO began sending its employees to meetings to urge producers to vote against merger into the proposed regional cooperative.
140. NFO actively opposed the formation of AMPI and urged dairy farmers who were NFO members to leave plants which were to become part of AMPI.
141. [Rejected]
142. [Rejected]
143. [Rejected]
144. [Rejected]
145. [Rejected]
146. NFO employees appeared at meetings throughout the States of Wisconsin and Minnesota speaking in opposition to the AMPI mergers.
147. One of the cooperatives considering merging in the proposed regional cooperative was the New Prague Cooperative Creamery in New Prague, Minnesota.
148. [Rejected]
149. [Rejected]
150. [Rejected]
151. [Rejected]
152. The NFO employees stated that it was NFO policy to oppose the AMPI regional cooperative mergers.
153. In November the Scott County NFO newsletter published a letter from a local NFO leader expressing anger at NFO's change in position and his continued support for the proposed regional cooperative.
154. [Rejected]
155. [Rejected]
156. New Prague merged with AMPI on December 1, 1969.
158. Another cooperative considering merging into AMPI was Turtle Lake Cooperative Creamery in Turtle Lake, Wisconsin.
159. [Rejected]
160. On the night before the Turtle Lake members were to vote on the merger, NFO held a meeting of NFO members to try to convince Turtle Lake members to vote against consolidation into AMPI.
161. Five Star Dairyland Cooperative was one of the cooperatives in Minnesota considering merging to form a regional cooperative.
162. In the Spring of 1969 a number of meetings were held for Five Star members to vote on the proposed merger with AMPI.
163. At the first such meeting, NFO supported the merger.
164. Thereafter, NFO employees held meetings with Five Star members who were NFO members prior to each Five Star meeting and urged them to vote against the merger.
165. [Rejected]
166. [Rejected]
167. Within a few days after Five Star voted to merge into AMPI, its plants, including those at Clarkfield, Paynesville and New Ulm, lost many NFO member producers.
168. The Rochester Dairy Cooperative was one of the original cooperatives which merged to form AMPI on October 1, 1969.
169. Don Berkhahn and Albin Rust appeared at a meeting of NFO members at the Mayo Clinic Auditorium in Rochester, Minnesota in 1969.
170. At this meeting Berkhahn urged NFO members to vote against the proposed regional cooperative mergers.
*510 171. Many Rochester producer members ceased supplying the Rochester plant after the Rochester membership voted to merge with AMPI.
172. One of the cooperatives considering joining AMPI was Antigo Milk Producers Cooperative.
173. In October, 1969 Ed Graf attended a meeting for producer members of the Antigo Milk Producers Cooperative at Villas, Wisconsin.
174. At that October, 1969 meeting, Ed Graf advised the producers present to vote against the proposed Antigo merger into AMPI.
175. NFO had earlier supported the participation of Antigo in the new regional cooperative.
176. North Central Dairymen's Cooperative was one of the cooperatives considering participating in the proposed regional cooperative.
177. [Rejected]
178. NFO followed each informational meeting with a meeting of their own for the NCDC members.
179. [Rejected]
180. [Rejected]
181. At the merger vote on November 5, 1969, only 38% of NCDC members voted for the merger.
182. Western Wisconsin Dairies at Blair, Wisconsin, merged into AMPI on November 1, 1971.
183. [Rejected]
184. [Rejected]
185. The Blair operation was building a very large, million dollar whey-drying plant at the time of the merger.
186. [Rejected]
187. Turtle Lake Coop Creamery was one of the original cooperatives which merged to form AMPI on October 1, 1969.
188. At a meeting the night before the merger vote at Turtle Lake, Oren Lee Staley spoke against the merger.
189. Don Berkhahn attended a meeting of NFO members in the Turtle Lake area and explained NFO's opposition to the proposed merger.
190. Many NFO producer members removed their milk from the Turtle Lake plant shortly after the Turtle Lake members voted to be a part of AMPI.
191. [Rejected]
192. [Rejected]
193. NFO announced that its supply contract program would "kick off one of the biggest fights NFO has ever started ... [a fight that] ... would determine who would control the supply of milk." NFO also announced that "whether farmers themselves are going to do it and maintain control where they vote on final decisions and on contracts or whether they turn their milk supply over to someone else who will take the authority and power away from them."
194. These supply contracts, which provided for services rendered fees to be paid to a custodial account, were viewed by NFO as a step toward the Master Contracts.
195. [Rejected]
196. [Rejected]
197. The supply contracts were viewed by NFO as a stepping stone toward implementation of its Master Contracts.
198. [Rejected]
199. [Rejected]
200. [Rejected]
201. [Rejected]
202. The Wisconsin Department of Agriculture informed each dairy plant in the State that the NFO Milk Supply Contract provision for additional payments to NFO members might be unlawful.
203. In September of 1969, the Minnesota Department of Agriculture advised Dairy Processors, Inc. that, preliminarily, it felt that the NFO Supply Contract would violate Minnesota law.
204. The North Dakota Attorney General advised NFO that the NFO Supply Contract was illegal because the "services rendered *511 fee" violated North Dakota's statutes forbidding discrimination among dairy cooperatives' patrons.
205. In 1970 the IRS advised AMPI Director Keith Squires that payments of more money to NFO members would not qualify as a deductible patronage dividend, and were therefore not a deductible expense on a cooperative income tax return.
206. NFO decided some time in 1968 to move into direct assistance in the marketing of member milk in addition to its efforts to block the proposed merger.
207. [Rejected]
208. [Rejected]
209. [Rejected]
210. [Rejected]
211. [Rejected]
212. [Rejected]
213. [Rejected]
214. In October, 1970 a meeting was held in John Gage's office in Kansas City; present were Ed Graf and Gordon Shafer for NFO, Wes Johnson, Gary Hanman, William Powell and John Gage for Mid-America.
215 to 221. [Paragraphs 215 to 221 all relate to what was said at the October, 1970 meeting in John Gage's office. We have made full and complete findings elsewhere in regard to that meeting, all of which are incorporated at this place by this reference. The findings proposed in paragraphs 215 to 221 are therefore rejected.]
216. [Rejected]
217. [Rejected]
218. [Rejected]
219. [Rejected]
220. [Rejected]
221. [Rejected]
222. [Rejected]
223. [Rejected]
224. [Rejected]
225. On July 19, 1969 NFO entered into its first contract to supply Grade A milk for fluid purposes with Midwest Creamery of Ponca City, Oklahoma.
226. [Rejected]
227. Between July of 1969 and January of 1970, NFO was preparing to open reloads in Missouri.
228. On July 19, 1969, NFO did not have a functioning reload program.
229. In January and February of 1970, NFO opened its first reload stations at Mountain Grove and Jefferson City, Missouri and began supplying Midwest Creamery.
230. All of the NFO reloads were leased and set up by separate local corporations or groups of individuals.

1. Order 30

231. NFO's first Chicago area reload located at Stoughton, Wisconsin became operational in June, 1970.
232. Thereafter, more than ten NFO reloads were opened and, as was the case in Missouri, these reloads were leased and operated by incorporated or unincorporated groups of NFO members.
233. Henry Soldwedel requested that the Stoughton Reload's first health permit be issued in the name of Wanzer Dairy. Stoughton was considered an extension of the Wanzer plant as far as inspection is concerned only.
234. Henry Soldwedel similarly arranged for health department permits in Wanzer's name at Harvard, Menasha and Dickeyville.
235. [Rejected]
236. [Rejected]
237. [Rejected]
238. [Rejected]
239. [Rejected]
240. [Rejected]
241. [Rejected]
242. [Rejected]
243. During the summer of 1970, NFO was trying to build a volume of milk and getting producers to transfer their milk in order to supply milk to Wanzer.
244. Additional NFO reloads were opened and NFO members and employees *512 solicited dairy farmers to transfer their milk to NFO.
245. [Rejected]
246. NFO also held meetings of nonparticipating members and informed them of their contract arrangement with Wanzer and urged them to participate.
247. [Rejected]
248. In one two-day span in November of 1970, NFO held nineteen meetings throughout Wisconsin to discuss the supply of milk for Wanzer.
249. During the period from 1969 through at least September, 1971, NFO employees and officers, and NFO members, acting at the suggestion of NFO employees and officers, contacted members of AMPI for the purpose of soliciting them to market through the NFO dairy program.
250. Prior to May, 1972, NFO fieldmen were told that they could solicit any farmer who had an NFO Membership Agreement prior in time to any cooperative marketing agreement.
251. Prior to May, 1972, NFO employees soliciting milk production received no instructions to inquire whether a milk producer had signed a marketing or membership agreement with a cooperative.
252. NFO employees may have solicited the milk of dairy farmers without any apparent concern for their contractual status with any cooperative.
253. NFO kept no records indicating names of dairy farmers whose NFO membership agreements predated their cooperative marketing agreements.
254. [Rejected]
255. [Rejected]
256. [Rejected]
257. [Rejected]
258. [Rejected]
259. [Rejected]
260. In January, 1970 AMPI operated plants located at Mount Horeb and Wyocena, Wisconsin.
261. Some of the milk producers shipping to the plant at Mount Horeb and Wyocena had signed membership and marketing agreements with AMPI predecessor Pure Milk Association, Inc.
262. [Rejected]
263. In early 1970, the National Farmers Organization, Inc., had a supply contract for milk with Gruber Brothers Dairy.
264. In January, 1970 Henry Ochsner, an employee of NFO, reported to the NFO Dairy Department: "I called Gruber Brothers at Baraboo again this morning to arrange to get members free from AMPI and into Gruber's plant. Gruber wants the milk and needs it, but will not risk antagonizing AMPI further by picking up another load before the patrons are out of AMPI. A full load of AMPI milk is ready and waiting for freedom."
265. The load of milk referred to in Mr. Ochsner's report as "ready and waiting for freedom" was milk going to the AMPI plant at Mount Horeb.
266. The transfer of AMPI milk from Mount Horeb to Gruber Brothers involved more than one load.
267. During the period from early 1970 through 1971, the milk of the producers which had been going to the AMPI plants at Mount Horeb and Wyocena was transferred directly to Gruber Brothers.
268. When the Sauk City NFO reload opened, the milk of the producers which had been transferred out of the AMPI plants at Mount Horeb and Wyocena moved through that reload to Gruber Brothers.
269. [Rejected]
270. In mid 1971, NFO began negotiating an agreement to supply Kraml Dairies in Chicago its full supply of raw milk.
271. When NFO was negotiating with Kraml to supply its entire requirements for milk, Kraml's requirements were approximately 400,000 pounds per day.
272. [Rejected]
273. In August of 1971 NFO entered into an agreement to supply Kraml Dairy of Chicago with its full raw milk supply.
*513 274. In September of 1971 NFO cut back its sales to Wanzer in order to be able to fulfill its commitment to Kraml.
275. In the summer of 1971, NFO opened additional reloads at Marathon, Sauk City and Footville, Wisconsin.
276. [Rejected]
277. During the period from April, 1971 through January, 1972, except in Wisconsin where the dates were April, 1971 until September, 1971, NFO field representatives contacted many AMPI member milk producers who had signed milk marketing agreements with AMPI or its predecessors in an attempt to get them to switch their milk production to NFO.
278. [Rejected]
279. NFO employees knew they were receiving at the NFO reloads milk from farmers who were members of and had marketing contracts with AMPI.
280. [Rejected]
281. During the nine months ending September 20, 1971 the NFO custodial accounts collected $9,411.49 in AMPI and predecessor cooperative dues but paid none of that amount to AMPI.
282. [Rejected]
283. No one at NFO investigated the accuracy of AMPI letters claiming that NFO was marketing milk in violation of AMPI contracts.
284. NFO field personnel routinely reported to their supervisors on forms which reflected the progress of NFO employees in enrolling new members, the inventory of production for movement under NFO contracts and the collection of dues.
285. These reports reflected the fact that milk producers who were being solicited to sign NFO dairy agreements to ship and transfer their milk under NFO direction were shipping their milk production under some sort of a relationship with cooperatives, including AMPI.
286. [Rejected]
287. [Rejected]
288. In the Fall of 1972 NFO was unable to supply an additional volume of milk to Wanzer because it did not have sufficient uncommitted milk.
289. NFO generally had insufficient Chicago inspected milk to meet Wanzer's complete needs.
290. On at least two occasions in 1973, Wanzer asked NFO to supply additional milk, but NFO was only able to fulfill portions of those requests.
291. In 1972 Harvey Mews operated a milk hauling route, hauling milk from producers' farms to a plant located in Abbottsford, Wisconsin.
292. [Rejected]
293. The majority of the milk producers on Harvey Mews' hauling route were members of AMPI.
294. In February, 1972 the National Farmers Organization, Inc., was receiving complaints of low pay price from milk producers shipping their milk to the Marathon Reload facility operated by NFO.
295. In February or March, 1972, a meeting was held by the NFO Marathon-Clark Dairy Bargaining Committee at a restaurant in Abbottsford, Wisconsin, to discuss the problem of the low pay price for the Marathon Reload shippers.
296. During the meeting at the restaurant in Abbottsford, Wisconsin, the NFO Marathon-Clark Dairy Bargaining Committee discussed shipping the milk of the Marathon Reload shippers on a direct basis to other locations.
297. [Rejected]
298. NFO representatives discussed the movement of milk on the Harvey Mews' route and the possibility of contracting with another handler.
299. Thereafter, efforts were made by NFO employees to get the producers on the Harvey Mews' route to switch their milk from the AMPI Abbottsford plant to a location that was then being considered by NFO.
300. NFO employee Ray Keck approached various plants about the possibility of their buying this milk.
*514 301. [Rejected]
302. [Rejected]
303. [Rejected]
304. [Rejected]

2. Order 68

304. In late 1970 or early 1971, NFO first discussed supplying milk to handlers in the Minneapolis-St. Paul area.
305. At that time NFO was not marketing any Grade A milk in the State of Minnesota.
306. [Rejected]
307. The first Twin Cities buyer with whom NFO negotiated was Ewald Dairy.
308. NFO told the representatives of Ewald that they were prepared to deliver all or part of Ewald's requirements within a reasonable time.
309. [Rejected]
310. NFO entered into a contract to supply Schroeder Dairy's requirements shortly before July, 1971.
311. The Schroeder contract called for NFO to supply Schroeder its milk requirements beginning on July 27, 1971.
312. [Rejected]
313. [Rejected]
314. [Rejected]
315. In the spring of 1971 members of NFO opened a reload at Chetek, Wisconsin to move milk to fluid milk handlers on Order 68.
316. The Chetek Reload began operating in May, 1971.
317. NFO was anxious to move milk production into the Chetek Reload when it began operations.
318. In 1971 NFO representatives contacted milk producers to get them to switch their milk production to the Chetek Reload operated by NFO members.
319. In 1971 many AMPI member milk producers switched their production from AMPI plants or plants under AMPI auspices to the NFO Chetek Reload.

3. Current NFO Goals

320. [Rejected]
321. In or about December, 1974, NFO instituted the "Think 30 Program."
322. It was the goal of the NFO Think 30 program to put together 30% of the nation's total production of milk, meat and grain and announce prices for those commodities.
323. If industry refuses to pay the price announced by NFO after it has control of 30% of any commodity, the NFO program contemplated an automatic holding action.
324. NFO presently seeks to have 30% of the milk produced in the United States marketed through the NFO reload system or under NFO contracts.
325. NFO has recently come to believe that it can accomplish its goals with control of 30%, instead of 60%, of the nation's milk production.
326. It is a goal of NFO to set the price of the milk it markets for its members throughout the nation.

4. North Central Dairymen's Cooperative

327. North Central Dairymen's Cooperative was formed on June 15, 1964 to provide a dairy cooperative organization for the NFO members who lost their milk market when the Owen Dairy Company went out of business in April, 1964.
328. Although North Central was made up of NFO members, the North Central Board managed the North Central operations separately from any NFO controls.
329. In 1969 North Central sought a facility near the Chicago market so that North Central's members could receive the benefit of a more favorable zone differential.
330. [Rejected]
331. [Rejected]
332. [Rejected]
333. [Rejected]
334. [Rejected]
335. [Rejected]
336. [Rejected]
*515 337. [Rejected]
338. [Rejected]
339. [Rejected]
340. [Rejected]
341. In August, 1969, RMD, Inc., a corporation created by the Rettigs and Dalton Wery to manage the Hartford reload, and the Temkins executed a one-year lease for the Hartford facility which provided RMD with an option to purchase the Hartford property.
342. NFO was not a party to the lease between the Temkins and RMD but NFO officials were familiar with the terms of the lease.
343. In August, 1969 RMD entered into a lease agreement with North Central for the Hartford facility.
344. [Rejected]
345. [Rejected]
346. During May, 1970, NFO was in the process of setting up its first reload in Wisconsin, the Stoughton Reload.
347. On May 7, 1970 Norbert Connor, Henry Ochsner, Steve Pavich, Tony Briskie, Allen Skroch and Ric Avila met at the Aloha Inn, Madison, Wisconsin, to discuss NFO's taking over the Hartford lease.
348. [Rejected]
349. After the Aloha Inn meeting the NFO representatives met with Jachial Temkin at his office and at the office of John Shiels, Temkin's attorney. During those meetings a five year lease for the Hartford facility was executed to take effect September 1, 1970 with Allen D. Skroch and Henry Ochsner, both of whom were NFO members, as lessees and NFO as guarantor.
350. No North Central Board member or RMD principal was invited to attend nor did they attend any of the May 7, 1970 meetings with NFO representatives and the Temkins.
351. NCDC and RMD were not informed by NFO of these meetings and arrangements.
352. The May 7 lease provided minimum monthly rental of three to four cents for each one hundred pounds of milk received at the facility with a minimum of $2,500, whereas RMD's lease had had a maximum of $2,500.
353. When the May 7 lease was executed, neither the Temkins nor NFO notified either the North Central Board or RMD of the agreement.
354. By June, 1970 it was common knowledge that North Central and NFO were moving in opposite directions with one another, like two trains running at each other on the same track.
355. [Rejected]
356. [Rejected]
357. [Rejected]
358. On June 25, 1970, RMD notified the Temkins in writing of its intention to exercise its option to purchase the Hartford facility.
359. [Rejected]
360. On or about July 2, 1970, John Shiels, attorney for the Temkins, notified Ernest C. Gay, attorney for RMD, that the Temkins refused to honor RMD's option because of "substantial defaults" under the lease.
361. By return letter Ernest C. Gay stated that RMD was unaware of such defaults under the lease and requested an explanation, but no such explanation was ever provided.
362. [Rejected]
363. [Rejected]
364. [Rejected]
365. RMD's final rent check for the month of August, 1970 (check number 216), dated September 23, 1970, bearing on the face of the check "1 year lease paid in full through 8/29/70" was deposited in the Temkins' bank account on September 30, 1970.
366. [Rejected]
367. During the month of May, 1970, North Central delivered 9,057,160 pounds of milk to Wanzer Dairy in Chicago from the Hartford facility.
368. [Rejected]
*516 369. [Rejected]
370. [Rejected]
371. [Rejected]
372. On July 24, 1970 the North Central Board met with Ed Graf and Ric Avila to discuss the disposition of the Hartford facility.
373. At that time NFO had only one reload in operation in Wisconsin with about 127,000 pounds of milk per day.
374. At a meeting in Wausau, Wisconsin on July 24, 1970, Ed Graf indicated that NFO had guaranteed the remainder of RMD's rent payments to the Temkins but had not paid any rent payments on behalf of RMD.
375. [Rejected]
376. [Rejected]
377. It was NFO's intention to offer to include all North Central facilities and producers in NFO's proposed Federal Order No. 30 marketing unit.
378. [Rejected]
379. Several days after the July 24, 1970 meeting, Ric Avila and Ed Graf met again with the North Central Board to offer that they become part of an NFO marketing unit.
380. [Rejected]
381. Jachial Temkin assisted NFO in finding New Jersey and New York markets for the milk of its members.
382. [Rejected]
383. [Rejected]
384. In August, 1970, North Central and NFO were still discussing the possibility of selling or leasing all of North Central's Grade A manufacturing facilities to NFO for about $10,000 per month but NFO would not make any commitments and stated the price North Central was offering was too high.
385. [Rejected]
386. Ed Kriewaldt was employed by RMD as the Hartford fieldman from August, 1969 until NFO took over the Hartford reload one year later.
387. While serving as an RMD employee, Ed Kriewaldt frequently had discussions with Ed Graf, Don Berkhahn and Ric Avila.
388. When Ed Kriewaldt was an RMD employee, his salary was about $300 per month.
389. After Ed Kriewaldt learned that NFO was going to take over the Hartford reload, he contacted NFO for he believed that NFO would want to employ him in the same capacity that he was working for RMD.
390. [Rejected]
391. In preparation for NFO's takeover of Hartford on August 28, 1970, Ed Kriewaldt assisted John Van Boxtel and Ed Graf in coordinating the truckers and permits for Hartford.
392. [Rejected]
393. [Rejected]
394. From August, 1969 up to August 30, 1970, North Central accounted to the Market Administrator for the following number of Hartford producer members and product pounds received at Hartford:

 Month Producer Members Product Pounds
 Aug., 1969 31 46,489
 Sept., 1969 130 3,636,432
 Oct., 1969 140 4,623,086
 Nov., 1969 171 5,203,112
 Dec., 1969 171 6,439,875
 Jan., 1970 191 7,315,332
 Feb., 1970 241 8,685,399
 Mar., 1970 261 10,550,982
 Apr., 1970 268 11,154,851
 May, 1970 276 12,154,139
 June, 1970 274 11,624,504
 July, 1970 276 11,407,404
 Aug., 1970 272 10,210,157

395. [Rejected]
396. [Rejected]
397. [Rejected]
398. [Rejected]
399. [Rejected]
400. [Rejected]
401. [Rejected]

5. Mid-America

402. In the fall of 1969, NFO needed milk to fulfill its contract with Midwest Creamery.
*517 403. Beginning in the fall of 1969, NFO attempted to recruit Mid-America Missouri members to market milk in NFO's marketing program.
404. [Rejected]
405. NFO fieldmen contacted some dairy farmers who were Mid-America members.
406. NFO fieldmen called on milk producers who had not signed NFO Membership Agreements.
407. Their purpose in calling on producers who had not signed NFO Membership Agreements was to get these producers to become a part of the NFO marketing program.
408. Some of the producers the NFO fieldmen called on had not signed NFO Membership Agreements and these producers were marketing their milk through Mid-America.
409. In 1970, NFO fieldmen called on milk producers, some of whom were then marketing their milk through Mid-America, in an attempt to get more milk for NFO. Some of these producers later started shipping through NFO.
410. A letter was drafted in Corning, Iowa and read to Hackler over the telephone, who had it typed up by the secretary in the Springfield office.
411. The letter stated that the producer who was signing the letter had no record of having signed a Mid-America agreement, and that if he had signed a Mid-America agreement, this letter was notice that the producer would like to have the Mid-America agreement terminated.
412. Hackler caused the letters to be distributed to patrons who were shipping to the NFO member reload at the time the letter was drafted, including those persons who had membership agreements with Mid-America.
413. Hills and Hackler themselves mailed some of the letters and other termination notices to Mid-America.
414. [Rejected]
415. [Rejected]
416. [Rejected]
417. [Rejected]
418. Billy Stacey was a Mid-America hauler in Southwest Missouri.
419. Billy Stacey was the lessee of a station which was going to act as an NFO receiving station or transfer point in Springfield, Missouri.
420. Ted Forbes, while an employee of NFO, actively solicited or encouraged persons to solicit Mid-America members to join the National Farmers Organization and to market milk through that organization.
421. Ted Forbes was paid by the National Farmers Organization for his work in solicitation of Mid-America members.
422. NFO employees called on and attempted to procure milk from farmers, many of whom may have signed Mid-America membership agreements. Some of those farmers later switched their production to an NFO facility.

E. Misrepresentation

423. [Rejected]
424. [Rejected]
425. [Rejected]
426. [Rejected]
427. [Rejected]
428. [Rejected]
429. [Rejected]
430. NFO published a pamphlet entitled "The Snubber."
431. [Rejected]
432. NFO employees and representatives distributed large numbers of the "Snubber" at various county meetings and used it in soliciting dairy producers.
433. [Rejected]
434. [Rejected]
435. [Rejected]
436. [Rejected]
437. NFO Reporters over the years have sometimes claimed that NFO was responsible for specific increases in the M-W Series Price.
*518 438. NFO's M-W Series claims were disseminated through various media including audio-visual aids, pamphlets and graphs, for use in soliciting dairy producers.
439. [Rejected]
440. [Rejected]
441. In November, 1972, NFO caused articles to be published in the November, 1972 NFO Reporter entitled, "NFO Gets Him $641.67 More For His Milk," and "Dairyman Finds NFO Prices, Tests and Returns All Above AMPI on Alternate Day Milk Deliveries."
442. This article was published in an effort to convince dairy farmers they would be better off if they marketed milk through NFO.
443. These articles purported to show that a farmer named Delmar Jenneman, who marketed his milk to AMPI one day and to NFO the next for eight months during 1972, would have made $641.67 more by shipping it all through NFO than if he had marketed it all through AMPI.
444. [Rejected]
445. [Rejected]
446. [Rejected]
447. The same article was reprinted as part of a December, 1972 NFO Reporter, Dairy Edition, at Ben Stong's suggestion and with Ed Graf's approval.
448. This was circulated to dairy farmers to induce them to market their milk through NFO.
449. [Rejected]
450. An NFO zone supervisor at one NFO county meeting in February of 1972 told the assembled dairy farmers that "AMPI has been found guilty of restraint of trade. The Federal Justice Department is also suing AMPI  an effort to keep NFO from receiving the credit for this suit. If we win we will break AMPI and Mid-Am."
451. [Rejected]
452. [Rejected]
453. [Rejected]
454. [Rejected]
455. [Rejected]
456. [Rejected]
457. [Rejected]

F. Alleged Misrepresentation to USDA and IRS

458. Federal Milk Marketing Orders have been promulgated for 62 geographic areas of the country regulating certain aspects of milk marketing and sales therein.
459. Each of the Federal Milk Marketing Orders establishes and utilizes a classified price system in which milk is classified according to the use to which it is put; a separate price is established for each classification.
460. The Cooperative Qualification Branch of the Dairy Division receives applications from associations of dairy farmers who request to be given the privileges and rights of cooperative marketing associations under the Agricultural Marketing Agreement Act; the Cooperative Qualification Branch has the responsibility for making recommendations to the Director of the Dairy Division for both an initial qualification and the continuing qualification of cooperative marketing associations.
461. If the Dairy Division determines that an association is within a particular Federal Order's definition of "Cooperative Marketing Association," an additional determination must be made by the Dairy Division as to whether such cooperative marketing association has full authority in the sale of its members' milk.
462. The determination as to whether a cooperative marketing association has full authority in the sale of its members' milk requires submission of proof that such association has full authority in regard to the sale of the milk of its members.
463. Where the Dairy Division has not determined that a cooperative marketing association is performing certain marketing services such as checking weights and tests and providing market information for a producer or group of producers, the Federal Milk Marketing Administrator performs such services and requires that the handler to whom such producers' milk is being sold *519 deduct a fee from their checks and remit such fee to him in payment for such services.
464. If the Dairy Division has (1) qualified a cooperative marketing association and (2) has determined that the association is performing the marketing services specified in the provisions of the applicable Order, no fee is deducted by the handler to be remitted to the Administrator; instead, the full use value or blend price may be paid to the association or directly to the farmer.
465. Blending (also termed "reblending") occurs where a cooperative takes all the money which it has left over from all of its sales in all markets and all use classifications, and divides such money among its members in whatever fashion it deems appropriate.
466. NFO is the only association qualified by the USDA to market milk that was exempt from payment of federal income taxes under ¶ 501(c)(5) of the IRC at the time so qualified.
467. In the Dairy Division's opinion, Article I of the NFO Membership Agreement, which purportedly gives NFO authority to act as representative in collective bargaining for its members except for those commodities covered by other marketing contracts, did not give NFO full authority to market the milk of its members.
468. [Rejected]
469. 7 CRF § 900.353 requires an applicant to have full authority in the sale of its members' milk in order to become qualified by the Dairy Division.
470. In order to obtain qualification as a cooperative marketing association, NFO was required to present to USDA evidence that it had full authority in the sale of its members' milk, including evidence that it had full authority to collect in its own name the proceeds of sale of the milk of its members.
471. When Avila learned that USDA required NFO to submit evidence of its authority to collect the proceeds of sale of the milk of its members, Form 7-3-39AR, "NFO Milk Sales Agreement," was prepared for submission to USDA.
472. Through NFO answers to the question set forth in Section C-1 of the Form DA-25, Avila represented to the Dairy Division in March, 1970 that NFO members by executing NFO Form No. 7-3-39AR provided NFO with full authority to market its members' milk.
473. The only milk sales agreement submitted by NFO with its application on March 11, 1970 was Form 7-3-39AR.
474. NFO Form No. 7-3-39A was the milk sales agreement being used at the time that Avila filed NFO's DA-25 application for qualification and was still being used as of June 9, 1971.
475. In reviewing NFO's application for qualification with Avila, USDA suggested that NFO should clarify its Form 7-3-39A.
476. On May 8, 1970, Avila and Gordon Shafer came to Washington, met with Forest, March, La Liberte and some attorneys from the USDA General Counsel's Office, and stated that the Form 7-3-39AR was the NFO milk sales agreement and was basically a revision of the Form 7-3-39A, the "AR" standing for "as revised."
477. [Rejected]
478. [Rejected]
479. The Cooperative Qualification Branch's conclusion that there were signed 7-3-39AR Forms in the field was based upon Avila's statement to that effect at the May 8, 1970 meeting.
480. Form 7-3-39AR has never been used by NFO except in its application to USDA.
481. In preparing NFO Form 7-3-39AR, Ric Avila merely added a paragraph numbered 2 to Form 7-3-39A and changed the form's designation to 7-3-39AR.
482. The addition of new paragraph 2 to Form 7-3-39A, designated as Form 7-3-39AR, purported to give NFO "full power and authority in its own name to collect the entire amount due for milk delivered hereunder."
483. [Rejected]
*520 484. The NFO membership agreement, standing alone, confers no authority on NFO to collect the proceeds of the sales of its members' milk.
485. [Rejected]
486. [Rejected]
487. [Rejected]
488. The NFO Dairy Custodial Account, allegedly "an agent and/or instrumentality of NFO," collects, and is authorized by the members to collect, the full amount due for milk of NFO members.
489. [Rejected]
490. [Rejected]
491. Avila stated to the Dairy Division that NFO was using Form No. 7-3-39AR in the field so that the Dairy Division would qualify NFO as a cooperative marketing association under the Agricultural Marketing Agreement Act of 1937.
492. [Rejected]
493. The fact that an association had members who were not and had never been engaged in the production of agricultural commodities whatsoever would be fatal to the Dairy Division's qualification of such association.
494. In response to Paragraph A-12 of Form D-24 asking how long a producer may be inactive before his membership is terminated, Avila prepared and gave to the Dairy Division on March 11, 1970 the answer "Terminated immediately if he no longer owns or controls production at the farm level."
495. [Rejected]
496. In response to Paragraph A-4 of Form DA-25, NFO represented to the Dairy Division that membership in NFO was restricted to producers of farm commodities for those who had control of the production of commodities at the farm level.
497. [Rejected]
498. NFO in fact had no procedure whereby the membership rolls are periodically updated to remove from the rolls those who have quit farming.
499. NFO has carried non-producers on its membership rolls for lengthy periods of time.
500. In qualifying NFO as a cooperative marketing association, the Dairy Division relied upon NFO's assurance that there were no non-farmer members of NFO and that all members were producing agricultural commodities.
501. [Rejected]
502. [Rejected]
503. In its application for exemption from federal income taxes, submitted to the IRS and dated 11-7-56, William Barnes, Secretary of NFO represented to the IRS that the purpose for which NFO was formed was "to promote agricultural benefits for all farmers" and that the only activities that the organization would engage in would be to "organize farmers on the county level for the purpose of discussing their problems and solutions thereto and securing recognition of these problems by the United States Congress and others."
504. [Rejected]
505. [Rejected]
506. [Rejected]
507. NFO never reported to the IRS that it had applied for, and had been granted, qualification as a cooperative marketing association by the Dairy Division of USDA.
508. Article II, Section 5 of the bylaws of NFO, as adopted at the 1969 National Convention, provides:
To assure that National Farmers Organization acts only as a service organization, it is hereby provided that the Board of Directors and officers of this organization are expressly forbidden to enter into, or engage in any business in behalf of or in the name of the organization, of the sort commonly engaged in by corporations for profit.
509. [Rejected]
510. [Rejected]
511. [Rejected]
512. NFO first became qualified as a cooperative marketing association by the *521 Dairy Division of the USDA in July, 1970; in order to obtain such qualification, NFO represented that it marketed its members' milk.
513. [Rejected]
514. In reaching a determination as to whether NFO was in fact marketing milk pursuant to a contract between NFO and a handler, Forest made a distinction between the wording "N.F.O. is selling" and the wording "N.F.O. is selling on behalf of its members."
515. Until NFO began to actually market milk, the Dairy Division would not qualify NFO as a coop.
516. At a meeting in early 1970 of Forest and NFO representatives, there was a discussion of whether NFO, as an organization, was selling milk to milk dealers, as distinguished from NFO, acting only as an agent for its producers and arranging for contracts between buyers and individual producers.
517. Avila, Sinclair and Graf have specifically told Forest and La Liberte that NFO as an organization sells milk.
518. [Rejected]
519. In qualifying NFO Herb Forest had a precise understanding with NFO that NFO was selling milk to handlers, and that the handlers were buying milk from NFO; this understanding was between Forest, Graf, Avila and Sinclair.
520. In qualifying NFO, the Dairy Division qualified NFO of Corning, Iowa as opposed to any other association or organization such as the National Dairy Commodity Division of NFO or the NFO Members Dairy Trust.
521. NFO membership agreement provides that NFO, Inc. "shall not become legal owner or engage in business activities, but must remain within the framework of a service organization bargaining for its members who have signed marketing contracts."
522. [Rejected]
523. [Rejected]
524. From 1969 to date, members of NFO have established, acquired, or leased reload facilities to which the milk of NFO members is delivered.
525. NFO activities on behalf of NFO members in collective bargaining and marketing assistance are of essentially the same type and character for grain, livestock and milk products.
526. [Rejected]
527. [Rejected]
528. [Rejected]
529. [Rejected]
530. [Rejected]
531. [Rejected]
532. The National Dairy Trust is separate and apart from NFO.
533. The funds in custodial accounts are separate from the funds of NFO.
534. [Rejected]
535. NFO has never claimed any right to the proceeds from the sale of the products of its members.
536. NFO does not own any collection points, grain elevators, processing plants, milk reloads or any other assets for the marketing, processing, or transporting of the products of its members.
537. NFO has no net earnings and it makes no distributions of any kind to its members.
538. [Rejected]
539. [Rejected]
540. [Rejected]
541. [Rejected]
542. NFO until dissolved, is prohibited by its articles of incorporation, from paying dividends or making distributions in property to its members or officers.
543. By letter dated September 20, 1970, NFO requested the Dairy Division to qualify it as a cooperative marketing association on Federal Milk Marketing Orders Nos. 106 and 126, representing that NFO operated two transfer stations in Missouri near Jefferson City, Missouri and Mountain Grove, Missouri, which were "exactly like the ones *522 in Wisconsin," that NFO would handle "all aspects of marketing milk," and that field service was provided by Mr. Bruemmer and Mr. Hills, both of whom had attended the University of Missouri school for fieldmen.
544. Ric Avila drafted this September 20, 1970 letter for Ed Graf's signature and caused it to be sent to the USDA.
545. As of September 30, 1970, neither Mr. Hills nor Mr. Bruemmer had attended the University of Missouri school for fieldmen nor did they have any formal training in that regard.
546. [Rejected]
547. [Rejected]
548. The NFO Jefferson City reload is not owned by NFO.
549. On February 20, 1970, Frank Schwarzer, Charles Braun and Wilbur Rackers leased the Jefferson City reload with the lease being guaranteed by NFO.
550. From the execution of the lease on the realty on which the Jefferson City reload facility was constructed until the spring of 1971, Henry Rackers paid the rent under such lease.
551. A corporation by the name of Mid-Missouri Milk Producers Association, Inc. was formed by a number of NFO milk producers in the Jefferson City area on February 16, 1971 to operate the financing of the NFO Jefferson City reload facility.
552. Mountain Grove Dairy Producers, Inc. was incorporated as a Missouri corporation on February 16, 1971.
553. Mountain Grove Dairy Producers, Inc. leased the Mountain Grove reload facility on March 15, 1971.
554. [Rejected]
555. [Rejected]
556. [Rejected]
557. [Rejected]
558. [Rejected]
559. [Rejected]
560. A group of individual farmers incorporated Southwest Milk Producers, Inc., and paid for the equipment which Billy Stacey installed in the Springfield reload station.
561. Billy Stacey was authorized by the Board of Directors of Southwest Milk Producers, Inc. to maintain the Springfield reload station.
562. [Rejected]
563. [Rejected]
564. [Rejected]
565. [Rejected]
566. [Rejected]
567. [Rejected]
568. All equipment and tanks installed at the Springfield reload station were purchased by Southwest Milk Producers, Inc.
569. [Rejected]
570. [Rejected]
571. [Rejected]
572. [Rejected]
573. Since the Springfield reload station opened, Stacey maintained a public liability insurance policy, at least until January, 1973, on the premises and has continued paying the annual premiums on such policy without even being reimbursed by NFO for such amounts.
574. The insurance policy was in Stacey's name and Stacey has never given copies of the policy to NFO.
575. Affidavits signed by Billy Stacey and others were submitted by NFO in response to an inquiry made by the USDA Dairy Division as to who was operating the Springfield plant and were considered by the Dairy Division in its determination that NFO was the operator of such plant.
576. [Rejected]
577. Al Scott told Billy Stacey that he was being asked to lease the Springfield reload in Stacey's own name "because NFO couldn't lease or own any property."
578. Stacey was not working for NFO while loading and unloading the milk.
579. Stacey received a $1,200 payment from Southwest Milk Producers, Inc. for his loading-unloading services during the months of February, March and April, 1971.
*523 580. The determination that NFO was a qualified cooperative on the North Texas Order in relation to the Springfield reload was made March 25, 1971.
581. Forest signed the determination that NFO was a qualified association on the North Texas Order on March 25, 1971 and sent a copy of it to Dunham.
582. The determination was made retroactively to February 1, 1971 since the Dairy Division believed the conditions prevailing on such date were the same as those prevailing on March 25, 1971.
583. [Rejected]
584. [Rejected]
585. [Rejected]
586. [Rejected]
587. [Rejected]
588. [Rejected]
589. A qualified cooperative must distribute market information, such as pool data and general information regarding milk movements and milk marketing to its members.
590. On May 24, 1971, Dunham, Market Administrator for the North Texas Order, told La Liberte that after reviewing NFO's annual report, Dunham still saw nothing to indicate that NFO was marketing its members' milk. Dunham reported that although NFO repeatedly promised to perform numerous kinds of marketing services, the Dairy Division always had to talk to reload personnel or haulers to obtain any information regarding milk movements.
591. Avila gave Mid-Am Ex. 500 at 8 (22-23) to Dairy Division Deputy Director March at a March, 1971 meeting.
592. The purchase price is collected by the Dairy Trust and disbursed by the Dairy Trust to the members.
593. [Rejected]
594. NFO does not collect and has not collected proceeds from handlers for members' milk.
595. As of June 8, 1971, the Dairy Division had not received from NFO any evidence that NFO made payments for the rent due under the lease on the Springfield facility, that NFO arranged and paid for the inspection of its members by the Texas health authorities, or that NFO rendered bills to its Texas customers from the NFO headquarters in Corning, Iowa and received the proceeds of such sales at such headquarters.
596. NFO never received the proceeds from the sale of milk to Boswell at its Corning headquarters; rather, a separate legal entity, the Springfield Receiving Station Account (which was subsequently replaced by the NFO Member Dairy Trust), received such proceeds.
597. [Rejected]
598. The proceeds of all NFO members' milk sales which are not paid directly to the producers are received by various NFO custodial accounts. With the exception of deductions which it claims, NFO has no interest whatsoever in such custodial accounts and the moneys therein are the property of the NFO members.
599. The only documentary evidence on which the Dairy Division found that NFO, not Stacey, was the operator of the Springfield reload, was the self-serving statements prepared by Avila and Stacey and submitted to the Dairy Division.
600. [Rejected]
601. [Rejected]
602. [Rejected]
603. Some members of NFO are not farmers and are not engaged in the production of agricultural products.
604. [Rejected]
605. Some NFO members were not farmers when they joined.
606. [Rejected]
607. [Rejected]
608. [Rejected]
609. NFO fixes the price of commodities, including milk, as between those of its members for whom it bargains.
610. NFO Supply Contracts were designed and intended to raise the price of milk in plants executing such contracts.
*524 611. [Rejected]
612. [Rejected]
613. [Rejected]
614. [Rejected]
615. [Rejected]
616. [Rejected]
617. [Rejected]
618. [Rejected]

G. Alleged Bad Faith Counterclaim

619. NFO's counterclaim was filed on or about May 19, 1971. An amended counterclaim was filed June 25, 1971.
620. [Rejected]
621. [Rejected]
622. [Rejected]
623. [Rejected]
624. [Rejected]
625. [Rejected]
626. [Rejected]
627. [Rejected]
628. NFO has had persistent problems with uncollected back dues.
629. NFO has borrowed money to meet operating expenses every year since 1968 through 1974.
630. [Rejected]
631. In June, 1971, Oren Lee Staley announced to a staff meeting that the financial situation of the organization was critical.
632. The "Crisis Drive" for funds began in July, 1971.
633. The primary appeal of this drive was that millions of dollars must be raised to finance pending litigation.
634. The appeal for money in the Crisis Drive was designed to reach every NFO county.
635. The NFO counties were told that AMPI had sued NFO in Wisconsin in August, 1971 and had counterclaimed against NFO in September, 1971; that NFO would incur enormous expenses in prosecuting its litigation; that recoveries as high as $125 million were possible; and that the future of NFO might depend upon the contributions of NFO members.
636. This appeal resulted in collection of over $1 million in two or three weeks.
637. As of September 30, 1971 NFO had collected approximately $1,190,000 pursuant to the Crisis Drive effort.
638. [Rejected]
639. [Rejected]
640. The Crisis Drive appeal continued into early 1972, with NFO asking the counties to donate money from their treasuries and to waive all or part of the counties' share of NFO dues.
641. Stanley announced to a 1972 NFO convention that he hoped NFO could raise $10 million in loans.
642. [Rejected]
643. [Rejected]
644. [Rejected]
645. [Rejected]
646. [Rejected]
647. [Rejected]
648. [Rejected]
649. [Rejected]
650. [Rejected]
651. NFO's complaint was amended to name a number of individual NFO farmer members as claimants in the counterclaim against AMPI, individually and as representatives of an alleged class.
652. [Rejected]
653. [Rejected]
654. [Rejected]
655. [Rejected]
656. [Rejected]
657. [Rejected]
658. [Rejected]
659. Some of the counterclaimants are not, and at the time of filing of the counterclaim were not, dairy farmers.
660. Oren Lee Staley, an individual counterclaimant, has not been a dairy farmer for many years.
*525 661. All of the counterclaim plaintiffs expected NFO or someone other than themselves to pay their costs and legal fees; NFO even undertook to pay the expenses many of them incurred in attending their depositions.
662. [Rejected]
663. Avila is not trying to collect any damages for personal injuries in this lawsuit.
664. On July 31, 1974 NFO counsel filed a brief on behalf of the individual counter claimants.
665. In that pleading NFO attorneys state that the non-dairy farmer individual counterclaimants are seeking only to recover damages suffered by NFO, not by themselves personally.

H. Damage Theory and Computation

Paragraphs 666 through 752  [Rejected]
Part H of AMPI's Phase III proposed findings of fact, entitled "Damage Theory and Computation," contains paragraphs 666 to 752, respective. AMPI added a damage summary on page 148 of its Phase III proposed findings which stated the following:
DAMAGE SUMMARY
As a direct and proximate result of the unlawful activities of NFO and the other Phase III defendants, AMPI sustained at least the following damages:

(1) Lost Checkoff $ 116,412.02
(2) Price Fixing Damages 2,948,552.78
(3) Improper Unit Pooling
 Damages 352,786.58
(4) Mt. Horeb Plant Losses 107,807.45
(5) Abbottsford Plant Losses 33,622.00
(6) North Central Region
 Plant Losses 5,240,994.00
(7) Blair, Wisconsin Plant
 Hauling Losses 191,359.00
(8) Forced Sale of Howard
 Lake Plant  Loss 153,470.00
 _____________
 Total $9,145,003.83

We reject each paragraph of AMPI's Phase III proposed findings of fact in regard to damages, paragraphs 666 to 752, for the reason that we need not and therefore do not reach any question of AMPI's alleged damages in light of the conclusions of law which we have determined to be applicable to Phase III of this case.

Discussion of NFO's Phase III Proposed Findings of Fact
NFO proposed 110 paragraphs of findings of fact, divided into six separate parts, in connection with its defense of AMPI's Phase III claim. In light of our determination of the Phase III issues of liability against AMPI and in favor of NFO, it is unnecessary to examine NFO's proposed findings of fact in any detail. It is appropriate, however, to make and state particular findings and conclusions suggested by particular paragraphs of NFO's proposed findings of fact as those paragraphs present questions which relate to and reflect our determination of the sufficiency and weight of the evidence adduced by AMPI in support of its Phase III claim.
We therefore make and state the following findings and conclusions, giving those paragraphs new consecutive paragraph numbers which contain the paragraph number of NFO's proposed findings of fact in parenthesis for ready reference.
1. (17) AMPI claims either in its brief (AMPI Br., p. 7) or its proposed Conclusions of Law (ACL 4, 12) that Henry Soldwedel, Jachial Temkin, Gruber Brothers and Harvey Mews conspired with NFO to monopolize the sale of raw milk throughout the United States and that Soldwedel and Temkin further conspired with NFO to violate the Agricultural Fair Practices Act.
2. (25) The weight of the evidence in the record does not support a finding of fact that Soldwedel, either as an individual or as the chief operating officer of Southland's Wanzer plant, was aware of, or joined in, any purpose of NFO, if any, to monopolize the sale of raw milk throughout the United States.
3. (26) The weight of the evidence in the record does not support a finding of fact that Soldwedel conspired with NFO to do anything forbidden by the Agricultural Fair Practices Act.
*526 4. (27) The weight of the evidence in the record does not support a finding of fact that Soldwedel, either as an individual or as the chief operating officer of Southland's Wanzer plant, had any agreement with NFO other than the normal one between a buyer and a seller.
5. (46) The weight of the evidence in the record does not support a finding of fact that Temkin was aware of, or joined in, any purpose of NFO, if any, to monopolize the sale of raw milk throughout the United States.
6. (47) The weight of the evidence in the record does not support a finding of fact that Temkin conspired with NFO to do anything forbidden by the Agricultural Fair Practices Act.
7. (48) The weight of the evidence in the record does not support a finding of fact that Temkin and NFO, its employees or members had any agreement other than the normal one between a landlord and a tenant.
8. (52) The weight of the evidence in the record does not support a finding of fact that Gruber Brothers was aware of, or joined in, any NFO purpose, if any, to monopolize the sale of raw milk throughout the United States.
9. (53) The weight of the evidence in the record does not support a finding of fact that Gruber Brothers and NFO had any agreement other than the normal one between a buyer and a seller.
10. (58) The weight of the evidence in the record does not support a finding of fact that Mews was aware of, or joined in, any NFO purpose, if any, to monopolize the sale of raw milk throughout the United States.
11. (59) There is not even evidence in the record to suggest that Mews had any agreement with NFO.
12. (87) There is insufficient evidence in the record to support a finding of fact that NFO induced any farmer to breach any agreement that he may have had with AMPI.
13. (88) There is insufficient evidence to support a finding of fact that NFO or any of its employees or agents made any material false reports about AMPI's finances, activities or management.
14. (89) The weight of the evidence in the record does not support a finding of fact that NFO lowered its prices to various Order 30 handlers, including Mar-Vel and Kraml, for the purpose of harming AMPI or any other cooperative.
15. (91) The weight of the evidence in the record does not support a finding of fact that the allegedly false information submitted by NFO to the USDA was relevant to, or relied upon in the grant of, NFO's qualification as a marketing association under federal milk marketing orders.
16. (92) The weight of the evidence in the record does not support a finding of fact that NFO enjoyed any reduction in tax liability by reason of alleged misrepresentations to the Internal Revenue Service.
17. (93) The weight of the evidence in the record does not support a finding of fact that NFO's counterclaim was brought or has been pursued in bad faith.
18. (108) The evidence in the record does not support a finding of fact that NFO coerced or intimidated any farmer, let alone any AMPI member.
19. (109) There is insufficient evidence to support a finding of fact that NFO or any of its employees or agents made any false reports about AMPI's finances, activities or management.
20. (110) The evidence in the record does not support findings of fact that NFO (1) knew that any reports it may have made about AMPI's finances, activities or management were false or (2) knowingly permitted its employees or agents to make any such false reports.
21. (112) AMPI failed to sustain its burden of proving that it has been damaged by NFO's alleged violations of the Sherman Act or the Agricultural Fair Practices Act.

*527 PHASE III CONCLUSIONS OF LAW[32]
1. We need not and do not reach the question of whether NFO is entitled to the exemption from the antitrust laws conferred by the Capper-Volstead Act, 7 U.S.C. §§ 291-292, and Section 6 of the Clayton Act, 15 U.S.C. § 17.[33]
2. We need not and do not reach the question of whether NFO is incapable of conspiring with its members, employees, officials, agents or the NFO Dairy Custodial Account or dairy reloads for purposes of the violations of the antitrust laws and the Agricultural Fair Practices Act charged here by AMPI.
3. Milk haulers, bottling plants, landlords and any other persons who entered into normal business relationships with NFO and its members in their marketing of milk did not thereby conspire or combine with NFO in violation of the Sherman Act or the Agricultural Fair Practices Act.
4. AMPI failed to carry the burden of proving that the purpose behind NFO's dairy program was to eliminate competition.
5. NFO's marketing the milk of farmers who had previously been marketing to or through AMPI, regardless of how it was accomplished, had the effect of enhancing competition and is wholly consistent with the policy and purposes of the Sherman Act.
6. NFO's selling milk in Order 30 at prices below CMPC's enhanced competition in the sale of milk and was wholly consistent with the policy and purposes of the Sherman Act.
7. NFO's procurement of USDA qualification as a milk marketing association under the Agricultural Marketing Agreement Act, regardless of how it was accomplished, had the effect of enhancing competition in federal order markets and was wholly consistent with the policy and purposes of the Sherman Act.
8. AMPI failed to carry the burden of proving that NFO's claim of tax exemption under Section 501(c) of the Internal Revenue Code resulted either in a reduction in taxes or some other financial benefit to NFO so that it is apparent that NFO's tax exemption claim cannot be the basis for finding a violation of the Sherman Act.
9. AMPI failed to carry the burden of proving that any of NFO's conduct violated Section 1 of the Sherman Act.
10. AMPI failed to carry the burden of proving that NFO coerced or intimidated any AMPI members to breach or terminate any agreements they may have had with AMPI and thereby violated the Agricultural Fair Practices Act.
11. AMPI failed to carry the burden of proving that NFO knowingly made or knowingly permitted any employee or agent to make any false reports about AMPI's finances, management or activities and thereby violated the Agricultural Fair Practices Act.
12. We need not and do not reach the question of whether AMPI lacks standing to recover any price reductions on Order 30 Class I milk.
13. AMPI has failed to carry the burden of proving any damages compensable under Section 4 of the Clayton Act or under the Agricultural Fair Practices Act.
*528 14. AMPI has failed to carry the burden of proving any basis for injunctive relief under Section 16 of the Clayton Act or under the Agricultural Fair Practices Act.
An appropriate order will therefore be entered in regard to Phase III of this case which will direct the Clerk to enter judgment against AMPI in regard to its Phase III counterclaim and in favor of NFO.

ORDERS TO THE CLERK IN REGARD TO THE ENTRY OF JUDGMENTS
Rule 58 of the Rules of Civil Procedure provides in part that "upon a decision by the court ... that all relief shall be denied, the clerk, unless the court otherwise orders, shall forthwith prepare, sign, and enter the judgment without awaiting any direction of the court." Rule 58 also provides that "every judgment shall be set forth in a separate document" and that "entry of the judgment shall not be delayed for the taxing of costs."
Unless otherwise directed, the Clerk of this Court would routinely enter judgments in this case in accordance with clause (1) of Rule 58 and Form 32 (Judgment on Decision by the Court), as contained in the Appendix of Forms attached to the Rules. That form provides, however, that when it is appropriate that it be "Ordered and Adjudged that the plaintiff take nothing, [and] that the action be dismissed on the merits," it would also be appropriate, under ordinary circumstances, to add a final clause which would provide that "the defendant recover of the plaintiff his costs of action."
Rule 54(d) of the Rules of Civil Procedure and the applicable law make clear that "[t]he allowance of costs to the prevailing party is not obligatory." Section 2668, 10 Wright and Miller, Federal Practice and Procedure at 139. Indeed, Section 2667 of the same work points out that "[v]arious circumstances may influence the award of costs in individual cases and result in the prevailing party not receiving costs." 10 Wright and Miller, Federal Practice and Procedure at 135. See also the cases cited in footnote 20 on page 35.
Counsel are familiar with this Court's ruling of NFO's Rule 37 motion and its reservation of all questions concerning what sanctions, if any, should be imposed under the circumstances. See Tr. 12, 212, et ff. The question of what costs should be awarded may be related to the final determination of what Rule 37 sanctions may be appropriate under the circumstances. It is therefore appropriate that the determination of all questions relating to costs be deferred for separate and later consideration and that, consistent with Rule 58, the entry of the judgments in this case should not be delayed for the taxing of costs. Appropriate orders will therefore be entered which direct the Clerk to omit any reference to costs from the judgments he shall enter in regard to each of the three Phases of this case.
For the reasons stated, it is
ORDERED (1) that in accordance with Rule 58 of the Rules of Civil Procedure, the Clerk enter separate judgments on separate documents which will reflect the decisions of this Court made and rendered in regard to Phase I, Phase II and Phase III of this case. It is further
ORDERED (2) that each of those separate judgments shall follow the appropriate language of Form 32 in the Appendix to the Rules of Civil Procedure, except that none of those judgments shall contain any provision for the award or taxing of costs. It is further
ORDERED (3) that the parties shall confer and within twenty (20) days of this order make a joint or separate recommendation to the Court in regard to what procedures they would like to follow in regard to the taxing and award of costs in connection with all three Phases of this case.
NOTES
[1] Total shipments by NFO to Wanzer in January, 1971 were
5,579,729 pounds, including 42,180 pounds that NFO sold to an
ice cream company after the milk was first received at and
pumped through Wanzer's plant.
[2] Total shipments by NFO to Wanzer in August, 1971 were
6,935,648 pounds, including 1,543,127 pounds that NFO sold to
manufacturing plants after the milk was first received at and
pumped through Wanzer's plant.
[3] NFO denied Mid-Am's proposed findings of ultimate facts as stated in this paragraph 39 and Mid-Am's proposed findings stated in the two immediately following paragraphs 40 and 41. NFO based its denial on the alleged ground that the "evidence does not establish NFO positions or authority of individuals named." We find and conclude that the ground upon which NFO based its objection is not tenable. We therefore make all three findings in the language proposed by Mid-Am.

It should also be noted that NFO further objected to all three of the findings proposed in Mid-Am's paragraphs 39, 40 and 41 on the additional ground that those findings are "irrelevant." Study of the pages of NFO's post-trial brief and NFO's separate answer brief shows that the thrust of NFO's argument in that regard is primarily directed against the weight to be given Mid-Am's proposed findings. NFO's objection that what may have occurred at the meetings in 1963 and 1964 is "irrelevant" is also based on the legal premise that the factual data contained in the three findings proposed by Mid-Am are of no legal consequence to the determination of this action within the definition of "relevant evidence," as stated in Rule 401 of the Rules of Evidence.
While we quite agree with NFO's contention that evidence of NFO's 1963 insistence that it would not sell NFO milk to TCMPA unless that co-op executed an NFO Master Contract, standing alone, does not establish an antitrust law violation, we believe the orderly way to proceed is to make the findings in the form proposed by Mid-Am so that such findings may be given appropriate weight and be considered as part of all the facts and circumstances of the case.
[4] NFO made the same "irrelevant" objection to Mid-Am's proposed finding of ultimate fact No. 42 as it made to the findings Mid-Am proposed in its paragraphs 39, 40 and 41, which we discussed in the preceding footnote. NFO makes the same "irrelevant" objection to all of Mid-Am's findings as proposed in Mid-Am paragraphs 42 to 67, inclusive, except paragraphs 56 and 57, which are admitted without objection, and paragraph 55, which is denied. The findings proposed by Mid-Am in this group of findings relate to detailed circumstances concerning NFO's efforts to obtain NFO Master Contracts from other cooperatives in the years 1963 and 1964.

We shall make the findings in the language proposed by Mid-Am because NFO's objection is based solely on the ground that the proposed findings are "irrelevant." We do so on the same basis and for the same reasons that we stated in connection with NFO's "irrelevant" objection made to Mid-Am's findings as proposed in paragraphs 39 to 41, inclusive. We make clear, of course, that we do not believe that the factual data contained in those paragraphs establish any antitrust violation or otherwise illegal conduct on the part of NFO.
[5] NFO's denial of Mid-Am's proposed finding in this paragraph on the alleged ground that "Rust position with NFO is not established by the record" is untenable. Mid-Am's proposed finding is in the exact language of paragraph 239 of the stipulation. We accordingly make the finding as proposed.
[6] NFO objects to the relevancy of proposed finding 95 and all findings proposed in Mid-Am's paragraphs 96 to 109, inclusive. All the findings proposed by Mid-Am in this group are supported by the cited paragraphs of the stipulation. We therefore make the findings as proposed but we have given the undisputed factual circumstances the weight we believe such findings deserve in light of all the other facts and circumstances of the case.
[7] Mid-Am initially cited two pages (Tr. 742-743) of the trial testimony of witness Powell and a single page (Tr. 859) of the testimony of witness Hackler to support proposed findings of ultimate fact Nos. 117 to 120. Additional pages of the trial transcript were cited in Mid-Am's reply to NFO's denial of all four paragraphs. The findings proposed by Mid-Am in those three paragraphs are not supported by the cited testimony.

We have therefore modified the findings proposed by Mid-Am in each of those four paragraphs consistent with all the evidence adduced by Mid-Am. It is to be recognized that the modified findings of fact as made, however, do not significantly add to the quantum of Mid-Am's proof.
[8] The parties' arguments in their respective briefs about the October, 1970 meeting in John Gage's office and its alleged significance contain a good deal of talk about NFO being a "burr under the saddle" and about NFO's alleged intention "to destroy Mid-Am and pick up the pieces," as Mid-Am proposed in its finding of ultimate fact as proposed in its paragraph 131. NFO admitted paragraph 1282 of Mid-Am's post-trial proposed findings so that there is no factual dispute about the fact that Shafer did say something about NFO's being "a burr under the saddle."

In paragraphs 1283 and 1285 of its post-trial postponed findings, Mid-Am proposed much milder findings than its "destroy Mid-Am and pick up the pieces" finding as proposed in paragraph 131 of its proposed findings of ultimate fact. The findings proposed in those paragraphs stated:
1283. Powell said to Shafer: "Gordon, are you going to completely tear down the marketing structure that we have all worked so long to build up?" (Tr. 740, 755, 760, Ex. 101, Tr. 970-971, 979-980)
1285. Shafer's reply to Powell was: "That is exactly what we are going to do. We will tear it down and we can rebuild it the way we want." (Tr. 740, 741, 754, 755, 759, 760, 931, 970-971, 979-980, Ex. 101)
Mid-Am also proposed a number of other findings in regard to the October, 1970 meeting in its attempt to strengthen its argument that what was said at that meeting would support a finding that NFO intended to and did in fact threaten to "destroy Mid-Am" at that meeting. Typical of those additional findings as proposed in Mid-Am post-trial proposed findings are the following:
2194. Gary Hanman, Executive Vice-President of Mid-Am, was present at the meeting at John Gage's office in October, 1970, when statements were made by Shafer and Graf of NFO: Hanman took those statements very seriously, as did the other Mid-Am representatives present. (Tr. 1369)
2197. No other organization had ever told Mid-Am that it was going to tear up Mid-Am and pick up the pieces, other than NFO. (Tr. 1394)
2200. A reasonable, prudent man would have taken the statements made by Shafer at the Gage office meeting seriously.
2213. The statements made at the office of John Gage in October, 1970 by NFO representatives to Mid-Am representatives "unless you sign our contract we will break up Mid-Am and pick up the pieces" are evidence of predatory intent if the threats could be taken seriously. (Tr. 1343-1344)
We find and conclude that Shafer's apparent agreement with Powell's suggestion that the market structure might be torn down and that NFO would rebuild that market structure could not have been reasonably considered as a threat. In short, we find that NFO's denial of Mid-Am's proposed findings in paragraphs 2194, 2197, 2000, and 2213 is consistent with our view that Mid-Am did not carry the burden of proof in regard to those and similar proposed findings.
[9] NFO's admission is qualified by its statement that NFO denies that it "was marketing within the meaning of Form 990."
[10] See also paragraphs 212 to 215 of the stipulation of facts. Those paragraphs provide:

212. During the period 1962 through 1967, NFO personnel encouraged NFO members, who were also members of dairy cooperatives, to be active in the affairs of their cooperatives including running for elective office in the cooperative.
213. During the period 1962 through 1967, some NFO personnel encouraged NFO members in seeking election to dairy cooperative boards to encourage those boards to sign Master Contracts with NFO.
214. During the period 1962 through 1967, some NFO personnel encouraged NFO members to support candidates for election to the Board of Directors of dairy cooperatives who were also NFO members.
215. During the period 1962 through 1967, the concept of having NFO members elected to dairy co-op Boards of Directors for the purpose of encouraging those cooperatives to sign Master Contracts was a matter discussed by NFO Dairy Department personnel.
Those additional stipulated factual circumstances are inconsistent with the notion that NFO's single goal was to eliminate all existing cooperatives.
[11] Mid-Am's proposed conclusions of law 25-8 and 26-9 were submitted in exactly the same language, which stated: "25-8 and 26-9. The activities of NFO, its members and employees in inducing dairy farmers to withhold their milk from predecessors of Mid-Am during the 1967 Milk Holding Action constituted a concerted group boycott."

Our discussion of Mid-Am's conclusions of law 25-6 and 25-7 is applicable to Mid-Am's 25-8 and 26-9.
[12] Mid-Am's proposed conclusions of law 25-5 and 26-15 repetitiously state that:

25-5. The activities of NFO, its members, and employees in attempting to induce predecessors of Mid-Am to sign NFO Master Contracts by the 1967 Milk Holding Action constituted a concerted group boycott designed to force, persuade, or coerce predecessors of Mid-Am to accede to trade practices desired by NFO, that is, to sign an NFO Master Contract.
26-15. The means used by NFO to induce or attempt to induce predecessors of Mid-Am to sign NFO Master Contracts during the 1967 Holding Action, included withholding of milk, threats of withholding of milk, threats of withdrawal of milk from cooperatives which refused to sign, intimidation, force and coercion.
Our discussion of Mid-Am's conclusion of law 26-12 in the text is applicable to Mid-Am's 25-5 and 26-15.
[13] Mid-Am's separately proposed conclusions of law 26-10 and 26-11 duplicate Mid-Am's 28-19. What we say in the text about 28-19 is applicable to 26-10 and 26-11 which state:

26-10. The activities of NFO, its members and employees in persuading, forcing, or coercing dairy farmers not to perform their marketing contracts with predecessors of Mid-Am during the 1967 Milk Holding Action constituted a concerted group boycott.
26-11. The activities of NFO, its members and employees in inducing dairy farmers to refuse to have normal business relations with predecessors of Mid-Am during the 1967 Milk Holding Action constituted a concerted group boycott.
[14] Mid-Am's proposed conclusions 28-23 and 28-24 incorporated and assumed factual data concerning one of Mid-Am's predecessors. Those two proposed conclusions of law stated:

28-23. At least one cooperatives [sic] which is now part of Mid-Am, Fergus Dairy Cooperative, signed an NFO Supply Contract.
28-24. Fergus Dairy Cooperative signed an NFO Supply Contract involuntarily, as a result of threats and actual loss of milk before signing an NFO Supply Contract.
We find and conclude that Mid-Am's evidence does not support a conclusion of law that assumes that any NFO Supply Contract that Fergus Dairy Cooperative may have signed was in fact signed involuntarily as a result of any illegal threat.
[15] One additional conclusion of law proposed by Mid-Am, 28-25, related to "action taken by NFO which affected Mid-Am." That proposed conclusion related to Mid-Am's legal position in regard to NFO's alleged exemption under the Capper-Volstead Act and stated: "28-25. Action taken by NFO which affected Mid-Am, or its predecessors, which were undertaken by NFO to force Mid-Am to sign an NFO Supply Contract are not immune from the Sherman Act."

We will discuss NFO's exemption claim in a later part of this memorandum opinion in which we state our general agreement with Mid-Am's view of the Capper-Volstead Act exemption.
[16] Mid-Am's proposed conclusions 28-20 and 28-26 reiterate the factual untenable claim that the NFO Supply Contracts were "illegal price fixing agreements." Those two proposed conclusions, both of which we reject on factual grounds, stated:

28-20. The NFO Supply Contracts were agreements which actually fixed an agreed price to be paid to NFO members, and were therefore illegal price-fixing agreements.
28-26. The fact that few NFO Supply Contracts were signed or activated or were only partially effective when activated has no bearing upon whether these contracts were illegal price fixing agreements.
[17] NFO proposed four other Capper-Volstead conclusions of law in connection with various aspects of Mid-Am's claims relating to the alleged illegal boycott which read as follows:

5. Each contract, combination, or conspiracy that Mid-Am attributes to NFO, its members, officers, directors, and employees, including any that sets the price NFO members would be paid for their milk, is exempted from Section 1 of the Sherman Act by the Capper-Volstead Act and Section 6 of the Clayton Act.
7. In the absence of proof that a contract, combination, or conspiracy with non-farmers was involved, the efforts of one agricultural marketing organization to become exclusive bargaining agent for the members of another agricultural marketing organization do not violate Section 1 of the Sherman Act, being exempted therefrom by the Capper-Volstead Act.
12. NFO's solicitation of Mid-Am members to ship through NFO, when engaged in solely by NFO and its members and employees, is within the antitrust exemption afforded by the Capper-Volstead Act and Section 6 of the Clayton Act.
15. NFO's 1967 milk holding action, including its members' withholding of milk from the market and their recruitment of additional farmers to join NFO and participate in the holding action, was activity protected by the Capper-Volstead Act and hence exempt from Section 1 of the Sherman Act.
What we say about NFO's proposed conclusions Nos. 1 and 2 is applicable to the conclusions proposed by NFO set forth in this footnote.
[18] The Ninth Circuit's conclusion in that regard was brushed aside with the statement in footnote 6 of Sunkist II that "non-grower participation in Sunkist was not pointed out nor was the issue raised in that [Sunkist I] case; indeed, it was conceded by the respondents there that Sunkist was a Capper-Volstead cooperative."
[19] Mr. Justice Brennan's concurring opinion stated: "I agree that since several of NBMA's members were not engaged in the production of agriculture as farmers, Case-Swayne v. Sunkist Growers, Inc., 389 U.S. 384, 88 S.Ct. 528, 19 L.Ed.2d 621 (1967), compels the holding that NBMA's activities challenged by the United States cannot be afforded the Sherman Act exemption NBMA asserts." 436 U.S. at 829, 98 S.Ct. at 2130 2131.
[20] Mid-Am proposed seven separate conclusions of law in connection with its tying arrangement claim. We have numbered the separate paragraphs as they appear on pages 38 and 39 of Mid-Am's proposed conclusions of law. Those paragraphs stated the following:

38-1. The NFO membership agreement clearly represents a tying contract because of economic power in the tying product, and a not insubstantial amount of commerce in the tied product.
38-2. Under the stipulated facts this Court finds and concludes that NFO does have economic power in the commodities of grain and livestock sufficient to establish the first criteria of a tying contract, and that the number of dairy producers participating in NFO programs on a nationwide basis is sufficient evidence of a not insubstantial amount of commerce being affected by the NFO Membership Agreement.
38-3. Sherman 1 (15 U.S.C. 1) prohibits tying arrangements involving services.
38-4. For a farmer to obtain the NFO services of bargaining in either grain or livestock (or both), that farmer must sign the NFO Membership Agreement which authorizes NFO to be his exclusive marketing agent for all commodities which includes milk; the NFO collective bargaining service in grain or livestock is a tying service, and the NFO marketing function in dairy is a tied service, and the Membership Agreement is a tying arrangement, in per se violation of Sherman 1 (15 U.S.C. 1).
38-5. NFO has sufficient economic power with respect to the tying product (NFO collective bargaining service in grain or livestock) to appreciably restrain free competition in the market for the tied product (NFO marketing function in dairy) and a sufficiently substantial amount of interstate commerce is affected in the tied product; therefore, the NFO tying arrangement constitutes a per se violation of Sherman 1 (15 U.S.C. 1).
39-6. Tying arrangements because of their pernicious effect on competition and lack of any redeeming virtue, are conclusively presumed to be unreasonable without necessitating any inquiry as to the effect on the market, or the business reason for their use and are per se in violation of Sherman 1 (15 U.S.C. 1).
39-7. NFO's bargaining services in grain and livestock are different from its marketing service in milk, for the purposes of applying the elements of a per se violation of Sherman 1 (15 U.S.C. 1); which require a "tying" service and a different "tied" service.
While the conclusions of law proposed by Mid-Am in paragraphs 38-3 and 39-6 may accurately state abstract principles of law, we refuse to make those proposed conclusions of law or the other conclusions of law proposed in the other tying arrangements paragraphs quoted in this footnote because of Mid-Am's failure to carry the burden of proof imposed on it by applicable law.
[21] Article I of the NFO membership agreement authorizes NFO to act for the member "as my exclusive representative in collective bargaining in respect to all commodities marketed from my farm." An exception, however, was created in that article for "those commodities presently covered by other marketing contracts." Article VII, Section 1 and Article XII, Section 3, provide, respectively, that an NFO member was "free to market his commodity as he chooses" until certain contracts or marketing procedures were established and that the NFO member could request a waiver from his area bargaining committee for matters "unforeseen at the time of signing of this agreement."
[22] The conclusions of law proposed by Mid-Am in regard to NFO's alleged unfair trade practices, which we expressly reject, are as follows:

43-1. NFO, its employees and co-conspirators, engaged in unfair trade practices with the purpose of eliminating Mid-Am from the market of representing Mid-Am's members.
43-2. NFO's unfair trade practices included the withholding of milk from Mid-Am and its predecessors, threats to withhold milk from Mid-Am and its predecessors, solicitation of members of Mid-Am and its predecessors to become NFO members, picketing of processors who purchased milk through Mid-Am and its predecessors, and threats to destroy Mid-Am and its predecessors.
43-3. NFO violated federal antitrust, securities, and tax laws and supplied false information to the United States Department of Agriculture in moving into the marketing of milk in competition with Mid-Am.
43-4. NFO violated state anti-price discrimination statutes, securities laws, and non-solicitation laws in moving into the marketing of milk in competition with Mid-Am.
43-5. NFO knew, or should have known, that if Mid-Am signed an NFO Supply Contract which called for higher milk prices to be paid to NFO members than to non-NFO members, all of Mid-Am's members would join NFO, thus effectively eliminating Mid-Am from the market of representing its members.
43-6. NFO, its employees and co-conspirators intended, by their unfair trade practices, to eliminate Mid-Am from the market of representing Mid-Am's members.
43-7. The willful submission of false information by NFO and its agents and employees to the U.S.D.A. to obtain qualification from the U.S.D.A. so that NFO could, through unfair methods, obtain a competitive advantage over Mid-Am and the conduct of NFO such as soliciting breaches of contract in violation of state laws, violating federal and state securities law, misrepresentations to IRS and violations of the income tax laws, in an effort to restrain competition, fix prices, and allocate markets and to eliminate Mid-America from the market of representing fluid milk producers, constituted a violation of Section 1 of the Sherman Act.
[23] The conclusions of law proposed by Mid-Am in regard to Mid-Am's Robinson-Patman claim, which we expressly reject, are as follows:

45-1. NFO's Milk Supply Contracts require payment of a commission to NFO in connection with the sale of milk by NFO members in violation of Section 2(c) of the Robinson-Patman Act.
45-2. NFO is a person within the meaning of Section 2(c) of the Robinson-Patman Act which forbids the receipt by a "person" in the course of commerce of a commission in connection with the sale of goods.
46-3. The payments of purchasers of milk under NFO Milk Supply Contracts were payments made in the course of NFO's commerce, within the meaning of Section 2(c) of the Robinson-Patman Act.
46-4. Payments to the NFO by the purchasers under the NFO Milk Supply Contracts were payments which violated Section 2(c) of the Robinson-Patman Act.
46-5. Under the NFO Milk Supply Contracts, the NFO received a payment from the other party to Milk Supply Contracts, which payment was in violation of Section 2(c) of the Robinson-Patman Act.
46-6. The NFO Milk Supply Contracts required that a commission be paid by the purchaser of milk to the seller over and above the payment of the base price for the milk itself, in violation of Section 2(c) of the Robinson-Patman Act.
46-7. The sale of milk by NFO pursuant to the NFO Milk Supply Contracts was a sale of goods, wares or merchandise within the purview of Section 2(c) of the Robinson-Patman Act.
46-8. The amount of the commission required by any particular NFO Milk Supply Contract to be paid to NFO was negotiated, thus, the commission was discriminatory in violation of Section 2(c) of the Robinson-Patman Act.
46-9. NFO provided no actual services in exchange for receiving a "commission" pursuant to its Milk Supply Contracts; thus, those contracts violated Section 2(c) of the Robinson-Patman Act.
46-10. The NFO Milk Supply Contracts violate Section 2(c) of the Robinson-Patman Act, and, therefore, all acts which were taken by NFO to force Mid-Am to sign such an illegal contract are beyond any antitrust exemption.
47-11. NFO signed NFO Supply Contracts, as agent for its members, which required the purchaser of milk to pay an additional fee to the NFO Dairy Trust; such fees were brokerage, commission or "other compensation" paid to the agent of the members by the purchasers of the NFO members' milk in violation of Section 2(c) of the Robinson-Patman Act.
[24] Mo.Rev.Stat. § 274.260 provides, in pertinent part, that:

Any person ... or any corporation whose officers or employees knowingly induce or attempt to induce any member of an association ... organized under similar statutes of other states ... and operating in this state ... to break his marketing contract with the association, or who maliciously and knowingly spreads false reports about the ... activity thereof, shall be guilty of a misdemeanor and ... shall be liable to the association aggrieved in a civil suit in the penal sum of five hundred dollars for each such offense.
[25] Interestingly enough, those state statutes were passed as part of a movement to "save the farmer," which followed in the wake of the agricultural depression which followed World War I. The Court further noted in Warehouse Co. v. Tobacco Growers that the Capper-Volstead Act and the Cooperative Marketing Act of 1926 were also a part of that broad state and federal legislative movement designed to enable an agricultural producer to obtain a fair price for his products.
[26] Mid-Am proposed the following conclusion of law on damages:

51-1. Mid-America Dairymen, Inc., having been injured in its business and property within the meaning of Section 4 of the Clayton Act (15 USC 15) by virtue of the violation of Section 1 of the Sherman Act (15 USC 1) of defendant National Farmers Organization, is entitled to judgment in the amount of $1,989,350.00 single damages, to be trebled, to the amount of $5,968,050.00 and for reasonable attorneys' fees and its costs incurred herein.
NFO proposed the following conclusion of law on damages:
46. None of the damages claimed by Mid-Am are recoverable under Section 4 of the Clayton Act, since they are all "designed to provide [Mid-Am] with the profits [it] would have realized had competition been reduced," within the meaning of Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc., 429 U.S. 477, 488, 97 S.Ct. 690, 697, 50 L.Ed.2d 701 (1977).
[27] NFO's proposed findings of fact 2018 to 2062, inclusive, contained in part XI of its proposed findings and entitled "Beatrice Fort Worth Damages," claims damages in the amount of $151,135.02. NFO's proposed findings of fact 2063 to 2065, inclusive, contained in part XII of its proposed findings and entitled "Pressure Pooling Damages," claims damages in the amount of $137,786.74. NFO's proposed findings of fact 2066 to 2080, inclusive, contained in part XIII of its proposed findings and entitled "Chicago Damages," claims damages in the amount of $924,248.00. NFO's proposed findings of fact 2098 to 2488, inclusive, contained in part XV of its proposed findings and entitled "NFO Lost Penetration Damages," claims damages in the amount of at least $12,850.899.00.* NFO thus claimed total damages in the amount of $14,064,068.76. NFO also proposed in its conclusion of law No. 21 a claim for additional damages by requesting a finding that NFO "is entitled to recover attorneys' fees and costs of defending against defendants bad faith litigation."

* Part XIV of NFO's proposed findings of fact, containing paragraphs 2081 to 2097, inclusive, and entitled "NFO's Customers and Market Penetration," does not contain any proposed finding claiming any particular amount of damages. The purpose of the proposed findings contained in that part of NFO's proposed findings reflected NFO's attempt to support the alleged reasonableness of its damage estimates.
[28] The use of "[Rejected]" in regard to paragraph 97 above and in regard to many, many of the paragraphs of findings of fact proposed by NFO reflect an explicit finding and conclusion that NFO failed to prove the particular finding of fact proposed and that the weight of all the evidence adduced in the case is likewise insufficient to support the particular finding proposed by NFO.

While we have modified, and as modified have made many of the findings proposed, we have keyed our findings to the paragraph numbers of the findings proposed by the parties so that an appellate court will understand the significance of our use of "[Rejected]" in regard to a particular proposed finding.
In Phase I of this case we stated in some detail why particular paragraphs of findings proposed by Mid-Am in support of its claim against NFO were rejected. It must, however, be noted that in Phase I we were required to deal with only a total 239 paragraphs of proposed findings by Mid-Am and that we had the benefit of exemplary cooperation of the parties which produced a stipulation of 3,247 paragraphs of agreed facts. NFO's Phase I responses to Mid-Am's proposed findings further reduced the area of disputed fact.
In Phase II and in Phase III of this case we were required to consider literally thousands upon thousands of paragraphs of proposed findings of fact and to work with a record which shows that the parties were not as successful in reducing the area of disputed factual data either by stipulation or by their responses to proposed findings as they were in Phase I.
It is apparent that it simply was not practicable to spell out the rationale of our rejection of proposed findings in Phase II and Phase III in the same manner as we were able to do in Phase I. We would have liked to have been able to have done so for the benefit of any appellate court which may be required to review our findings of fact under Rule 52(a) but we believe that obvious limitations of time and the production of an even longer memorandum opinion made such a procedure impracticable for Phase II and Phase III.
[29] It is not necessary to deal separately with the 16 conclusions of law proposed by ARSPC. Paragraph I related to subject matter jurisdiction and is obviously covered. Paragraphs 2 to 9 and 12 relate to various aspects of ARSPC's claim of exemption under the Capper-Volstead Act, Section 6 of the Clayton Act, and under the rationale of Sunkist Growers, Inc. v. Winckler, 370 U.S. 19, 82 S.Ct. 1130, 8 L.Ed.2d 305 (1962), particularly as Sunkist I was recently applied by the Second Circuit in Fairdale Farms, Inc. v. Yankee Milk, Inc., et al., 635 F.2d 1037 (2nd Cir. 1980). Our formal conclusion of law No. 7 states our view that we need not and do not need to reach the various antitrust exemption questions presented in Phase II of this case.

By the same token, ARSPC's proposed conclusions that "the evidence fails to establish that ARSPC conspired to restrain trade or monopolize in violation of Sections 1 and 2 of the Sherman Act" (¶ 10); that ARSPC has not violated Section 2 of the Sherman Act (¶ 11); that "the evidence presented by NFO fails to show any right to relief against ARSPC (¶ 13); and that "NFO has failed to establish a relevant product market" (¶ 14) or "a relevant geographic market" (¶ 15) are covered by appropriate paragraphs of our formal conclusions. And finally, ARSPC Paragraph 16 relating to venue is covered by paragraph 3 of our formal findings.
[30] Paragraphs 1 to 752 of our Phase III findings of fact are keyed to the findings of fact proposed by AMPI.
[31] We use "[Rejected]" in Phase III in the same way "[Rejected]" was used and explained in Phase I and Phase II.
[32] Consistent with procedures followed in connection with Phase I and Phase II of this case, the conclusions of law which we state for Phase III of the case are keyed to the conclusions of law proposed by the party for whom judgment will be rendered. For purposes of appellate review, we state for the record that we have considered and expressly reject all sixteen of the Phase III conclusions of law proposed by AMPI, except the single conclusion proposed in paragraph 1 thereof, the substance of which we adopt, in the following form:

1. This Court has subject matter jurisdiction over the claims against NFO, Inc. and the individuals named as counterclaim defendants in AMPI's First Amended Counterclaim. The Court also has personal jurisdiction over all Phase III defendants. Venue is proper as to AMPI's Phase III claims.
[33] We, of course, adhere to what we said in Phase I in regard to how we believe we would have been required to decide the Capper-Volstead antitrust exemption question if we had been required to do so.
[1] Total shipments by NFO to Wanzer in January, 1971 were
5,579,729 pounds, including 42,180 pounds that NFO sold to an
ice cream company after the milk was first received at and
pumped through Wanzer's plant.
[1] Total shipments by NFO to Wanzer in January, 1971 were
5,579,729 pounds, including 42,180 pounds that NFO sold to an
ice cream company after the milk was first received at and
pumped through Wanzer's plant.
[2] Total shipments by NFO to Wanzer in August, 1971 were
6,935,648 pounds, including 1,543,127 pounds that NFO sold to
manufacturing plants after the milk was first received at and
pumped through Wanzer's plant.